IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:26-cr-00139-ECM-KFP |
| | ) | [18 U.S.C. § 1343; |
| SOUTHERN POVERTY LAW CENTER, INC. | ) | 18 U.S.C. § 1014; |
| | ) | 18 U.S.C. § 1956(h)] |
| | ) | |
| | ) | SUPERSEDING INDICTMENT |

The Grand Jury charges:

## INTRODUCTION

The Southern Poverty Law Center's ("SPLC") stated mission included the dismantling of white supremacy and confronting hate across the country. However, unbeknownst to donors, some of their donated money was being used to fund the leaders and organizers of racist groups, including the Ku Klux Klan, the Aryan Nations, and the National Alliance. The SPLC's paid informants ("field sources") engaged in the active promotion of racist groups at the same time that the SPLC was denouncing the same groups on its website. The SPLC also had a field source who was a member of the online leadership chat group that planned the 2017 "Unite the Right" event in Charlottesville, Virginia. That field source made racist postings under the supervision of the SPLC and helped coordinate transportation to the event for several attendees. In order to covertly pay its field sources, the SPLC opened bank accounts connected to a series of fictitious entities. The covert nature of the accounts allowed the SPLC to disguise the true nature, source, ownership, and control of the fraudulently obtained donated money the SPLC paid the field sources. In order to keep the scheme going, the SPLC made a series of false statements related to the operation of the accounts.

1

## THE ORGANIZATION

1.     At all times relevant to this Indictment, the SOUTHERN POVERTY LAW CENTER, INC. ("SPLC") was a non-profit, tax-exempt 501(c)(3) organization headquartered in Montgomery, Alabama, which is located within the Middle District of Alabama.

2.     According to its website, "*The SPLC is a catalyst for racial justice in the South and beyond, working in partnership with communities to dismantle white supremacy, strengthen intersectional movements, and advance the human rights of all people.*"

3.     To carry out this mission, the SPLC actively solicited public and corporate donations. As the SPLC explained on its website:

> *With your help, we're standing up for the most vulnerable people in society — those who have no other champion. We're exposing hate and injustice, fighting discrimination, and providing award-winning anti-bias material — free of charge — to schools across America.*
>
> *We never take legal fees from our clients, and we accept no government funding. Rather, we rely on the compassion and generosity of people like you.*

4.     The SPLC website also explained to potential donors that, "*Your support powers our work to confront hate, stand up to injustice, and defend our civil and human rights. From the courtroom to the classroom to communities across the country, you can help create a more just and inclusive future for all.*" These donations were used, in part, to fund various SPLC publications such as the "Hate Map," "Intelligence Report," "Hatewatch," and the "Intelligence Project Dispatch."

5.     According to the SPLC website, the "Hate Map" was "*The SPLC interactive map [that] tracks hate and anti-government groups.*" Within the website, users could toggle between the years 2000 and 2024 to view organizations by state that the SPLC labeled as "hate" or "anti-government" groups.

6.     The "Intelligence Report" was a magazine-like periodical "*published . . . by the staff of the Southern Poverty Law Center's Intelligence Project and provided free of charge to law*

2

enforcement officials, journalists, scholars, and others."

7.      "Hatewatch" was a blog operated by the SPLC that "*monitors and exposes activities of the hard right in the United States.*" Blog topics included reporting on hate crimes and events, hate groups and individuals, and lawsuits related to these topics. By providing the SPLC with an email address, a person could receive "*the latest updates from Hatewatch.*"

8.      The "Intelligence Project Dispatch" was a monthly online publication issued by the Hatewatch Staff that "*monitors and exposes white supremacy and its impact on communities.*" The header at the top of the publication further explained to readers that, "*The Southern Poverty Law Center works to dismantle white supremacy in public forums and online, exposes hate and anti-democracy extremism, and counters disinformation and conspiracy theories with research and community resources.*"

9.      The top banner of the SPLC website had a link for public donations. By clicking the "Donate" button, potential donors were brought to a webpage that explained how to donate money to the SPLC. This page also informed donors that, "*With your support, the SPLC Action Fund will pursue a bold action agenda to confront our country's most urgent challenges. Together, we'll uplift progressive candidates who uphold inclusive democratic values while investigating and exposing candidates using hate and extremism to gain power.*"

### THE SPLC'S NETWORK OF PAID EXTREMISTS — THE "FS"

10.      Starting in the 1980s, the SPLC began operating a covert network of individuals who were either associated with violent extremist organizations or who had infiltrated such organizations at the SPLC's direction. These individuals were referred to by some high-level employees within the SPLC as the "field sources" or the "Fs." Upon entering into an agreement with an F, the SPLC assigned each F a unique number. The SPLC assigned these numbers in chronological order. The SPLC then paid the Fs with donor money.

