**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

UNITED STATES OF AMERICA,

       v.

THE SOUTHERN POVERTY LAW CENTER,
INC.

      Defendant.

Case No. 2:26-cr-0139-ECM-KFP-1

**THE SOUTHERN POVERTY LAW CENTER'S REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION TO DISMISS THE INDICTMENT
<u>FOR VINDICTIVE PROSECUTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 6

I.     The Government Formulates a Narrow and Never-Before-Adopted Standard for Vindictive Prosecution Claims ....................................................................................... 6

II.    These Criminal Charges Are the Result of Both Actual and Presumed Vindictiveness by the Trump Administration. .................................................................. 12

        A.       The Government's Statements and Conduct Reveal Actual Vindictiveness. ................................................................................................. 12

        B.       The Government Has Not Rebutted the SPLC's Showing of Presumed Vindictiveness. ................................................................................................. 14

III.   The Justice Department Is Not Entitled to the Presumption of Regularity or Unquestioned Deference. ................................................................................................ 17

IV.   Discovery Is Appropriate to Develop the Factual Record Fully. ..................................... 21

CONCLUSION ................................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Thomas*,
  2008 WL 2225753 (M.D. Ala. May 27, 2008) ........................................................................ 12

*Bordenkircher v. Hayes*,
  434 U.S. 357 (1978) ............................................................................................................... 18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................................................... 19

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................................................... 18

*Fed. Educ. Assoc. v. Trump*,
  795 F. Supp. 3d 74 (D.D.C. 2025) .......................................................................................... 19

*Houston v. Hill*,
  482 U.S. 451 (1987) ............................................................................................................... 14

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ............................................................................................................... 15

*R. A. V. v. St. Paul*,
  505 U.S. 377 (1992) ............................................................................................................... 15

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................................... 14

*United States v. Abrego Garcia*,
  802 F. Supp. 3d 1055 (M.D. Tenn. 2025) .......................................................................... 12, 16

*United States v. Abrego Garcia*,
  2026 WL 1454303 (M.D. Tenn. May 22, 2026) ................................................. 7, 15, 16, 17, 21

*United States v. Armstrong*,
  517 U.S. 456 (1996) ............................................................................................................... 21

*United States v. Barner*,
  441 F.3d 1310 (11th Cir. 2006) ............................................................................................. 7, 8

*United States v. Carey*,
  816 F.Supp.3d 129 (D.D.C. 2026) ............................................................................................ 8

*United States v. Eichman*,
  496 U.S. 310 (1990) ...................................................................................... 14

*United States v. Goodwin*,
  457 U.S. 368 (1982) .................................................................................. 7, 12

*United States v. Holland*,
  830 F. Supp. 1388 (N.D. Okla. 1993)......................................................... 8, 9

*United States v. Johnson*,
  221 F.3d 83 (2d Cir. 2000) ...................................................................... 12, 13

*United States v. Jordan*,
  635 F.3d 1181 (11th Cir. 2011)..................................................................... 21

*United States v. Oseguera Gonzalez*,
  507 F. Supp. 3d 137 (D.D.C. 2020)............................................................... 16

*United States v. Pottorf*,
  828 F. Supp. 1489 (D. Kan. 1993)................................................................. 17

*United States v. Rasco*,
  2010 WL 2160836 (S.D. Ga. May 27, 2010) ................................................ 21

*United States v. Sanders*,
  211 F.3d 711 (2d Cir. 2000).......................................................................... 9

*United States v. Smith*,
  231 F.3d 800 (11th Cir. 2000)....................................................................... 19

*United States v. Stanchich*,
  550 F.2d 1294 (2d Cir. 1977) ....................................................................... 18

*United States v. Trump*,
  2024 WL 3638344 (D.D.C. Aug. 3, 2024) .................................................... 16

*United States v. Yagman*,
  2007 WL 9724368 (C.D. Cal. May 3, 2007)................................................. 10

**Other Authorities**

FBI Domestic Investigations and Operations Guide ................................................. 2, 20

**INTRODUCTION**

The government represents to the Court that this investigation was always an investigation into "financial crimes" and that the SPLC's "exercise of [its] First Amendment right was *never* relevant to the criminal charges." Opp. at 2, 6 n.3, 17 (emphasis added). That is demonstrably incorrect. Documents produced in discovery by the government wholly rebut the government's assertion. In fact, the SPLC's exercise of its protected First Amendment rights was the genesis of this Administration's decision to reopen its investigation of and prosecute the SPLC.

After being opened by IRS Criminal Investigation agents during President Trump's first term, the Biden administration continued the investigation into the SPLC's informant program, looking at any possible tax fraud or issues arising from its use of bank accounts to pay its informants. Following that multi-year investigation, the Justice Department closed the matter.[1] The investigation sat closed for approximately four years. It was suddenly reopened during the Trump Administration at least as early as September 2025. The question before the Court is *why*.

The government's own discovery answers that question. The Justice Department and FBI reopened the investigation to investigate whether the SPLC's designation of certain conservative groups on the Hate Map—unquestionably protected First Amendment activity—was a crime. *See* Exhibit 28 (10/24/25 FBI Incident Summary). According to the Incident Summary produced by the government, the government concluded that the SPLC placed entities on the Hate Map "as a smear tactic solely because they disagree with the ideology of the SPLC" and that "[t]he SPLC labels conservative values and faith-based organizations like Liberty Counsel, Moms for Liberty,

---

[1] *See* Sarah Lynch, *No tax charges filed in Southern Poverty Law Center probe, after IRS lawyers determined informant program legally structured, sources say*, CBS News (May 29, 2026), https://www.cbsnews.com/news/tax-probe-southern-poverty-law-center/ ("The tax portion of the investigation, which has not been previously reported, was initiated during President Trump's first term" but as further noted herein, "the probe failed to yield any [tax] charges").

