# THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **CASE NO: 2:26-cr-0139-ECM-KFP-1** |
| **SOUTHERN POVERTY LAW** | ) | |
| **CENTER,** | ) | |
| | ) | |
| *Defendant.* | ) | |

## BRIEF OF *AMICUS CURIAE* SOCIETY FOR THE RULE OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR VINDICTIVE PROSECUTION

Samantha K. Trepel
Kelsey L. Stimple
Christine P. Sun
**STATES UNITED DEMOCRACY CENTER**
1101 17th St. NW, Suite 250
Washington, DC 20036
Telephone: (202) 999-9305
Email: *sam@statesunited.org*
        *kelsey@statesunited.org*
        *christine@statesunited.org*

Robert E. Battle (ASB-7807-T67R)
Adam P. Plant (ASB 6324-A64P)
Mallory Morgan Combest (ASB-7455-A57C)
**BATTLE & WINN LLP**
2901 Second Avenue South, Suite 220
Birmingham, Alabama 35233
Telephone: (205) 397-8160
Facsimile: (205) 397-8179
Email: *rbattle@battlewinn.com*
        *aplant@battlewinn.com*
        *mmorgan@battlewinn.com*

*Attorneys for Amicus Curiae Society for the Rule of Law*

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus curiae Society for the Rule of Law is a national membership organization of conservative, libertarian, and center-right lawyers, and others, who prioritize the defense of the rule of law, the Constitution, and American democracy above their partisan and policy preferences. The Society was originally founded as Checks & Balances in 2018 by lawyers and jurists who served at the highest levels of government in previous Republican administrations. The Society relaunched in its current form, in 2023, with a renewed vision to defend and advance the aforementioned beliefs and to amplify, among other constitutional principles, the separation of powers and each branch's importance as a check and balance on the other branches of government.

Amicus curiae's interest in this case lies in preserving the constitutional and institutional safeguards that protect the federal prosecution function from political influence, and in ensuring that courts fulfill their independent role as a check on prosecutorial abuse when the executive branch's own internal protections have failed. This case is of central concern to the Society, because it implicates the integrity and credibility of the Department of Justice as an impartial enforcer of the law—indispensable pillars for the rule of law. Although the Society has not always concurred with the Southern Poverty Law Center's rhetoric, actions, or tactics—many of its members have strongly objected to them—the Society nevertheless

2

categorically opposes vindictive prosecution against any target.

Prosecutors wield immense power whose misuse causes devastating and often irreversible harm to targeted individuals and organizations, and to the rule of law itself. Our constitutional system of checks and balances exists to ensure that prosecutorial power is applied rationally and objectively, insulated from partisan or other inappropriate influences. When that system is bypassed and the Justice Department is turned into an instrument of political retribution, the values that the Society holds dear and that the rule of law requires are placed in jeopardy: an impartial criminal justice system, free speech, due process, equal protection, and the ability to petition the government without fear of retaliation. The executive branch's apparent disregard for these values, and for the constitutional guarantees that enforce them, is what brings amicus curiae before this Court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The criminal indictment is, in theory, merely an accusation. In practice, it is among the most powerful instruments of coercion in the federal government's arsenal, as its consequences for individuals and organizations alike are often severe, irreversible, and wholly independent of whether the government ever obtains a conviction. Because that power is exercised largely through discretionary judgments shielded from meaningful scrutiny, a healthy democracy committed to the rule of law cannot leave it unchecked. Historically, those constraints have primarily come from the internal norms and policies of the Department of Justice ("DOJ" or "the Department"). Those safeguards, however, have been visibly and dramatically eroded during the second Trump administration, which has publicly directed DOJ to prosecute perceived adversaries, replaced career prosecutors who resisted with loyalists, and framed the resulting indictments as personal and political victories rather than the product of neutral law enforcement.

When the executive branch's internal checks fail, the courts can supply the missing restraints. The Fifth Amendment's Due Process Clause and the doctrines of vindictive and selective prosecution provide the tools. Courts need only apply the existing standards with clear eyes, informed by a complete understanding of the context in which the prosecution before it arose. Here, the indictment of the Southern Poverty Law Center ("SPLC") followed a path that has unfortunately become all too

familiar in this presidential administration: disparaging public statements by senior officials, dismissal or threatened dismissal of top DOJ officials who were not sufficiently aggressive in bringing charges, and the President's own public declarations that tie the prosecution to his political grievances. This Court should consider the full context in which this indictment arose and, at minimum, permit discovery into the government's charging decision or convene an evidentiary hearing at which the government is required to demonstrate that this prosecution is grounded in law and evidence rather than the political objectives that the public record reflects.

**ARGUMENT**

I.    **Prosecutorial power must be wielded responsibly to maintain a healthy democracy and a system governed by the rule of law.**

Prosecutors occupy a uniquely powerful position in our constitutional order. Vested with the authority of the sovereign, they can bring the full weight of the state to bear upon any individual or organization they choose to pursue. This power is among the most significant held by any government official, and the importance of wielding it responsibly cannot be overstated. As former Attorney General Robert Jackson put it: "The prosecutor has more control over life, liberty, and reputation than any other person in America. . . . While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base

motives, he is one of the worst."[1]

That power is as formidable as it is because the consequences of prosecution are wide-ranging and begin to materialize long before any finding of guilt. As the Department of Justice's own Manual acknowledges, "prosecution entails profound consequences for the accused . . . whether or not a conviction ultimately results."[2] The decision to investigate and charge can cost a defendant their livelihood, reputation, or liberty, and it is a decision largely shielded from meaningful scrutiny. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."). It is precisely that combination—sweeping consequences and near-unreviewable discretion—that makes the responsible exercise of prosecutorial power so critical.

