IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA ) 
 )
    v. )     CASE NO. 2:26-cr-139-ECM
 )     [WO]
SOUTHERN POVERTY LAW CENTER, )
INC. )
 )

**MEMORANDUM OPINION and ORDER**

This dispute concerns the Government's—specifically, the United States Attorney for the Middle District of Alabama's—decision to indict the Southern Poverty Law Center. The parties present diametrically opposed accounts of that decision. The SPLC contends that it is being vindictively prosecuted at the behest of various political actors—including the President of the United States—for engaging in speech protected under the First Amendment. (*See* doc. 49-1 at 6, 26–38). To remedy this alleged constitutional wrong, the SPLC moves for dismissal of the indictment or, in the alternative, discovery into the Government's prosecutorial motives. *(Id.* at 38–44). The Government opposes the SPLC's motion in its entirety, asserting that "this indictment was secured based on the law and the facts uncovered during a federal investigation." (Doc. 68 at 2). The parties' briefing is, like much of our modern political discourse, heavy on heated rhetoric, better suited for cable news, or a podcast. It emphasizes noise over substance.

After filtering out the noise, the Court is left to decide only whether the Government's decision to prosecute the SPLC was constitutionally impermissible. On this record, the SPLC is not entitled to discovery or dismissal of the indictment. The SPLC has

failed to offer some evidence tending to show animus on the part of the prosecutors involved in bringing this case and that such animus resulted in the prosecution, the showing required for discovery. Because it cannot satisfy that standard, it necessarily fails to satisfy the higher standard that would entitle it to dismissal of the indictment. Accordingly, the SPLC's motion is due to be denied.

## I. BACKGROUND

The Court begins by briefly summarizing the superseding indictment and this case's procedural history. The Court then recites the facts necessary to resolve the SPLC's motion.

## A.    Procedural Background

In 1971, two lawyers founded the SPLC as a nonprofit organization dedicated "to ensur[ing] the promise of the Civil Rights Movement became a reality for all." *Our History*, THE S. POVERTY L. CTR., https://www.splcenter.org/about/our-history/ (last accessed Aug. 7, 2026). According to the SPLC, part of its mission is to "track[] and expose[] the existence and activities of hate groups and other domestic extremists." (Doc. 49-1 at 11). In pursuit of these "hate groups," "the SPLC used paid consultants to infiltrate and inform on various white supremacist and other extremist groups." (*Id.* at 12). The Government contends that this "informant program" forms the basis of the SPLC's criminal liability.[1] (Doc. 51 at 3–4, paras. 10–14 (superseding indictment); *see* doc. 68 at 19).

---

[1] The SPLC also publishes the "Hate Map," which documents purported "hate and antigovernment extremist groups across the United States." (Doc. 49-1 at 11). "The SPLC includes a group on the Hate Map if" the organization finds it "'vilif[ies] others because of their race, religion, ethnicity, sexual orientation[,] or gender identity.'" (Doc. 74 at 8–9 n.6 (first alteration in original) (quotation omitted)).

On April 21, 2026, the Government unsealed an eleven-count indictment against the SPLC, charging it with six counts of wire fraud, four counts of false statements to a federally insured bank, and one count of conspiracy to commit concealment money laundering. (Doc. 1 at 6–12, paras. 13–40).  The superseding indictment, unsealed on June 2, 2026, charges the SPLC with the same eleven counts. (Doc. 51 at 13–19, paras. 19–43).

On May 26, 2026, the SPLC moved to dismiss the indictment for vindictive prosecution or, in the alternative, for further discovery and an evidentiary hearing.[2] (Doc. 49 at 2).  According to the SPLC, President Donald J. Trump's administration has launched an all-out assault "on civil rights groups in general" and the SPLC faces charges solely because it "exercis[ed] its First Amendment right to identify, report on, and criticize extremist hate groups." (Doc. 49-1 at 6, 8).  The SPLC submits that in this case the Government started with a target—the SPLC—and looked for some crime, any crime, to pin on it. (*See id.* at 9).

**B.    Factual Background**

Below, the Court outlines the factual background relevant to the SPLC's claim—from the Government's original investigation into the SPLC, to various pre-indictment actions and statements, and then, finally, to what the SPLC terms a "post-indictment media blitz." (*Id.*).

---

[2] The SPLC represented at a hearing on a separate matter that, although its motion technically seeks dismissal of the original indictment, its arguments apply with full force to the superseding indictment. (*See* doc. 76 at 2).  The Government agreed. (*Id.*).  Accordingly, the Court construes the motion to dismiss the indictment as addressing the superseding indictment. (*See* doc. 51).

### 1.    2019 Investigation

During President Trump's first term, the Internal Revenue Service's Criminal Investigation arm (the "IRS-CI") examined the "SPLC's informant program," which "used paid consultants to infiltrate and inform on various white supremacist and other extremist groups." (Doc. 74 at 5; doc. 49-1 at 12).  The instant indictment was spun off from this older investigation, when prosecutors working alongside the Federal Bureau of Investigation and the IRS-CI interviewed a few individuals associated with the SPLC "and subpoenaed documents from the SPLC's banks."[3] (Doc. 49-1 at 13).

That investigation "look[ed] at any possible tax fraud or issues arising from [the SPLC's] use of bank accounts to pay its informants." (Doc. 74 at 5).  It also involved the SPLC's informant program—the same program at the center of the superseding indictment. (*See* doc. 51 at 3–5, paras. 10–14; doc. 49-1 at 13; *see also* doc. 74 at 5).  That initial probe "was closed without charges" under President Joseph R. Biden's administration. (Doc. 49-1 at 8 & n.6, 13).  The SPLC suggests that, after sitting dormant for several years, the investigation into it "was suddenly reopened during the Trump [a]dministration at least as early as September 2025." (Doc. 74 at 5).

The Government does not deny that the SPLC was previously investigated. (*See* doc. 68 at 17).  Acting Attorney General Todd Blanche explained that "[t]here was a time that [the investigation] was shut down for a while during [President Biden's]

---

[3] Although the parties are unsure whether this earlier investigation began in 2019 or 2020, they agree that it began during President Trump's first term. (Doc. 74 at 5; doc. 68 at 17).  Because the exact date does not impact the Court's analysis, and to avoid unnecessary clunkiness, the Court assumes that the investigation began in 2019.

administration.  I don't know why.  And it was started again over the past year or so, and that brings us to today." THE JUST. DEP'T, *Acting AG Blanche, FBI Director Patel Announce Charges Against Southern Poverty Law Center*, at 15:00 (YouTube, Apr. 22, 2026),  https://www.youtube.com/watch?v=bViWBct5FzI  [hereinafter *Charges Against SPLC*].  Mr. Blanche later reiterated that "this investigation was open during the Biden administration and then mysteriously closed.  I really don't have any information about why it was closed." Video posted by U.S. Dep't of Just. (@TheJusticeDept), X, *Acting Attorney General Todd Blanche joined @IngrahamAngle to discuss the Southern Poverty Law Center Indictment*, at 0:08 (Apr. 22, 2026, 19:10 CT), https://x.com/TheJusticeDept/status/2046743411403681994 [hereinafter *Mr. Blanche Discusses Indictment*].

