IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> THE SOUTHERN POVERTY LAW CENTER, INC. <br><br> Defendant. | Case No. 2:26-cr-0139-ECM-KFP-1 |

**THE SOUTHERN POVERTY LAW CENTER'S MOTION TO COMPEL THE
GOVERNMENT TO PRODUCE EXCULPATORY MATERIAL**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 6

I.      The Government Should be Compelled to Produce All Exculpatory Evidence,
Including Impeachment Material. ............................................................................... 6

        A.      Documents Showing Cooperation Between the SPLC and Federal Law
Enforcement Must Be Produced. .......................................................... 9

        B.      Documents Related to SPLC Informants' History as Law Enforcement
Informants Must Be Produced. ............................................................ 10

        C.      Information About Taxes Paid on Informant Compensation. ............................... 12

CERTIFICATION PURSUANT TO M.D. Ala. LCrR 16.1(c) ....................................... 13

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland*,
   373 U.S. 83 (1963) ................................................................................................. *passim*

*Breedlove v. Moore*,
   279 F.3d 952 (11th Cir. 2002) ................................................................................9

*Giglio v. United States*,
   405 U.S. 150 (1972) ............................................................................................5, 7

*Kyles v. Whitley*,
   514 U.S. 419 (1995) .................................................................................................3

*Moon v. Head*,
   285 F.3d 1301 (11th Cir. 2002) ..............................................................................8

*Strickler v. Greene*,
   527 U.S. 263 (1999) .................................................................................................6

*United States v. Agurs*,
   427 U.S. 97 (1976) ...................................................................................................6

*United States v. Arnold*,
    117 F.3d 1308 (11th Cir. 1997) ............................................................................12

*United States v. Fernandez*,
   136 F.3d 1434 (11th Cir. 1998) ..............................................................................6

*United States v. Hyatt*,
   904 F. Supp. 1351 (M.D. Fla. 1994) .....................................................................11

*United States v. Jordan*,
   316 F.3d 1215 (11th Cir. 2003) ...........................................................................5, 6

*United States v. Knight*,
   867 F.2d 1285 (11th Cir. 1989) ..............................................................................7

*United States v. Nordean*,
   No. 21-cr-00175-TJK ............................................................................................12

*United States v. Puett*,
   735 F.2d 1331 (11th Cir. 1984) ............................................................................11

*United States v. Severdija*,
    790 F.2d 1556 (11th Cir. 1986) ...................................................................................3

**Other Authorities**

M.D. Ala. Loc. R. 16(a) ...............................................................................................5

M.D. Ala. Loc. R. 16.1 .................................................................................................7

M.D. Ala. Loc. R. 16.1(a)(1)(A) ..................................................................................7

M.D. Ala. Loc. R. 16.1(a)(1)(B) ..................................................................................7

M.D. Ala. Loc. R. 16.1(c) .......................................................................................5, 13

## INTRODUCTION

The Superseding Indictment charges that the Southern Poverty Law Center (SPLC) secretly used donor funds to pay informants "engaged in the active promotion of racist groups[.]" ECF 51, Introduction. Information in the government's possession showing the opposite—that the SPLC utilized informants to disrupt and dismantle these groups—constitutes exculpatory material that must be produced to the defense. Evidence demonstrating that rather than seeking to conceal the existence of its informant program, the SPLC actually shared information generated by that program with law enforcement is likewise material and favorable to the defense.

Documents showing the SPLC's coordination with law enforcement exist, and the government could readily collect and produce them. That should have happened without the need for a request or this motion. It did not. Instead, the SPLC has repeatedly sent the prosecution detailed letters identifying the type of information sought and the basis for deeming it exculpatory. Each time, the government has refused to fulfill its obligation to collect and produce that material, rejecting the particular requests at issue here.