11.      Between in or about 2010 through in or about 2023, the SPLC secretly funneled

3

approximately $4.1 million dollars in tax-exempt donor funds to a series of fictitious accounts described hereinafter. The general purpose of these fictious accounts was to pay Fs who were either leading or affiliated with multiple violent extremist organizations. Fs used the money donors gave to the SPLC to, among other things:

a.  Attend extremist group rallies across the country;

b.  Host extremist group rallies throughout the country;

c.  Grow existing chapters of extremist groups;

d.  Create new chapters of extremist groups;

e.  Recruit new individuals into extremist groups;

f.  Make donations to extremist group leaders;

g.  Purchase materials for cross burnings;

h.  Purchase materials to make Ku Klux Klan robes and hoods;

i.  Create racist paraphernalia that extremist groups sold at rallies;

j.  Publish extremist literature used in the recruiting of more members; and

k.  Pay everyday living expenses, which allowed the Fs to focus on their extremist groups rather than seeking other employment.

12.  Certain SPLC employees knew that Fs used donors' money to actively recruit new members and grow their violent extremist organizations.

13.  The SPLC actively led donors to believe that their donations would be used to "*dismantle*" violent extremist groups. However, the SPLC hid from donors the fact that a portion of their donated funds was being secretly used to support extremist groups and to fund their violent, racist, and extremist activities. These activities were of the same nature as the activities about which the SPLC published articles on its website and other forums in an effort to obtain donations.

14.  During the period alleged in the Superseding Indictment, the SPLC's reported revenue on their IRS Form 990s increased from $38,712,628.00 in 2010 to $129,069,290.00 in

4

2023, an increase of approximately 233%. During this same time period, the SPLC's net assets grew from $238,134,564.00 in 2010 to $786,768,246.00 in 2023, an increase of approximately 230%.

### THE SPLC'S FICTITIOUS ENTITIES

15. To secretly funnel donors' money to the Fs, employees at the SPLC, including a person who would become the SPLC's Chief Financial Officer ("Employee-1") and the person who would become Director of the SPLC's Intelligence Project ("Employee-2") among others, opened and/or modified a series of bank accounts at Bank-1 and Bank-2 in the name of various fictitious entities, including the following:

a. Center Investigative Agency ("CIA");

b. Fox Photography;

c. North West Technologies ("North West Tech");

d. Tech Writers Group ("Tech Writers");

e. Rare Books Warehouse ("Rare Books");

f. Imagery Ink;

g. J&J Electronics;

h. Kelly's Marine; and

i. Turner Personnel.

16. These fictitious entities were never incorporated, had no *bona fide* employees, and conducted no legitimate business.

17. At all times relevant to this Indictment, Bank-1 and Bank-2 were insured by the Federal Deposit Insurance Corporation ("FDIC").

### DONORS' FUNDS SECRETLY PAID TO FS

18. Without disclosing material information to donors about the true use of a portion of their donations, the SPLC secretly used donors' money to fund Fs' extremist activities during

5

the period alleged in this Superseding Indictment. Examples of this include, but are not limited to, the following:

   a. **The SPLC Secretly Paid F-9 More Than $1,200,000.00 in Donors' Money**

   i. At the direction of the SPLC, F-9 infiltrated the neo-Nazi organization, the National Alliance. While clandestinely receiving donors' money through the Tech Writers bank account, F-9 was also fundraising for the National Alliance. The money F-9 raised helped the National Alliance carry out its extremist activities.

   ii. In 2014, F-9 broke into the headquarters of an extremist organization and stole approximately 25 boxes of documents. F-9 transported these documents across state lines from West Virginia to North Carolina. Thereafter, with the knowledge of Employee-2, donors' money was used to copy the stolen material after which F-9 broke into the headquarters again and returned the originals. Employee-2 used the copies, knowing they were stolen, as the basis for a story published on "Hatewatch." The SPLC used this story to solicit more donations. Thereafter, Employee-2 paid approximately $6,000.00 in donors' money to F-39 to falsely take responsibility for the burglary.