Family Research Council, Alliance Defending Freedom, Focus on the Family, and Turning Point USA as hate groups on the hate map." *Id*. at 2. The Incident Summary states that the Hate Map is itself a "scheme to defraud" and claims the designations of the "victim" entities are "fraudulent misrepresentations." *Id*. at 3.  It identifies the "victims" of this supposed illegal conduct as the groups designated on the Hate Map, *id*., which of course includes groups like the Ku Klux Klan, the Aryan Nation, and the National Alliance. The FBI apparently labeled the "Report Type" as "Financial Crimes/Fraud" despite the fact that it was explicitly scrutinizing the SPLC's First Amendment activity and expression. *Id.* at 1. Notably, the internal FBI number (the "Sentinel Case") begins with "44," which is the uniform code indicating a "civil rights" investigation—not a financial fraud investigation, as the government represented to the Court in its opposition.[2]  And because the FBI was investigating a "Domestic Political Organization," the matter was designated a "SIM," meaning a Sensitive Investigative Matter, which mandates additional internal controls and supervisory approvals not required for routine financial fraud investigations.[3]  *Id.* at 1.

The month before the FBI opened the investigation into whether the Hate Map was a "scheme to defraud," several of these "victim" groups (Moms for Liberty, Alliance Defending

---

[2] *See* "Categories of Records in the System," Federal Bureau of Investigation, *available at* https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/freedom-of-information-privacy-act/fbi-privacy-act-systems/63-fr-8659 (listing "44" as the code for "Civil Rights; Civil Rights, Election Laws, Voting Rights Act, 1965, Title 18, United States Code, Sections 241, 242, and 245; Title 42, United States Code, Section 1973; Title 18, United States Code, Section 243; Title 18, United States Code, Section 244, Civil Rights Act--Federally Protected Activities; Civil Rights Act--Overseas Citizens Voting Rights Act of 1975.").

[3] "If a SIM arises after an FBIHQ-led Type 1 & 2 Assessment has already been opened, ongoing and previously approved investigative activity may continue; however, before initiating or beginning additional investigative activity, the FBIHQ section with oversight **must consult with the affected ADIC(s) or SAC(s), obtain OGC [Office of the General Counsel] review, and obtain DD [Deputy Director] (nondelegable) approval to continue the investigation**. These steps must be completed as soon as practicable, but not more than five business days after the SIM arises."  FBI Domestic Investigations and Operations Guide, Section 5.6.3.1.4 (emphasis added).

2

Freedom, Turning Point USA, and Liberty Counsel) sent a joint letter to Stephen Miller, Deputy White House Chief of Staff.[4] *See* Exhibit 29 ("Miller Letter"). The Incident Summary and Miller Letter closely track each other, sometimes word-for-word:

| Stephen Miller Letter | FBI Incident Summary |
|---|---|
| "The reality, however, is that the SPLC places many groups on its 'Hate Map' as a smear tactic **solely because they disagree with its** radical leftwing **ideology**." | "Many of the entities on the hate map are placed there as a smear tactic **solely because they disagree with the ideology** of the SPLC." |
| "Less than a decade after its founding, however, it egregiously strayed from its mission, declining today into what Politico has described as '**more of a partisan progressive hit operation than a civil rights watchdog.**'" | "Recent publications such as Politico have noted that the SPLC is 'becoming **more of a partisan progressive hit operation than a civil rights watchdog.**'" |
| "Nathan J. Robinson, the editor-in-chief of Current Affairs, carefully scrutinized SPLC's 'Hate Map' and concluded that it is an '**outright fraud' and 'a willful deception designed to scare older liberals into writing checks to the SPLC.**'" | "Current Affairs' editor, Nathan J. Robinson, cited the hate map as '**an outright fraud' and 'a willful deception designed to scare older liberals into writing checks to the SPLC.**'" |
| "And former SPLC employee Bob Moser wrote that '**it was hard, for many of us, not to feel like we'd become pawns in what was, in many respects, a highly profitable scam.**'" | As stated by a former SPLC employee '**it was hard, for many of us, not to feel like we'd become pawns in what was, in many respects, a highly profitable scam.**'" |
| "**In 2012, a would-be mass murderer armed with a gun 'planned to** stride into the [Family Research Council's office in Washington, D.C.] and open fire on the people inside in an effort to kill as many people as possible.' **The gunman claimed he was motivated by the SPLC's listing of the FRC as a hate group.**'" | "**In 2012, a would be mass murderer armed with a gun planned to** shoot into Family Research Counsel's (FRC') office, in Washington, D.C. **The gunman claimed he was motivated by the SPLC's listing of the FRC as a hate group.**" |
| "**The SPLC hate designation was also cited as the reason for the riot and assault of a female professor at Middlebury College in 2017.**" | "**The SPLC hate designation was also cited as the reason for the riot and assault of a female professor at Middlebury College in 2017.**" |

---

[4] Press Release, *FBI Severs Ties With the Southern Poverty Law Center*, Liberty Counsel https://lc.org/newsroom/details/100625-fbi-severs-ties-with-the-southern-poverty-law-center-1 (accessed June 19, 2026) (noting the organization signed the coalition letter in August 2025).