This holds true regardless of whether the accused is an individual or organization. Prosecutors charging an organization can seek fines and financial penalties capable of crippling or outright destroying even the largest and most well-established institutions. And that devastation does not await a verdict. Mounting a

---

[1] Robert Jackson, U.S. Att'y Gen., Address to the Second Annual Conference of United States Attorneys:    *The    Federal    Prosecutor*    1    (Apr.    1,    1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

[2] U.S. Dep't of Just., Justice Manual § 9-27.001.

defense requires immediate expenditures for legal fees and compliance—costs that can rival the penalties sought in the indictment itself. Beyond those direct costs, the mere fact of an indictment can trigger reputational injury, management distraction, lost business or donations, terminated contracts, and frozen credit. Even where a prosecution ultimately fails, many of these losses are difficult or impossible to recover. For example, when the Supreme Court unanimously overturned the conviction of accounting firm Arthur Andersen for flawed jury instructions, it was "little more than a Pyrrhic victory for Andersen, which lost its clients after being indicted on obstruction of justice charges and ha[d] no chance of returning as a viable enterprise."[3] The power to charge is in itself a power to punish.

Such power carries "the potential for both individual and institutional abuse," *Bordenkircher*, 434 U.S. at 365, and the implications of that abuse extend far beyond those directly ensnared in its crosshairs. At its most basic level, the rule of law means that laws are enforced evenly, without fear or favor, and that not even those in power stand above them.[4] That principle breaks down when enforcement authority is wielded not to achieve justice, but to maintain political power, oppress dissent, or

---

[3] *See* Linda Greenhouse, *Justices Unanimously Overturn Conviction of Arthur Andersen*, N.Y. Times (May 31, 2005), https://www.nytimes.com/2005/05/31/business/justices-unanimously-overturn-conviction-of-arthur-andersen.html; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

[4] *See* Robert Stein, *What Exactly Is the Rule of Law?*, 57 Hous. L. Rev. 185, 188 (2019), https://http://scholarship.law.umn.edu/faculty_articles/698/; Brian Z. Tamanaha, *On the Rule of Law: History, Politics, Theory* 114-15 (Cambridge Univ. Press 2004)

target adversaries. Even a handful of publicized instances of the misuse of the justice erodes public trust in the system as a whole, seeding doubt about the fairness and impartiality of every prosecution and of the government itself.[5] Those who observe politically motivated prosecutions reasonably fear that they may be next and begin tailoring their conduct to avoid the government's political disfavor. Weaponized prosecutions therefore cast a long shadow by chilling advocacy, deterring dissent, and causing political opponents or those with disfavored views to self-censor rather than risk becoming the next target. When prosecution is deployed as an instrument of pressure and political strategy, our democracy suffers as a whole.

## II.   DOJ and its federal prosecutors have traditionally operated as a check on the abuse of prosecutorial power, but, unfortunately, we have seen an erosion of these protections.

The immense power that prosecutors wield has traditionally been constrained not only by the courts, but by the Department of Justice itself—through policies, norms, and a culture of impartiality. That internal check is failing.

---

[5] *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 811 (1987) ("[A]ppointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general . . . what is at stake is the public perception of the integrity of our criminal justice system."); *Allegations of Selective Prosecution: The Erosion of Public Confidence in Our Federal Justice System: Joint Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security and the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 110th Cong. (Oct. 23, 2007) (congressional recognition that selective prosecution directly erodes public confidence in the federal justice system as a whole).

### a. DOJ's policies are designed to ensure that criminal prosecutions are impartial and fundamentally fair.

Prosecutorial power, like all government power, must be exercised within principled limits. To that end, DOJ has established policies to ensure that prosecutors who exercise significant discretion and power do not act from "malice or other base motives"[6] or allow their decisions to be improperly influenced by political leaders. In these ways, DOJ and its federal prosecutors have themselves traditionally served as an important check on the abuse of prosecutorial power.

The Watergate scandal raised the specter that these values were not holding. In a speech to DOJ attorneys, Attorney General Griffin Bell acknowledged that "the partisan activities of some Attorneys General in this century, combined with the unfortunate legacy of Watergate, have given rise to an understandable public concern that some decisions at Justice may be the products of favor, or pressure, or politics" but insisted that it is DOJ's mission to "serve the Government as professionals, to exercise our independent judgment and to do our duty as we see it."[7] Watergate thus prompted the legal and political communities to reexamine the relationship between the White House and government lawyers. Ultimately,

---

[6] Robert Jackson, U.S. Att'y Gen., Address to the Second Annual Conference of United States Attorneys: *The Federal Prosecutor* 1 (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

[7] The Honorable Griffin B. Bell, U.S. Att'y Gen, Address before Department of Justice Lawyers 3 (Sept. 6, 1978), https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/09-06-1978b.pdf.

legislators preserved prosecutorial discretion and the Executive Branch's control over DOJ, choosing to rely primarily on professional norms and ethical obligations as the principal constraints on presidential influence.[8]

In the years that followed, DOJ developed and implemented a policy restricting communications with the White House, designed to avoid even the appearance of political influence over the Department's civil and criminal enforcement work. This White House Communications Policy imposes "procedural safeguards" that "are designed to protect our criminal and civil law enforcement decisions, and our legal judgments, from partisan or other inappropriate influences, whether real or perceived, direct or indirect."[9] The policy requires that initial communications between DOJ and the White House concerning pending or contemplated investigations or cases involve only the Attorney General, the Deputy Attorney General, and White House Counsel or Deputy Counsel, "[i]n order to insulate [prosecutorial decisions] from inappropriate influences."[10] Any further communications on the same matter may be conducted only by designated subordinates, who are required to monitor those communications and regularly

---

[8] *See* Bruce A. Green & Rebecca Roiphe, *Can the President Control the Department of Justice?*, 70 Ala. L. Rev. 1, 64 (2018).