From this sequence of events, the SPLC infers animosity:

> [A]fter some investigative activity in 2019 or 2020, the Biden administration reviewed the activities of the SPLC's field program, and despite the acquisition of financial records, interviews of those involved, and even a review by [the] DOJ and the IRS, no charges were brought. Then, as part of President Trump's specific targeting of civil rights groups and his . . . officials' particular focus on the SPLC, a dormant or closed investigation was revived, and the charges were filed.

(Doc. 49-1 at 36).  The SPLC claims that it was targeted specifically because it "continued to publicly criticize and challenge many of the [a]dministration's policies" by, for example, "expressing concern about [then-Attorney General Pamela] Bondi's record on civil rights" and "condemning President Trump's pardon of the January 6th participants." (*Id.* at 16; *see id.* at 16–17 (listing nine more examples)).

## 2.    Pre-Indictment Events

The SPLC contends that several pre-indictment statements made by high-ranking government officials evince vindictiveness.  It points to statements made by President Trump generally criticizing the political "left."  For example, before the indictment issued, he denounced "radical left maniacs who fund, organize, fuel[,] and perpetrate political violence." (*Id.* at 18 (quotation omitted)).  President Trump further claimed that the political left comprises "bad people," "people that want to destroy our country." (Doc. 49-23 at 3).

The SPLC also cites various legislators' statements.  Specifically, it contends that Senators Chuck Grassley and James Lankford and Representatives Jim Jordan and Chip Roy publicly criticized the SPLC. (Doc. 49-1 at 14, 18; *see* docs. 49-5, 49-20).  According to the SPLC, Senators Grassley and Jordan also "began to pressure the FBI to target the SPLC" before President Trump returned to office in 2024. (Doc. 49-1 at 14).  And those Senators contacted the FBI to "express deep concern that the FBI continues to use the [SPLC] as a source for investigative reports and activities, despite its clear bias." (Doc. 49-5 at 2; *see* doc. 49-1 at 14).

The tension the SPLC perceives between itself and the administration appears to have ramped up in late 2025 after the assassination of Charlie Kirk.[4]  After Mr. Kirk's shooting, President Trump issued a memorandum on "Countering Domestic Terrorism and

---

[4] In 2025, Mr. Roy campaigned for a "committee to be formed to investigate the money, influence, and power behind the radical left's assault on America." (Doc. 49-1 at 18 (quoting doc. 49-20 at 2)).  He specifically noted that the SPLC had placed "Charlie [Kirk] . . . on the SPLC's notorious 'Hate Map'" just a few months before he was murdered. (*Id.* (quoting doc. 49-20 at 2)).

Organized Political Violence," in which he directed the "National Joint Terrorism Task Force and its local offices" to investigate, among other things, "institutional . . . funders . . . that are responsible for, sponsor, or otherwise aid and abet" "individuals engaged in acts of political violence and intimidation." National Security Presidential Memorandum on Countering Domestic Terrorism and Organized Political Violence, 90 Fed. Reg. 47225, 47225–26 (Sep. 25, 2025); (*see* doc. 49-22).  "This directive," according to the SPLC, "was plainly focused on attacking civil rights organizations who engaged in political speech with which President Trump disagrees." (Doc. 49-1 at 19).  The SPLC responded by signing an "Open Letter Rejecting Presidential Attacks on Nonprofit Organizations," which stated that "[n]o president—Democrat or Republican—should have the power to punish nonprofit organizations simply because he disagrees with them." (Doc. 49-24 at 2, 73).

Shortly thereafter, FBI Director Kash Patel reported on social media that the FBI would be cutting "all ties with the SPLC," which he labeled "a partisan smear machine," stating that his FBI would no longer rely on "politicized or agenda-driven intelligence from outside groups—and certainly not from the SPLC." (Doc. 49-1 at 21 (quoting FBI Director Kash Patel (@FBIDirectorKash), X (Oct. 3, 2025, at 08:57 CT), https://x.com/FBIDirectorKash/status/1974111445488185774)).  Mr. Patel justified his decision to end the FBI's relationship with the SPLC based on the Hate Map, which he claimed had "been used to defame mainstream Americans and even inspired violence." (*Id.*).

A few weeks later, internal FBI records show that a separate formal investigation was opened into the SPLC.  The "Incident Summary" report attached to that investigation primarily focuses on the Hate Map, noting that "[m]any of the entities on the [H]ate [M]ap are placed there as a smear tactic solely because they disagree with the ideology of the SPLC." (Doc. 74-1 at 2).

According to the SPLC, this report was generated in direct response to criticism of the Hate Map.  In August 2025, groups that had been placed on the Hate Map, including conservative organizations like Liberty Counsel and Turning Point USA, penned a letter to Stephen Miller, President Trump's Deputy Chief of Staff, complaining about the designations. (Doc. 74-2 at 2).  They criticized the SPLC as "biased, politicized, and unmoored from its original mission." (*Id.*); *see FBI Severs Ties With the Southern Poverty Law Center*, LIBERTY COUNS. (Oct. 6, 2025), https*://lc.org/newsroom/details/100625-fbi-severs-ties-with-the-southern-poverty-law-center*.  The groups did not seek an indictment against the SPLC; rather, they requested an executive order to (1) "remove any past use of SPLC data from all Federal agenc[ies'] websites, documents, and work product"; (2) "prohibit any future use of any SPLC data on Federal agenc[ies'] websites"; and (3) block "federal funds from going to government contractors who use the SPLC's work product." (Doc. 74-2 at 4).

On September 26, 2025, a Liberty Counsel employee spoke with an FBI agent and apparently discussed Liberty Counsel's grievances with the SPLC. (Doc. 95-3 at 1).  The employee memorialized the conversation in an email sent later that same day, in which the employee said he would "have [his] team look for materials that might support [the]

investigation on the issues [he and the FBI agent] discussed." (*Id.*).  He also attached the "recent coalition letter" and offered to "be in touch with any additional materials that [Liberty Counsel] find[s] relevant to [the] investigation." (*Id.*).  The FBI subsequently opened a case file "[t]o determine if a federal crime has been or is being committed" by the SPLC. (Doc. 74-1 at 2).  That case file included the incident report at issue here.

That report explored the potential consequences of being placed on the Hate Map, concluding with what appears to be an assertion that the publication is itself a "[s]cheme to [d]efraud." (*Id.* at 3–4).