Almost four months ago, when the government conjured up its "active promotion" theory prior to indictment, the SPLC's counsel met with prosecutors to demonstrate how the SPLC used the informant program to dismantle extremist groups by recruiting informants, many of whom risked their lives, to gather information about the criminal activities of these groups and their members in order to, among other things, report this conduct to law enforcement. In that meeting and in subsequent communications and filings, the SPLC has identified three examples of that cooperation:

- Prosecution of Individual A, an avowed white supremacist and member of the extremist group Vanguard America who sought a national security clearance as part of his work at the Philadelphia Navy Yard. Information from the SPLC's informant program was

1

provided to law enforcement, leading to an investigation which led to this individual's subsequent arrest, conviction and incarceration. The pleadings in that criminal case reveal the ***government's*** repeated requests that he be detained because of the serious risk of violence he presented. *See* ECF 23 at 4-5.

- Prosecution of Individual B, a member of the white supremacist extremist group Atomwaffen Division charged in the District of Nevada in August 2019. The press release issued by the Department of Justice detailed his multiple planned terror attacks which were prevented as a result of information provided by the SPLC's informant program. According to the government's press release following the guilty plea, he planned a violent spree which included "setting fire to a Las Vegas synagogue and making Molotov cocktails and improvised explosive devices." *Id*. at 9-10.

- The SPLC also provided specific information to law enforcement ahead of the "Unite the Right" rally held in Charlottesville, Virginia in August 2017. While the Superseding Indictment references that event as one of the examples of the SPLC's "active promotion" of racist groups, the truth is that the SPLC did just the opposite. Those efforts included the preparation of a 45-page "event alert" detailing likely attendees, their affiliated hate and extremist groups and even, in some instances, their weapons of choice. The SPLC provided this information to law enforcement ahead of that rally in an effort to prevent the violence that ultimately occurred. ECF 23-1 at 2-3.

Information about the SPLC's cooperative law enforcement efforts relating to these examples exists in addition to those previously provided by defense counsel. Federal law enforcement agencies, including those who are members of the prosecution team, received and used information from the SPLC in these cases. They can provide information that not only

2

corroborates the fact of SPLC's cooperation with law enforcement and existence of this information, but also details the full extent of the government's reliance on the evidence the SPLC provided as a result of its informant program to investigate and prosecute other criminal activity.

The SPLC's repeated efforts to provide federal law enforcement agencies with evidence generated by the informant program and used by those agencies used to investigate, prosecute, and, on repeated occasions, convict individual members of racist groups engaged in criminal activity are fundamentally inconsistent with the government's core theory: that the SPLC was "engaged in the active promotion of racist groups." Such evidence is plainly favorable to the defense and must be produced. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 441-43 (1995) (evidence that another individual gave inconsistent accounts of the crime in a possible effort to frame the defendant was favorable to the defense and should have been disclosed); *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963) (prosecution's failure to disclose that another individual admitted to killing victim constituted suppression of evidence favorable to the accused); *United States v. Severdija*, 790 F.2d 1556, 1560 (11th Cir. 1986) (written recording of defendant's statement at time of event "constitute[d] favorable and material evidence wholly consistent with appellee's defense" and thus satisfied the *Brady* standard).

Despite the fact that evidence showing that the SPLC cooperated with law enforcement by providing information about the members of these groups is material and exculpatory, the government has apparently taken no steps over the past three months to search for or obtain this exculpatory information from its files or disclose it to the defense.[1]

---

[1] Shortly after arraignment on the original indictment on May 7, 2026, the government produced three categories of information it deemed exculpatory: 1) a letter from SPLC donors stating that they believed the use of their funds to support the informant program was proper and consistent with their expectations; 2) a recorded interview of a bank employee which included her statement that she was fully aware that the bank accounts the SPLC opened in the names of "fictitious

3

Two months ago, when it became apparent that the government had failed in this obligation, the defense sent a detailed letter to the government, identifying specific categories of requested information. Ex. 1 (5/13/26 Letter to K. Davidson). The government did not respond specifically to that letter and instead told defense counsel during a phone call conversation that it did not see any of the requested information as relevant.