   iii. The SPLC paid F-9 for over 20 years. However, in just the time period alleged in this Superseding Indictment, the SPLC secretly paid F-9 over $1,200,000.00 in donors' money. Most of this money was secretly funneled to F-9 through the Tech Writers bank account.

   iv. Employee-2 oversaw payments of donors' money to the Fs, including F-9. Employee-2 was also in a romantic relationship with F-9. During this relationship, Employee-2 and F-9 shared a house and two bank

6

accounts. Between 2015 and 2021, approximately $140,000.00 in donors' money flowed from the SPLC operating account, through the Tech Writers account, and was ultimately deposited into the joint bank accounts held by F-9 and Employee-2. This amounted to approximately 66% of all money ever deposited into their joint bank accounts. Employee-2 then used donors' money to pay the couple's personal living expenses.

b. **The SPLC Secretly Paid F-30 More Than $70,000.00 in Donors' Money**

i. F-30 led the National Socialist Party of America, was a member of the Ku Klux Klan, and was the leader of a faction of the Aryan Nations that had chapters in approximately 17 states.

ii. In approximately 2010, out of money and seeking to get out of the white nationalist movement ("the movement"), F-30 reached out to the SPLC, unsolicited, and discussed a plan to leave the movement. Thereafter, the SPLC employee offered F-30 a monthly salary of approximately $2,500.00 in addition to payment of expenses to continue to lead and maintain the violent extremist organization F-30 told the SPLC employee he wanted to leave.

iii. Thereafter, an SPLC employee provided Bank-2 with documentation identifying F-30 as a Rare Books employee. Based on this materially false representation, F-30 was issued a Rare Books employee pay card.

iv. From approximately 2010 through 2016, the SPLC secretly moved over $70,000.00 in donors' money from the SPLC operating account, through the CIA account, to the Rare Books account, and onto F-30's pay card. F-30 also received some donors' money via Automated

7

Clearing House ("ACH") transfers.

v. F-30 used donors' money to, among other things, travel to extremist rallies, host extremist rallies, donate money to leaders of other extremist organizations, recruit new members into his extremist organization, publish racist and extremist material for the purpose of recruiting new members, both inside and outside of prison, and create racist paraphernalia to sell at rallies to raise more money for his extremist organization. This was known to certain SPLC employees as they continued to secretly funnel donors' money to F-30.

vi. During the same period that SPLC was secretly using donors' money to fund F-30's extremist activities, the SPLC had an entire "Extremist File" webpage dedicated to F-30. The SPLC used this "Extremist File" webpage to solicit more public donations. At one point, F-30 asked an SPLC employee to soften the language about him on his "Extremist File" webpage so that it would not scare off new members from joining his extremist organization. The SPLC employee agreed and changed the language on the SPLC's "Extremist Files" webpage for F-30.

c. **The SPLC Secretly Paid F-31 and F-32 Donors' Money to Stay in the Movement**

i. F-31 and F-32 were members of a Ku Klux Klan organization in their area. In or about 2010, F-31 and F-32 feared for their safety from other Klan members and wanted out of the movement. F-32 had seen media coverage about how the SPLC helped an individual leave an extremist organization and how the SPLC paid for this individual's tattoo removals. This media coverage prompted F-32 to reach out to the SPLC,

8

unsolicited, and ask the SPLC for help to get F-31 and F-32 out of the movement.

ii. An SPLC employee invited F-31 and F-32 to Montgomery for a meeting. There, despite their requests for help getting out of the movement, an SPLC employee encouraged F-31 and F-32 to stay in the movement and offered to pay them a $1,200.00 monthly salary as well as to pay for expenses as incurred. Once they were financially backed by the SPLC to do so, F-31 and F-32 agreed to remain in the movement.

iii. Thereafter, an SPLC employee provided Bank-2 with documentation identifying F-32 as a Rare Books employee. Based on this materially false representation, F-32 was issued a Rare Books employee pay card.

iv. An SPLC employee told F-31 and F-32 that if anyone asked where the money came from, they were to say they worked for Rare Books and that their job was to help college students research and write essays. The SPLC employee told them that this was for their own safety. Neither F-31 nor F-32 ever researched or wrote any essays for any students, college or otherwise.