3

To put it succinctly, the Justice Department's justification for opening a "Full" investigation into the SPLC in October 2025—that led to the indictment in April 2026—appears to be a rehashing of a letter sent by conservative groups to Stephen Miller complaining about being designated as hate groups by the SPLC. Equally troubling is whether the investigation into the SPLC lacked independent predication altogether and instead was based upon copying or common sourcing from a political advocacy letter seeking Executive Branch action. The documents provided by the government reviewed to date do not reveal whether Miller directed the Justice Department to convert or open this investigation, but the facts suggest that may be the case.

Miller surely had a separate motive to set the Justice Department after the SPLC. In 2019, the SPLC wrote a series of pieces about hundreds of emails from Miller to an editor at the conservative *Breitbart News* following the editor's disclosure of them. One such article began, "In the run-up to the 2016 election, White House senior policy adviser Stephen Miller promoted white nationalist literature, pushed racist immigration stories and obsessed over the loss of Confederate symbols after Dylann Roof's murderous rampage, according to leaked emails reviewed by Hatewatch."[5]

As part of this investigation, which began at least as early as September 2025, the FBI interviewed leaders of some of the referenced organizations and collected documents from them. The FBI did not interview anyone within the SPLC about the investigative journalism that supported the designations. To be clear, these designations are based on the SPLC's definition, which closely tracks the FBI's definition of a "hate crime."[6] But the FBI did not try to obtain

---

[5] Michael Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, The SPLC (Nov. 12, 2019), https://www.splcenter.org/resources/hatewatch/stephen-millers-affinity-white-nationalism-revealed-leaked-emails/.

[6] The SPLC's website defines a "hate group" as "an organization that—based on its official statements or principles, the statements of its leaders, or its activities—has beliefs or practices that

documents from the SPLC to evaluate whether the designations were supported by good faith evidence and thus not misrepresentations at all.

Kevin Davidson, the then-Acting U.S. Attorney for this District and currently the lead prosecutor on this case, personally approved the opening of the investigation into the SPLC's First Amendment protected conduct. Ex. 28 at 3. This investigation into the SPLC was "convert[ed] to a full investigation" in or around October 2025. *Id.* (*see* Disposition).

At some unknown point in or after October 2025, an unknown person within the Justice Department must have realized that an investigation into the Hate Map as a "scheme to defraud" conservative groups is entirely violative of the First Amendment. Rather than dropping the facially flawed investigation, however, someone in the Justice Department decided to cloak this improper investigation under the guise of donor fraud. The SPLC does not know who made that decision or how it was communicated. What is clear, though, is that the SPLC was indicted a few months later and the superseding indictment includes allegations that the SPLC designated "hate groups" on its Hate Map, consistent with DOJ's early investigative conclusion. ECF 51, ¶¶ 4-5; *see also* Ex. 28 at 1–2.

This criminal investigation into the SPLC's protected speech activities comes as no surprise given the swirl of events leading up to it: the public accusations that the SPLC was "anti-Christian" and part of the Biden's Administration's "weaponization" of the Justice Department against

---

attack or malign an entire class of people, typically for their immutable characteristics." *See Methodology: How hate groups are identified and categorized* (Mar. 18, 2020), The Southern Poverty Law Center, https://www.splcenter.org/resources/reports/methodology-how-hate-groups-are-identified-and-categorized/. The SPLC includes a group on the Hate Map if it "vilif[ies] others because of their race, religion, ethnicity, sexual orientation or gender identity." *Id*. This definition tracks the FBI's definition of a hate crime. *See* FBI Uniform Crime Reporting (defining hate crimes as "crimes motivated by offenders' bias against race, gender, gender identity, religion, disability, sexual orientation, and ethnicity"). https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/ucr (accessed June 15, 2026).

conservative or religious groups; Attorney General Bondi's memorandum directing an investigation into the Richmond Memo that relied in-part on the SPLC's research as part of this supposed "weaponization"; FBI Director Patel's accusation that the SPLC was a "partisan smear machine" that "inspired violence" through the Hate Map; President Trump's issuance of NSPM-7, which directed investigations into groups that the Administration believed to be "silenc[ing] opposing speech"; and President Trump's October 2025 statements that progressive organizations are filled with "bad people" who "want to destroy our country." *See* Mot. at 8–16.

This case was not motivated by a genuine investigation of any statutory "financial crimes." The record before the Court establishes that this investigation and these criminal charges were instigated because the Administration *disagrees* with the SPLC's protected speech on the Hate Map and elsewhere. Events after the indictment, and the extremely limited discovery from the government about its motivations, confirm this conclusion. President Trump controls what this Justice Department does. And President Trump explained why the SPLC was indicted: the organization in his view is a "total scam run by the Democrats" that led to his 2020 electoral defeat and if the SPLC is convicted of a crime, then (in his words) "the 2020 Presidential Election should be permanently wiped from the books and be of no further force or effect!" *See* Mot. at 27.

This showing is more than sufficient to dismiss the indictment or, at a minimum, order that the government provide discovery to explain the real origins for this investigation and the criminal charges.