[9] U.S. Dep't of Just., Justice Manual 1-8.600; Memorandum from the Att'y Gen. to All Department Personel Regarding DOJ Communications with the White House (Jul. 21, 2021), https://www.justice.gov/archives/ag/file/1160781-0/dl?inline= (White House Communications Policy).

[10] *Id*. at 1-2.

report them to their superiors.[11]

Additional internal checks are codified in the Justice Manual, which sets the policies and standards governing the Department's prosecutors. The Justice Manual articulates a statement of principles designed both to "ensur[e] the fair and effective exercise of prosecutorial discretion and responsibility by attorneys for the government" and to "promot[e] confidence on the part of the public and individual defendants that important prosecutorial decisions will be made rationally and objectively based on an individualized assessment of the facts and circumstances of each case."[12] To give those principles effect, the Justice Manual lays out specific policies that provide an internal check on vindictive and politically motivated prosecutions.

Chief among them is the prohibition on impermissible considerations. The Justice Manual provides that in determining whether to take any action—including commencing or recommending prosecution—a government attorney may not be influenced by: (1) "the person's race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs"; (2) "the attorney's own personal feelings concerning the person"; or (3) "the possible effect of the

---

[11] *Id.* at 2.

[12] U.S. Dep't of Justice, Justice Manual § 9-27.001.

11

decision on the attorney's own professional or personal circumstances."[13] As to political considerations specifically, the Manual provides that "federal prosecutors and agents may never make a decision regarding an investigation or prosecution, or select the timing or investigative steps or criminal charges, for the purpose of . . . giving an advantage or disadvantage to any candidate or political party."[14]

Career prosecutors themselves have also traditionally served as a check on prosecutorial abuse, including vindictive prosecution. The Justice Manual recognizes that "the success of that system must rely ultimately on the character, integrity, sensitivity, and competence of those men and women who are selected to represent the public interest in the federal criminal justice process."[15] That reliance has not been misplaced. Fair-mindedness, impartiality, and the pursuit of justice over the pursuit of a particular outcome are values deeply ingrained in the vast majority of DOJ's career prosecutors. Indeed, many of those who recently departed the Department cited those very values in their farewell messages, choosing to leave rather than compromise them.[16]

---

[13] U.S. Dep't of Justice, Justice Manual § 9-27.260.

[14] *Id.*

[15] U.S. Dep't of Just., Justice Manual § 9-27.001.

[16] *See* Justice Connection, Farewell Messages by Recent DOJ Alumni (last visited May 21, 2026), https://www.thejusticeconnection.org/farewell-messages/.

**b. Unfortunately, we have seen an erosion of DOJ's protections against politicized and vindictive prosecutions during this Administration, both generally and with respect to this case.**

Despite being articulated in the Justice Manual and well established among its attorneys, these principles are not self-enforcing. And they have been visibly and dramatically eroded during the second Trump administration.

At the beginning of President Trump's second administration, DOJ and the White House forced out dozens of career prosecutors, including attorneys who had worked on cases involving the President himself.[17] Many others departed of their own volition. For example, within just a few months of President Trump retaking office, approximately 70% of the attorneys in the Civil Rights Division had left the Department.[18] Many of those who resigned frequently did so while making their reasons plain. One group wrote: "There is no greater privilege than to work for an institution whose mandate is to do the right thing, the right way, for the right reasons. We will not abandon this principle to keep our jobs. We resign."[19] Another departing attorney observed that "any assistant U.S. attorney would know that our laws and

---

[17] Brajesh Upadhyay, *Trump Administration Fires Justice Department Lawyers Who Investigated Him*, BBC (Jan. 27, 2025), https://www.bbc.com/news/articles/cy48j7yxl08o.

[18] Sam Levine, *Justice Department Civil Rights Division Loses 70% of Lawyers Under Trump*, The Guardian (May 1, 2025), https://www.theguardian.com/us-news/2025/may/01/civil-rights-division-doj-trump.

[19] Resignation Letter of Assistant U.S. Attorneys Celia Cohen, Andrew Rohrbach & Derek Wikstrom (Apr. 22, 2025), *reprinted in* N.Y. Times (Apr. 22, 2025), https://www.nytimes.com/interactive/2025/04/22/nyregion/prosecutor-letter.html.

traditions do not allow using the prosecutorial power to influence other citizens, much less elected officials, in this way."[20] Others left because they understood that prosecutors "must use the authority we have carefully" and "must ensure the coercive power of the state that we exert is judiciously exercised, or we risk creating an even greater injustice."[21] The cumulative effect of these departures has been to significantly weaken the protections that come from having nonpartisan, experienced career attorneys make charging decisions based on the facts and the law.