> The SPLC uses the [H]ate [M]ap as a key component for it[]s overall fundraising strategy. The [H]ate [M]ap capitalizes on fears, and the SPLC creates a sense of urgency to give based in part o[n] fraudulent representations as outlined herein. The SPLC uses the [H]ate [M]ap as a scheme to defraud by making false representations which are transmitted in interstate commerce through their website. The fraudulent representations entice donors all the while making the SPLC wealthy to the violent and financial detriment of those wrongfully designated. Simply stated, the SPLC makes fraudulent statements specifically targeting a victim entity for the purpose of causing financial harm and ultimately destroying that entity . . . .

(*Id.* at 4).  At the bottom of the report is a notation that on October 10, 2025, the FBI "obtained concurrence from Acting United States Attorney for [the] Middle District [of Alabama], Kevin Davidson, to open this matter"—but the report also notes that the investigation was then closed on October 24, 2025, "[w]ithout [s]ubmission."[5] (Doc. 74-1

---

[5] Mr. Davidson is no longer the Acting United States Attorney for the Middle District of Alabama.  On May 29, 2026, Thomas R. Govan, Jr. was sworn in as the United States Attorney for the Middle District of Alabama. Press Release, U.S. ATT'Y'S OFF., MIDDLE DIST. OF ALA., Career Prosecutor Thomas R. Govan, Jr. Sworn in as United States Attorney for the Middle District of Alabama (May 29, 2026),

at 4–5).  Nevertheless, the SPLC speculates that this report metastasized into the criminal case against it.

> At some unknown point in or after October 2025, an unknown person within the [DOJ] must have realized that an investigation into the Hate Map as a "scheme to defraud" conservative groups is entirely violative of the First Amendment. Rather than dropping the facially flawed investigation, however, someone in the [DOJ] decided to cloak this improper investigation under the guise of donor fraud. The SPLC does not know who made that decision or how it was communicated. What is clear, though, is that the SPLC was indicted a few months later and the superseding indictment includes allegations that the SPLC designated "hate groups" on its Hate Map, consistent with [the] DOJ's early investigative conclusion.

(Doc. 74 at 9 (citing doc. 51 at 2, paras. 4–5)).  If nothing else, the Court can agree with at least one of those propositions:  the SPLC was indicted a few months later. (Doc. 1).

### 3.    "Post-Indictment Media Blitz"

After the indictment was unsealed, President Trump and other high-ranking DOJ and FBI officials spoke at press conferences and televised interviews as part of a so-called "post-indictment media blitz." (Doc. 49-1 at 9).  Mr. Blanche and Mr. Patel held a press conference to announce the charges in which Mr. Blanche stated that the SPLC "pa[id] sources to stoke racial hatred" and "manufactur[ed] the extremism it purports to oppose." (Doc. 49-1 at 22) (alterations in original); *see Charges Against SPLC*, *supra* page 5 at 0:52. The SPLC further claims that Mr. Blanche made false statements about it during an interview with Fox News. (Doc. 49-1 at 23); *see Mr. Blanche Discusses Indictment*, *supra*

---

https://www.justice.gov/usao-mdal/pr/career-prosecutor-thomas-r-govan-jr-sworn-united-states-attorney-middle-district.  Mr. Davidson remains an attorney of record in this case.

page 5 at 1:05.  It also cites statements made by another high-ranking DOJ official—the Assistant Attorney General for Civil Rights, Harmeet Dhillon—in which, according to the SPLC, Ms. Dhillon "said that if the SPLC criticized one of [her] 'friends,' criminal charges were the appropriate response." (Doc. 49-1 at 26).

Five days after the SPLC was indicted, President Trump sat for a *60 Minutes* interview, during which he referred to the SPLC as "a total scam run by the democrats." *(Id.* at 25); *see* 60 MINUTES, *Extended interview: President Trump on White House Correspondents' Dinner*, at 23:45 (YouTube, Apr. 26, 2026), https://www.youtube.com/watch?v=zj6Hwb3XrWc.  In the same vein, the SPLC highlights one of President Trump's social media posts. (Doc. 49-1 at 24) (quoting Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Apr. 24, 2026, at 00:13 CT), https://truthsocial.com/@realDonaldTrump/posts/116457972455781406 ("The [SPLC], one of the greatest political scams in American History, has been charged with FRAUD. . . . If it is true, the 2020 Presidential Election should be permanently wiped from the books and be of no further force or effect!"))).

In short, the SPLC points to a flurry of activity surrounding its indictment— including congressional letters, an FBI report, and President Trump's stated distaste—as evidence of vindictiveness.

## II.  LEGAL STANDARDS

While prosecutors enjoy broad discretion in deciding whether to bring charges, *see United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006), the Government cannot punish someone simply for exercising his rights, *see United States v. Goodwin*, 457 U.S.

368, 372 (1982) ("To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978))). That is to say, the Government cannot punish someone out of "vindictiveness." *Barner*, 441 F.3d at 1315 ("Vindictiveness in this context means the desire to punish a person for exercising his rights."). Accordingly, a criminal defendant can seek to dismiss the indictment against him on the basis that his prosecution is vindictive. FED. R. CRIM. P. 12(b)(3)(A)(iv); *see United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) ("Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States.").

There are two ways that a defendant can succeed on a vindictive prosecution claim. He can show actual vindictiveness, "prov[ing] objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." *Goodwin*, 457 U.S. at 384; *accord United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987).[6] "This showing is, of course, exceedingly difficult to make." *Meyer*, 810 F.2d at 1245. To meet this high bar, "a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001) (citing *Goodwin*, 457 U.S. at 380 n.12); *accord Barner*, 441 F.3d at 1322.

---

[6] Here and elsewhere the Court cites nonbinding authority. While these cases are not precedential, the Court finds them persuasive.

12

Alternatively, a defendant may rely on a presumption of vindictiveness, but "only in cases in which a reasonable likelihood of vindictiveness exists." *Goodwin*, 457 U.S. at 373; *see United States v. Carey*, 816 F. Supp. 3d 129, 141 (D.D.C. Jan. 20, 2026) ("[I]f [a defendant] shows that his case fits a general fact pattern in which there is a 'realistic likelihood' of vindictiveness, then he creates a presumption that his prosecution was vindictive." (quoting *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017))).