At the status conference on July 7, 2026, the following exchange occurred following the defense's request for clarification on whether the government had met its discovery obligations:

THE COURT: Mr. Davidson, what is the status of discovery here?

MR. DAVIDSON: Your Honor, as you know, the defense has been -- is limited in the specific categories of discovery under Rule 16 that it has requested at this point. The government believes it has turned over everything it is required to turn over at this point. The government has liberally produced much, much, much more information through the discovery process to the defense than it believes it's required to. Certainly if Mr. Lowell has a concern, I can just make sure I limit only turning over from this point the stuff that the government is required by law to turn over. But up to this point, the government has provided much information that it is not required to, and the government is still talking to the defense about certain discovery items, but that's the current state.

THE COURT: Mr. Davidson, to be clear, at this time the government has completed all discovery that's required?

MR. DAVIDSON: Yes, Your Honor.

ECF 104 at 12–13.

Because this position appeared to be inconsistent with the government's failure to produce the information requested in the SPLC's *Brady* letter, the defense followed up to ensure the

---

entities" (ECF 51, Introduction) were in fact utilized by the SPLC to protect the safety of those individuals; and 3) Bank-1's records and email communications confirming the SPLC's connection to the alias bank account names that were associated with the SPLC, the bank's knowledge of that association, and its knowledge of the purpose of having the alias names on the accounts. In total, the government produced just 20 pages of supposed *Brady* material and none of it is responsive to the three requests at issue here.

government's compliance with its obligations to produce exculpatory material. The SPLC sent a second lengthy follow-up letter to the government, identifying the applicable case law requiring it to search for and produce this information and prioritizing some of the categories of requested material. Ex. 2 (7/13/26 Letter to K. Davidson). Once again, the government refused to provide the information or even look for it, claiming instead to have already "provided all *Brady* material within its possession." Ex. 3 (7/21/26 email from K. Davidson).

Despite the continued efforts of defense counsel to resolve this discovery issue without involving the Court, the government has refused to search for and produce substantial amounts of material discoverable under *Brady* and its progeny. Consistent with the meet and confer obligations imposed by Rule 16.1(c) of the Local Rules of the United States District Court for the Middle District of Alabama, the defense has gone to great lengths to detail for the government the specific information it seeks, and the reason why such information is due to be disclosed. Having failed in those efforts, and with trial nine weeks away, the SPLC is left with no choice but to seek this Court's assistance to ensure that the government's tactics do not delay the trial date or compromise the SPLC's constitutional rights. The SPLC respectfully requests that the Court order the government to immediately produce the requested information and any other *Brady* material requested by the defense or otherwise in its possession or control.

**ARGUMENT**

This motion seeks to compel the government to comply with its obligations under *Brady*, and its progeny to produce all exculpatory evidence, including all impeachment evidence as required by *Giglio v. United States*, 405 U.S. 150, 154 (1972).

**I.     The Government Should be Compelled to Produce All Exculpatory Evidence, Including Impeachment Material.**

The government has a constitutional obligation to "turn over to the defense evidence that is favorable to the accused, even though it is not subject to discovery under Rule 16(a)." *United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003); *id*. at 1226 n.15 ("*Brady* requires the prosecution to turn over to the defense any exculpatory evidence in its possession or control."). This "duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The prosecution's suppression of exculpatory or impeachment evidence violates *Brady* "irrespective of the good faith or bad faith of the prosecution" when the evidence is "material either to guilt or to punishment." *Brady*, 373 U.S. at 87; *see United States v. Fernandez*, 136 F.3d 1434, 1438 (11th Cir. 1998).

"When the prosecutor receives a specific and relevant request [for exculpatory information], the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976). *Agurs* further holds that "if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." *Id*.

This motion focuses on three categories of exculpatory or impeachment evidence that the SPLC identified for the government months ago in accordance with the approach set forth in *Agurs*:

6

(1) Documents or information showing cooperation between the SPLC and federal law enforcement, including information provided by the SPLC to law enforcement and documents showing how law enforcement used that information.