v. Although the SPLC employee claimed F-31 and F-32 needed to be paid as Rare Books employees for their safety, donors' money paid to them from the SPLC operating account, through the CIA account, through the Rare Books account, and onto the pay card resulted in F-31 and F-32 being put in the type of dangerous situations that F-32 sought SPLC's help to get away from in the first place.

vi. Using donors' money, F-31 and F-32 attended extremist group rallies in multiple states. This led to F-31 rising from merely a group member to

a leadership role within an extremist group. In the new leadership role, F-31 actively recruited new members using donors' money.

vii. F-32 also participated in recruiting new members using donors' money. In addition, an SPLC employee knew that F-32 used donors' money to purchase material to make Ku Klux Klan garments for others.

viii. F-31 and F-32 were reimbursed by the SPLC with donor money for all expenses they incurred for cross-burning events to include the wood and fuel used.

d. **The SPLC Secretly Paid F-42 More Than $155,000.00 in Donors' Money**

i. F-42 was the former chairman of the neo-Nazi organization, the National Alliance. Between 2016 and 2023, the SPLC secretly paid F-42 more than $155,000.00 in donors' money.

ii. Donors' money moved from the SPLC operating account to the CIA account, and then checks were issued out of the CIA account to F-42. In addition, F-42 received ACH payments directly out of the CIA bank account as well as masked ACH payments from the SPLC Operating Account at Bank-1.

iii. During the same period that the SPLC was secretly paying F-42 with donors' money, the SPLC also featured F-42 on its "Extremist File" webpage. The SPLC solicited public donations to stop extremists generally, and specifically F-42, at the exact same time the SPLC was secretly using prior donors' money to pay F-42.

e. **The SPLC Secretly Paid F-37 More Than $300,000.00 in Donors' Money**

i. F-37 was not involved in an extremist organization before F-37 reached out to the SPLC seeking employment.

10

ii. While receiving payment by the SPLC, F-37 made multiple racist posts on social media accounts under the supervision of SPLC Employee-3.

iii. In 2017, F-37 was a member of the online leadership chat group that helped plan the "Unite the Right" rally in Charlottesville, Virginia. SPLC Employee-3 directed F-37 to attend this event in which one woman and two law enforcement officers were tragically killed. F-37 assisted in arranging transportation for others involved in the movement to the event.

iv. The SPLC extensively covered the "Unite the Right" rally on its various media platforms, both at the time of the rally and in the following years. The "Unite the Right" rally led to a massive fundraising windfall for the SPLC with open-source media reporting that the SPLC more than doubled their previous year's reported revenue from private and corporate donations following the "Unite the Right" rally. The SPLC did not disclose to its donors that it used donors' money to pay F-37.

v. Between 2014 and 2023, the SPLC secretly paid F-37 over $300,000.00 in donors' money. The majority of the money paid to F-37 flowed from the SPLC operating account, through the CIA account, to the Rare Books account, and finally onto two pay cards issued to F-37 under the false pretense that F-37 was a Rare Books employee. F-37 further received checks written from the CIA account at Bank-1 and ACH payments through the SPLC Operating Account Bank-1 under the monikers "RAREBOOKS050" and "IPRESEARCHCON050".

f. **The SPLC Secretly Paid F-27 More Than $350,000.00 in Donors' Money**

i. F-27 was reported as an officer of the National Socialist Movement and

11

the Aryan Nations affiliated Sadistic Souls Motorcycle Club.

    ii. Between 2014 and 2020, the SPLC secretly paid F-27 more than $350,000.00 in donors' money. This money flowed from the SPLC Operating Account, through the CIA account, to the Rare Books account, and finally onto a pay card issued to F-27 under the false pretense that F-27 was a Rare Books employee. F-27 also received payments via masked ACH transfers under the monikers "RAREBOOKS050" from the SPLC Operating Account at Bank-1 and checks from Fox Photography through Bank-1.

g. **The SPLC Secretly Paid F-43 More Than $19,000.00 in Donors' Money**

    i. F-43 was reported to be the National President of the American Front. F-43 is also a federal felon having been convicted for participating in a cross burning.