## ARGUMENT

### I.    The Government Formulates a Narrow and Never-Before-Adopted Standard for Vindictive Prosecution Claims.

The government's opposition offers three primary arguments. It first contends that the SPLC has failed to establish a vindictive prosecution claim as a matter of law because the SPLC

has not shown that it "exercise[d] a legal right during litigation followed by an indictment." Opp. at 6. Neither the Supreme Court nor the Eleventh Circuit has adopted this narrow standard, and the Court should reject the government's request to apply it here.

The government's proposed standard impermissibly narrows the doctrine by limiting it to situations where a defendant exercised a protected right "during litigation." Opp. at 6. The vindictive prosecution cases in this Circuit to date have indeed addressed situations where the defendant asserted a protected right during the criminal case itself. But the government's constriction is too narrow, as none of those cases adopted the government's proposed bright-line "during litigation" standard.[7] In *United States v. Goodwin*, the Supreme Court made clear that it was not foreclosing the possibility that a future defendant "might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do," 457 U.S. 368, 384 (1982), without limiting the doctrine's reach to rights asserted only "during litigation."

No precedent prohibits a vindictive prosecution defense based on a defendant's assertion of protected rights before trial. In *United States v. Barner*, the Eleventh Circuit rejected the government's argument that presumed vindictiveness could not apply to the exercise of protected rights before trial in a case about the addition of charges. The Court of Appeals explained that "nothing in the language or rationale of *Goodwin* rules out the possibility that a case could present additional factors that would make it appropriate to use the presumption in a pre-trial setting." 441 F.3d 1310, 1317 (11th Cir. 2006); *see also* Mot. at 22 ("this Circuit 'has neither adopted nor

---

[7] The argument for the "during litigation" standard seems to be aimed at avoiding the application of the *United States v. Abrego Garcia* decision, which dismissed criminal charges in a situation where the Justice Department instigated criminal charges because the defendant had challenged the government's deportation decision in a different legal proceeding.

rejected a per se rule that the presumption of vindictiveness cannot apply in a pretrial setting'" (quoting *Barner* at 1318)). The Eleventh Circuit found that the actual vindictiveness standard applies in the pre-trial setting, remanding the case for factual findings of "whether the prosecutors were actually motivated by the desire to punish Barner for the exercise of his rights and whether the Fifth Superseding Indictment was the result of such animus." *Barner*, 441 F.3d at 1322.

A vindictive prosecution defense may be based on pre-prosecution speech even where that protected conduct was not "during litigation." *See United States v. Carey*, 816 F.Supp.3d 129 (D.D.C. 2026). The government claims *Carey* is both distinguishable and unpersuasive for several reasons, calling it an "outlier" and "analytically flawed" decision. Opp. at 7–10. But this Court should not disregard the persuasive force of *Carey*'s reasoning. The government's own argument that the doctrine of vindictive prosecution "prevents the Government from using prosecutions to deter people from exercising their rights"—which is the same rationale the *Carey* court relied upon—acknowledges the breadth of the doctrine's underlying purpose and reach. *Id*. at 9.

Moreover, the government's attempt to distinguish *Carey* on the ground that the SPLC's protected First Amendment activity is not "inextricably intertwined" (*id*. at 8) to the financial charges here misses the point: even if the SPLC was not charged for its speech, its speech was the motivating factor for the Justice Department's decision to reopen and then prosecute a previously closed case into unrelated conduct. *See generally* Ex. 28. This is precisely the concern that the vindictive prosecution doctrine addresses. *Carey* explained that the Justice Department is barred from making prosecutorial decisions to deter the exercise of constitutional rights, and that a defendant prosecuted for doing what the law plainly permits "is punished for exercising a protected . . . right"—rendering prosecution "an impermissible response to noncriminal, protected activity." *Carey*, 816 F.Supp.3d at 139. *See also United States v. Holland*, 830 F. Supp. 1388, 1389 (N.D.

8

Okla. 1993), *aff'd*, 19 F.3d 1444 (10th Cir. 1994) (evaluating vindictive prosecution claim premised on the principle that "[t]he First Amendment bars a prosecution that would not have been brought *but for* a desire to discourage protected expression," even where "a permissible motive for prosecution" may simultaneously exist (emphasis added)). That is exactly what has occurred to the SPLC here.

The government argues that *United States v. Sanders* (cited by the *Carey* court) supports its position because there the Second Circuit rejected a vindictive prosecution claim where defendants alleged the indictment was obtained in response to publication of news articles about federal agencies and FOIA requests by one of the defendants, which are First Amendment activities outside of formal litigation. Opp. at 10, n.5. However, the Government overlooks that the *Sanders* court engaged in a substantive analysis of whether First Amendment activity beyond formal litigation can support a vindictive prosecution claim. The Second Circuit did not dismiss the claim as categorically barred but rather rejected it on the merits after conducting a full analysis. *See* 211 F.3d 711, 716–19 (2d Cir. 2000). Furthermore, *Sanders* is distinct from the SPLC's situation because in *Sanders*, defendants were journalists challenging the government's explanation of an aircraft explosion, whereas the SPLC is a specific organization that Trump Administration officials have repeatedly targeted by name, whose unique and long-standing relationship with the FBI was publicly terminated, and against which a previously closed investigation was reopened. The targeted and specific nature of the government's actions toward the SPLC in the wake of its protected First Amendment expression distinguishes this case from the general news reporting context of *Sanders* and presents a stronger factual basis for a vindictive prosecution claim.