One of the most dramatic illustrations of this deterioration came in the fall of 2025. President Trump had spent months publicly attacking and calling on DOJ to prosecute a set of perceived political enemies.[22] Then, in a Truth Social post, he demanded that then-Attorney General Bondi prosecute former FBI Director James Comey, New York Attorney General Letitia James, and U.S. Representative Adam Schiff, declaring "[t]hey're all guilty as hell" and "JUSTICE MUST BE SERVED,

---

[20] Resignation Letter of Assistant U.S. Attorney Hagan Scotten Feb. 2025, https://www.documentcloud.org/documents/25538561-hagan-scotten-resignation-letter/.

[21] Resignation Letter of Civil Rights Division Acting Deputy Assistant Attorney General Tim Mygatt (May 2025), https://www.thejusticeconnection.org/farewell-messages/.

[22] *See* Maggie Haberman, *Trump and Comey: An Escalating Conflict with No Off-Ramp*, N.Y. Times (Sept. 29, 2025), https://www.nytimes.com/2025/09/29/us/politics/trump-comey-escalating-conflict.html; Ivan Pereira, *Letitia James, Trump Feud Has Been Building Up Since 1st Administration*, ABC News (Oct. 9, 2025), https://abcnews.com/Politics/letitia-james-trump-feud-building-1st-administration/story?id=126381146; Andy Sullivan, *Trump Says Democratic Rival Schiff Should be 'Brought to Justice' for Alleged Fraud*, Reuters (July 15, 2025), https://www.reuters.com/world/us/trump-says-democratic-rival-schiff-should-be-brought-justice-alleged-fraud-2025-07-15/.

14

NOW!!!"[23] That post came just one day after career prosecutor Erik Siebert resigned as interim U.S. Attorney for the Eastern District of Virginia under intense pressure after his office had determined there was insufficient evidence to charge James and had raised concerns about charging Comey.[24] Siebert was quickly replaced by Lindsey Halligan, who had previously served as President Trump's personal attorney and had no prior prosecutorial experience and no demonstrated familiarity with DOJ's principles and practices. With Halligan installed, Comey was indicted within three days of her swearing-in;[25] James was charged two weeks later.[26]

---

[23] Dennis Romero, Trump *Publicly Pushes Attorney General Pam Bondi to Prosecute His Political Foes*, NBC News (Sept. 21, 2025), https://www.nbcnews.com/politics/trump-administration/trump-publicly-pushes-attorney-general-pam-bondi-go-political-foes-rcna232669.

[24] Glenn Thrush et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. Times (Sept. 19, 2025), https://www.nytimes.com/2025/09/19/us/politics/erik-siebert-comey-letitia-james.html; Katherine Faulders, Alexander Mallin & Peter Charalambous, *Prosecutors' Memo to New U.S. Attorney Found No Probable Cause to Charge James Comey: Sources*, ABC News (Sept. 25, 2025), https://abcnews.com/US/prosecutors-memo-new-us-attorney-recommended-plans-charge/story?id=125925246. In the same Truth Social post, President Trump claimed that he had in fact fired Siebert.

[25] Press Release, U.S. Att'y's Office, E.D. Va., *Federal Grand Jury Indicts Former FBI Director for False Statements and Obstruction in Congressional Testimony* (Sept. 25, 2025), https://www.justice.gov/usao-edva/pr/federal-grand-jury-indicts-former-fbi-director-false-statements-and-obstruction.

[26] Press Release, U.S. Att'y's Office, E.D. Va., *New York State Attorney General Indicted* (Oct. 9, 2025), https://www.justice.gov/usao-edva/pr/new-york-state-attorney-general-indicted. A federal judge subsequently dismissed both the Comey and James indictments, finding that Halligan had been unlawfully appointed and that "all actions flowing from [her] defective appointment . . . constitute unlawful exercises of executive power and must be set aside." Opinion and Order Granting Motion to Dismiss Indictment at 18, *United States v. James*, No. 2:25-cr-00122 (E.D. Va. Nov. 24, 2025), ECF 140; *see also* Kyle Cheney, Josh Gerstein & Hassan Ali Kanu, *Comey, James cases dismissed as judge disqualifies interim US attorney Lindsey Halligan*, Politico (Nov. 24, 2025), https://www.politico.com/news/2025/11/24/james-comey-letitia-james-cases-lindsey-halligan-00666896.

This sequence of events was inconsistent with established DOJ practices and policies, to put it mildly. For decades, administrations of both parties respected a firewall between the White House and the Department's prosecutorial decisions, and adhered to the Justice Manual's prohibition on political considerations in charging decisions. Here, by contrast, the President publicly directed the Attorney General to achieve a result aligned with his personal and political retributive aims. That conduct violates not only the Justice Manual but also the White House Communications Policy, which exists precisely to "protect our criminal and civil law enforcement decisions . . . from partisan or other inappropriate influences."[27] Under that policy, U.S. Attorneys like Siebert and Halligan—those with "primary responsibility to initiate and supervise law enforcement investigations and cases"—are to be "insulate[d] from inappropriate influences," meaning they are not to communicate with the White House about pending matters at all.[28] Yet given the circumstances of Siebert's departure and the President's public statements, Halligan cannot have assumed the U.S. Attorney position without a clear understanding of what she was expected to deliver. Her decision to bring charges was not only shaped by the President's improper motives but also directly served her own professional circumstances, which is itself a violation of the Justice Manual's express prohibition

---

[27] White House Communications Policy at 1.