If a defendant cannot satisfy either of these standards, he may nevertheless obtain discovery in support of his claim if he comes forward with "some evidence tending to show the existence of the essential elements of the defense." *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (quoting *United States v. Armstrong*, 517 U.S. 456, 468 (1996)). In the First Amendment context, a defendant "must offer some evidence tending to show that he would not have been prosecuted but for his protected speech." *Carey*, 816 F. Supp. 3d at 144. However, even this standard "is a 'rigorous' one." *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (quoting *Armstrong*, 517 U.S. at 468). "To obtain discovery, [a defendant] must do more than simply 'identify a potential motive for prosecutorial animus.'" *United States v. Bucci*, 582 F.3d 108, 114 (1st Cir. 2009) (quoting *Sanders*, 211 F.3d at 718). "He must connect any vindictive animus to those making the challenged charging decisions in his case." *Id.* (citing *United States v. Goulding*, 26 F.3d 656, 662 (7th Cir. 1994)). And "to obtain an evidentiary hearing . . . , 'the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a

13

prosecution.'" *Jordan*, 635 F.3d at 1188 (quoting *United States v. Silien*, 825 F.2d 320, 322 (11th Cir. 1987) (per curiam)).[7]

### III. DISCUSSION

The Court's discussion proceeds in three parts. First, the Court outlines certain background principles that guide its analysis. Second, the Court addresses two threshold issues concerning the SPLC's vindictive prosecution claim: (1) whether the SPLC's protected speech qualifies as a legal right that can form the basis of a vindicative prosecution claim and (2) whether the SPLC is entitled to a presumption of prosecutorial vindictiveness. Third, and finally, the Court examines the SPLC's evidence of vindictiveness. After a thorough review of the record, the Court concludes that this is not one of those rare cases in which discovery is warranted—let alone dismissal of the indictment. Accordingly, the Court denies the SPLC's motion.

### A.    Constitutional Principles

The Constitution vests "[t]he executive Power . . . in a President of the United States of America," U.S. CONST. art. II, § 1, and charges him to "take Care that the Laws be faithfully executed," *id.* § 3. "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 679 (2023) (citations omitted); *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982)

---

[7] The Eleventh Circuit has not determined whether these discovery standards, which are largely lifted from the selective prosecution context, apply to vindictive prosecution claims. *See Armstrong*, 517 U.S. at 468–69. Other circuits that have considered the issue have found these standards applicable to vindictive prosecution claims, *Bucci*, 582 F.3d at 113; *Sanders*, 211 F.3d at 717; *Wilson*, 262 F.3d at 315–16; *United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir. 1989); *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990); *United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990), and this Court does, too.

(explaining "[t]he President" is "entrusted with supervisory and policy responsibilities of utmost discretion and secrecy," including "the enforcement of federal law"); *see also The Confiscation Cases*, 74 U.S. 454, 457 (1868) ("Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney.").

Federal prosecutors occupy a unique place in our criminal justice system. *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty."). They are armed with "broad discretion" to investigate and enforce the nation's criminal laws. *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *Goodwin*, 457 U.S. at 380 n.11). History confirms that prosecutors are entitled to a "presumption of regularity," meaning that, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). Thus, in the mine-run case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher,* 434 U.S. at 364.

But although federal prosecutors are given wide latitude to carry out their duties, a prosecutor's discretion remains "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). Prosecutors must ensure that individuals are "penalized for violating the law," not "for exercising a protected statutory or constitutional right." *Goodwin*, 457 U.S. at 372. "[I]n the rare situation in which the decision to prosecute

15

is so abusive of this discretion as to encroach on constitutionally protected rights, the judiciary must protect against unconstitutional deprivations." *United States v. Johnson*, 577 F.2d 1304, 1307 (5th Cir. 1978).[8]

Still, courts are "properly hesitant to examine the decision whether to prosecute." *Wayte*, 470 U.S. at 608. Federal prosecutors must wrestle with competing interests during the pre-indictment and trial phases of a criminal prosecution. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Armstrong*, 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at 607). Accordingly, federal judges should not engage in Monday-morning quarterbacking:

> Prosecutorial charging decisions are rarely simple. In addition to assessing the strength and importance of a case, prosecutors also must consider other tangible and intangible factors, such as government enforcement priorities. . . . [T]hey also must decide how best to allocate the scarce resources of a criminal justice system that simply cannot accommodate the litigation of every serious criminal charge.

*Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987) (internal citations omitted).

In short, the Constitution allows a federal prosecutor significant discretion to carry out his duties; when he acts, Courts presume "legitimate grounds for the action he takes." *Hartman v. Moore*, 547 U.S. 250, 263 (2006) (citing *Wayte*, 470 U.S. at 607–08). Judges

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down before October 1, 1981.

should not peek behind the prosecutorial curtain in all but the most unusual cases, where the prosecutor has acted so *irregularly* that he has forfeited the presumption of regularity.

**B.     Vindictive Prosecution Claim**

With these principles in mind, the Court turns to the SPLC's vindictive prosecution claim.

**1.     First Amendment Right to Speak**

The Government attempts to limit the application of the vindictive prosecution doctrine beyond recognition, arguing that it applies "only in the narrowest of circumstances." (Doc. 68 at 1).  The Government's argument is not that the SPLC faces a heavy burden—that is beyond dispute. *See United States v. Lee*, 2024 WL 4210779, at *4 (11th Cir. 2024) (proving actual vindictiveness is "exceedingly difficult" (quoting *Meyer*, 810 F.2d at 1245)).  Instead, the Government argues that a vindictive prosecution claim only arises "when a defendant has been prosecuted or punished after exercising a specific legal right." (Doc. 68 at 1 (emphasis omitted)).  And the universe of valid legal rights is, according to the Government, vanishingly small, recognizing only certain *procedural* rights (such as the right to appeal a conviction or to file a civil suit) rather than *substantive* rights (like the right to speak). (*See id.* at 5 ("Supreme Court and circuit precedent makes clear that, in the context of a claim of vindictive prosecution, a 'protected statutory or constitutional right,' means the exercise of a protected right during the course of litigation.")).

But the Supreme Court in *Goodwin* recognized the "basic" and "uncontroversial" principle that, "while an individual certainly may be penalized for violating the law, he just

as certainly may not be punished for exercising a protected statutory or *constitutional* right." 457 U.S. at 372 (emphasis added). Indeed, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, *including criminal prosecutions*, for speaking out." *Hartman*, 547 U.S. at 256 (emphasis added) (citations omitted); *accord Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("[T]he First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019))). The Government's argument—that "the general exercise of public speech" does not "qualif[y] as the type of procedural or legal right upon which a claim of vindictive prosecution c[an] be based," (doc. 68 at 1–2)—is simply wrong.

The Court does not agree with the Government that this "expansive view" of the vindictive prosecution doctrine will permit individuals to "immunize" themselves from prosecution by "openly and vigorously criticiz[ing] the [G]overnment." (*Id.* at 9). Where a defendant argues that he is the subject of a vindictive prosecution, "the court examines 'the prosecutor's actions rather than the defendant's reactions.'" *United States v. Spence*, 719 F.2d 358, 363 (11th Cir. 1983) (quoting *Hardwick v. Doolittle*, 558 F.2d 292, 302 (5th Cir. 1977)). And in any event, the Government's prosecutorial power and the First Amendment's protection of speech come into conflict only where the defendant can show that his prosecution was brought to punish him *for his speech*. *See Hartman*, 547 U.S. at 256 ("Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right' . . . ." (first alteration in original) (quoting

18

*Crawford-El v. Britton*, 523 U.S. 574, 588, n.10 (1998))).  As noted above and discussed in depth below, that is an "exceedingly difficult" thing to do.