(2) Documents or information showing that federal law enforcement directly engaged with, or used as informants, the same individuals that the SPLC used as informants and documents or information showing how these same individuals engaged with extremist groups (such as by paying membership dues, publication costs, or other amounts to appear to be a member of the group, and attending or participating in the groups' activities).

(3) Documents related to taxes paid or not paid by the informants working with the SPLC including how any deficiencies were resolved by the Internal Revenue Service.

These materials should be produced in short order so that the defense may use them "effectively" to prepare for trial.[2] *United States v. Knight*, 867 F.2d 1285, 1289 (11th Cir. 1989). The amount of time needed to make effective use of information depends on its character. More time is necessary to make effective use of "core" *Brady* material (that which can be used directly to exonerate the defendant) than impeachment material (information that can be used to attack the credibility of witnesses to support the inference that the government's proof is insufficient). Core *Brady* material includes information suggesting that the charged offense did not occur, was committed by another individual, or tends to show the defendant lacked the requisite mental state. The defense typically needs time to not only digest this material but investigate its full scope and gather evidence to be offered at trial. By contrast, impeachment material typically only requires that the defense have sufficient time to review such material and integrate into cross examination

---

[2] Under Rule 16.1 of the Local Rules of the United States District Court for the Middle District of Alabama, the government is required to tender to the defendant at arraignment all "*Brady* Material" and "*Giglio* Material." M.D. Ala. LCrR 16.1(a)(1)(A), (B). At the request of the parties because of a potentially anomaly in the application of Rule 16.1 to this case, this Court suspended the application of that rule. ECF 40. Even absent the rule's application, the defendant's request for prompt disclosure of exculpatory evidence aligns with the Court's practice in this district and is required by binding precedent.

outlines.[3] This will be a lengthy and complex trial, and it should not be further complicated by an unnecessary delay in disclosing exculpatory material.

It is unclear whether the government, through its inaction, is maintaining that (1) the material the defense has requested is immaterial or unfavorable to the defense (the government raised "relevance" but relevance is not a basis to withhold exculpatory material); or (2) the evidence does not exist (which, as described *supra*, the defense has already established is not the case). In any event, the government "asserts that it has provided all Brady material within its possession." Ex. 3 (7/21/26 email).[4]  But the government has a duty to search for and disclose exculpatory and impeachment evidence possessed by the "prosecution team, which includes both investigative and prosecutorial personnel." *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989)). The "prosecution team" includes "the prosecutor or anyone over whom he has authority." *Id*. at 1309.

Discovery provided thus far reveals that this investigation has included agents from the FBI, the IRS, and the U.S. Postal Inspection Service, as well as prosecutors from the Justice Department. All three agencies are firmly within this Circuit's definition of the "prosecution team" and their files must be searched for evidence favorable to the defense even if the prosecutor on this case is not personally aware of it or does not have those files in his office's possession. *See*

---

[3] Exceptions exist, of course. Effective use of impeachment material in the form of witness statements revealing a witness's bias, financial interest, or lack of credibility requires more time than simple prior inconsistent statements.

[4] In fact, after the Court issued its pre-trial scheduling Order in this case (ECF 107), Assistant U.S. Attorney Kevin Davidson emailed defense counsel and advised that, as it concerns any motion to compel, if the prosecution "[is] ordered to turn over FBI documents related to F's that haven't already been turned over . . .  some documents will almost certainly be classified" "at a certain level."  This is the first time the government has raised the specter of classified documents possibly existing as it relates to law enforcement material involving any F's, and would be encompassed in and by the SPLC's document requests described in this motion.

8

*Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002) ("[T]he prosecution team generally is considered a unitary entity, and favorable information possessed by the police but unknown to the prosecutor is nonetheless subject to the *Brady* test." (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("holding that the *Brady* rule encompasses evidence 'known only to police investigators but not the prosecutor'"))).