    ii. Between 2016 and 2019, the SPLC secretly paid F-43 more than $19,000.00 in donors' money. This money flowed from the SPLC Operating Account, through the CIA account, to the Rare Books account, and finally onto a pay card issued to F-43 under the false pretense that F-43 was a Rare Books employee.

h. **The SPLC Secretly Paid F-18 With Donors' Money**

    i. F-18 was the Imperial Wizard of the United Klans of America. Beginning in at least 2010, the SPLC secretly paid F-18 an unknown amount in donors' money.

    ii. In November 2013, the SPLC published an article in Hatewatch, describing the extremist organization that F-18 led as a "millennial reboot of what was once a serious domestic threat. In its prime, the

12

United Klans of America was responsible for, among other things, the 16th Street Baptist Church bombing in Birmingham, Ala., which resulted in the deaths of four little girls in 1963."

    iii. Despite being a leader of this violent extremist group, the SPLC secretly used donors' money to pay F-18.

## COUNTS ONE THROUGH SIX
### (Wire Fraud)

19.    The facts set out in paragraphs 1 through 18 are fully incorporated in these Counts.

20.    Beginning in or about 2010, and continuing through at least August 2023, in the Middle District of Alabama, the defendant,

SOUTHERN POVERTY LAW CENTER, INC.,

devised and intended to devise a scheme and artifice to defraud donors, and attempted to do so, to obtain money and property belonging to donors by materially false and fraudulent pretenses, representations, promises, as well as by omissions of material facts.

### PURPOSE OF THE SCHEME AND ARTIFICE

21.    The objective of the scheme and artifice was to obtain money via donations through materially false representations as well as by omissions of material facts about what the donated funds would be used for.

22.    To carry out this scheme and artifice, the SPLC sought donations under the explicit indication that donor money would be used to help "*dismantle*" violent extremist groups. In the SPLC's solicitations for donations as outlined herein, donors were not informed that a portion of the donors' money would be used by the SPLC to pay high-level leaders of violent extremist groups and others, nor were donors ever told that some of their donated funds were to be used for the benefit of the violent extremist groups, nor were donors ever told that some of the donated funds would be used in the commission of state and federal crimes.

### WIRE COMMUNICATIONS

13

23.    On or about April 25, 2023, in the Middle District of Alabama, and elsewhere, the defendant,

SOUTHERN POVERTY LAW CENTER, INC.,

for purposes of executing and attempting to execute the scheme and artifice set out in these Counts, caused to be transmitted in interstate commerce, by means of wire communications, certain signs and signals.

24.    Specifically, the SPLC caused interstate wire communications between Alabama and other states through the use of the ACH system which was used to transmit an ACH batch transfer from Bank-1 to various bank accounts used by the Fs. Specifically, $13,905.00 was caused to be transmitted by means of wire communications in interstate commerce the writings, signs, and signals, described below for each count, each transmission constituting a separate count:

| COUNT | DATE (On or About) | DESCRIPTION |
|---|---|---|
| 1 | 4/25/2023 | A wire transaction in the amount of approximately $4,750.00 from the SPLC Operating Account at Bank-1 to a First Citizens Bank account controlled by F-9. |
| 2 | 4/25/2023 | A wire transaction in the amount of approximately $1,000.00 from the SPLC Operating Account at Bank-1 to a Bank of America account controlled by F-11. |
| 3 | 4/25/2023 | A wire transaction in the amount of approximately $1,200.00 from the SPLC Operating Account at Bank-1 to a Capital One Bank, N.A. account controlled by F-35. |
| 4 | 4/25/2023 | A wire transaction in the amount of approximately $3,090.00 from the SPLC Operating Account at Bank-1 to a TD Bank, N.A. account controlled by F-37. |
| 5 | 4/25/2023 | A wire transaction in the amount of approximately $2,865.00 from the SPLC Operating Account at Bank-1 to a Woodforest Bank account controlled by F-40. |
| 6 | 4/25/2023 | A wire transaction in the amount of approximately $1,000.00 from the SPLC Operating Account at Bank-1 to a US Bank, N.A. account controlled by F-42. |

25.     All in violation of Title 18, United States Code, Section 1343.

## COUNTS SEVEN THROUGH TEN
### (False Statements to a Federally Insured Bank)

26.     The facts set out in paragraphs 1 through 18 are fully incorporated in these Counts.

27.     On or about the dates listed in the chart below, in the Middle District of Alabama, the defendant,

SOUTHERN POVERTY LAW CENTER, INC.,

knowingly made a false statement and report on an application to an institution whose deposits were insured by the Federal Deposit Insurance Corporation with the intent to influence an action of that institution, in violation of Title 18, United States Code, Section 1014.