Moreover, the government's repeated pattern of distinguishing each case the SPLC cited on the grounds that each involved a formal legal proceeding, while simultaneously arguing that no

case has ever recognized the doctrine outside that context, would foreclose the doctrine's application to an entire category of constitutionally protected activity without any principled basis. *See United States v. Yagman*, 2007 WL 9724368, at *5 (C.D. Cal. May 3, 2007) (noting that "speech criticizing public officials falls within the ambit of First Amendment protection," and that retaliation for such conduct could form the basis of a vindictive prosecution defense).

A simple hypothetical scenario highlights the error of the government's proposed approach: a progressive foreign policy think tank authors an op-ed that criticizes President Trump's recent war against Iran. The Justice Department investigates and then indicts the think tank for tax fraud having nothing to do with the critical piece. A few days later, President Trump announces that the think tank was indicted because it is part of the Democratic Party and because the op-ed was intended to help defeat Republican Party candidates in the upcoming midterm elections. Under the government's proposed standard, the think tank would have no vindictive prosecution defense as a matter of law because the think tank was not prosecuted for exercising a "legal right during litigation." No precedent supports this bright-line rule, and this Court should reject it and instead evaluate the totality of the circumstances here.

The government's second argument is that even if pre-prosecution speech can form the basis of a vindictive prosecution claim, the SPLC has not identified the "exercise of a specific protected right that led to the indictment" but merely "[a] generalized, nebulous assertion of a First Amendment right to free speech." Opp. at 4–5. This too is incorrect. The SPLC identified specific instances of its protected speech that directly, and harshly, criticize President Trump, his allies, and his policies—including his Justice Department. Mot. at 7, 11–12. And the SPLC now has additional evidence through the Incident Summary that identifies additional specific exercises of its free speech rights at issue. This showing is sufficient to meet the vindictive prosecution standard.

10

Third, and finally, the government argues the SPLC has not made a sufficient showing of causation, saying that it "cannot point to a specific First Amendment action that triggered the charges in this case," Opp. at 8, and that the SPLC "has not alleged any 'objective evidence' that this prosecution is a pretext to impinge on the defendant's First Amendment, or any other protected activity," Opp. at 12. As an initial matter, the newly provided Incident Summary rebuts this argument on its face. It is "objective evidence" that specific First Amendment action (the Hate Map designations) "triggered the charges in this case." And, to the extent the Court credits the government's position that the SPLC must show a temporal link between its First Amendment activities and the "charged financial fraud conduct that allegedly occurred between 2010 and 2023,'" Opp. at 6 n.2, the SPLC has met that standard. Whatever investigation occurred before 2025, it appears to have included actual questions of financial wrongdoing, and nothing was pursued. When a new inquiry was started in 2025, every indication—now confirmed with the FBI Incident Summary—is that its basis was tied to issues surrounding the Hate Map, with financial wrongdoing allegations being its ultimate cover to hide the reason it was revived. Consequently, there is a direct link between the SPLC's First Amendment protected activity and the renewed investigation that led to the charges here. To the extent the Court wishes to have a fuller record on this point or to determine whether the SPLC's criticism of the Administration in 2025 and 2026 also triggered this investigation, then targeted discovery would serve that goal.

Finally, the government attacks positions that the SPLC has not taken, arguing that engaging in protected speech does not "immunize" an entity from criminal prosecution and that the SPLC's argument runs the risk of a "chilling effect on otherwise routine, lawful prosecutions." Opp. at 9. But that is not the SPLC's position nor is it the situation here. The government's "sky is falling" argument—that any defendant could avoid prosecution by criticizing the government—

11

overlooks that courts apply a demanding evidentiary standard requiring subjective evidence of vindictiveness or a realistic (objective) likelihood of vindictiveness, which adequately filters meritless claims. The SPLC has met this demanding standard.

## II. These Criminal Charges Are the Result of Both Actual and Presumed Vindictiveness by the Trump Administration.

### A. The Government's Statements and Conduct Reveal Actual Vindictiveness.

The statements of Administration officials and the government's discovery establish that the government acted "with genuine animus toward" the SPLC and that the SPLC "would not have been prosecuted but for that animus." *Baker v. Thomas*, 2008 WL 2225753, at *8 (M.D. Ala. May 27, 2008) (quoting *Goodwin*, 457 U.S. at 372).

The government characterizes the Administration's statements cited by the SPLC as "reiterat[ing] the true reason the defendant was indicted: because a grand jury determined there was probable cause to believe it committed fraud." Opp. at 11-12. It also tells the Court that these statements are simply the Administration's "criticism of, and disagreement with" the SPLC and thus cannot serve as "objective evidence" of vindictiveness. *Id*. at 11.

Statements by those overseeing prosecutions, like the ones here, are the quintessential form of direct evidence of animus. *See, e.g.*, *United States v. Abrego Garcia*, 802 F. Supp. 3d 1055, 1060–61 (M.D. Tenn. 2025) (noting that "[a]ctual vindictiveness may be apparent based on the Executive Official Defendants' and their subordinates' statements about Abrego from the time he filed his Maryland lawsuit through his arrest in this District"); *United States v. Johnson*, 221 F.3d 83, 94 (2d Cir. 2000) (noting "evidence of a statement by the prosecutor" among forms of direct evidence of actual vindictiveness). The statements made here amount to far more than expressions of "disagreement with" the SPLC, and they have *nothing* to do with what the grand jury found.