[28] *Id.*

on allowing personal or professional self-interest to influence charging decisions.[29]

The indictment of the SPLC, unfortunately, raises similar concerns that DOJ's prosecutorial power is again being wielded for improper reasons and in service of unjust objectives. For decades, the SPLC has maintained a program through which confidential informants were paid to infiltrate white supremacist and extremist organizations. The government has long known about, and occasionally relied upon, information SPLC had gathered through their paid informant program.[30] The indictment now characterizes this same program as the basis for its wire fraud, bank fraud, and conspiracy to commit money laundering charges. These charges are, at minimum, difficult to reconcile with the government's own prior conduct and suggest that the about face may be motivated by the current Administration's disagreement with or distaste for the SPLC's mission or views.

The manner in which the prosecution was conducted also appears to have been unusual and rushed. Whistleblowers reported to the Committee on the Judiciary that a DOJ official "ordered the U.S. Attorney's Office for the Middle District of

---

[29] *See* U.S. Dep't of Just., Justice Manual § 9-27.260.

[30] *See* Alan Feuer, *F.B.I. Knew Civil Rights Group Informants Helped Bring Down Extremists, Lawyers Say*, N.Y. Times (Apr. 28, 2026), https://www.nytimes.com/2026/04/28/us/politics/fbi-southern-poverty-law-center-informants.html; *see also* Eric Tucker, *FBI Cuts Ties with Southern Poverty Law Center, Anti-Defamation League After Conservative Complaints*, Associated Press (Oct. 3, 2025), https://apnews.com/article/fbi-antisemitism-patel-comey-kirk-f997bd60b92a07023c00cfbf6c4ed7e6 ("The organizations over the years have provided research on hate crime and domestic extremism, law enforcement training and other services.").

Alabama to rush through the indictment of the SPLC despite serious concerns about the strength of the case."[31] According to SPLC's Motion to Dismiss, DOJ did not seek any documents from the SPLC until after advising defense counsel that the SPLC would be indicted within weeks, did not interview any current SPLC employees before the indictment, and informed defense counsel (who had reached out to schedule a meeting) that the decision to seek an indictment had already been made.[32] If accurate, this unusual process suggests that the prosecution was not the product of a careful examination of the evidence. Additionally, it appears that DOJ has added facts and corrected charging language in their original indictment by obtaining a superseding indictment, further supporting an inference that DOJ rushed to indict.[33]

The surrounding circumstances further compound the concern. The Trump

---

[31] Letter from Rep. Jamie Raskin, Ranking Member, H. Comm. on the Judiciary, & Rep. Mary Gay Scanlon, to Aakash Singh, Assoc. Deputy Att'y Gen., U.S. Dep't of Just. (Apr. 30, 2026), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-04-30-raskin-scanlon-to-singh-doj-re-splc-and-first-amendment.pdf ("The Committee on the Judiciary has received whistleblower reports that you ordered the U.S. Attorney's Office for the Middle District of Alabama to rush through the indictment of the SPLC despite serious concerns about the strength of the case").

[32] *See* Memorandum in Support of Motion to Dismiss the Indictment for Vindictive Prosecution at 3-4, *United States v. Southern Poverty Law Center, Inc.*, No. 2:26-cr-00139 (M.D. Ala. May 26, 2026), ECF No. 49-1.

[33] *See* Superseding Indictment, *United States v. Southern Poverty Law Center, Inc.*, No. 2:26-cr-00139 (M.D. Ala. June 2, 2026), ECF No. 51. It also appears that DOJ then shared an unsigned copy of the superseding indictment with the media before it was unsealed, making these additional allegations public before the defendant even had an opportunity to review them. *See* Sarah N. Lynch, *Justice Dept. Says It Has Obtained Superseding Indictment Against Southern Poverty Law Center With New Details on Donor Funds*, CBS News (June 2, 2026), https://www.cbsnews.com/news/southern-poverty-law-center-superseding-indictment/.

administration has consistently and publicly identified the SPLC as a "partisan" organization that espouses repugnant and dangerous political views. From the outset of this term, SPLC has publicly criticized many of this administration's policies and individuals associated or allied with President Trump. SPLC has, for example, expressed concern over the appointment of Pamela Bondi and Harmeet Dhillon to DOJ positions[34] and even created an "extremist file" on White Houes Deputy Chief of Staff Stephen Miller.[35] Indeed, SPLC has reported on many allies of the administration, including now-deceased Turning Point USA founder Charlie Kirk.[36] Notwithstanding the fact that SPLC quickly and unequivocally condemned Kirk's murder,[37] some of President Trump's political allies seized on his statement blaming

---

[34] Letter from LaShawn Warren, Chief Policy Officer, & Sakira Cook, Federal Policy Director, Southern Poverty Law Center, to Members of the United States Senate, *Vote No on the Confirmation of Harmeet Dhillon for Assistant Attorney General of Civil Rights* (Mar. 31, 2025), https://www.splcenter.org/wp-content/uploads/2025/03/letter-senate-oppose-confirmation-harmeet-dhillon.pdf; Letter from LaShawn Warren, Chief Policy Officer, & Sakira Cook, Federal Policy Director, Southern Poverty Law Center, to Members of the United States Senate, *Vote No on the Confirmation of Pamela Bondi as Attorney General* (Jan. 27, 2025), https://www.splcenter.org/resources/policies/letter-in-opposition-to-nomination-of-pam-bondi/.

[35] *Extremist Files: Stephen Miller*, Southern Poverty Law Center (last updated June 3, 2025), https://www.splcenter.org/resources/extremist-files/stephen-miller/.