### 2. Presumption of Vindictiveness

The SPLC argues that it is entitled to a presumption of vindictiveness given "the unique circumstances of this case." (Doc. 49-1 at 34).  The Court disagrees.  Presumptions are strong medicine, and "may operate in the absence of any proof of an improper motive," thereby "block[ing] a legitimate response to criminal conduct." *Goodwin*, 457 U.S. at 373.  Given this "severity," a presumption is only to be applied where "a reasonable likelihood of vindictiveness exists." *Id.*; *accord Barner*, 441 F.3d at 1321.  Accordingly, the Supreme Court has limited the application of a presumption to situations involving a specific fact pattern or series of events that would, no matter when or where that pattern or series appeared, *necessarily* give rise to a "reasonable likelihood of vindictiveness." *See North Carolina v. Pearce*, 395 U.S. 711, 725–26 (1969) (presumption of vindictiveness exists where a trial judge "imposes a more severe sentence upon a defendant" after he "successfully attacked his first conviction"); *Blackledge v. Perry*, 417 U.S. 23, 27–28 (1974) (applying the same presumption where a prosecutor obtained a felony indictment after the defendant appealed his misdemeanor conviction).  That is, a presumption must be "applicable *in all cases*." *Goodwin*, 457 U.S. at 381 (emphasis added); *see Wilson*, 262 F.3d at 315 ("[A] presumption is warranted only when circumstances warrant it for all cases of the type presented." (citation omitted)).

No presumption is called for here.  The SPLC relies upon the "pattern of Executive Branch conduct" in this case—that is, the purported opening, closing, and reopening of a

"moribund" investigation into the SPLC—as producing the requisite "'realistic likelihood' of vindictiveness." (Doc. 49-1 at 35–38).  But the Supreme Court has cautioned against presuming vindictiveness based on pretrial conduct. *Goodwin*, 457 U.S. at 381 (noting that, prior to trial, "the prosecutor's assessment of the proper extent of prosecution may not have crystallized"); *see United States v. Mays*, 738 F.2d 1188, 1190 (11th Cir. 1984) ("The *Goodwin* court was reluctant to invoke a presumption in the pre[]trial context, inasmuch as it might inflexibly fetter the prosecutor's discretion.").  This is not to say that a presumption of vindictiveness can never apply based upon pretrial conduct. *See Barner*, 441 F.3d at 1318 (assuming without deciding that "compelling facts could justify a presumption in a pre[]trial setting" (citation omitted)).  It may, so long as the facts were of such a character that, wherever they arose, they "form[ed] a realistic likelihood of vindictiveness." *Id.* (citing *Goodwin*, 457 U.S. at 383–84); *see Meyer*, 810 F.2d at 1243–44, 1247 (presuming vindictiveness where the Government charged "approximately 200 political demonstrators" for "demonstrating without a permit," but later added additional charges only as to those demonstrators who elected to go to trial rather than pay a $50 fine); *see also Carey*, 816 F. Supp. 3d at 144 ("Any time a policy directs the [DOJ] to find charges to bring against people who exercise their rights in disfavored ways, the odds of vindictiveness are high indeed.").

Assuming that a presumption of vindictiveness can apply in the pretrial setting, the facts of this case do not warrant one.  As the Government notes, investigations are routinely opened, shut, and opened again for myriad, proper reasons. (Doc. 68 at 18 & n.7).  Indeed, the fact that the closing and reopening of the investigation into the SPLC each corresponds

20

to changes in presidential administrations is susceptible of an innocent explanation just as readily as an improper one, as different administrations routinely have different enforcement priorities. *Compare* Memorandum from Merrick Garland, Attorney General of the United States, to All Federal Prosecutors, General Department Policies Regarding Charging, Pleas, and Sentencing (Dec. 16, 2022), *with* Memorandum from Pamela Bondi, Attorney General of the United States, to All Department Employees, General Policy Regarding Charging, Plea Negotiations, and Sentencing (Feb. 5, 2025).  Accordingly, it would be improper to presume vindictiveness merely because an indictment issued after an investigation was reopened, as this would not, standing alone, necessarily mean that "a reasonable likelihood of vindictiveness exists." *Goodwin*, 457 U.S. at 373.

Nor does the fact that the SPLC was indicted after engaging in protected activity entitle it to a presumption.  It is true that before its indictment, the SPLC extensively criticized the Trump administration. (*See* doc. 49-1 at 16–17).  But if that were sufficient to warrant a presumption, then the Government's fears would be realized, (*see* doc. 68 at 9), and an entity could effectively immunize itself from prosecution simply by engaging in protected speech, such as criticizing political figures and their policies.[9]  Because a presumption of vindictiveness is not called for by the facts of this case, the SPLC must demonstrate actual vindictiveness.[10] *Alabama v. Smith*, 490 U.S. 794, 799–800 (1989)

---

[9] Other courts have applied a presumption of vindictiveness to prosecutions expressly predicated upon, rather than merely subsequent to, protected activity. *See, e.g.*, *Meyer*, 810 F.2d at 1243–46 (demonstrating without a permit); *Carey*, 816 F. Supp. 3d at 133–34, 144 (flag burning).  This is not such a case.

[10] To the extent that the Eleventh Circuit adopts a totality of the circumstances test for applicability of a presumption of vindictiveness, the Court is satisfied that the facts of this case do not warrant application of the presumption for the reasons stated *infra* Part III.C.

("Where there is no[t] [a] reasonable likelihood [of vindictiveness], the burden remains upon the defendant to prove actual vindictiveness." (citing *Wasman v. United States*, 468 U.S. 559, 569 (1984)).

C.      **Evidence of Actual Vindictiveness**

When evaluating the SPLC's motion to dismiss the indictment, the Court is mindful that the "central figure" in any prosecution is the prosecutor. *Blackledge*, 417 U.S. at 27. So it is the motivations of the United States Attorney's Office for the Middle District of Alabama that are central and not, say, those of members of Congress. *See United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) ("In all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant." (citing *United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995)). Nevertheless, because prosecutors do not operate in a vacuum, the Court can consider whether the prosecutor "was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'" *Sanders*, 211 F.3d at 717 (quoting *United States v. Koh,* 199 F.3d 632, 640 (2d Cir. 1999)).[11] Although the Court will not arbitrarily constrain the scope of its review, the SPLC still must introduce "some evidence tending to show the existence of the essential elements of the defense," *Sanders*, 211 F.3d at 717 (quoting *Berrios*, 501 F.2d at 1211), animus and causation, *Barner*, 441 F.3d at 1322.

---

[11] A stalking horse is, apparently, "a horse or a figure like a horse behind which a hunter stalks game." *Stalking Horse*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/stalkinghorse.