A.    **Documents Showing Cooperation Between the SPLC and Federal Law Enforcement Must Be Produced.**

Communications and other documents showing that the SPLC provided information about extremist groups to law enforcement, whether or not the material references informants, as well as communications and other documents showing how law enforcement made use of that information, are favorable to the defense. They must be obtained from the prosecution team's files and disclosed to the defense.

The government's theory of the case is that the SPLC defrauded its donors when it said on its website that it was working to "dismantle" extremist groups when in fact "a portion of their donated funds was being secretly used to support extremist groups and to fund their violent, racist, and extremist activities." ECF 51 ¶ 13. The purpose and use of the informant program are the key issues for the jury: Did the SPLC intend and use the program to obtain information to dismantle extremist groups or to encourage the groups? Information showing that the informant program was intended, and in fact used, by the SPLC to dismantle these groups by reporting their activity to law enforcement contradicts the government's theory. As explained above, such information is material and favorable to the defense.

This request is far from speculative. As identified in the SPLC's July 13 letter, during the government's investigation, there are at least ten circumstances where witnesses disclosed in their interviews with the government that information from the SPLC's informant program was

9

provided to law enforcement over the years. These interviews occurred as long as eight months ago, and the government has had more than sufficient time to gather this exculpatory material and produce it to the defense. These examples of the SPLC's cooperation with law enforcement using the informant program establish the favorable and material nature of the requested information. The government should be ordered to comply with its *Brady* obligations by undertaking a good faith search for this information in the prosecution team's files.

**B.      Documents Related to SPLC Informants' History as Law Enforcement Informants Must Be Produced.**

The SPLC also requested documents showing (a) which of the informants who worked with the SPLC had separately worked as informants for law enforcement, (b) what extremist groups they infiltrated while working for law enforcement, and (c) what steps the informants took to infiltrate the extremist groups for law enforcement, such as paying membership dues, ordering publications, obtaining t-shirts or other clothing, or attending meetings or rallies. This information is favorable to the defense. It can readily be obtained from the prosecution team's files and must be disclosed to the defense.

The government alleges that these informants were violent extremists who were "leading or affiliated with multiple violent extremist organizations," and thus were not helping to dismantle them. ECF 51, ¶ 11. In support of this allegation, the government claims that the informants took action to support the organizations, such as "attend[ing] extremist group rallies across the country," and "mak[ing] donations to extremist group leaders." *Id.*

Surely the government is not taking the position that when federal law enforcement worked with these same informants to infiltrate extremist groups, this work was to "support extremist groups and to fund their violent, racist, and extremist activities." Instead, the implication of the government's utilization of these same informants is obvious and exculpatory: these individuals

10

were legitimate sources of information used to disrupt and dismantle hate groups, the government was aware that its informants were taking steps to remain undercover in order to obtain that information, and the government employed the same tactics as the SPLC in compensating them to gather information in a clandestine fashion. And, if those government informants—like the SPLC informants—engaged in activity that made the informants appear to be affiliated with the group (as part of infiltrating the groups), this information is favorable to the defense.

Government informants infiltrate groups by engaging in behavior, including providing items of value, that may appear to make them members of those groups. Courts in this circuit have long recognized that such efforts are a legitimate and permissible means of investigation. *See, e.g.*, *United States v. Puett*, 735 F.2d 1331, 1335 (11th Cir. 1984) ("We have recognized that government infiltration of criminal activity is a legitimate and permissible means of investigation and frequently necessitates the government agent's supplying something of value to the criminal.") (*citing United States v. Tobias*, 662 F.2d 381, 386 (5th Cir. Unit B 1981)); *United States v. Hyatt*, 904 F. Supp. 1351, 1354 (M.D. Fla. 1994) (rejecting defendant's claim that government's reliance on informant to investigate use of airstrip to traffic drugs was improper, even where the informant "had a significant criminal history and was otherwise of questionable character" because "individuals of questionable character often times make the best informants, as their willingness to engage in criminal activities must be convincing to the other participants") (quoting *United States v. Collins*, 972 F.2d 1385, 1396-97 (5th Cir. 1992)).