### OVERVIEW

28.     One or more SPLC employees opened bank accounts for CIA, Fox Photography, North West Tech, Tech Writers, Imagery Ink, J&J Electronics, Kelly's Marine, and Turner Personnel at Bank-1. Similarly, one or more SPLC employees opened a bank account for Rare Books at Bank-2.

29.     The purpose of opening these bank accounts for the fictitious entities was to be able to conduct financial transactions that made it appear as if the Fs were receiving money from the fictitious entities rather than receiving donors' money from the SPLC.

30.     After the accounts were opened, the SPLC, through Employee-1, and others, executed Sole Proprietorship Resolution of Authority documents with Bank-1. These documents contained false information regarding the ownership and control of the fictitious entities for which the bank accounts were opened. Employee-1, and others, signed these documents containing false statements for the benefit of the SPLC. These documents containing false statements were submitted to Bank-1 for the purpose of influencing the actions of Bank-1.

31.     On or about the dates listed below, the following false statements were made to an FDIC insured financial institution for the purpose of influencing the actions of that financial

15

institution:

| Count | Date | False Statement | Document Type | Financial Institution |
|---|---|---|---|---|
| 7 | Dec. 20, 2016 | *I, "Employee-1", certify that I am the sole owner of the above named proprietorship, Federal Tax I.D. number . . . 9788, engaged in business under the trade name of Center Investigative Agency.* | Sole Proprietorship Resolution of Authority | Bank-1 |
| 8 | Dec. 20, 2016 | *I, "Employee-1", certify that I am the sole owner of the above named proprietorship, Federal Tax I.D. number . . . 9788, engaged in business under the trade name of Fox Photography.* | Sole Proprietorship Resolution of Authority | Bank-1 |
| 9 | Dec. 20, 2016 | *I, "Employee-1", certify that I am the sole owner of the above named proprietorship, Federal Tax I.D. number . . . 9788, engaged in business under the trade name of North West Technologies.* | Sole Proprietorship Resolution of Authority | Bank-1 |
| 10 | Dec. 20, 2016 | *I, "Employee-1", certify that I am the sole owner of the above named proprietorship, Federal Tax I.D. number . . . 9788, engaged in business under the trade name of Tech Writers Group.* | Sole Proprietorship Resolution of Authority | Bank-1 |

32.     In 2020, Bank-1 conducted an internal investigation into these accounts. Thereafter, an SPLC employee requested that Bank-1 close the accounts associated with the CIA, Fox Photography, North West Tech, and Tech Writers and transfer the remaining balances in these accounts to the SPLC's operating account ending in 6050.

33.     In response to Bank-1's internal investigation, on or about September 9, 2021, the President and Chief Executive Officer of the SPLC, as well as the Board Chair of the SPLC admitted the following in writing to Bank–1:

*Pursuant to the discussion we had earlier this week, please let this correspondence serve as confirmation that the accounts listed below were opened for the benefit of Southern Poverty Law Center operations and operated under the Center's authority. The following accounts are listed below:*

- *. . . 6700 Center Investigative Agency — opened 1/31/2008 — closed 8/5/2020*
- *. . . 9674 Fox Photography — opened 1/31/2008 — closed 8/5/2020*
- *. . . 6743 North West Technologies — opened 1/31/2008 — closed 8/5/2020*
- *. . . 6751 Tech Writers Group — opened 1/31/2008 — closed 8/5/2020*
- *. . . 6719 Imagery Ink — opened 1/31/2008 — closed 3/15/2013*
- *. . . 6727 J&J Electronics — opened 1/31/2008 — closed 3/15/2013*
- *. . . 6735 Kelly's Marine — opened 1/31/2008 — closed 3/15/2013*
- *. . . 6600 Turner Personnel — opened 4/25/2008 — closed 11/8/2011*

*Additionally, this will confirm that the entity "Rare Books Warehouses" operates under Center authority as well.*

34.     All in violation of Title 18, United States Code, Section 1014.

## COUNT ELEVEN
### (Conspiracy to Commit Concealment Money Laundering)

35.     The facts set out in paragraphs 1 through 18 as well as paragraphs 28 through 30 and 32 through 33, are fully incorporated in this Count.