The FBI Director claimed, based on the SPLC's exercise of its protected First Amendment rights, that the Center is a "partisan smear machine" that "inspired violence." Mot. at 27. Whatever this false statement is, it is not an allegation of financial fraud. The Assistant Attorney General for Civil Rights stated that the charges against the SPLC were "personal" to her because she had seen friends "targeted" by the organization. *Id.* Putting aside the inappropriateness of a DOJ official admitting a case was brought for "personal" reasons, this too is not an allegation of financial fraud. The Justice Department concluded early in its investigation that the SPLC's Hate Map was a "smear tactic" against conversative and religious groups. And President Trump said that the SPLC is a "Democrat Hoax, along with Act Blue." *Id.* at 19. He accused the SPLC of funding the Unite the Right rally in 2017 to make him "look bad" and to "rig" the 2020 election against him. And he claimed that if the SPLC were to be convicted of a crime, then his electoral loss would disappear. Claiming the SPLC made the President "look bad" or that the SPLC's statements influenced the 2020 election also are not allegations of financial fraud.

Beyond these statements by the President, the FBI Director, and the head of DOJ's Civil Rights Division—which would suffice to meet the standard—the Justice Department's conduct in this case supports a finding of actual vindictiveness. The Acting Attorney General misrepresented evidence known to the Justice Department while appearing on a nationally televised news show, *see* ECF 23, and DOJ's Office of Public Affairs saw fit to release an undocketed draft superseding indictment to news organizations in advance of providing a copy to the SPLC or the public, *see* ECF 53.

Considered in its entirety, this record is more than sufficient to meet the actual vindictiveness standard and requires the indictment's dismissal.

13

### B.    The Government Has Not Rebutted the SPLC's Showing of Presumed Vindictiveness.

Much of the government's argument about presumed vindictiveness is a rehash of its general argument about whether the SPLC has asserted a protected right "during litigation" and the specificity of that showing. Opp. at 12-16. The SPLC will not repeat its response here.

The government makes the incredible claim that because the SPLC "continues to exercise its First Amendment rights," the government cannot be deemed to have "upped the ante" such that the presumption applies. Opp. at 17. Putting aside the fact that *Goodwin* does not limit the presumption's availability to this narrow category of cases, there is no support for the argument that a defendant's continued exercise of protected rights after indictment forfeits this defense. SPLC's right to exercise its First Amendment rights in the face of government efforts to chill it is well established, and the government's position overlooks the panoply of Supreme Court decisions making clear that the government may not use its police powers to chill free speech rights as it has tried to do here. *See, e.g.*, *United States v. Eichman*, 496 U.S. 310, 317–18 (1990) (holding that prosecuting individuals for burning the American flag as a form of protest violated the First Amendment, holding that "it suppresses expression out of concern for its likely communicative impact. . . . [T]he Government's interest cannot justify its infringement on First Amendment rights"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (affirming the overturning of defendant's conviction under a Texas statute for burning the American flag during a political protest, holding that "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Houston v. Hill*, 482 U.S. 451, 462-63 (1987) (striking down ordinance that made it unlawful to verbally interrupt a police officer in the performance of their duties, holding that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking

14

arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *R. A. V. v. St. Paul*, 505 U.S. 377, 382 (1992) (invalidating ordinance that prohibited hate speech, noting that the "First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." (internal citations omitted)); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982) (holding that "the nonviolent elements" of petitioners' politically motivated boycott were protected by the First Amendment).

The fact that an organization under indictment stands up for its rights despite being targeted for doing so and continues to exercise its First Amendment rights does not preclude the organization from pointing out and challenging the illegal basis of the charges the government is using to punish it for speaking out in the first place. It means that the Center refuses to accede to the government's draconian efforts to chill its exercise of those rights.

The government next asserts the "other factors" that the SPLC raised are insufficient to establish an objective "likelihood of vindictiveness." Opp. at 17–20. The government may be right that the fact that this is a re-opened investigation, standing alone, does not establish the presumption, but now that the SPLC has demonstrated that the reopening was triggered by and aimed at criminalizing the SPLC's exercise of its free speech rights, the fact is strong support for the presumption.

The government repeatedly suggests *United States v. Abrego Garcia*, 2026 WL 1454303 (M.D. Tenn. May 22, 2026), is inapposite or distinguishable because in that case Mr. Abrego Garcia took specific legal action that immediately preceded the Justice Department's prosecution of him—demonstrating blatant retaliation for exercising a legal right. Opp. at 6–7, 12, 21–22. But the *Abrego Garcia* decision underscores the strength of a properly developed factual record to

15

decide the SPLC's vindictive prosecution claim. The temporal proximity between the SPLC's public criticism of this Administration in 2025-2026, and the indictment that followed only months later, combined with the prior closure of the federal investigation into the SPLC by the Biden Administration, *see infra* at 1, is analogous in structure to *Abrego Garcia*, where a court found the reopening of a criminal investigation shortly after a successful legal challenge to be significant in establishing presumed vindictiveness, *Abrego Garcia*, 802 F. Supp. 3d at 1064.[8]

Perhaps a more relevant corollary to consider here is *United States v. Trump*, 2024 WL 3638344 (D.D.C. Aug. 3, 2024). In that case, the district court held that the *timing* of the prosecution reflected "'restraint and careful pursuit of potential investigative leads,'" rather than vindictiveness. *Id.* at *7 (quoting *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 177 (D.D.C. 2020)). Where, unlike here, an investigation demonstrably predates any protected activity, a vindictive prosecution claim is weakened—underscoring the significance of the SPLC's argument that the investigation was closed and only then re-opened in proximity to its protected First Amendment advocacy.