[36] Rachael Fugardi, *Turning Point USA: A Case Study of the Hard Right in 2024*, Southern Poverty Law Center (May 22, 2025), https://www.splcenter.org/resources/reports/turning-point-usa-case-study-hard-right-2024/.

[37] Southern Poverty Law Center, Statement on the Assassination of Charlie Kirk, Facebook (Sept. 10, 2025), https://www.facebook.com/SPLCenter/posts/violence-is-never-the-answer-we-condemn-the-shooting-of-charlie-kirk-and-all-vio/1185914590230967/ ("Violence is never the answer. We condemn the shooting of Charlie Kirk and all violence in any form. Our history shows violence only fuels division — justice requires peace."); *see also* Southern Poverty Law Center (@splcenter), Instagram (Sept. 10, 2025), https://www.instagram.com/p/DObxkrkjexj/.

19

"Radical Left Terrorists"[38] for the killing to draw an explicit connection between SPLC's earlier criticism and this horrific act of political violence.[39]

Just fifteen days after the Kirk murder, President Trump directed DOJ to "coordinate and supervise a comprehensive national strategy to investigate, prosecute, and disrupt entities and individuals engaged in acts of political violence and intimidation designed to suppress lawful political activity or obstruct the rule of law," including those engaged in "money laundering by funding, creating, or supporting entities that engage in activities that support or encourage domestic terrorism."[40] Based on its timing and content, the SPLC indictment, which charges money laundering,[41] appears to be a direct response to that command.

In the more immediate aftermath of the Kirk murder, senior administration officials and congressional allies openly and repeatedly sought to to discredit and delegitimize SPLC. In October 2025, FBI Director Kash Patel officially severed all ties between the bureau and the SPLC, publicly denouncing the organization as a

---

[38] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 24, 2025), https://truthsocial.com/@realDonaldTrump/posts/115261106680507707.

[39] *See, e.g.,* Letter from Rep. Chip Roy et al. to Speaker Mike Johnson, Chairman Jim Jordan & Chairman James Comer (Sept. 11, 2025), https://roy.house.gov/sites/evo-subsites/roy.house.gov/files/evo-media-document/roy_select_committee_letter_v_9.15.25-v5.pdf.

[40] Memorandum on Countering Domestic Terrorism and Organized Political Violence §§ 2(a), (c)(ii), NSPM-7 (Sept. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

[41] Indictment at 11, *United States v. Southern Poverty Law Center, Inc*., No. 2:26-cr-00139-ECM-KFP (M.D. Ala. Apr. 21, 2026), ECF No. 1.

"partisan smear machine."[42] Patel's denunciation cited the administration's broader "anti-Christian bias" initiative,[43] which culminated in an April 2026 report that specifically cited the SPLC's role in providing information that the FBI used to investigate certain Catholic Americans.[44] Representative Jim Jordan, Chair of the House Judiciary Committee, separately sent a formal letter to Attorney General Bondi asking for an examination of "SPLC's influence over our nation's federal law enforcement during the Biden-Harris administration." His letter specifically alleged that DOJ had "colluded with the radical, left-wing Southern Poverty Law Center on matters relating to federal civil rights enforcement."[45] Though the FBI and Congress both have the authority to investigate alleged religious discrimination—and root it out where it exists—and examine an organization's influence on federal law enforcement, the politically charged language used by the FBI Director and the

---

[42] Jacob Wendler, *FBI Cuts Ties with Southern Poverty Law Center After MAGA Push*, Politico (Oct. 3, 2025), https://www.politico.com/news/2025/10/03/fbi-southern-poverty-law-center-cut-ties-00593416.

[43] *Id.*

[44] U.S. Dep't of Just., *Eradicating Anti-Christian Bias within the Federal Government* ii, 41 (April 30, 2026), https://www.justice.gov/opa/media/1438506/dl?inline. On February 5, 2025, Attorney General Bondi issued a memorandum establishing a DOJ "Weaponization Working Group" tasked with reviewing, among other topics, the January 2023 Richmond Memorandum—a reference to FBI relying on SPLC information, as detailed in the anti-Christian Bias report. *See* Memorandum from Att'y Gen. Pam Bondi to All Dep't Emps., *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline.

[45] Tyler O'Neil, *Just How Closely Did Biden's DOJ Rely on the SPLC? Jim Jordan Is on the Case*, Daily Signal (Nov. 25, 2025), https://www.dailysignal.com/2025/11/25/just-how-closely-did-bidens-doj-rely-on-the-splc-jim-jordan-is-on-the-case/.

21

President's political allies suggests that the resulting indictment was not a product of the neutral, evidence-driven deliberation that the Justice Manual requires.

The circumstances surrounding the indictment itself accentuate these concerns. In early April 2026, Attorney General Bondi was fired by President Trump, reportedly, in part, because he was frustrated by the pace at which she was securing indictments against his perceived political enemies.[46] Weeks later, the SPLC indictment was announced by her successor, Acting Attorney General Todd Blanche, while standing alongside FBI Director Patel,[47] who had previously publicly condemned the SPLC. President Trump also weighed in shortly after the indictment was issued, declaring on Truth Social that SPLC is "one of the greatest political scams in American History" and part of a "Democratic Hoax." He further connected the indictment to his longstanding claims about the 2020 presidential election, writing that "[i]f it is true, the 2020 Presidential Election should be permanently wiped from the books and be of no further force or effect!"[48] Days later, on 60

---

[46] *See* Susan Heavey et al., *Trump Has Discussed Firing Attorney General Bondi Media Reports Say,* Reuters (Apr. 2, 2026), https://www.reuters.com/world/trump-has-discussed-firing-attorney-general-bondi-media-reports-say-2026-04-02/ (citing four unnamed sources familiar with the discussions and reporting Trump's frustration included "what he sees as a lack of aggression in targeting his enemies").