### 1.    Pre-Indictment Statements

The Court begins with the SPLC's least compelling evidence—statements made by Senators Grassley and Lankford and Representatives Jordan and Roy.  The SPLC's focus on these statements notably omits any reference to the United States Attorney's Office.  And on their own, statements made by legislators—that is, statements from outside the Executive Branch—have little bearing on the prosecutor's purported animus.

"To obtain discovery, [the SPLC] must do more than simply 'identify a potential motive for prosecutorial animus.'" *Bucci*, 582 F.3d at 114 (quoting *Sanders*, 211 F.3d at 718).  While high-ranking Republican members of Congress criticized the SPLC, the SPLC fails to "connect any vindictive animus to those making the challenged charging decisions." *Id.* (citing *Goulding*, 26 F.3d at 662).  There is simply no evidence that Senators Grassley and Lankford or Representatives Jordan and Roy prompted the SPLC's prosecution for speaking out against the administration.

Indeed, the members of Congress referenced by the SPLC merely expressed discontent with the FBI's reliance on the SPLC. (Doc. 49-5 at 2 ("We [(Senators Lankford and Grassley)] write to express deep concern that the FBI continues to use the [SPLC] as a source for investigative reports and activities, despite its clear bias.")).  Senators Grassley and Lankford did not mention financial fraud or focus on the potential victims identified in the October 2025 FBI report. (*See id.* at 2–3).  Instead, the Senators "demand[ed] that the FBI stop using the SPLC as an investigative source and direct all field offices that the SPLC not be used in any analytical product." (*Id.* at 3).  Separation of powers counsels against placing much stock in legislative opinions unrelated to the decision to prosecute.

23

To be sure, Republican members of Congress have publicly criticized the SPLC.  But without more, the Court will not impute these legislators' expressed criticism of the SPLC to the United States Attorney for the Middle District of Alabama.

Likewise, Mr. Patel's decision to cut ties with the SPLC has little bearing on the charging decision here.  Once again, the Court is focused on the prosecutor's motives, not those of others. *See, e.g.*, *Gilbert*, 266 F.3d at 1187 ("The purported motivation of another agency, the IRS, is no indication that the prosecutor brought charges against Gilbert to punish him for his action against the IRS.").  Those courts that have permitted discovery into a vindictive prosecution claim on the strength of imputed animus rely upon objective evidence to substantiate the link between the agency with the animus and the prosecutor. *See, e.g.*, *Adams*, 870 F.2d at 1141 (permitting discovery where the defendant adduced affidavits from agency insiders, including one from a "retired [Equal Employment Opportunity Commission] official," who "expressed a belief that 'the EEOC instigated and pushed the investigation and prosecution of [the defendant] as revenge against her'").

As noted above, Mr. Patel stated that the SPLC has "turned into a partisan smear machine" and "inspired violence."  But Mr. Patel's statements are not automatically imputed to the United States Attorney's Office for the Middle District of Alabama. *See United States v. Dickerson*, 975 F.2d 1245, 1251 (7th Cir. 1992).  There is no evidence that Mr. Patel or the FBI's perceived "ill will . . . actually motivated [the SPLC's] prosecution." *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir. 1996).  While Mr. Patel's statements were certainly critical of the SPLC, his pre-indictment decision to no longer rely on the

24

SPLC does not militate in favor of vindictiveness—especially because, as discussed below, the investigation into the SPLC for the criminal acts alleged in this case predates his tenure.

### 2.    2019 Investigation

The SPLC concedes that in 2019 the "FBI looked into the same allegations at issue here," and that this "earlier inquiry resulted in no charges being brought." (Doc. 49-1 at 13).  The FBI and IRS-CI began investigating the SPLC during President Trump's first term, and President Biden's administration ended the investigation without filing charges. (*Id.* at 36 ("[T]he Biden administration reviewed the activities of the SPLC's field program, and despite the acquisition of financial records, interviews of those involved, and even a review by [the] DOJ and the IRS, no charges were brought.")).  The SPLC calls the current charges part of "the revival of a moribund investigation" that occurred "only after [President Trump] made the SPLC part of his overall attack on civil rights organizations." (*Id.* at 38).

The SPLC asks this Court to infer actual vindictiveness from that sequence of events:  the opening, closing, and reopening of an investigation. (*See id.* at 36).  But President Biden took office during the pendency of the original investigation, and it was closed during his tenure.  As noted above, changes in presidential administrations routinely prompt changes in prosecutorial priorities, too. (*See* doc. 68 at 18).  And by the SPLC's own admission, the 2019 investigation and the instant indictment involve "the same allegations" and the same informant program; and, moreover, it appears that the two matters were investigated by the same entities, the FBI and IRS-CI. (Doc. 49-1 at 13, 36; doc. 74 at 5); *see* Press Release, U.S. ATT'Y'S OFF., MIDDLE DIST. OF ALA., *Federal Grand*

*Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering* (Apr. 21, 2026), https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-poverty-law-center-wire-fraud-false-statements-and.  The SPLC does not argue that the DOJ improperly opened the 2019 investigation into the informant program.  Thus, the Court is left to speculate why the probe was closed during the Biden administration.  The standard to subject the Government to discovery is "rigorous"; it cannot be satisfied by speculation.

The Government describes the original investigation as a "fraud investigation." (Doc. 68 at 18).  That description is plausible, given that the Government "interviewed at least two former confidential informants, at least one former SPLC employee, and subpoenaed documents from [the] SPLC's banks." (Doc. 49-1 at 13).  And, though it took some time, it appears that this investigation produced the instant indictment, which likewise charges the SPLC with fraud.  The Court has no evidence that the original investigation, through its subsequent closing and ultimate reopening, became an improper one.  Indeed, the superseding indictment charges the SPLC with violating federal law through 2023, *after* the original investigation was closed. (Doc. 51 at 3–4, para. 11). Federal prosecutors are not ineluctably bound based on an initial investigation, and "[a]n initial decision should not freeze future conduct." *Goodwin*, 457 U.S. at 382.  The fact that an investigation was closed (for unknown reasons) and subsequently reopened does not appear improper or out of the ordinary at all, much less compel a finding of vindictiveness.

In brief, it is plausible that a fraud investigation predicated on conduct spanning more than a decade could extend over multiple years, particularly where there is an

intervening change in administrations and allegations of additional criminality. Federal prosecutors may "uncover additional information that suggests a basis for further prosecution or [they] simply may come to realize that information possessed by the [Government] has a broader significance." *Goodwin*, 457 at 381. This is especially true in the pretrial posture, where "the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *Id.* Without more, the Court cannot find that the continuation of the 2019 investigation evinces vindictiveness by the prosecutor.