A recent trial against leaders of the Proud Boys who led the January 6 Capitol riot demonstrates the government's use of these tactics. In that case, an FBI informant who testified as "Aaron" revealed that while acting as an FBI informant to infiltrate groups that day, he marched with the group to the U.S. Capitol and then "ultimately entered the Capitol building" with the other

participants. Ex. 4 (3/29/23 Tr. at 15734, *United States v. Nordean*, No. 21-cr-00175-TJK). Marching with the group and then breaking into the U.S. Capitol helped "Aaron" appear to be a willing participant in the violent Proud Boys group, a crucial part of his legitimate and information-gathering work as an FBI informant. "Aaron" testified that his FBI handler told him he "would not get in trouble" if he "did something minor" that was illegal as long as the minor criminal act "kept [him] safe." *Id*. at 15746.

The SPLC's request is neither a fishing expedition nor mere speculation. By letter dated April 17, 2026, the SPLC provided a list of the informants it used in response to a grand jury subpoena issued by the government. Moreover, the prosecution team has already confirmed that at least one SPLC informant was also an informant for federal law enforcement. Ex. 2 at 6. Documents showing that the federal government worked with these informants for legitimate information-gathering purposes, and that the same informants engaged in activity that would make them appear to be part of these groups, are favorable to the defense and must be disclosed by the government under *Brady*.

C.    **Information About Taxes Paid on Informant Compensation.**

As noted above, the IRS is part of the prosecution team in this case. As a result, the government is required to search IRS files for potentially exculpatory information. Information about whether the informants paid taxes on their compensation from the SPLC, and whether any tax deficiencies have been resolved with the IRS, is favorable to the defense. In the government's discovery, at least one witness suggested an SPLC employee told him that he did not need to pay taxes on the amounts paid by the SPLC. If the informants paid taxes on the amounts paid to them, then this information would directly contradict this expected testimony by a government witness.

In addition, if the IRS has favorably resolved tax deficiencies by any informant, then this must likewise be disclosed under *Brady*. *See United States v. Arnold*, 117 F.3d 1308, 1317 (11th

12

Cir. 1997) (ordering a new trial where government did not disclose tapes in the possession of members of prosecution team that included "numerous examples of [a government witness's] desires for, and belief that he received a promise of, a sentence reduction in return for his cooperation in this case").

## CERTIFICATION PURSUANT TO M.D. ALA. LCRR 16.1(C)

In accordance with Rule 16.1(c) of the Local Rules of the United States District Court for the Middle District of Alabama, I hereby certify that I have conferred with Assistant U.S. Attorney Kevin Davidson in good faith in an effort to resolve the issues raised by this motion.

Dated: August 7, 2026

Respectfully Submitted,

/s/ *Addy R. Schmitt*
Addy R. Schmitt (DC Bar No. 489094)
Andrea L. Moseley (DC Bar No. 502504)
Sara E. Kropf (DC Bar No. 481501)
Janelle J. Geddes (TN Bar No. 035141)
Kropf Moseley Schmitt PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
Telephone: (202) 627-6900
addy@kmlawfirm.com
andrea@kmlawfirm.com
sara@kmlawfirm.com
janelle@kmlawfirm.com

/s/ *Abbe David Lowell*
Abbe David Lowell (DC Bar No. 358651)
David A. Kolansky (NY Bar No. 5887765)
Isabella M. Oishi (DC Bar No. 90018056)
Lowell & Associates, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
alowellpublicoutreach@lowellandassociates.com
dkolansky@lowellandassociates.com
ioishi@lowellandassociates.com

William C. Athanas (ASB-4639-A59A)
Brianna R. Stone (ASB-0400-Y40J)
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8996
Facsimile: (205) 521-8800
bathanas@bradley.com
bstone@bradley.com

*Counsel for the Southern Poverty Law Center, Inc.*

14