36.     Beginning in or about 2010 and continuing through at least August 2023, in the Middle District of Alabama and elsewhere, the defendant,

SOUTHERN POVERTY LAW CENTER, INC.,

knowingly combined, conspired, confederated, and agreed with persons known and unknown to

17

the grand jury to commit concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## OBJECTIVE OF THE CONSPIRACY

37.    It was the objective of this conspiracy to conduct financial transactions designed to conceal the true nature, source, ownership, and control of fraudulently obtained donated money the SPLC paid to Fs.

## MANNER AND MEANS OF THE CONSPIRACY

38.    After receiving donated funds obtained via the wire fraud scheme alleged in Counts 1-6, individuals at the SPLC transferred proceeds of the wire fraud scheme from the SPLC's operating account at Bank-1 to another account at Bank-1 in the name of the CIA.

39.    Thereafter, the funds in the CIA account at Bank-1 were transferred to accounts at Bank-1, to include: Fox Photography, North West Tech, and Tech Writers. These funds were then transferred from the Fox Photography, North West Tech, and Tech Writers' accounts to the various Fs. These financial transactions were designed to conceal the true nature, source, ownership, and control of the donated funds the SPLC was paying to the Fs.

40.    In addition, a portion of the proceeds that had been deposited into the CIA account at Bank-1 was deposited into the Rare Books account at Bank–2. The financial transactions from the CIA account to the Rare Books account were designed to further conceal the true nature, source, ownership, and control of the donated funds the SPLC was paying to the Fs.

41.    The funds deposited in the Rare Books account at Bank-2 were then loaded onto pay cards issued to the Fs who were supposedly employees of the fictitious entity, Rare Books. The financial transactions moving funds from the Rare Books account to the Fs' pay cards were designed to still further conceal the true nature, source, ownership, and control of the donated funds the SPLC was paying to the Fs.

42.    After the closure of the fictitious entities' accounts following Bank–1's internal

investigation, the SPLC altered their method of conducting financial transactions designed to conceal the true nature, source, ownership, and control of the donated funds that the SPLC was paying to the Fs.

43.    Specifically, from in or about August 2020 and continuing through in or about August 2023, the SPLC used the ACH system to pay Fs with donated funds. These ACH payments were masked with monikers such as "RAREBOOKS050" and "IPRESEARCHCON050." These masked ACH transactions were designed to conceal the true nature, source, ownership, and control of the donated funds the SPLC was paying to the Fs.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION-1

A.    The allegations contained in Counts 1-6 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

B.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 1343, set forth in Counts 1-6 of this indictment, the defendant,

SOUTHERN POVERTY LAW CENTER, INC.,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from the offenses in violation of Title 18, United States Code, Section 1343.

C.    If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendant:

(1)    cannot be located upon the exercise of due diligence;

(2)    has been transferred or sold to, or deposited with, a third party;

(3)    has been placed beyond the jurisdiction of the court;

19

(4)  has been substantially diminished in value; or

(5)  has been commingled with other property which cannot be divided

without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United

States Code, Section 2461(c).

## FORFEITURE ALLEGATION-2

A.  The allegations contained in Count 11 of this Indictment are hereby realleged and

incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States

Code, Section 982(a)(1).

B.  Upon conviction of the offenses in violation of Title 18, United States Code,

Sections 1956(a)(1)(B)(i) and (h), set forth in Count 11 of this Indictment, the defendant,

SOUTHERN POVERTY LAW CENTER, INC.,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, or any property traceable to such property.

C.  If any of the property described in this forfeiture allegation, as a result of any act

or omission of the defendant:

(1)  cannot be located upon the exercise of due diligence;

(2)  has been transferred or sold to, or deposited with, a third party;

(3)  has been placed beyond the jurisdiction of the court;

(4)  has been substantially diminished in value; or

(5)  has been commingled with other property which cannot be divided

without difficulty,

20

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL;

FOREPERSON

THOMAS GOVAN
UNITED STATES ATTORNEY

Kevin P. Davidson
First Assistant United States Attorney

Russell T. Duraski
Assistant United States Attorney

21