Here, the government has failed to provide a non-retaliatory explanation for reopening the investigation into (and later charging) the SPLC. *See United States v. Pottorf*, 828 F. Supp. 1489, 1500 (D. Kan. 1993) (evaluating whether government's alleged selective prosecution of defendant

---

[8] The government offers a similar retort about *United States v. Petrova* as with *Abrego Garcia*, claiming that in *Petrova* the defendant (foreign exchange student working at Harvard and ambushed at the airport) "took *specific legal action[]* that *immediately preceded* the indictment[] in [her] case, which resulted in making the threshold showing necessary for discovery in those cases." Opp. at 22 (emphasis in original). The government argues that nothing of the sort occurred here, and that the SPLC has not alleged facts of this nature. *Id.* But again, the government shrugs off the *timing* of this prosecution, and combined with additional circumstantial factors beyond mere temporal proximity—such as this Administration's reopening of a closed investigation following intensified public criticism by the SPLC and the absence of new evidence against the SPLC—it supports a clear presumption of vindictiveness.

16

was designed to chill the exercise of his First Amendment rights). Discovery would assist in the determination of whether, as in *Abrego Garcia*, the government here "chose to pursue that evidence only after" the SPLC's public advocacy activities intensified. *Abrego Garcia*, 2026 WL 1454303, at *5.

And this prosecution is not, as the government contends, the result of the typical administration setting new prosecutorial priorities. Opp. at 18. In February 2025, then-Attorney General Bondi's memorandum directed the Justice Department to investigate the Richmond Memo and review four years of investigative files "to identify instances where a department's or agency's conduct appears to have been designed to achieve political objectives or other improper aims rather than pursuing justice or legitimate government objectives." ECF 49, Ex. 7, at 3. This was not, as the government contends, a run-of-the-mill directive to focus on "fraud prosecutions," Opp. at 18, but rather a demand from the top of the Justice Department to open politicized investigations into President Trump's perceived enemies. And these prosecutors surely complied with the directive in this case.

Taken as a whole, the SPLC has shown sufficient objective evidence about the timing for re-opening of the investigation, the reasons for the investigation, and the fact that the investigation directly violates the Justice Manual by conducting an investigation influenced by the target's "political association, activities, or beliefs." *Justice Manual* § 9-27.260. At a minimum, this is a sufficient showing to require the government to rebut the presumption and provide discovery into the additional reasons for this prosecution.

### III.    The Justice Department Is Not Entitled to the Presumption of Regularity or Unquestioned Deference.

President Trump has seized control of this Justice Department in an unprecedented manner. Right after the indictment, President Trump took to his 12.8 million followers on Truth Social and

to 7 million viewers[9] on *60 Minutes* to proclaim that the SPLC was a "political scam" and a "Democrat Hoax." He announced that the SPLC had helped "rig" the 2020 election against him by funding the deadly 2017 Charlottesville rally to "make [him] look bad." He said that once the SPLC was found guilty, the "2020 Presidential Election should be permanently wiped from the books and be of no further force or effect!" The absurdity of these statements does not mean the Court may disregard them.

The government asks the Court to bypass the evidence of vindictiveness and instead defer blindly to the "broad discretion afforded to the Government's prosecutorial decisions" and the "general presumption of regularity." Opp. at 4, 9. The Court should decline to do so. As the Supreme Court has long acknowledged, "[t]he breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). The Due Process Clause is one of those limits. Even where a court's review of the government's motive "is deferential," courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (concluding that the government's stated reason for including a citizenship question on census "seems to have been contrived," that "the evidence tells a story that does not match the explanation the Secretary gave for his decision," and that "[a]ccepting contrived reasons would defeat the purpose of the [judicial review] enterprise.")).

---

[9] *See* 60 Minutes, *available at* https://ustvdb.com/networks/cbs/shows/60-minutes/ (accessed June 19, 2026).

While courts in the past have afforded a "strong 'presumption of regularity'" to prosecutorial decisions, *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000), no such presumption is appropriate here. One federal court has already found that "the President of the United States may have forfeited the right to such a presumption of regularity" because of DOJ's misrepresentations to courts, irregular charging decisions, and repeated violations of court orders. *Fed. Educ. Assoc. v. Trump*, 795 F. Supp. 3d 74, 92 (D.D.C. 2025); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (noting the presumption of regularity can be scrutinized where the record reveals that the government's actions are infected with "bad faith or improper behavior"). The Court should consider what courts across the country have already found: this Justice Department is no longer entitled to the presumption of regularity. The nonpartisan publication *Just Security* documented categories of executive conduct between January 20, 2025, and March 19, 2026, finding, for example, that courts had expressed concerns about this Administration's non-compliance with judicial orders in 34 non-immigration cases, and that courts had expressed distrust of government representations in over 90 non-immigration cases.[10] On the same day this brief was filed, *Just Security* published a tracker entitled, "Immigration Habeas Tracker: Government Obstruction, Judicial Trust, and Accountability."[11] It tracks over 800 federal immigration cases filed during the Trump Administration. In summary, "[t]he results present patterns not only in government behavior but also in how courts have responded. Judges have increasingly expressed serious concerns about trust in the executive branch

---

[10] Ryan Goodman et al., *The "Presumption of Regularity" in Trump Administration Litigation (4th edition)*, Just Security (Mar. 19, 2026), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/.