[47] Press Release, U.S. Dep't of Just., Office of Pub. Affs., *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering* (Apr. 21, 2026), https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-poverty-law-center-wire-fraud-false-statements-and.

[48] Steve Benen, *Trump Says a Bit Too Much in His Weird Rant About the Southern Poverty Law Center*, MSNBC (Apr. 24, 2026), https://www.ms.now/rachel-maddow-

22

Minutes, President Trump proclaimed that SPLC funded the Charlottesville rally to "make [him] look bad" as part of the "rigging" of the 2020 election.[49] The President's own public statements make plain that he views this prosecution as retribution against a political and electoral adversary.

Whatever the ultimate merits of the underlying charges may prove to be, the full sequence of events—public denunciation by a high-ranking DOJ official, congressional pressure, dismissing the Attorney General for insufficient prosecutorial vigor, an indictment announced alongside the very official who had previously disparaged the the target, and the President's own celebratory framing of the charges in overtly political terms—presents precisely the kind of circumstantial record that courts have recognized as bearing the hallmarks of a prosecution whose neutrality cannot be assumed.

### III.    As DOJ's ability and inclination to act as a check on prosecutorial abuses is eroding, the courts must step forward.

Thankfully, the constitutional protections against politically motivated prosecution do not depend solely on the good faith of any particular prosecutor or administration. They are enforced, ultimately, by the courts. This has always been true, but the significance of judicial oversight is thrown into sharp relief when the

---

show/maddowblog/trump-says-a-bit-too-much-in-his-weird-rant-about-the-southern-poverty-law-center.

[49] 60 Minutes, *Extended Interview: President Trump on White House Correspondents' Dinner,* at 23:50 (CBS News Apr. 26, 2026), https://www.youtube.com/watch?v=zj6Hwb3XrWc.

executive branch's own internal safeguards are failing. *See* The Federalist No. 78 (Alexander Hamilton) ("[T]he independence of the judges may be an essential safeguard against the effects of occasional ill humors in the society"). The present moment demands that courts take seriously their independent constitutional role in scrutinizing prosecutions that bear the hallmarks of political motivation.

To be sure, prosecutors have broad discretion to enforce the law, and their decisions are presumed proper absent clear evidence to the contrary. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). But "[a]lthough prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (internal quotations omitted); *see also Bordenkircher,* 434 U.S. at 365 ("broad though that [prosecutorial] discretion may be, there are undoubtedly constitutional limits upon its exercise").

The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." Courts enforce this guarantee, in part, through the related doctrines of vindictive and selective prosecution. The vindictive prosecution doctrine reflects the courts' longstanding recognition that it is an "improper penalty" for a prosecutor's charging decision to "result[] from the defendant's exercise of a protected legal right, as opposed to the prosecutor's normal assessment of the social interests to be vindicated by the prosecution[.]" *United States v. Taylor*, 749 F.2d 1511, 1514 (11th Cir. 1985) (per

24

curiam) (internal quotations omitted). The selective prosecution doctrine provides a parallel protection, prohibiting the government from making charging decisions based on "an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Wayte*, 470 U.S. at 608 (internal citations and quotations omitted).

The Eleventh Circuit has recognized both doctrines. A vindictive prosecution claim may be established by demonstrating circumstances that create "a presumption of vindictiveness," at which point the burden shifts to the prosecution to rebut the presumption. *United States v. Jones*, 601 F.3d 1247, 1260 (11th Cir. 2010). Alternatively, a defendant may come forward with evidence of "actual vindictiveness." *United States v. Barner*, 441 F.3d 1310, 1317 (11th Cir. 2006). A selective prosecution claim requires the defendant to produce "some evidence tending to show the existence of the essential elements of a selective prosecution claim—discriminatory effect and discriminatory purpose." *United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021) (internal quotations omitted). These doctrines typically arise in the case law under somewhat different factual circumstances than those presented here. Vindictive prosecution claims most commonly arise when a defendant asks a court to infer vindictiveness from heightened charges or a harsher sentence imposed after the defendant exercised a constitutionally protected right, such as the right to trial or appeal. *See, e.g., Jones*, 601 F.3d at 1261. Selective

25

prosecution claims typically turn on a showing that the defendant was singled out for prosecution while others in similar circumstances were not. *See, e.g., Armstrong*, 517 U.S. at 465.

At their core, however, both doctrines rest on a simple proposition: the government may not use the criminal justice system to arbitrarily target individuals and organizations because of their legally and constitutionally protected conduct; and a defendant who is charged because of who they are or what they believe has been denied due process. These principles establish a constitutional floor beneath prosecutorial conduct that the courts are charged with enforcing. Despite their atypical presentation here, the politically motivated prosecutions that have characterized the current administration fit comfortably within the standards the courts have articulated. It is a violation of due process to prosecute a person or organization in retaliation for doing something "the law plainly allows," *Bordenkircher*, 434 U.S. at 363, such as the First Amendment right to hold and express politically disfavored views or criticize the government and its allies. It likewise violates due process to single out a person or organization because of their exercise of constitutional rights. The doctrines extend, as they must, beyond their most common applications to reach abuses of prosecutorial power stemming from the highest levels of government.