### 3.    October 2025 FBI Report

The SPLC views the October 2025 FBI report, in conjunction with the earlier letter sent to Mr. Miller, as a smoking gun, linking the indictment against it to protected activity that various conservative organizations did not like—namely, the SPLC's publication of the Hate Map. (Doc. 74 at 5). To support this conclusion, the SPLC notes that the report and letter "closely track each other, sometimes word-for-word." (*Id.* at 7). But that is not surprising. It is undisputed that the report was generated in response to requests for investigation from conservative organizations that claim to have been harmed by the SPLC. (*See* doc. 95-2 at 1). Indeed, half of the examples the SPLC identifies are included in the FBI report *as quotes*. (*See* doc. 74 at 7; doc. 74-1 at 2–3). The fact that the FBI generated a report in response to a complaint that borrowed some language from that complaint is not only unsurprising, it is precisely what one would expect from a law enforcement agency.

The letter to Mr. Miller requested that the Trump administration cease any use of SPLC data on federal agencies' websites. (Doc. 74-2 at 4). There is no evidence that the conservative groups "targeted" by the SPLC pushed for an indictment. Instead, one group

27

contacted law enforcement with grievances, which the FBI documented. Even if the contents of the FBI report (including the conservative groups' complaints) *were* cause for concern, the SPLC must link that report (or those complaints) to the decision to prosecute. *See United States v. Wells*, 873 F.3d 1241, 1254 (10th Cir. 2017) (holding that emails from a nonprofit to a government entity "push[ing] for [a defendant's] prosecution" did not establish prosecutorial vindictiveness where the evidence revealed that the nonprofit did not seek to "limit[] [the defendant]'s First Amendment rights").

In attempting to forge that link, the SPLC notes that Mr. Davidson "personally approved the opening of the investigation into the SPLC's First Amendment protected conduct." (Doc. 74 at 9). That seems to be true, so far as it goes; the FBI report notes that the FBI case agent "obtained concurrence from Acting United States Attorney for [the] Middle District [of Alabama], Kevin Davidson, to open this matter." (Doc. 74-1 at 4). But what does it mean for a United States Attorney to "concur" in the opening of a matter? And how does that "concurrence" figure into the ultimate determination of whether to bring an indictment? The SPLC cannot say. They can, however, speculate.

> At some *unknown point* in or after October 2025, an *unknown person* within the [DOJ] *must have* realized that an investigation into the Hate Map as a "scheme to defraud" conservative groups is entirely violative of the First Amendment. Rather than dropping the facially flawed investigation, however, *someone* in the [DOJ] decided to cloak this improper investigation under the guise of donor fraud. *The SPLC does not know who made that decision or how it was communicated.* What is clear, though, is that the SPLC was indicted a few months later and the superseding indictment includes allegations that the SPLC designated "hate groups" on its Hate Map, consistent with [the] DOJ's early investigative conclusion.

(Doc. 74 at 9 (emphases added)). In other words, all the SPLC has shown by objective evidence is that it was indicted a few months after the report was generated. But suspicious timing, alone, is insufficient. *See United States v. Jarrett*, 447 F.3d 520, 528 (7th Cir. 2006) ("The timing of a federal prosecution, alone, cannot change a legitimate exercise of normal prosecutorial discretion into a vindictive prosecution." (alterations adopted) (quoting *United States v. Dickerson*, 975 F.2d 1245, 1252 (7th Cir. 1992))); *United States v. Dean*, 119 F. Supp. 2d 81, 83–84 (D. Conn. 2000) (rejecting a vindictive prosecution argument despite the purportedly "close temporal proximity between the referral of [the defendant's] case by state prosecutors to the United States Attorney's Office and his insistence on a trial in state court," concluding that the defendant's evidence did "not rise above the level of mere allegations and conjecture drawn from the sequence of events").

The SPLC also makes much ado about the fact that the report's penultimate "Disposition" section contains the following note: "Converting to a full investigation." (Doc. 74-1 at 4; *see* doc. 74 at 8–9). But the last notation in the *ultimate* "Workflow" section says that on October 24, 2025, the incident was "[c]lose[d] . . . [w]ithout [s]ubmission." (Doc. 74-1 at 5). Even if it is true that this report was connected in some way to the investigation that ultimately produced the indictment, the extent of that connection is not at all clear. The SPLC's bald, citationless assertion that the FBI report "led to the indictment in April 2026," (doc. 74 at 8), is not evidence and therefore cannot move the needle.

29

### 4.   "Post-Indictment Media Blitz"

The SPLC also infers animus from statements made after the Government unsealed the indictment.  The SPLC focuses on statements made by President Trump, Ms. Dhillon, and Mr. Blanche.  The Court addresses each in turn.

The SPLC cites several statements made by President Trump before the indictment was unsealed that are unrelated to the SPLC.  The Court does not find the SPLC's reliance on those statements persuasive. *See United States v. McIver*, 809 F. Supp. 3d 221, 252 (D.N.J. 2025) (finding that President Trump's "broad statements . . . not specific to th[e] [d]efendant" were not "clear evidence of personal animus").

The Court is similarly unpersuaded by President Trump's post-indictment statements about the SPLC.  President Trump's rhetoric is (rather famously) wide-ranging, and he has undoubtedly been critical of the SPLC.  However, the SPLC fails to establish that President Trump's statements evince animus on the part of the United States Attorney for the Middle District of Alabama.  So, though President Trump has specifically criticized the SPLC, the organization has not provided evidence that the prosecutors working on this case were in any way motivated by his purported animus.  And, in any event, "there cannot be a finding of actual vindictiveness just because 'the defendant[] w[as] a thorn in the [G]overnment's side.'" *United States v. Ji*, 662 F. Supp. 3d 424, 431 (E.D.N.Y. 2023) (quoting *Sanders*, 211 F.3d at 718).

The SPLC also cites statements made by Ms. Dhillon during an April 24, 2026 interview on Newsmax.  According to the SPLC, Ms. Dhillon "said that if the SPLC criticized one of [her] 'friends,' criminal charges were the appropriate response." (Doc. 49-

1 at 26). Ms. Dhillon made statements during an interview that addressed the criminal charges brought against the SPLC and the organization's opposition to her nomination. *See* Newsmax, *SPLC indictment is 'earth shattering': Harmeet Dhillon*, at 0:08 (YouTube Apr. 24, 2026), https://www.youtube.com/watch?v=jGiYsEWOZxY. Even crediting the SPLC's characterization of Ms. Dhillon's statements, the Court is not persuaded that her comments are salient here. Whatever alleged animus Ms. Dhillon has for the SPLC, the SPLC fails to link that animus or her comments to the United States Attorney's decision to charge the organization. The SPLC has not shown that Ms. Dhillon's purported animus infected the United States Attorney's Office for the Middle District of Alabama. And the Court will not impute her alleged animus to those bringing the charges. *See Wilson*, 262 F.3d at 319–20 ("Even if a presumption of vindictiveness could have attached on these facts to a charging decision made by the U.S. Attorney for the District of South Carolina, we could not, on this record, impute the improper motivation to the U.S. Attorney for the Eastern District of North Carolina").