[11] Siven Watt, *Immigration Habeas Tracker: Government Obstruction, Judicial Trust, and Accountability*, Just Security (June 22, 2026), https://www.justsecurity.org/133928/immigration-habeas-tracker/.

and have escalated judicial enforcement and accountability measures. As many judges stated, the government's misconduct often goes to the heart of the matter – threatening meaningful habeas review or effective relief." *Id*. The evidence of the *lack of regularity* by this Administration is overwhelming.

The Justice Department, by its conduct, surely has forfeited any presumption in this case. The Justice Department opened an investigation into First Amendment activity, which is itself contrary to its internal investigative policy. The FBI Domestic Investigations and Operations Guide (DIOG) notes that all investigations must be "conducted for an authorized purpose." Exhibit 30. The "Constitution sets limits on what that purpose may be. It may not be solely to monitor the exercise of Constitutional rights, such as the free exercise of speech, religion, assembly, press, and petition." It cautions that, "[n]o investigative activity, including Full Investigations, may be taken solely on the basis of rights that are protected by the First Amendment. . . A Full Investigation may not be opened based solely on the exercise of these First Amendment rights."[12] *Id.* Despite this clear guidance, this investigation began and was later converted to a Full Investigation based on the SPLC's exercise of its free speech rights on the Hate Map. *See* Ex. 28 at 3.

Beyond that irregularity, the Acting Attorney General made comments to the media about the evidence in this case on national television that were, in the Court's words "false, misinformed, or misguided," ECF 71 at 11, requiring a correction. And the Justice Department's Office of Public Affairs sent a draft superseding indictment to media organizations in advance of its appearance on the public docket to gin up positive media coverage of its unproven allegations. In short, *nothing*

---

[12] Exhibit 30, FBI Domestic Investigations and Operations Guide (DIOG), Part 01 (Feb. 27, 2024) § 7 (Full Investigations), *see* 7.3 (the full DIOG is available at https://vault.fbi.gov/).

about this case is "regular" and the Court should decline to apply the presumption of regularity to excuse the government's vindictiveness here.

**IV.     Discovery Is Appropriate to Develop the Factual Record Fully.**

The government opposes discovery without addressing the legal standard here. The SPLC need not have fully proven the vindictive prosecution defense to obtain discovery. Rather, as suggested by cases in this Circuit, the correct standard is whether the SPLC has come forward with "***some evidence tending to show*** the existence of the essential elements of the defense." *See, e.g.*, *United States v. Rasco*, 2010 WL 2160836, at *5 n.5 (S.D. Ga. May 27, 2010) (quoting *United States v. Armstrong*, 517 U.S. 456, 468 (1996)) (emphasis added). An evidentiary hearing is warranted because the SPLC has "present[ed] facts sufficient to create a reasonable doubt about the constitutionality of a prosecution." *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011).

The SPLC has met both standards here. To the extent, however, that the Court has questions about which part of the SPLC's protected speech led directly to these criminal charges, targeted discovery of the Justice Department's and FBI's internal communications will be illuminating. For example, this targeted discovery could include: communications between Stephen Miller and the Justice Department about the SPLC; internal communications within Main Justice and between Main Justice and the U.S. Attorneys' Office addressing the past investigation and however it was restarted in 2025, including the October 2025 investigation into the Hate Map and the reasons for its conversion to the Full Investigation that led to this indictment. In *Abrego Garcia*, for example, the link between Mr. Abrego Garcia's exercise of protected rights and the decision to indict him was not clear *until* the government was forced to produced discovery. 2026 WL 1454303, at *6-7.

21

**CONCLUSION**

As stated in the SPLC's opening motion and reiterated herein, the proper remedy here is dismissal of the indictment with prejudice. In the alternative, the SPLC requests that the Court order discovery on these issues and schedule an evidentiary hearing regarding the same.


Dated: June 22, 2026                                  Respectfully submitted,

/s/ *Addy R. Schmitt*
Addy R. Schmitt (DC Bar No. 489094)
Andrea L. Moseley (DC Bar No. 502504)
Sara E. Kropf (DC Bar No. 481501)
Janelle Geddes (TN Bar No. 035141)
Kropf Moseley Schmitt PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
Telephone: (202) 627-6900
addy@kmlawfirm.com
andrea@kmlawfirm.com
sara@kmlawfirm.com
janelle@kmlawfirm.com

/s/ *Abbe David Lowell*
Abbe David Lowell (DC Bar No. 358651)
David A. Kolansky (NY Bar No. 5887765)
Isabella M. Oishi (DC Bar No. 90018056)
Lowell & Associates, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
alowellpublicoutreach@lowellandassociates.com
dkolansky@lowellandassociates.com
ioishi@lowellandassociates.com

William C. Athanas (ASB-4639-A59A)
Brianna R. Stone (ASB-0400-Y40J)
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8996
Facsimile: (205) 521-8800
bathanas@bradley.com

22

bstone@bradley.com

*Counsel for the Southern Poverty Law Center, Inc.*

23