A recent decision concerning this administration's actions is instructive. In

26

*United States v. Abrego Garcia*, the court applied the standard vindictive prosecution test and concluded that "the totality of events creates a sufficient evidentiary basis to conclude that there is a 'realistic likelihood of vindictiveness'" and that this finding entitled the defendant to discovery and an evidentiary hearing on the issue. 802 F. Supp. 3d 1055, 1057-58 (M.D. Tenn. 2025). The court reached that conclusion after considering the timing of the charges and public statements by senior administration officials. As the court observed, "[a]s a representative of the state, a prosecutor's exercise of coercive power must be impartial . . . [in] that prosecutorial power may not be exercised vindictively — meaning that the prosecutor may not punish a defendant for exercising a protected statutory or constitutional right." *Id*. at 1057 (quoting *United States v. Zakhari*, 85 F.4th 367, 384-85 (6th Cir. 2023) (Kethledge, J., concurring)). Following an evidentiary hearing and additional briefing, the court concluded that the "evidence before [it] sadly reflects an abuse of prosecuting power." *United States v. Abrego Garcia*, No. 3:25-cr-00115, 2026 WL 1454303, at *12 (M.D. Tenn. May 22, 2026). Because DOJ failed to rebut the presumption of vindictiveness, the court granted Abrego Garcia's motion to dismiss. *Id.* at *3.

The SPLC indictment presents a record that warrants similar serious judicial scrutiny. Long before charges were filed, senior administration officials had publicly and repeatedly singled out SPLC as an organization whose work and mission they

27

viewed as dangerous, partisan, and deserving of government scrutiny. The Attorney General was dismissed, reportedly because the pace of indictments against the President's perceived enemies was insufficient. Her successor announced the charges alongside the official who has publicly disparaged SPLC. The President then declared on Truth Social that the prosecution vindicates his longstanding political grievances. Each of these facts, standing alone, might be explained away. Taken together, they present precisely the kind of circumstantial record that courts have recognized as sufficient to shift the burden to the government. Consistent with the approach taken in *Abrego Garcia*, this Court should consider the full context in which this indictment arose and, at minimum, permit discovery into the government's charging decision or convene an evidentiary hearing at which the government is required to demonstrate that this prosecution is grounded in the law and the evidence.

## CONCLUSION

Amici respectfully request that the Court consider the context in which this prosecution was initiated and the danger to the rule of law it poses and order discovery or an evidentiary hearing on the issue.

**Dated: June 26, 2026**                    Respectfully submitted,

                                            *s/ Robert E. Battle*
                                            Robert E. Battle (ASB-7807-T67R)
                                            Adam P. Plant (ASB 6324-A64P)
                                            Mallory Morgan Combest (ASB-7455-
                                            A57C)

                                            ***Attorneys for Amicus Curiae***
                                            ***Society for the Rule of Law***

<u>**OF COUNSEL:**</u>

Samantha Trepel                             Robert E. Battle (ASB-7807-T67R)
Kelsey Stimple                              Adam P. Plant (ASB 6324-A64P)
Christine P. Sun                            Mallory Morgan Combest (ASB-7455-
**STATES UNITED DEMOCRACY CENTER**          A57C)
1101 17th St. NW, Suite 250                 **BATTLE & WINN LLP**
Washington, DC 20036                        2901 Second Avenue South, Suite 220
Telephone: (202) 999-9305                   Birmingham, Alabama 35233
Email: *sam@statesunited.org*               Telephone: (205) 397-8160
       *kelsey@statesunited.org*            Facsimile: (205) 397-8179
       *christine@statesunited.org*         Email: *rbattle@battlewinn.com*
                                                   *aplant@battlewinn.com*
                                                   *mmorgan@battlewinn.com*

## CERTIFICATE OF SERVICE

On June 26, 2026, I electronically filed this document with the Clerk of the Court using the CM/ECF system which will notify the following parties and counsel of its filing:

Kevin P Davidson
Joel Feil
Russell Turner Duraski
**United States Attorney's Office**
131 Clayton Street
Montgomery, AL 36104
*kevin.p.davidson@usdoj.gov*
*joel.feil4@usdoj.gov*
*russell.duraski@usdoj.gov*

***Attorneys for the United States of America***

Abbe David Lowell
David A. Kolansky
IsabellaM. Oishi
**Lowell  Associates, PLLC**
1250 H Street NW, Suite 250
Washington, DC 20005
*alowellpublicoutreach@lowellandass ociates.com*
*dkolansky@lowellandassociates.com*
*ioishi@lowellandassociates.com*

William C. Athanas
Brianna R. Stone
**Bradley Arant Boult Cummings LLP**
1819 Fifth Avenue North
Birmingham, Alabama 35203
*bathanas@bradley.com*
*bstone@bradley.com*

Addy R. Schmitt
Andrea L. Moseley
Sara E. Kropf
Janelle Geddes
**Kropf Moseley Schmitt PLLC**
1100 H Street NW, Suite 1220
Washington, DC 20005
*addy@kmlawfirm.com*
*andrea@kmlawfirm.com*
*sara@kmlawfirm.com*
*janelle@kmlawfirm.com*

***Attorneys for Defendant Southern Poverty Law Center, Inc.***

Jeffery Clyde Duffey
**Law Office of Jeffery C. Duffey**
505 South Perry Street
Montgomery, AL 36104
334-834-4100
*jefferyduffey@gmail.com*

***Attorney for Amicus Curiae Protect Democracy Project***

*/s Robert E. Battle*
OF COUNSEL

30