Mr. Blanche asserted that the SPLC "pa[id] sources to stoke racial hatred" and "manufactur[ed] the extremism it purports to oppose." (Doc. 49-1 at 22 (alterations in original)); *see also Charges Against SPLC*, *supra* page 5 at 0:53. The SPLC takes issue with this statement; however a very similar statement is contained on the first page of the superseding indictment: "The SPLC's paid informants ('field sources') engaged in the active promotion of racist groups at the same time that the SPLC was denouncing the same groups on its website." (Doc. 51 at 1). Recounting the allegations contained in the

superseding indictment—even slightly editorializing those allegations—does not constitute vindictiveness.[12]

The objective evidence confirms that Mr. Blanche and Mr. Davidson only spoke to the allegations within the superseding indictment. After an indictment is unsealed, federal prosecutors often hold press conferences or release information to the press. This is true particularly in high profile prosecutions. At the press conference announcing the indictment, Mr. Blanche stated that "[t]he indictment speaks for itself. I'm not going to talk outside the four corners of the indictment."[13] *See Charges Against SPLC*, *supra* page 5 at 09:40. He continued, "I want to be careful to keep any comments that we make inside the indictment." *Id.* at 10:21. Similarly, Mr. Davidson's public statements focused on the allegations against the SPLC: "As alleged, the SPLC . . . diverted a portion of [donor] funds to benefit individuals and groups they claimed to oppose. That kind of deception undermines public trust and social cohesion." Press Release, *supra* page 25–26. On May 7, 2026, after the SPLC's initial arraignment, Mr. Davidson stated: "I'm excited to finally go to court to start the process of seeking justice in this case. . . . [W]e'll just see how things progress through the system." Emma Ellis, *Southern Poverty Law Center*

---

[12] The SPLC contends that Mr. Blanche's statement that the SPLC never shared informants' information with law enforcement was false. (Doc. 49-1 at 23; *see* doc. 27-1). Mr. Blanche corrected this statement and confirmed that "[i]t is true that over the years the[] [SPLC] ha[s] selectively shared information with law enforcement." (Doc. 27 at 2 (citing doc. 27-1 at 0:55)). The Court is not persuaded that a stray, later-corrected remark warrants an inference of vindictiveness. (*See* doc. 50 (order denying the SPLC's motion to address the Government's materially false statements and to enforce rules prohibiting further prejudicial extrajudicial statements)).

[13] The DOJ's press release also explained that "[t]he details contained in the civil forfeiture complaint are allegations only." Press Release, *supra* page 25–26.

*pleads not guilty in federal fraud case*, WSFA (May 7, 2026), https://www.wsfa.com/2026/05/07/southern-poverty-law-center-pleads-not-guilty-federal-fraud-case/.

In sum, the evidence the SPLC has identified, considered separately or together, does not warrant discovery into the Government's motives or dismissal of the superseding indictment. The Court has little trouble concluding that the SPLC offers insufficient objective evidence that Mr. Davidson or any other prosecutor in the Middle District of Alabama, was vindictively motivated to indict the SPLC for the exercise of its First Amendment rights. Nor does the SPLC provide evidence that Mr. Davidson was directed to bring the present charges by a superior with a vindictive motive. *See Barner*, 441 F.3d at 1322 (the party asserting vindictive prosecution must demonstrate that "the prosecutors were actually motivated by a desire to punish [him] for the exercise of his rights" and that the indictment "was the result of such animus"). The SPLC would have the Court dismiss the indictment against it, or permit discovery into the Government's motives, based on little more than speculation. Indeed, the SPLC candidly remarks that one of its main theories—the indictment against it was predicated exclusively on "a letter sent by conservative groups to Stephen Miller complaining about being designated as hate groups by the SPLC"—is just a guess. (Doc. 74 at 8 ("The documents provided by the [G]overnment reviewed to date do not reveal whether Miller directed the [DOJ] to convert or open this investigation, but the facts suggest that may be the case.")). The Court cannot license a fishing expedition based on innuendo or speculation.

33

It is the SPLC's, not the Court's, burden to show that the Government's prosecution was improperly motivated. The SPLC cannot merely provide the rough outline of a theory—the President is out to get it—and expect the Court to fill in the blanks. If the presumption of regularity means anything, it should at least caution against doing *that*.

## IV. CONCLUSION

The question before this Court is not whether the Government should prosecute the SPLC. It is a bedrock principle of constitutional law that the decision to prosecute is entirely within the Executive's purview. *See Nixon*, 457 U.S. at 749–50. Separation of powers prevents this Court from entering upon or intruding into "the business of prosecution." *In re Wild*, 994 F.3d 1244, 1276 (11th Cir. 2021) (Tjoflat, J., concurring). The Court is not blind to the fact that this prosecution has generated strong reactions from individuals equally delighted and outraged by the indictment. But, as the Court noted at the outset, the only question before the Court is a narrow one: Whether the Government's decision to prosecute the SPLC was constitutionally impermissible. Because the SPLC has not adduced some evidence tending to show the existence of the essential elements of vindictive prosecution, the Court denies the SPLC's motion in its entirety.

Although the Government is entitled to the presumption of regularity, courts are not forced to turn a blind eye to constitutionally suspect conduct. In the rare case that warrants a closer look, courts can and should order the Government to produce discovery into a prosecutor's motivations to ensure the defendant's due process rights are protected. But this is not the rare case in which such extraordinary relief is appropriate. The SPLC's submissions stack speculation upon conjecture, relying upon hypothetical links in assumed

34

chains to show prosecutorial vindictiveness. Once again, the standard to receive discovery is a rigorous one that the Court finds has not been met here.

This case typifies modern American discourse. It is unsurprising that the parties' arguments primarily comprise what has become all too common: ad hominem attacks in the form of press releases, interviews, and social media posts. Opponents of past, current, and future administrations may full-throatedly protest the decisions made by those in power. But our Republic recognizes different venues to vindicate different wrongs; federal courts are not the proper forum for airing political grievances. For that reason, the doctrine of vindictive prosecution places a heavy burden on the accused, and decades of precedent counsels against its application here. Two things can be true at once: critics are not constitutionally immunized solely because they speak frequently and prosecutorial decisions may be second guessed—*if* they evince some evidence of animus. Missing here is the requisite objective evidence to show that the United States Attorney's Office for the Middle District of Alabama (on its own accord or at the direction of others) prosecuted the SPLC for exercising its First Amendment rights.

The SPLC fails to establish some evidence tending to show prosecutorial animus or causation, rendering discovery improper. And because the SPLC cannot establish some evidence of vindictiveness, the Court will not grant the extraordinary relief of dismissing the indictment. The SPLC's motion is thus denied in full.

Accordingly, it is

ORDERED that the SPLC's motion to dismiss the indictment for vindictive prosecution, (doc. 49), is DENIED.

DONE this 7th day of August, 2026.

                                /s/ Emily C. Marks
                              EMILY C. MARKS
                              UNITED STATES DISTRICT JUDGE