IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA      CR Nos. 1:21-cr-00175-TJK-1
     1:21-cr-00175-TJK-2

v.      1:21-cr-00175-TJK-3
     1:21-cr-00175-TJK-5

1-ETHAN NORDEAN      1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL      Washington, D.C.
5-ENRIQUE TARRIO      Wednesday, March 29, 2023
6-DOMINIC J. PEZZOLA,      9:00 a.m.
     Defendants.
- - - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF JURY TRIAL - DAY 56
*** MORNING SESSION ***
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the United States:      Jason B.A. McCullough, Esq.
     Erik M. Kenerson, Esq.
     Nadia Moore, Esq.
     Conor Mulroe, Esq.
     U.S. ATTORNEY'S OFFICE
     555 4th Street, NW
     Washington, DC 20530
     (202) 252-7233

For the Defendants:      Nicholas D. Smith, Esq.
     DAVID B. SMITH, PLLC
     7 East 20th Street
     Suite 4r
     New York, NY 10003
     (917) 902-3869

     Norman A. Pattis, Esq.
     PATTIS & SMITH, LLC
     383 Orange Street
     1st Floor
     New Haven, CT 06511
     (203) 393-3017

     John D. Hull, IV, Esq.
     HULL MCGUIRE PC
     1420 N Street, NW
     Washington, DC 20005
     (202) 429-6520

APPEARANCES CONTINUED:

For the Defendants:    Carmen D. Hernandez, Esq.
7166 Mink Hollow Road
Highland, MD 20777
(240) 472-3391

Nayib Hassan, Esq.
LAW OFFICES OF NAYIB HASSAN, P.A.
6175 NW 153 Street
Suite 209
Miami Lakes, FL 33014
(305) 403-7323

Sabino Jauregui, Esq.
JAUREGUI LAW, P.A.
1014 West 49 Street
Hialeah, FL 33012
(305) 822-2901

Steven A. Metcalf, II, Esq.
METCALF & METCALF, P.C.
99 Park Avenue
6th Floor
New York, NY 10016
(646) 253-0514

Roger I. Roots, Esq.
ROGER ROOTS, ATTORNEY AT LAW
113 Lake Drive East
Livingston, MT 59047
(775) 764-9347

Court Reporter:    Timothy R. Miller, RPR, CRR, NJ-CCR
Official Court Reporter
U.S. Courthouse, Room 6722
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3111

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                                                    **PAGE:**

AARON:
Direct Examination by Mr. Smith..................15711
Direct Examination by Ms. Hernandez.............15745
Cross-Examination by Mr. Mulroe.................15761

**P R O C E E D I N G S**

THE DEPUTY CLERK: This is Criminal Matter 21-175, United States of America v. Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs; Defendant 3, Zachary Rehl; Defendant 5, Enrique Tarrio; and Defendant 6, Dominic J. Pezzola.

Present for the Government are Jason McCullough, Erik Kenerson, Conor Mulroe, and Nadia Moore; present for Defendant 1 is Nicholas Smith; present for Defendant 2 are John Hull and Norman Pattis; present for Defendant 3 is Carmen Hernandez; present for Defendant 5 are Nayib Hassan and Sabino Jauregui; present for Defendant 6 are Steven Metcalf and Roger Roots. Also present are Defendant 1, Mr. Nordean; Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl; Defendant 5, Mr. Tarrio; and Defendant 6, Mr. Pezzola.

THE COURT: All right. Good morning to everyone.

Looks like we are back on track as far as our juror and Mr. Rehl's health.

So is there anything further before we bring in the jury and the witness?

MR. PATTIS: Briefly, Judge. We had requested a curative instruction and we had given some language to the Government and I neglected to follow up on that yesterday. This was the First Amendment instruction that Ms. Hernandez and I requested. I don't know where the Government is on

that.

MS. HERNANDEZ:  I'm sorry.  I couldn't hear.  I heard my name.

MR. PATTIS:  The issue of the curative instruction on First Amendment issues.  I had proposed language to the Government and, candidly, forgot to follow up on it yesterday.  And Ms. Hernandez and I had both requested that.

THE COURT:  All right.  Mr. Kenerson?

MR. KENERSON:  Thank you, Your Honor.

I think the Government was fine with the language that the defense proposed.  They had proposed it to us, I think, on a sheet of notebook paper.

THE COURT:  If you could move your mouth closer to the microphone.

MR. KENERSON:  They had proposed it on a sheet of notebook paper.  We have typed it up.  I'm happy to send it to the chambers account or to the defense for -- if they want to see it first, whatever is the easiest here.

THE COURT:  All right.  Look, let's just -- if you can respond that way and we can, at the first break or at lunch, take that up.  It sounds like it's not going to be an issue, but I'd rather not burn time at the moment dealing with it.  If you would respond -- and any defense counsel that wants to respond to the Government's, I think, restating, it sounds like, of what -- Mr. Pattis, what you

would like, and we'll take it up after the first break.

MR. PATTIS:  Yes, sir.

THE COURT:  All right.  Mr. Smith?

MR. SMITH:  Your Honor, can we make one point to the Court on the telephone lines before the witness takes the stand?

THE COURT:  All right.

MR. SMITH:  Thank you.

(Bench conference:)

(Following proceedings under seal:)



15701







15703











████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

████████████████████████

█████████████████████

(Following proceedings in open court.)

THE COURT: All right. Ms. Harris, could you bring in the jury, please.

(Brief pause.)

MS. HERNANDEZ: Your Honor, just -- we left it yesterday we were putting on two witnesses and two witnesses only today. I think the -- everyone's understanding is that -- that's what's happening, no matter how short or long these things go or --

THE COURT: Well, we do have the ability to go forward with more. So I -- my suggestion would be if you -- if we can have a third in the hopper, we should do that --

MS. HERNANDEZ: Okay.

THE COURT: -- given where we are.

MS. HERNANDEZ: I know Mr. McCullough had --

THE COURT: Mr. --

MS. HERNANDEZ: -- raised it this morning, but we're -- I'll have somebody.

THE COURT:  All right.  Who -- well --

MR. MCCULLOUGH:  Your Honor, we can discuss it at the first break.

THE COURT:  Okay.

(Brief pause.)

THE DEPUTY CLERK:  Jury panel.

(Jury returned to jury box.)

THE COURT:  Everyone may be seated.

Ladies and gentlemen, we're now going to hear from a witness called by Defendant Nordean.

Mr. Smith, you may proceed with your direct examination.

MR. SMITH:  Thank you, Your Honor.

Good morning, sir.  Just when I ask you questions, remember to lean towards the mic and answer so that the court reporter can hear.

THE COURT:  And one other thing, sir, just -- because we sometimes run into this problem.  If you can wait until the question's fully asked before answering and then, hopefully, the lawyer will wait until you're done answering before he asks the next question.  We have a court reporter taking down things, and if two people speak at the same time, it's really difficult for him to do that.

THE DEPUTY CLERK:  And, Your Honor, I need to swear the witness.

THE COURT:  Yes.  You do need to do that, as well.

Sir, if you would stand for a moment.

**AARON, WITNESS FOR DEFENDANT NORDEAN, SWORN**

DIRECT EXAMINATION

BY MR. SMITH:

Q.  So can you please state your name for the jury.

A.  Aaron.

Q.  Okay, Aaron.  Did there come a time when you joined the Proud Boys group?

A.  Yes.

Q.  And when was that?

A.  I believe it was spring of 2019.

Q.  Did you -- I'm sorry --

THE COURT:  Yeah.

THE WITNESS:  I believe it was spring of 2019.

BY MR. SMITH:

Q.  Okay.  And did you join of your own initiative?

A.  Yes.

Q.  Okay.  So did you come to Washington, D.C. on January 6th, 2021?

A.  Yes.

Q.  Okay.  At the time you decided to come to Washington, D.C. did you have a reporting relationship with the FBI?

A.  Yes.

Q.  And do you understand that the FBI designates people in

such a relationship as confidential human sources?

A.   Yes.

Q.   Okay.  And so you -- does that -- is it your understanding that the relationship you had was with an agent at the Federal Bureau of Investigation?

A.   Yes.

Q.   Was it more than one agent or one agent?

A.   Primarily one.  Sometimes someone else would show up with them.

Q.   Okay.  And do you understand that the agent who has a relationship with someone who is a source is known as a handler agent?

A.   Yes.

Q.   So before -- when you decided -- strike that.

When you decided to come to Washington, D.C. did you inform the agent or agents that you would be traveling to D.C. on January 6th?

A.   I was asked if I was planning to go.

Q.   And what was your response?

A.   Yes.

Q.   And how -- what -- where did the -- and what was the agent's response to that indication?

A.   He asked me to try to see if I could locate someone in D.C. that had nothing to do with the Proud Boys to figure out why they were there, if they were there, and what their

motivation was.

Q. So just to be clear, the agent did not ask you to go to D.C. in the --

A. Correct.

Q. -- first place?

Okay. And the agent did not ask you to march with the Proud Boys on January 6th?

A. Correct.

Q. Okay. Now, was there an expectation that you would later report back to the agent what you observed that day?

A. Yes, if there was, like, violence and all that, they would have wanted to know.

Q. And did you -- did your conversation with the agent contemplate what might happen if you encountered some people engaging in bad activity?

A. Yes.

Q. And what was the understanding?

A. If there's an emergency situation, and to protect myself from physical harm or worse, I have to do something minor, like if I'm surrounded by Antifa and I have to spray paint on a wall or break a window to try and get them to, you know, leave me alone, then that could be explained and would be much better than me being severely hurt.

Q. So when you say that that could be explained, what is your understanding of what that meant?

A.   That I wouldn't get in trouble if I did something minor like that if it was in the act of self-preservation, but not to seek out to do --

Q.   And that conversation, was that in the context of Antifa or -- alone or was it anything else?

A.   They mentioned Antifa.

Q.   So it was your understanding that the potential bad activity would center around interactions between Antifa and the -- where you were?

        MR. MULROE:   Object to leading.

        MR. SMITH:   I can ask it --

BY MR. SMITH:

Q.   Was it your understanding that the authorization that you received related to Antifa alone?

A.   Yes.

Q.   Okay.  You didn't -- in that conversation, did you discuss any other potential bad activities that wouldn't be related to interactions with Antifa?

A.   I don't recall.

Q.   Okay.  So when did you arrive in Washington, D.C.?

A.   The 5th.  Evening.

Q.   Okay.  And did there come a time when you decided to meet -- well, did there come a time when you decided what you would do on the -- the following day, on January 6th?

A.   We didn't know specifics at that time, just that we were

going to try to meet up with other Proud Boys.

Q.  Okay.  And did there come a time when you learned something more specific about where you'd be meeting or when?

A.  On the 6th.

Q.  And what did you learn?

A.  To meet at the Washington Monument at 10:00 a.m.

Q.  Okay.  I'm going to bring up Nordean Exhibit-301 at 10 minutes and 54 seconds.

MR. HULL:  Both voices up, Your Honor.

THE COURT:  All right.  All right.  Mr. Smith, you heard that.

And, sir, you heard it.  If you could just keep your voice up so everyone can hear.

BY MR. SMITH:

Q.  So Aaron, can you see the scene on the screen right there?

A.  Yes.

Q.  Okay.  Let me ask you an initial question here first. Do you recall somebody who was -- a handicapped individual who was in a wheelchair that was filming that day?

A.  Yes.

MR. MULROE:  Object to leading.

MR. SMITH:  I --

BY MR. SMITH:

Q. Do you recall anyone filming that day?

A. Yes.

Q. And what did that -- do you recall what that individual looked like?

A. There were multiple individuals.

Q. Was there one who was a Proud Boys member, to your knowledge, who was filming along with the group?

A. Yes.

Q. And do you recall what he looked like?

A. I believe he was in an electric wheelchair.

Q. Okay. So does this image on the screen resemble the scene that you arrived at the morning of January 6th at the Washington Monument?

A. Vaguely.

Q. Okay. Can you -- what was the scene like when you arrived there that morning?

A. A large group of people just milling about.

Q. And was it your sense that those people were deciding what they wanted to do at that point or had they already decided what they wanted to do and they were getting ready to go?

A. At that point, I don't think anyone knew what was going on, just that we were meeting.

Q. Why -- what leads you to that conclusion?

A. Because we were waiting for someone to come along and

say what we were to do and all that, like, if we were to go marching or whatever.  We were waiting for leadership at that time.

Q.  Okay.  And let me -- you mentioned the word "leadership."  So I will go in the same exhibit to 1 hour, 17 minutes, and 50 seconds.  And I'll just let you -- well, let me ask you one question first.  Aaron, were you along from -- for the entire march from the Washington Monument to the Capitol building?

A.  Yes.

Q.  Were you able to observe what you characterize as leadership?

A.  Yes.

Q.  You were able to see what they were doing and what they were saying?

A.  For the most part, yes.

Q.  Okay.  So I'm going to go to 1 hour, 17 minutes, and 59 seconds.

        MR. SMITH:  Oh, can I have the audio.

        (Brief pause.)

        (Video played.)

BY MR. SMITH:

Q.  So Aaron, are you able to see the group on one side of the street here, (indicating) and then some -- a smaller number of figures on the other side of the street?

A.  Yes, I can see that.

Q.  Okay.  And the smaller number of figures right here, (indicating) is that who you're referring to when you refer to leadership?

A.  Yes.

Q.  Okay.  And -- okay.  I'll let you just watch this for a second here.

            (Video played.)

BY MR. SMITH:

Q.  So do you recall marching with this group down the National Mall?

            MR. MULROE:  Object to leading.

            THE COURT:  Sustained.

BY MR. SMITH:

Q.  Do you --

            MR. SMITH:  I don't -- I'm not really sure how to -- I'm asking him whether he marched down the Mall.  I -- that's not leading.

            THE COURT:  I -- where did you go from here?

BY MR. SMITH:

Q.  Well, do you recall being on the National Mall with this group?

A.  Yes.

Q.  Okay.  Now, a couple of minutes ago, you mentioned photographs being taken.  Do you recall saying that -- or I

think you mentioned that a few people were filming the march.

A.   Yes.

Q.   Do you recall photographs being taken along the way of the group as they walked towards the Capitol building?

MR. MULROE:  Object to leading.

MR. SMITH:  Your Honor, there's no way to refer to the question without using the noun.

MR. MULROE:  Object to speaking response.

THE COURT:  Over- -- the objection is overruled.

THE WITNESS:  Yes.

BY MR. SMITH:

Q.   Okay.  So just to clarify this for the jury, you answered yes to the question of whether you recall photographs being taken of the group as they walked towards the Washington Monument?

A.   Yes.

Q.   Okay.  You testified that you could see and hear leadership as you walked with the group; correct?

A.   Most of the time, yes.

Q.   What was your understanding, based on your experience in the group as they marched towards the Capitol, of the purpose of walking towards the Capitol?

MR. MULROE:  Object to foundation.

THE COURT:  Sustained.  Just did he have an

understanding.

BY MR. SMITH:

Q.  Oh.  Did you have an understanding of the purpose as the group walked towards the Capitol?

A.  No.  I didn't know of a specific purpose other than just being on the streets and being seen.

Q.  And did being -- in your understanding, did being seen involve having opportunities to have photographs taken?

A.  Yes.

Q.  And did you understand that the reason the group was walking towards the Capitol was to have photographs taken there, based on your experience on the march?

MR. MULROE:  Object to leading.

THE COURT:  Sustained.

BY MR. SMITH:

Q.  Did you or did you not have an understanding that the reason the group was walking towards the Capitol was to have photographs taken there?

A.  Yes.

Q.  And what is that understanding?

A.  That we were going to have some pictures taken, to stay behind the head of the group, don't walk past them, and to listen when we're asked to stop.

Q.  And did you understand that there was any other reason for walking towards the Capitol besides that opportunity to

have photographs taken?

A.   No.

Q.   Now, later on in the march, did there come a time when the group ate lunch?

A.   Yes.

Q.   And do you remember where that might have happened?

A.   At the food trucks to the right of the Capitol facing the Washington Monument.

Q.   I'm just going to bring up Nordean Exhibit-301 again and -- at -- I'm going to bring up Nordean Exhibit-301 at 2 hours, 44 minutes, and 50 seconds.

          MR. SMITH:   Thank you, Ms. Harris.

BY MR. SMITH:

Q.   Aaron, can you see a truck in front of us with some food on it?

A.   Yes.

Q.   Does this look like the scene that you were just describing?  The food trucks.

A.   Yes.

Q.   Now, do you recall what the group did after the -- they were stopped at the food trucks?

A.   Re-formed up again cohesively.

Q.   And at that point, did they go anywhere?

A.   Walked back towards the Capitol while chanting.

Q.   Okay.  And do you remember this -- well, strike that.

How would you characterize the scene at the food trucks?

A.   Typical.  Hungry guys.

Q.   Would you say that -- were the guys standing around and talking while they were eating or just eating?

A.   Conversing, talking.

Q.   Did you -- based on your experience there, did you have an understanding of whether the group knew what it wanted to do at that point or was deciding what it wanted to do?

A.   Deciding.

Q.   And what gives you that sense?

A.   Because all the average guys around me, we were still, you know, wondering what was going on, you know, are we going to walk until we're tired?

Q.   Okay.  Were you tired?

A.   Yes.

Q.   Why?

A.   I had on new boots.

Q.   And?

A.   My feet were very sore.

Q.   Okay.  Were you inclined to keep walking around that day?

A.   Yes.  I was taking ibuprofen.

Q.   Okay.  At this point, when you're at the food trucks, did your understanding of the reason for walking towards the

Capitol change?

A.   No.

Q.   So earlier, you testified that the reason the group was walking towards the Capitol was to take photographs; right?

A.   Yes.

Q.   And so what you're saying is that nothing in your experience at this point led you to believe that the reason was different at this point?

MR. MULROE:   Object to leading.

THE COURT:   Overruled.

THE WITNESS:   Nothing at that time.   No.

BY MR. SMITH:

Q.   Okay.   So up until this point, based on your -- what you saw and heard, did you have any reason to believe that the group was walking towards the Capitol in order to invade the building?

A.   No.

Q.   Did you have any reason to believe that the reason the group was walking towards the Capitol was to interfere with law enforcement at the Capitol?

A.   No.

Q.   Did you hear anything along the way where people would say, "We have to interfere with members of Congress inside the building"?

A.   No.

Q.   Was that your understanding?  Was it -- well, I know that -- okay.

So you didn't hear people say that, but did you understand that that was the reason the group was walking towards the Capitol?

A.   To interfere?

Q.   To interfere with members of --

A.   No.

Q.   Okay.  This is -- maybe, this is a slightly different question.  But did you hear anyone saying that the purpose of walking towards the Capitol was to occupy the area in front of the Capitol building?

A.   I don't remember.

Q.   So I'm going to -- do you recall that you were interviewed by your -- an agent after January 6th?

A.   Yes.

Q.   And do you recall whether that might have happened in April of 2021?

A.   Yes.

MR. SMITH:  Okay.  I'm going to bring up a document just for the witness.  Let's see here.

(Brief pause.)

Okay.

BY MR. SMITH:

Q.   Aaron, can you see the -- can you see a transcript on

the screen in front of you?

A. Yes.

Q. Okay. I'm going to go to the first page of this just so you can see what this transcript's about. Do you see that there's, like, a case caption there at the top?

A. Yes.

Q. Do you see the date -- let me put a yellow line next to that, (indicating.)

A. Yes.

Q. Okay. I'm going to go to Page 30 of this -- oh, can you let us know what the date is.

A. April 5th, 2021.

Q. Okay. I'm going to go to -- and you don't need to read this out loud. I'm just going to ask you whether something refreshes your recollection. I'm just going to draw a line next to a question and answer. Can you see that? (Indicating.)

A. Correct.

Q. Okay. Does that refresh your recollection of whether you heard anyone along the march saying there was a plan to occupy the area in front of the Capitol building?

A. It does refresh my mind.

Q. And what's your understanding?

A. No --

Q. Okay.

A.   -- we were not going to occupy the area in front of the Capitol.

Q.   Okay.  Thank you.

So I think you testified that after the food trucks, the group began walking towards the Capitol building; right?

A.   Yes.

Q.   And do you know where they ended up?

A.   Yes.  They ended up not facing the Capitol -- or the Capitol on the left, the Washington Monument on the right, just behind center past the gates and all that off to the side.

Q.   In terms of landmarks, do you remember a roundabout -- a traffic circle?

A.   Off the top of my head, not really.  I think there was a water fountain not far away.

Q.   Okay.  I'm going to bring up what's been admitted as Government Exhibit-436.

(Brief pause.)

Now, before I bring that up, let me ask you a couple questions about the defendants in this case.

Have you ever -- do you have any personal relationship with Ethan Nordean?

A.   No.

Q.   Have you ever met him?

A.  No.

Q.  Have you ever met Enrique Tarrio?

A.  No.

Q.  Have you ever met Joseph Biggs?

A.  No.

Q.  And have you ever met Zachary Rehl?

A.  No.

Q.  Okay.  And before you came to Washington, D.C. on January 6th, were you a member of something called the Ministry of Self-Defense?

A.  No.

Q.  Were you in any Telegram chats relating to the Ministry of Self-Defense?

A.  No.

Q.  Were you in any Telegram chats relating to something called the Boots on the Ground?

A.  No.

Q.  Were you in any Proud Boys Telegram chats at all?

A.  A few.

Q.  And did they relate to a particular place or were they national?

A.  National.

Q.  Okay.  You don't -- do you recall what those -- what the names of those ones were?

A.  No, they were -- I think one was open for the general

public or something, but they were very generic.

Q. Okay. To your understanding, did they have anything to do with going to Washington, D.C. on January 6th?

A. No.

Q. Okay. So I'm bringing up Government Exhibit-437.

THE DEPUTY CLERK: 437 or 436?

MR. SMITH: Oh, excuse me. 436. You're right. And I'm going to 4 minutes and 34 seconds -- 4 minutes and 43 seconds.

BY MR. SMITH:

Q. So Aaron, I'm going to show you a scene right here and ask you whether this represents the fountain area where the Proud Boys group headed that you testified about.

(Video played.)

BY MR. SMITH:

Q. Now, I'm going to pause it here and just draw a circle around someone with a backwards black baseball cap and sunglasses. Do you see that figure?

A. Yes.

Q. Do you recognize that as one of the people who was leading the march along the Capitol?

A. Yes.

Q. Did you know that person by any name?

A. I believe that's Ethan Nordean.

Q. Yeah. Well -- and did you -- was there another name

that people called him?

A.  I think it was Rufio.

Q.  Okay.

(Video played.)

BY MR. SMITH:

Q.  Okay.  Aaron, do you recall being with the marching group at this point in this traffic circle?

A.  Yes, but I was farther back.

Q.  So let me just go back here and I'll --

A.  And I'm estimating about two-thirds of the way back.

Q.  So do you recall -- I've circled the person you've identified as Ethan Nordean.  Do you -- would you be able to, sort of, draw on the screen -- your own -- on your own with your finger, like, how far back you think you might have been.

A.  (Indicating.)

Q.  Okay.

A.  That's just a guess, though.

Q.  Okay.  So I'm going to let this play and we'll see what happens next and we can -- and then I'll ask you questions about it.

(Video played.)

BY MR. SMITH:

Q.  Are you able to see these two individuals walking towards a fence in front of the Capitol there?

(Indicating.)

A.   Yes.

Q.   Okay.  I'd ask you to keep your eye on the crowd here while we play this.

(Video played.)

BY MR. SMITH:

Q.   Now, Aaron, do you recall that -- a time when the crowd you were standing among began moving forward towards a fence outside the Capitol building?

A.   You mean after it was breached?

Q.   Do you recall the moment when the crowd started walking towards the fence to breach it?

A.   Oh, while Proud Boys were stationary as a group watching the Trump crowd waving their flags, advancing up towards the front of where the Proud Boys were at.

Q.   And do you recall being there in the moment when the crowd starts moving past barriers?

A.   Yes.

Q.   And what -- how -- what was your reaction to that?

A.   I thought there was a barrier over there.

Q.   And were you -- what -- how -- did that come as -- were you expecting that or were you not expecting that?

A.   I was not expecting.  I was confused at the moment.

Q.   Were you surprised?

A.   Yes.

Q.  And did there come a time when you communicated with the handler agent at the -- around this time?

A.  Yes.

Q.  And when you communicated with the agent, was it about the subject that we're looking at in this video?

A.  Yes.

Q.  And did you communicate with that agent at the time you were observing these activities?

A.  Yes.

Q.  And when you communicated with that agent, were you still -- were you surprised?

A.  Yes.

Q.  Okay.  And what did you communicate to the agent?

A.  I don't know if I'll say it exactly, but, "Proud Boys didn't do this.  It was herd mentality."  Something to that effect.

Q.  Okay.

A.  Because from my point of view, it looked like the Trump supporters who had walked up had done it.

Q.  It -- because it had looked like what?  I apologize.  I didn't --

A.  The Trump supporters who had walked up had done it, but -- from where I was stationed towards the back, judging by the movement of their flags.

MR. SMITH:  Okay.  I'm going to bring up what is

going to be marked as Nordean Exhibit-6.  And I'm going to show this to the witness, but I'm -- before -- let's not publish this yet.

THE DEPUTY CLERK:  You said 6?

MR. SMITH:  Yeah, I -- this will be marked as 6.

MR. MULROE:  No objection to this.

MR. SMITH:  Your Honor, we would move to publish this to the jury as a present-sense impression.

THE COURT:  All right.  It will be admitted.  And permission to publish.

BY MR. SMITH:

Q.  So Aaron, can you see the text on the screen now?

A.  Yes.

Q.  So can you read -- are those your text messages?

A.  Yes.

Q.  Okay.  Can you read those.

A.  "PB did not do it, nor inspire.  The crowd did as herd mentality, not organized.  Barriers down at Capitol Building.  Crowd surged forward, almost to the building now."

Q.  And I'm not going to get too specific here, but do you see how the timestamp says "12:02 p.m."?

A.  Yes.

Q.  You were -- do you understand that you were texting with someone who was not on the East Coast?

A. Yes.

Q. And do you understand that the phone that agent may have been using would be one hour behind East Coast time?

A. Yes.

Q. So what time would you have approximately sent this?

A. Well, it says "12:02." That would put it as having successfully sent at 1:02 East Coast time.

Q. And you said successfully. Why did you say that?

A. There were multiple times I would look down and see that it was still sending, and I'm assuming that's because there were just so many people there with cell phones that it was slowing down the cellular service.

Q. So do you recall trying to, maybe, send this message a few minutes before?

A. It would be dependent on the time that I saw the first barrier go down. It was probably within two minutes of that that I was trying to send that message.

Q. Okay. So at that point, after you send that message, what happens next?

A. I started walking with the group, just observing what was going on, not sure what I should do. I had only sent a message because I was told if I found myself in an emergency situation, to reach out.

Q. Did you consider that an emergency situation?

A. Yeah.

Q. So when you -- a couple of minutes ago, you mentioned Trump supporters -- a crowd of Trump supporters converging with the group you were with?

A. Yes.

Q. What was it about those Trump supporters that led you to think that they may have also been responsible for the breach?

A. The movement of the flags and all looked like they got in front of us. And then there was, like, a pause, and then people started going up.

Q. And --

A. And I don't know how long that took, but I was far enough back, though, that I was only going by, like, the movement of the flags up the -- where the reflection pools used to be and all that.

Q. And you've mentioned the flags they're carrying a couple of times. What -- is there any significance to them?

A. Trump flags, stuff like that. No significance, just they -- you were able to see the movement of the crowd easy.

Q. And did -- do you recall members of the group you were with carrying flags like that?

A. Yes.

Q. Okay. So did there come a time when you ultimately entered the Capitol building?

A. Yes.

Q.   Why did you do that?

A.   I wasn't going to at first, but then it was under the understanding that if I could prevent someone from destroying something of historic significance, that that would be a valid reason to go in.

Q.   And do you remember discussing that with anyone or did you decide that on your own?

A.   Someone else had mentioned it, and that's when I decided -- I could probably justify going in for -- because they said, "Boy, I hope they're not destroying things of historic significance in there," and I thought, hmm, I could justify going in there to stop that.

Q.   So when you got inside, where did you end up going in the building?

A.   I turned right and there was a small room on the right. It looked like a waiting room.  And I looked in there first, and then I advanced a little further in to the left where I saw a gentleman fighting with a police officer with a chair, playing a game of tug of war.

Q.   And what did you -- what -- how did you react?

A.   I walked over and placed my hands on the shoulders of the gentleman who was in the tug of war and that caused him to pause and look over his shoulder at me and allowed the cop time to run away.

Q.   Did you also have an opportunity to film some of your

efforts to do as you said, to prevent people in the building from committing --

A. Some.

MR. SMITH: Okay. I'm going to bring up what's been marked as -- will be marked as Nordean Exhibit-7. And I'm going to bring it up just for the witness first. Play this without sound.

BY MR. SMITH:

Q. So Aaron, can you just watch this video for a second and I'll ask you if you recognize it.

(Video played.)

BY MR. SMITH:

Q. Do you recognize that scene?

A. Yes.

Q. Do you think -- do you recognize this as a film that you made on your phone?

A. Yes.

MR. SMITH: Your Honor, I would move this into evidence as Nordean Exhibit-7.

THE COURT: All right. It will be admitted. And permission to publish.

MR. SMITH: Okay.

(Video played.)

BY MR. SMITH:

Q. So do you remember that moment?

A.   Yes.

Q.   What -- do you know approximately where in the building you were in that?

A.   Down the stairs from where I placed my hands on the guy's shoulders who was wrestling with a cop over a chair. I believe that that was a doorway that they were guarding to the House floor.

Q.   And how long had you been in the building at this point when you filmed this?

A.   I can only guess.  Maybe, 10, 15 minutes at that time.

Q.   And how -- do you know how long approximately total you were in the building?

A.   As a guess, I would assume about 20.

Q.   So I'm just going to take a step back to -- when you said --

A.   If I'm wrong, it's my error.

Q.   Okay.  I'm going to go back to your testimony that -- when you said -- you gave -- you explained your reason for going in the building.  When you decided to go into the building, was that a result of an agreement you had with anyone on the group that was marching towards the Capitol building?

A.   No.

Q.   Did you have an agreement with any of them to go inside or do anything in there?

A. No.

Q. So Aaron, did there come a time when you had another -- when you had an interaction with a law enforcement officer at some point in the building?

A. While exiting.

Q. I'm going to --

A. Shortly after that scene.

Q. And what happened? Do you recall what your interaction was like with the law enforcement officer?

A. I was letting an officer know as I walked by that -- and these aren't my exact words -- but trying to let him know that we had cleared out people from the downstairs area who had been going against the cops and, you know, letting them know that areas were safe and, you know -- as we were exiting.

MR. SMITH: So this is going to be marked, I guess, as -- I think we're at 9 now -- at Nordean Exhibit-9, Ms. Harris, or is it 8?

THE DEPUTY CLERK: 8.

MR. SMITH: 8? So this would be 8. And I'm going to bring it up for the witness first. And this is going to be at the -- this is Officer Alioto's footage, and it's going to be at the 1-hour-27-minute mark and 9 seconds. I'll just play it here for the witness first.

BY MR. SMITH:

Q.   Aaron, I'm going to play some body cam footage and see whether you recognize this and I'll let -- play this first.

          (Video played.)

BY MR. SMITH:

Q.   So do you recognize the person on the screen there?

A.   Yes.

Q.   Who is that?

A.   Me.

          MR. SMITH:  Okay.  So Your Honor, we would move this into evidence.  And permission to publish the statement of the witness?

          MR. MULROE:  No objection.

          THE COURT:  All right.  It will be admitted.  And permission to publish.

          (Video played.)

BY MR. SMITH:

Q.   So Aaron, do you recognize the person in the circle?

A.   Yes.

Q.   Who is that?

A.   Me.

Q.   Okay.  And do you -- what do you -- who are you -- are you approaching someone right now?

A.   A line of police officers.

Q.   Okay.  And why did you decide to approach the line of police officers?

A.   They were basically -- well, everyone was walking along past them as if they were, like, a guiding path to follow out, and that's when I thought I would, you know, let them know that the situation below was improved.

Q.   And what were you -- at this time, where were you heading right then?

A.   Out.

Q.   Out?

Do you exit shortly after this or --

A.   Yes.

Q.   Okay.

(Video played.)

BY MR. SMITH:

Q.   Were you able to hear what you said there?

A.   It's a little garbled, but how Proud Boys were able to get people to stand down against the police.

Q.   Okay.

(Brief pause.)

So why did you decide to leave the building?

A.   I didn't want to be in there any longer than I have to and the situation was changing -- improving.

Q.   Did you have an understanding of -- well, strike that.

You testified that you contacted the agent handler at some point because you felt like you should tell him what was happening to you; is that what you said?

A.  If I found myself in an emergency situation, to reach out.

Q.  And what was your understanding of what the expectation would have been of you at that point when people are going over the barriers?  The expectation from the agent.

MR. MULROE:  Object to relevance.

MR. SMITH:  This goes to his state of mind and --

THE COURT:  It's -- overruled.

BY MR. SMITH:

Q.  So I'm just asking you about what your understanding of the agent's expectation would have been of you, as you understood it, as you're in the Capitol building.

A.  If I saw a crime committed and I was asked about it, to truthfully answer about it.

Q.  Okay.  So when you leave the building, what do you do then?

A.  Went back to the -- met up with other people.  Went back to the subways and went back to our residence for the evening.

Q.  And then did you head home that day or the next day?

A.  The next day.

Q.  And did there come a time when the agent or agents wanted to talk about this with you?

A.  Yes.

Q.  And did you -- when was that?  Do you remember?

A.   The first time was within about, maybe, 10 days of getting home.

Q.   And did you --

A.   And it wasn't very specific, just a lot of random questions.

Q.   And then was there another -- a second time when you were interviewed --

A.   Yes.

Q.   -- by the agent?

And when was that, approximately?

A.   That may be April 5th.

Q.   And then was there another time when you met with agents?

A.   I believe that would have been in August.

Q.   Of?

A.   2021.

Q.   And, at that time, were you -- was it just agents or was it also a prosecutor?

A.   A prosecutor or a lawyer of some kind.  I don't recall.

Q.   And what you informed those agents and the prosecutor or lawyer, was it consistent with what you have testified today?

A.   Yes, I believe so.

Q.   Just to be clear, you are not a member of Proud Boys leadership, are you?

A.  No.

Q.  You were not involved in any discussions about planning for the events on January 6th; correct?

A.  No.

MR. SMITH:  Okay.  I think that's everything. Thank you, Aaron.

THE COURT:  All right.  Let me hear -- well, first of all, is there any request for any additional direct?

MS. HERNANDEZ:  (Indicating.)

THE COURT:  Yes.  All right.  Let me hear counsel at sidebar.  Let's do it at sidebar.

(Bench conference:)

MR. SMITH:  Your Honor, there's one video where there's a person named Chrestman -- Billy Chrestman who's a Proud Boy from Kansas City.  We're not going to object to the video, given the Court's ruling of the video showing the witness at -- on January 6th.  We understand that's fair play.  The Court's -- but there are a couple videos where there's long monologues by this person named Billy Chrestman.  They're not the witness's words and they're very inflammatory.  So -- yeah.

THE COURT:  So let me just -- Mr. Mulroe, how do you get -- if he's never seen them, what's your basis to confront him with them?

MR. MULROE:  Your Honor, I think, at this point, I

am probably inclined to -- not to offer them, but I may seek to elicit some foundation from the witness that would permit us, in our view, to use them --

THE COURT:  All right.

MR. MULROE:  -- and if so, I'll ask for a sidebar and raise that, but --

THE COURT:  All right.

MR. MULROE:  -- I don't think we're just going to put them up in front of him and try to do it cold.

THE COURT:  Okay.  That -- let -- Ms. Hernandez, though, you would like some additional direct; correct?

MS. HERNANDEZ:  Yes, just a few questions about how long he was in there and a few other things like that.

THE COURT:  All right.  So we'll proceed with Ms. Hernandez; then we'll proceed with the cross-examination.  It sounds like we're more or less aligned on where we are and we'll see if we get to any of these, kind of, selfie videos that I'm skeptical there would be foundation, but we'll see.

MR. MULROE:  Your Honor, just logistically, I think we'll probably use the demonstrative during our cross which would involve putting the easel up.  So if we're close to the time for a break when Ms. Hernandez finishes --

THE COURT:  All right.

MR. MULROE:  -- it might make sense, but leave it

to you.

THE COURT:  All right.  Let -- we'll do that just for that purpose.  I think we're, maybe, a little bit -- it will be -- well, we'll see how long she goes.  It may be a little bit early, but we have to take one at some point. Okay.

(Return from bench conference.)

(Brief pause.)

DIRECT EXAMINATION

BY MS. HERNANDEZ:

Q.  Good morning, sir.  Thank you for being here.  My name's Carmen Hernandez.  I represent Zachary Rehl.  He's the gentleman at the end there.

You already indicated you didn't know him -- you don't know him?

A.  No.

Q.  Right.  I just wanted to ask you a couple of questions about when you entered the Capitol.  You said you were in about 20 minutes --

A.  Random --

Q.  -- give or take?

A.  Yeah.

Q.  I'm sorry?

A.  Yes, give or take.

Q.  Thanks.

And also, you understood that -- or you believed that if you did something minor -- I think those are the -- your words, "minor" -- you wouldn't get in trouble?

A.   Could you rephrase?

Q.   I believe you stated on direct that you understood from your handler that when you were in these situations, if you did something minor, you would not get in trouble?

A.   If it kept me safe.

Q.   I see.  And --

A.   I wasn't given --

Q.   -- do you -- I'm sorry?

A.   I wasn't told to explicitly, you know, be okay with doing minor things and all.

Q.   Okay.  And when you entered the Capitol, did you think that was something minor or you thought it was for --

MR. SMITH:  Objection.  Speculation.

THE COURT:  Overruled.

BY MS. HERNANDEZ:

Q.   When you entered the Capitol, did you think that was something minor?

A.   I wasn't thinking like that at the time.  I was thinking about, maybe, making sure that important things were not being destroyed.

MS. HERNANDEZ:  Okay.  Thank you.  That's all I have, Your Honor.  Thanks.

THE COURT:  All right.  Ladies and gentlemen, we're going to take a quick 10-minute break for the court reporter.  We'll come back with cross-examination from the Government.

(Jury returned to jury room.)

THE COURT:  Everyone may be seated.

All right.  And, sir, you may step down.

(Witness steps down.)

THE COURT:  And, Ms. Harris, what we'll do is just have the witness back on the stand and the jury back in the box in 10 minutes to proceed.

So we'll be in recess for 10 minutes.

THE DEPUTY CLERK:  All rise.  This Honorable Court stands in recess for 10 minutes.

(Brief recess taken.)

THE DEPUTY CLERK:  We are back on the record in Criminal Matter 21- -- oh, hold on.

(Brief pause.)

We are back on the record in Criminal Matter 21-175, United States of America v. Ethan Nordean, et al.

THE COURT:  All right.  The parties wanted to address something before we move forward.

Mr. Smith?

MR. SMITH:  So Your Honor, yesterday, we asked the Government in the afternoon whether they would provide

the -- any chats or messages -- statements of the witness that they would intend to use so we could make redactions for the reasons we've talked about and to see whether it's outside the scope. Mr. Mulroe decided not to. He sent them a couple of minutes ago. They appear to -- we forwarded the chats to the Court. They appear to contain many references to a place of residence that would easily identify the witness. Your Honor will see -- we don't even know whether these are the witness's statements. We've had no opportunity to examine where the messages came from. This could have all been done yesterday. Mr. Mulroe sent a couple of exhibits yesterday and represented these are some of the materials we use. We don't understand why the texts could not have been sent at the same time.

Your Honor, the direct examination did not cover any political issues at all. It was solely focused on what this person observed. So to bring up some potential statements of the witness about January 6th, his opinions, his politics is outside the scope beyond exposing his identity more than it needs to be. So Your Honor, we don't think this is proper impeachment material.

THE COURT: All right. Mr. -- well, Mr. Mulroe?

MR. MULROE: Your Honor, we have heard several times in this courtroom that the credibility and bias of the witness is always appropriate cross-examination, always

within the scope.  And that is largely what these exhibits go to.  I'll note it's roughly four pages of text messages that have been provided in discovery and that I provided to defense counsel upon conclusion of his direct examination of the witness as has been the uniform practice for every witness in this case.

The relevance of these is, first -- I know Your Honor has them.  So Exhibit-1710B is a portion of the chat group that this witness was in, along with other members of his Proud Boys chapter who were going to Washington, D.C. on January 6th.  It was the venue in which they discussed the trip and made their plans for the trip.  And we're offering this for the statements of one of the members of his chapter, a defendant who's charged in a separate case, Chris Kuehne, who makes statements about what he expects for January 6th, some very colorful language referring to serious violence, such as, "Be prepared not only to beat down, but when you do, action of violence so utterly massive that we send a message."  There are more messages from Mr. Kuehne along those lines.  And I think this is relevant to the witness's expectations coming into the trip, to his understanding of what the Proud Boys were going to be doing there.  And I think that it bears very directly on his credibility.  Mr. Smith has put him forward as an agent of the Government, a person who had a reporting relationship

and whose testimony about how there was no plan and how this wasn't the Proud Boys' fault ought to be given some special weight for that reason. So I think the jury's entitled to know that he was in this chat group where one of his close associates, who he spent the entire day with on January 6th, was talking about anticipated violence in these terms and he didn't see fit to report that to the FBI and let them know that that was part of what was brewing for January 6th.

MR. SMITH: Your Honor, these are not the witness's statements. We don't know if he's seen them. The witness did not testify about his expectations for violence. Your Honor will note that we carefully avoided any question about opinion, expectation of violence, anything like that. He testified about what he observed and that was all. Did he see something? Did he hear something?

THE COURT: He testified as to what his understanding of the purpose behind the rally was; correct?

MR. SMITH: Based on his observation -- what he saw and heard on the march, not based on his conversations -- Your Honor, the -- we did this deliberately to avoid impeachment with other people's statements. The -- this is not -- Your Honor will recall that impeachment and credibility testimony that we've had so far in trial is based on the witness's own remarks. These are not even the witness's statements, Your Honor. The suggestion here is we

can show the jury inflammatory remarks that not even the witness made on the theory that he saw them and could have reported them to the FBI?  He is not -- what he saw before January 6th is not at issue.  Whether he reported this to the FBI, we don't know.  We don't even know whether that was within the scope of what the agent asked this person to do, Your Honor.  We didn't elicit from this witness that he was tasked with informing on Proud Boys.  To the contrary, he reported the opposite:  "I joined on my own initiative."  So the fact that he didn't report on someone is not -- is neither here nor there to his credibility when he wasn't charged with that task.  That is what he testified.

But -- and then, Your Honor, on the 403 basis, it would be one thing if this witness were making these statements.  To just show these to the jury and insinuate this is a part of the defense case when we -- the witness didn't say these things.  It's of -- a piece showing a monologue from Billy Chrestman talking about storming the Capitol, and we don't know whether the witness even saw it.

THE COURT:  That's a little bit different in that we really have no information whatsoever.  I mean, here, the -- we're back to the chat group issue.  It -- so it's a, you know -- he was a part of these chat groups.

MR. SMITH:  Your Honor, it would be equivalent to, if we're cross-examining an FBI agent, if we said, "Didn't

Case 2:21-cr-00139-JKFP Document 1025-4 Filed 10/08/24 Page 58 of 173   15752

an FBI agent from a different field office say this? You're in the same organization. Didn't an agent 300 miles away say this?" Your Honor would never allow something like that. And so what is the difference here?

THE COURT: It's -- well, I just -- it's highly contextualized; right? This is about a particular thing that they're preparing for -- when are the -- what are the -- it's within -- they're within a few days of January 6th and they're speaking about -- I mean, look, even if it's something like this -- I'm just looking at one of the statements here, you know -- "This is going to get kinetic quick." I mean, his whole -- part of his testimony was, "I was surprised. I didn't -- I didn't see any of this." Now, he may say, "I didn't see that," but I guess, if you're in a chat with someone, I don't know why -- when you testified, "I was totally surprised at what happened, that this effectively got kinetic," and here's someone in your chat in a relatively -- I mean, it -- I don't know how big this chat group was, but in a chat group saying, in fact, it -- and someone you're closely associated with that day says something to the contrary, I don't know why that's not fair.

MR. SMITH: Well, two things, Your Honor. One, if this witness testifies he didn't see it, we can't publish this to the jury. This is not -- just because someone is a

member of a chat group with dozens of people, or more, that doesn't mean they've seen something. There is no proof the person's seen it. So he can't be impeached with something he didn't see or know about. That's the first thing.

And the second thing, Your Honor, is his observations on direct are about what he saw on January 6th. I am not -- the question was not, "Have there been violent conversations in the past among people you were with?"

THE COURT: I understand that. I understand that. But the question is whether it goes to -- it still impeaches his testimony and whether it's relevant to bias. I hear what you're saying. I hear what you're saying. But -- I mean, it's -- let's just say -- putting aside the question of whether he saw the statements, let's just say for the moment he would say, "Yes, I remember them," just for the purposes of this, to get to your next point, again, he testified, "I was surprised by what happened." I don't know how this doesn't -- let me --

MR. SMITH: If Your Honor scrolls up, you will see they're referring to fights with Antifa. That is the constant theme of this case. The Government is taking snippets of statements that relate to Antifa and violence and presenting them as related to the presidential election. That's the whole bait and switch here. You can go to the beginning of this chat and see they're talking about Antifa,

not violence in connection with the Capitol. There's nothing inconsistent with what he testified about the Capitol -- "Did you expect people to storm the Capitol" -- and comments from another person about Antifa and violence. That is not inconsistent. And it's not impeaching his credibility.

THE COURT: I'm not -- it -- well, we've been through this.

Mr. Pattis, why don't you --

MR. PATTIS: Any number of times, the defense sought during cross-examination of Government witnesses to impeach along a variety of theories, and we used the argument that Mr. Mulroe would say, and repeatedly we were stopped because of scope. And I earned -- learned a grudging admiration for the thought that went into the Government's case by -- they laid appropriate foundations to get what they wanted and to stop us from getting what we wanted. I think Mr. Smith is right. He laid a foundation such that this is beyond the scope, and we would, you know -- oh, that we had tried this case with more robust cross-examination rights, it might look different, but we didn't get them and it's hard -- I'm hard pressed to see why the Government should. I think Mr. Smith laid that foundation. You can't impeach a person by third-party statements. He didn't -- I mean, he did say he was

surprised that day and that's as close as it gets.

THE COURT:  But that's pretty close.

And let me just say this.  The idea that you all didn't have robust cross-examination, given how -- the sheer amount of time we spent on cross-examination, I don't begrudge --

MR. PATTIS:  May --

THE COURT:  -- I don't begrudge that, but I think the record will reflect there was robust cross-examination.  Now --

MR. PATTIS:  The record --

THE COURT:  -- the --

MR. PATTIS:  -- will probably also reflect --

THE COURT:  Mr. Pattis, I'm speaking.  Thank you.

You are correct insofar as you say I policed the scope issue.  You're -- the point you were making is correct.  But I think it's different when we're talking about the -- let me put it this way.  These are percipient witnesses of what happened that day testifying as to what they saw and what they expected and what they thought the purpose of the Proud Boys being there that day.  So it's a different -- it's a -- the question of whether these chats -- now, I think it is a little -- it strikes me as -- Mr. -- well, anyway, I think it's a fundamentally different type of impeachment and type -- different type of issue.

Mr. Pattis --

MR. PATTIS:  Briefly?

THE COURT:  -- you can proceed.

MR. PATTIS:  However long our cross-examinations may be, I would wager that we spent as much time arguing about the scope of them as we did conducting them.

THE COURT:  I don't -- I wouldn't quite go that far.

Mr. -- let me just ask this one question, Mr. Mulroe.  If he says, "I don't" -- it strikes me that you -- even if you have -- I don't know that you can get these into evidence if he says, "I didn't see them."  That doesn't mean you can't ask him about them.  Is that -- how would you get it into evidence if he says, "I don't ever remember seeing this"?

MR. MULROE:  I think that's probably right, Your Honor.  I think we have an authenticity problem if --

THE COURT:  Right.

MR. MULROE:  -- or a foundation problem if he doesn't remember seeing them, but I fully expect that he will.  It was a small group.  He was actively involved.

THE COURT:  Well, again, even then, you're saying you get them in just as impeachment evidence even beyond his testimony about "I saw it" or -- whatever his testimony about it might be, let's say he does remember them and

we'll -- can explain them or has some comment about them -- you still think they come in -- again, I guess, not for the truth of the matter asserted, just for impeachment or credibility to -- as they reflect on his credibility?

MR. MULROE:  I think that's correct.

MR. SMITH:  Your Honor, if the witness hasn't seen them, what is being impeached?

THE COURT:  Well, I mean, I guess -- right, no, no, no, no, I don't think Mr. Mulroe is disputing what you're saying.

MR. SMITH:  No, Your Honor.  I think Mr. Mulroe just indicated that they still come in even if the witness hasn't seen them.  Then the question becomes, what is being impeached if the witness has not seen the messages?

MR. MULROE:  I don't want to jump in.  I don't think that's what I said.  I think I agreed with Your Honor that if he doesn't -- if he claims he's never seen them or doesn't remember them, I think that probably -- I would be inclined to just move on at that point.  Now, I think that we could -- I think there's an argument to be made that if he's in the small group and didn't see -- or claims to not have seen these, that that is raising an inference about his powers of observation.

THE COURT:  Okay.

MR. MULROE:  We're going to -- that's not what

we're trying to do here.

THE COURT:  Okay.

MR. MULROE:  I think he's going to say that, "Yes, I remember those messages."

THE COURT:  We're going to put off the issue of whether they're going to be admitted.

MR. ROOTS:  (Indicating.)

THE COURT:  And I'll hear you in a second, Mr. Roots.

We're going to put off the issue of whether they're going to be admitted, but I'll -- I'm going to permit you to ask him about them -- put them up on the screen and ask him about them, and he says what he says, but we won't admit them for now.

Mr. Roots?

MR. ROOTS:  Mr. Pezzola has made the choice not to do direct.  We still have -- at this moment, we have not waived our direct.  And we did that based on our understanding of Your Honor's -- the limited scope that Mr. Smith laid.  We did that -- we've made that choice based on the -- our understanding that the scope was limited.

THE COURT:  Okay.

MR. ROOTS:  If the Government --

THE COURT:  Do you want direct now?

MR. ROOTS:  I'm saying if you rule that this --

these doors are wide open, then we could go deep, deep, deep into this stuff.

MR. MULROE:  We have no objection with Mr. Pezzola's counsel doing direct.

THE COURT:  If any counsel, based on this, feels they want -- they need direct examination, you can have it. Is any --

MR. ROOTS:  Honestly, we would need a five-minute consultation among the lawyers to discuss --

MR. SMITH:  No, Your Honor.  We're moving on. We've made a decision.  We're not opening this up further than has already --

THE COURT:  Mr. Smith, the -- the court reporter could not hear you.

MR. SMITH:  We are prepared to proceed, Your Honor.  Let's move to cross, please.

THE COURT:  Well, I'm -- I have to ask the other -- just as I did before -- whether the other defendants want direct examination.

MR. SMITH:  They do not, Your Honor.

THE COURT:  Well, Mr. Smith, you can't ask -- you can't answer on behalf of the other defendants.  Goodness gracious.

MR. SMITH:  Your Honor --

THE COURT:  I mean, what in the world --

MR. SMITH:  -- we called the witness and we have not heard -- Your Honor, I understand the funny games the Government would like to play here.  The defense has made a determination about the scope of this witness.  It's narrow.  It's about the march.  That is what the scope of this testimony is.  And no defendant is taking the position that we're kicking the door open to further testimony.

THE COURT:  I'm going to ask any -- does any other defense want direct examination?

MR. ROOTS:  Your Honor, speaking for Pezzola, we would like a five-minute consultation with the other lawyers so we can discuss this.

THE COURT:  I'm going to give you one minute while I sit here.

(Brief pause.)

MR. ROOTS:  Okay.  Your Honor --

THE COURT:  Yes, sir?

MR. ROOTS:  Okay.  I believe, after a little bit of consultation, we are going to waive our direct.

THE COURT:  All right.  Then let's proceed.  You can bring in the witness and the jury.

(Brief pause.)

(Witness resumed the witness stand.)

(Brief pause.)

THE COURT:  A couple of scheduling things just for

the attorneys or -- I have the instruction, Mr. Pattis. Is -- we discussed -- and so I'll give that instruction, if that's agreeable to the parties.  There was an instruction related to the prior witness.  I don't know if the parties -- are we just not -- if we're not there, we're not there.  I guess -- are we not there in terms of whether the parties have settled on something?

MR. PATTIS:  I just raised the First Amendment issue.  That's the only one I --

THE COURT:  Okay.  I understand.

MS. HERNANDEZ:  The other -- I -- we have not resolved --

THE COURT:  Okay.  Okay.  And is it the parties' request -- all right.  So I'll give this at the first opportunity, Mr. Pattis.  The one --

MR. PATTIS:  Thank you, sir.

THE COURT:  -- you suggested.

THE DEPUTY CLERK:  Jury panel.

(Jury returned to jury box.)

THE COURT:  All right.  Everyone may be seated.

All right.  Mr. Mulroe, you may proceed with cross-examination.

MR. MULROE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MULROE:

Q. Good morning, sir.

You first developed a connection to the FBI around 2008; is that correct?

MR. SMITH: Objection. Scope.

THE COURT: Mr. Mulroe?

(Bench conference:)

THE COURT: Mr. Mulroe, what are we doing here?

MR. MULROE: Well, I just think the history of his work with the FBI is relevant to his credibility.

THE COURT: Well, what is going to be -- what are you going to go into?

MR. MULROE: Oh, I just -- what I'm trying to make clear is that he reported for a long time on things that were not the Proud Boys. I'm certainly not going to ask what those things are, but the fact that the primary thrust of his work with the FBI was completely unrelated to this case, I think, is relevant to assessing his credibility.

THE COURT: All right.

MR. SMITH: Your Honor, if he doesn't get into the subject matter --

THE COURT: Yeah.

MR. SMITH: -- of what was being reported on, okay, but if -- but, Your Honor, if --

THE COURT: We're --

MR. SMITH: -- he's about to say they were

neo-Nazi groups --

THE COURT: Mr. Smith, Mr. Mulroe has said he's not going to get into it, and if he does and you object, I'm going to sustain the objection.

You may proceed.

(Return from bench conference.)

BY MR. MULROE:

Q. 2008 sound about right for when you first started?

A. Yes.

Q. And that was about 12 years before January 6th; correct?

A. Yes.

Q. And that was about -- approximately eight years before the Proud Boys started?

A. I don't know when they started exactly.

Q. Quite a few years before the Proud Boys came into existence, though, you already had this relationship?

A. Yes.

Q. And, sir, you're aware that, within the FBI, there's an official term for folks who provide information in the way you have; right?

A. I do now, yeah.

Q. That's confidential human source, or CHS?

A. Yes.

Q. But that is not a term that you would have used to describe yourself; correct?

A.   Correct.

Q.   Fair to say that being a CHS is not a full-time job?

A.   Correct.

Q.   Fair to say that being a CHS did not define your identity as a human being?

A.   Could you rephrase the question?

Q.   Well, when you -- think about, kind of, who you are and what makes you you.  A CHS isn't at the top of that list; right?

MR. PATTIS:  Objection.  Vague, Judge.

THE COURT:  Overruled.  If the witness can answer.

THE WITNESS:  Correct.

BY MR. MULROE:

Q.   And fair to say that even though the FBI considered you a source of information, you had a whole personal life that your contacts at the FBI didn't know about and didn't care about; right?

MR. METCALF:  Objection as to what other people knew.

THE COURT:  Overruled.

THE WITNESS:  I feel like I've had multiple lives.

BY MR. MULROE:

Q.   You joined the Proud Boys in early 2019; correct?

A.   Yes.

Q.   And what drew you to the group was what you've described

as a channel of energy, kind of, heading in the club's direction?

A. Yes, and they were, kind of, libertarian-leaning and not as extreme as other people I had known over the years.

Q. Libertarian-leaning -- well, strike that.

So you felt a channel of energy. And would it be fair to say that you had some affinity for the group's views?

A. Partially, yes.

Q. And part of the channel of energy that drew you in was the club's history of fighting Antifa in Oregon; correct?

MS. HERNANDEZ: Objection.

MR. SMITH: Objection. Scope. Relevance.

THE COURT: Overruled.

MS. HERNANDEZ: 403.

THE COURT: Overruled.

THE WITNESS: That I saw them standing up against something that appeared overly aggressive on one end, like, it -- I'd say that watching people getting jumped by Antifa and then seeing someone else trying to prevent that, it was, kind of, exciting to watch on YouTube and all.

BY MR. MULROE:

Q. Exciting to watch. And when you say "stand up," you mean stand up in a way that involves physical force; correct?

A. No, just -- sometimes just their presence was enough to see what I saw as, like, average everyday Joes not getting trounced by Antifa and stuff like that.

Q. But you did use the word "fighting" when you explained to the FBI in August of 2021 what drew you into the --

A. Yes --

Q. -- group?

A. -- defense is -- "fighting," yeah.

Q. And when you joined the Proud Boys, that wasn't something that the FBI directed you to do; correct?

A. Not at all.

Q. That was something that you did because you wanted to do it; right?

A. Yes.

Q. And so it would not be accurate to say that the FBI embedded you in the Proud Boys, would it?

A. They did not.

Q. If someone described it that way, that would be entirely false; right?

A. Correct.

Q. You did, however, mention to your contacts at the FBI that you joined the Proud Boys; right?

A. I don't recall if I mentioned it prior to them asking me if I was going to D.C.

Q. Okay. It's not something that you kept a secret from

them; right?

A. I don't recall if I had mentioned to it -- it to them prior.

Q. Are you familiar with the term "tasking" in the context of the FBI?

A. No.

MR. ROOTS: Objection. Scope.

THE COURT: Overruled.

BY MR. MULROE:

Q. Well, there were times, sir, when the FBI would ask you to go out and learn about certain things; right?

MR. ROOTS: Objection. Scope.

THE COURT: Overruled.

THE WITNESS: Could you rephrase the question?

BY MR. MULROE:

Q. Well, you didn't just go to the FBI and tell them what you figured they might want to know; right? They, kind of, asked you to either go out and learn stuff or go out and do stuff; right? They provided you some guidance?

A. Guidance like, "Don't use your camera." Stuff like that. It will raise suspicion in dealing with other things in the past.

Q. The FBI never asked you to go out and gather information about the Proud Boys; right?

A. Correct, that I can recall.

Q. Nonetheless, though, you had an understanding that you should keep your eyes open for signs of trouble; correct?

A. Yeah, if a fight broke out and someone got stabbed and they asked me about it, be honest about it.

Q. Generally, throughout your time as a member of the Proud Boys, you didn't see the need to report anything about the club's activities to the FBI; correct?

A. Correct.

Q. And most of what your chapter was doing was just, kind of, having barbecues and drinking beer; is that right?

A. Yes.

Q. In terms of your position within that chapter, you did not hold a leadership position; right?

A. No.

Q. That was a no?

A. No.

Q. And you only went as far as second degree; correct?

A. Yes.

Q. You didn't get a third degree; right?

A. No.

Q. That would have required you to get a tattoo?

A. Correct.

Q. And you didn't get your fourth degree; right?

A. Correct.

Q. That would have required you to fight Antifa or get

arrested?

MS. HERNANDEZ:  Objection.

MR. METCALF:  Objection.  Misstates the evidence.

MR. ROOTS:  Objection.  Facts not in evidence.

THE COURT:  Actually, overruled.

THE WITNESS:  No, I have never engaged Antifa or got arrested.

BY MR. MULROE:

Q.  And I've accurately described what it would have taken you to get the fourth degree; right?  Fight Antifa or get arrested?

MR. SMITH:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. MULROE:

Q.  I should ask you on this point, sir, just because the FBI considered you a CHS, that did not mean that you had a free pass to go out and commit crimes; right?

A.  Correct.

Q.  There were times when the FBI would give you very narrow authorization to do specific things that would otherwise be he illegal; right?

A.  I don't recall them saying stuff like that prior.  I may be incorrect.

Q.  Well, I certainly don't want to go into detail, sir, but there were times when you would help the FBI get certain

items off the street?

    MR. SMITH:  Objection.  Relevance.  Scope.  403.

    THE COURT:  Overruled as to this one question.

BY MR. MULROE:

Q.  Let me ask you this way, sir.  Were there times when your work as a CHS involved possessing things that would otherwise not be legal for you to possess?

A.  Like drugs?  Firearms?  I don't --

    MR. SMITH:  Objection.  Relevance.  Scope.

    THE COURT:  Overruled, if the witness can answer the question.

    Yes or no, sir?

    THE WITNESS:  I don't recall possessing something illegal like that.  No, I don't recall.

BY MR. MULROE:

Q.  You don't remember --

    MR. PATTIS:  Objection.

    MR. SMITH:  Objection.  The Court's -- asked and answered.  Scope.  403.  Prior Court ruling.

    MR. MULROE:  I'd like to finish my question, Your Honor, pursuant to the decorum --

    THE COURT:  Mr. Mulroe, if you'll -- I'll hear you at sidebar.

    (Bench conference:)

    THE COURT:  I -- Mr. Mulroe, I know what you're

trying to get at, the question of tasking and not tasking. I understand. Isn't there -- and tasking as to an unlawful activity. He said he doesn't remember. What's going to be your next question? I do want to get ahead of this, because I don't --

MR. MULROE: Sure, sure, sure. I was just going to ask whether he remembers signing a form laying out the authorization -- he signed a form days before January 6th related to something different.

THE COURT: Okay. I think that's fine. Look, again, I think this is relevant. The point is he wasn't given an authorization to go in the Capitol, and that's what the Government is, sort of, trying to elicit, and I think that's fairly within the scope, but --

MR. SMITH: And, Your Honor, I think that can be asked without asking him if he's possessed illegal --

THE COURT: Right.

MR. SMITH: -- materials --

THE COURT: Well, that's --

MR. SMITH: -- in the past.

THE COURT: -- why we --

MR. SMITH: If he --

THE COURT: Mr. Smith, that's why I sustained the objection and that's why we're moving on.

(Return from bench conference.)

BY MR. MULROE:

Q. Sir, you never remember signing a form that authorized you to do very limited activities that might otherwise be unlawful?

A. I don't recall. I signed forms saying that I was voluntarily meeting with them, I was -- et cetera, I was not being pressured and all that. And I've signed some other forms. I just can't recall the scope of some of them.

Q. Sure. More to the point, sir, you never signed a form or received any specific instruction that you were authorized specifically to act illegally in connection with the Proud Boys; correct?

A. Correct.

Q. You did have an understanding, you told us on direct, that if it became necessary to protect your safety, it would be okay for you to do something minor like doing a graffiti, perhaps?

A. Yeah, like if I -- specifically mentioned, like, suppose I get cornered by Antifa.

Q. And --

A. But they were very vague about that.

Q. And you wouldn't be allowed to shoot someone; right? You think --

A. Not at all.

Q. You used the example of graffiti before.

A.   Yeah.

Q.   That was something that was understood by you; right?

A.   Yes.

Q.   Understood, kind of, implicitly?

A.   Define implicitly.

Q.   You didn't receive a form in writing telling you that; right?

A.   If I did, I don't recall it.

Q.   Now, in connection with the Proud Boys, sir, you traveled to Washington, D.C. for a rally on December 12th, 2020?

A.   Yes.

         MR. SMITH:   Objection.  Scope.  Relevance.  403.

         THE COURT:   Overruled.

BY MR. MULROE:

Q.   And that was because you wanted to; right?  The FBI didn't direct you to attend that rally?

A.   Yes, I was already planning to go when they asked me if I was going with them.

Q.   And so you let them know that you were going to D.C. with the Proud Boys in December?

A.   Yes.

Q.   And they didn't ask you to do anything in particular while you were there?

A.   I can't recall the name, but they said if I can find out

if a certain person is going to be there and find out his
motivations, to let them know.  But I don't recall who.

Q.  The person who has nothing to do with this case, though;
right?

A.  Correct.  And nothing to do with the Proud Boys.

Q.  How did you get to D.C.?

A.  Carpool.

Q.  And that's about a 16-hour drive without stops?

A.  18 to 20.

Q.  So you weren't going to D.C. on a lark.  This was a lot
of time and effort it took you to get there; right?

A.  Yes.

Q.  And you went to be part of this Proud Boys event?

A.  Yes.

Q.  That December rally was a powerful experience for you,
wasn't it?

A.  It was an interesting experience.

Q.  You found, while you were there, that ordinary Trump
supporters looked up to you guys?

A.  Yes, I believe I used the term "acted like rock stars."

Q.  Rock stars.  Yeah.  That was an ego boost in a way,
wasn't it?

            MR. SMITH:  Objection.  Relevance.

            THE COURT:  Overruled.

            THE WITNESS:  Not necessarily for me, but I was,

like, surprised at their reaction.  I was -- I hadn't processed it in a way that would have made me feel myself like a rock star, just that that was the vibe that they acted like it.

BY MR. MULROE:

Q.  The vibe was that there had never been another time in your life when people were so happy to have you --

MR. SMITH:  Objection.  Outside -- hearsay.  No prior inconsistent statement.  Your Honor, the prosecutor's reading an out-of-court statement.

THE COURT:  Overruled.

BY MR. MULROE:

Q.  The vibe for you, sir, was that there had never been another time in your life when people were so happy to have you around; isn't that right?

A.  I don't know if I said those words exactly, but that's just my interpretation of the situation.

Q.  And it was your status as a Proud Boy that made you feel that way, not your status as an FBI CHS; isn't that right?

A.  People's reaction to me, yes, but my feelings were pretty neutral.  It wasn't my reason of going there, is to feel that way.

Q.  You believed that more than 1,000 Trump supporters joined the Proud Boys that day; right?

A.  Define "joined."

Q.  Followed.

A.  Walked with, amongst.

Q.  Walked with and amongst?

And you believed that all those numbers made you and the other Proud Boys more effective at keeping Antifa under control; right?

A.  Yes.  They were less likely to attack rally attendees because there was a larger force there to prevent that and -- yeah.

Q.  And after the December rally, you drove those 18 hours home?

A.  Yes.

Q.  And then, shortly after that, you became aware of another rally in D.C. planned for January 6th; correct?

A.  Yes.  At first, no one was planning to go, though.

Q.  Your chapter at first was not thinking about attending; right?

A.  Correct.

Q.  Your understanding was that your chapter's leadership didn't condone people going to D.C. on January 6th; correct?

A.  At that time, yes.

Q.  They understood, though, that some of the guys were probably going to go anyway?

A.  I believe so.  Also, that there had been reports that Antifa would be infiltrating the crowd dressed up like Trump

supporters.

Q. And so the leadership of your chapter issued some guidance to the guys who might be thinking about going?

A. Yes.

Q. And your understanding was that this guidance was put together just in your local chapter. It didn't come from national leadership; correct?

A. Correct.

Q. The guidance said that conflict was almost certain?

A. If we ended up face to face with them, yeah.

Q. And the guidance from your chapter leader said that if you get in trouble, that's on you. There's not going to be chapter funds available to bail you out; right?

A. I do recall that.

Q. Your chapter leadership, sir, had concerns based on what happened at the December rally; correct?

A. I don't recall specific concerns.

Q. You don't remember them having concerns about all the aggression that happened that night and actively going out and looking for Antifa and challenging them at BLM Park and all --

MR. SMITH: Objection. Relevance. Scope. 403. Antifa and BLM.

MR. ROOTS: Objection. Misstates the evidence.

THE COURT: The witness can answer the question.

BY MR. MULROE:

Q. I'll repeat the question. You don't remember concerns from your chapter leadership about all the aggression that had happened that night and actively going out and looking for Antifa and challenging them at BLM Park and all that stuff?

A. I recall that one guy who, when he had exited an alley and had run face to face with them and all and had gotten into a fight, was thinking he had become fourth degree but was told no, we should never, you know, be in a -- like that -- like -- just fighting is not enough; that you've got to have sacrificed because you were being defensive, is a lot of the speech that I was hearing.

Q. And that was all coming from your chapter leadership --

A. Yeah --

Q. -- correct?

A. -- like any interactions should remain defensive.

Q. And part of your chapter leadership's concern, also, was that your local president didn't approve of Enrique Tarrio's leadership style; correct?

MR. SMITH: Objection. Relevance.

THE COURT: Sustained.

BY MR. MULROE:

Q. Now, to prepare for the D.C. trip, you had a chat group on Telegram with some other of the brothers from your local

chapter?

A.   Yes.

Q.   And Chris Kuehne was a part of that group?

A.   Yes.

Q.   Chris Kuehne used some pretty heated language in that chat, didn't he?

A.   I don't recall.

MR. MULROE:  Can we have just for the witness 1701B, please.  1710B.  I'm sorry.

MR. SMITH:  Objection.  Foundation.

THE COURT:  Overruled at the moment.

MR. MULROE:  If we could scroll down just a bit, Ms. Rohde.

BY MR. MULROE:

Q.   And, sir, I'll ask you, just to yourself, to take a look at the top message on the screen.  And I'll ask you first, do you recognize the name Chris who that's from?

A.   Yes.

Q.   Take a look at the message and let me know if you remember Chris sending that message.

A.   I don't recall it, because sometimes there would be so many messages that all you could do is just scroll through to the bottom.

MR. SMITH:  Objection.  Foundation.

THE COURT:  There's no question pending, sir.

You may proceed, Mr. Mulroe.

BY MR. MULROE:

Q.  This was a chat group with about 13 people in it?

A.  Yeah.

Q.  And this is where the arrangements for your travel logistics were taking place?

MR. SMITH:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Like carpooling, organizing, and -- which some of that would also happen off of the chat.

BY MR. MULROE:

Q.  And so in this chat, there were discussions of who would be driving in which cars?

A.  I believe so.

Q.  And to make sure that there was enough room for everyone to get there?

A.  I believe so.

Q.  And to make sure that there were accommodations to sleep in once you got there?

A.  Yes.

Q.  Make sure everybody had a place to stay?

A.  Yes.

Q.  But you didn't keep up with all those messages?  You would just scroll to the bottom?

A.  I had to sometimes ask extra questions on the side to

catch up.

MR. MULROE:  Ms. Rohde, let's scroll down a little bit more, just for the witness still.  And -- up, up, sorry. Bottom of Page 1.

BY MR. MULROE:

Q.  So you don't remember that message from Chris either?

A.  No.  I don't remember a lot of them because my thoughts hadn't been focused on trying to remember those.  It had been on other things.

MR. MULROE:  Let's scroll down a bit more.

BY MR. MULROE:

Q.  So this message at the bottom from Chris, I suppose you don't remember that message either.

MR. PATTIS:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  I do not recall that.

MR. MULROE:  Scroll down a little more.

BY MR. MULROE:

Q.  And this message from Chris on the bottom now, do you remember that one?

A.  No, I don't recall it specifically.

MR. MULROE:  Scroll down a bit more.

BY MR. MULROE:

Q.  How about this one on the bottom?

A.  I don't recall that particular post, no.

Q.   There was nothing that you saw or remembered in the chat group that you felt the need to report to the FBI; correct?

MR. SMITH:   Objection.   Foundation.   He said he didn't see them.

THE COURT:   Overruled as to the question that was asked.

THE WITNESS:   No, I -- that one was in the middle of the night.   So I would have probably --

THE COURT:   Sir, the question was:   "There was nothing that you saw or remembered in the chat group that you felt the need to report to the FBI; correct?"

THE WITNESS:   Not at that time, no.

BY MR. MULROE:

Q.   And just to be clear, sir, you understand that the timestamps here are in UTC time.   So that would be off by about six hours from Central time?

A.   I -- what is UTC time?

Q.   It's a different time zone.

THE COURT:   It -- you can answer, sir, only if you know the answer.

THE WITNESS:   I didn't -- I did not know.

BY MR. MULROE:

Q.   Other than Chris Kuehne, Ryan Ashlock was also a member of this planning chat group?

A.   Yes.

Q.   And you were aware that he had said some pretty wild things, too; correct?

A.   I had been told he had.

Q.   Messages about burning --

MR. SMITH:  Objection.  Foundation.

MR. ROOTS:  Objection.  Hearsay --

THE COURT:  Sir -- he --

MR. ROOTS:  -- as well.

THE COURT:  He's already -- overruled.

MR. SMITH:  Relevance.

THE COURT:  It's -- overruled.

BY MR. MULROE:

Q.   Ryan Ashlock had said some stuff about burning Antifa's eyes out of their sockets?

MR. SMITH:  Objection.

MR. ROOTS:  Objection.  Hearsay.

MR. SMITH:  Foundation.

THE COURT:  Over- --

Sir, you can -- if you remember the message, you can answer the question.

THE WITNESS:  I had been told it from another party.

BY MR. MULROE:

Q.   And you had a talk with Ryan about that; correct?

A.   Yes.

Q. And you told him, "You'd better not say stuff like that"?

A. Yes, but he did not -- I don't recall him confirming to me that he had said those things, just that, "Hey, be careful what you say, type."

Q. And then Billy Chrestman was a member of this chat, as well; right?

A. I believe so.

Q. And not to get ahead of ourselves. But you would later consider Billy Chrestman to be one of the instigators of the crowd at the Capitol; correct?

A. Based off his words after the fact.

Q. Let me take you to the morning of January 6th. And let me ask, again, first, how did you get to D.C. for the January trip?

A. We took vehicles to a parking garage, then boarded a subway and exited into D.C.

Q. And so that's about an 18-hour drive, again, to get to D.C.?

A. No, we were just outside of D.C. at an Airbnb.

Q. But you did come from home originally; right?

A. Yes.

Q. So like in December --

A. I may have misunderstood what you had asked.

Q. To get to the D.C. metro area when you first came from

home, you drove about 18 hours; right?

A. Yes.

Q. And the FBI didn't direct you to do that?

A. No.

Q. And the FBI didn't suggest to you that you should do that?

A. No.

Q. You did that because you wanted to; right?

A. They said, if I'm going, see if you can find person X and find out --

Q. Nothing to do with this case?

A. Yeah.

THE COURT: Sir, if you can just -- I know it's hard. If you could keep your voice up just because we have folks who need to be able to hear you here.

BY MR. MULROE:

Q. On the morning of the 6th, you went to Harry's early, early in the morning; right?

A. Yes.

Q. And you went to Harry's because you really didn't know where else to go; right?

A. Correct.

Q. You hadn't received any specific instructions about where to go or what to do?

A. No.

Q. And, sir, this is a good time for me to ask you about access. Do you know what I mean by access in the context of your reporting to the FBI?

A. No.

Q. Would it make sense that, to provide information, you need to be in a position to know things; right?

A. I get that -- I understand what you're trying to say.

Q. And so prior to January 6th, you knew who Enrique Tarrio was?

MR. SMITH: Objection. Relevance.

THE COURT: Overruled.

BY MR. MULROE:

Q. You knew who Enrique Tarrio was; right?

A. I knew of him.

Q. But you never had direct contact with him?

A. No. I once took a selfie with him in the background.

Q. There was a time when you were able to get about five feet away from him and take a selfie with him in the background; right?

A. Yes.

Q. And you didn't do that so you could send the photo to the FBI. You just thought it was cool to get a photo with the chairman; right?

A. A public figure, like a movie star or anything else out there.

Q. That's how you looked at him?

A. Well, no, it's just someone that's in the public eye, you know. If it was Jeffrey Dahmer on trial and he was in the background, I might, you know --

Q. You were familiar with the name Rufio; right?

A. Yes.

Q. But you didn't know him as Ethan Nordean?

A. No, it's later that I realized they were the same person.

Q. As far as you knew, you had never had contact with someone named Ethan Nordean?

A. Not to my knowledge.

Q. And you didn't know Joe Biggs?

A. Not to my knowledge.

Q. As far as you knew, you'd never had contact with someone named Joe Biggs?

A. Correct.

MR. MULROE: May I have, just for the witness, 1705A. If we can just zoom and scroll just a tad bit there.

BY MR. MULROE:

Q. Sir, the FBI showed you this photo sometime after January 6th; correct?

A. I vaguely recall the picture.

Q. And asked you whether you could identify people in the picture?

A.   Yeah, I think I struggled a little bit.

MR. MULROE:  Move to admit 1705A.

THE COURT:  All right.

MR. SMITH:  No objection.

THE COURT:  It will be admitted.  And permission to publish.

And, sir, again, if I could just have you keep your voice up.

MR. MULROE:  And I'm having trouble with the annotation on the screen.

BY MR. MULROE:

Q.   But do you see the guy with the backwards baseball cap and sunglasses who's, kind of, holding his fists in front of him?

A.   Yes.

Q.   You recognized him as one of the leaders on January 6th?

A.   Yes.

Q.   But you thought his name was Biggs or Briggs, is what you knew about that guy; right?

A.   Yes.

Q.   And do you see the guy second from the left with the checked coat and the winter cap who's got a beard and is smiling?

A.   Yes.

Q.   You didn't recognize him; correct?

A.   Correct.

Q.   And you didn't recognize anyone else in that photo?

A.   Yeah -- correct.  And I -- any familiarity I had was more face, less names.

Q.   I'll ask you about a few more people.  You didn't know Zachary Rehl?

A.   Not that I recall.

Q.   You didn't know Dominic Pezzola?

A.   Not that I recall.

Q.   In terms of the Telegram chat groups that you had access to, Mr. Smith asked you some of these, but you were never a member of a chat called Skull and Bones; right?

A.   Not that I recall, no.

Q.   You were never a member of the Official Presidents chat?

A.   No.

Q.   Never a member of a chat called OG Pickleback Crew?

A.   Not that I remember.

Q.   Never a member of a chat called Space Force chat?

A.   I might recall Space Force chat, but I also am a fan of Elon Musk and follow a lot of that stuff, so there could be some confusion in my mind.

Q.   How about a Space Force chat involving Florida Proud Boys?

A.   I don't recall.

Q.   Never a member of a chat group called East Coast Rally

Command?

A. I don't recall.

Q. Never a member of a chat group called D.C. Street Sweepers?

A. I know that there were some T-shirts for that, but I can't recall if that's the context that I know that phrase in or if the -- it was from a chat.

Q. You were never a member of a chat group for the Ministry of Self-Defense leaders?

A. I do not recall that.

Q. You were never a member of a chat group for the Ministry of Self-Defense members?

A. I don't recall that.

Q. Never a member of a chat group called Ministry of Self-Defense Op?

A. I don't recall that either.

Q. And you were never a member of a chat group called Boots on Ground that was active on January 6th, 2021; correct?

A. Not that I remember.

Q. Fair to say, sir, that you had basically zero access to the Proud Boys national leadership?

A. I would say that's a correct assumption, yes.

Q. Fair to say that you had zero access to anything going on within the Ministry of Self-Defense?

A. Correct.

Q.  Fair to say that you had zero access to the Proud Boys who were in charge of planning and organizing for January 6th?

A.  Correct.

Q.  Let me take you back to Harry's on the morning of the 6th.  So you showed up there and you didn't know what to do; right?

A.  Correct.

Q.  The president of your chapter was not present with you; right?

A.  Correct.

Q.  They were back home?

A.  Yes.

Q.  But you reached out and the president told you to go to the Monument; right?

A.  Yes.

Q.  You didn't hear it from anyone else, just the chapter president who was back home; right?

A.  To the best of my memory, yes.

MR. MULROE:  Ms. Rohde -- this is in evidence -- I'll ask you to show 512-5.

(Brief pause.)

MR. SMITH:  Foundation.  He testified he wasn't a member.

THE COURT:  All right.  Let's let the question be

asked.

BY MR. MULROE:

Q.  My question, sir, is, so you never would have seen the message that's on the screen here in front of you; correct?

A.  Correct.  I believe I was told manually and/or read -- told person to person and/or read on the local chapters that they wanted people to not wear colors.

MR. MULROE:  Ms. Rohde, we could take that message down.

BY MR. MULROE:

Q.  The information that you did get you received from your chapter president over Telegram; correct?

A.  I believe so, yes.

Q.  But when the FBI asked you later, you were not able to provide those messages; correct?

A.  Correct.

Q.  And that's because he -- meaning, the chapter president -- had deleted them?

A.  Yes, he had quit the chapter, deleted the chats, everything.

Q.  And so your understanding was that a person can delete their own Telegram messages and then they disappear from everybody's phones?

MR. SMITH:  Objection.  Relevance.  His opinion.

THE COURT:  I mean, sustained.

BY MR. MULROE:

Q. You then went to the Monument; right?

A. Yes.

Q. And when you arrived, it was pretty clear that Rufio was in charge; correct?

A. Once he showed up and began advising us about the march and waiting for -- like, when they said stop, everyone stop, but stay behind the front for the pictures and stuff.

Q. And apart from saying stop and go and who should stand where, the leadership wasn't communicating very much to all you guys who were marching with them; correct?

A. Correct.

Q. You just followed them as they led you from place to place?

A. Yes.

Q. And you were surprised that they were having you do so much walking; correct?

A. Yes.

Q. You remember thinking, "What are they going to do, walk us all day and expect us to be able to defend against Antifa at night?"

A. Yes, I recall that.

Q. And those new boots you had, those didn't help, did they?

A. Not at all.

Q.   As you marched, the group would chant things?

A.   Yes.

Q.   One of the things they chanted was 1776?

A.   That one, I believe, was later and happened shortly prior to the first breach.

Q.   And as the group marched and chanted, it brought the word "revolution" to your mind, didn't it?

A.   I'm sorry.  Ask again.

Q.   When you were marching with the Proud Boys group, the word "revolution" was on your mind, wasn't it?

A.   I don't know if that distinct word alone was in my mind, but I do recall that morning making a statement, "Jeez, I hope this doesn't result in a color revolution today," just because Trump supporters, they were so angry.  But that wasn't our reason for being there.  Our reason was defense of people to attend the rally and then go home.

Q.   And that's based on what you saw on the morning of the 6th?

A.   I'm sorry?

Q.   That's based on what you observed there in D.C. on the 6th?

A.   Vaguely.  There were a few people that came by who were screaming at the cops a lot and cussing them out, saying, "You don't know what they did last night," blah, blah, blah. So there was a handful that were very, very angry, whereas

the majority seemed pretty peaceful.

Q.  Sir, two days before the rally, on January 4th, before you'd seen any of those angry people, you used that same phrase, color revolution, in a chat group with the guys from your chapter.  Do you remember that?

A.  I -- yeah, because it was, you know, a -- hopefully, something stupid like that didn't happen after, you know, watching the spring revolution over the past years in Egypt and the orange revolution in Ukraine.  It was, you know, a very negative thing to happen if it did.

MR. MULROE:  Can we have just for the witness 1710A, please.  And scroll to the bottom.  Let's go just a little bit up, actually.  Can I see the two messages above that.

MR. SMITH:  Your Honor, we would ask for a redaction on the names here.  Place name.

THE COURT:  Hold on one second.

MR. SMITH:  It's also not inconsistent.

MR. MULROE:  Court's indulgence.  One moment.

THE COURT:  All right.

BY MR. MULROE:

Q.  Well, let's do this, sir.

MR. MULROE:  If we could move the mouse, Ms. Rohde.

BY MR. MULROE:

Q.   Two days before January 6th, guys in the chat were talking about the National Guard in Washington, D.C.; correct?

A.   I believe so.

Q.   And then you sent a message saying, "Be funny if the troops turned on them and side with us.  Would be a legit color revolution"; isn't that right?

A.   Yes.

Q.   So that phrase, color revolution, was on your mind before you got to D.C.?

A.   Yes, but --

Q.   And in your mind, the revolution --

         MR. PATTIS:  Objection.  He wasn't permitted to finish his answer.

         THE COURT:  Hold on.  Sir, you can finish your answer.

         THE WITNESS:  It's -- it was -- every -- guys were putting out a lot of scenarios that, obviously, were never going to happen.  It was, like -- almost, like, joke role-playing, in a way.  But when I said that, it was because -- it was, like, you know, what if something like that did happen?  It would, you know -- farthest thing from possible to happen, but we always try and think of the worst thing that could possibly happen, too, sometimes.

BY MR. MULROE:

Q.   So this revolution would involve National Guard turning on the left-wing people and siding with you all; correct?

A.   Yeah, something that would never happen.

Q.   Now, as the group marched on the 6th, there were lots of people who followed with them; right?

A.   Are you referring to the entire march or just a certain portion of it?

Q.   The entire march.

A.   Not up the lawn.  It was mostly Proud Boys and just a few others.

Q.   I want to ask you about one of those others.

         MR. MULROE:  Can we have, please, 499A, which is in evidence.

         And I'd ask to publish that.

         MR. SMITH:  No objection.

         THE COURT:  It's in evidence.  It will be published to the jury.

BY MR. MULROE:

Q.   Now, sir, do you see the guy with the camouflage suit and the vest and the helmet and the baseball bat in his left hand?

A.   Yes.

Q.   You recognize him; right?

A.   Yes.

Q.   He approached you the morning of January 6th before you

went to the Monument; right?

A.  Yes.

Q.  And he asked if he could stick with you for a little bit?

A.  He approached and said, "Are you all guys a militia?" We said, "No."  And he said he was all alone.  Could he walk with us for a little bit?  Something along those lines.

Q.  And then you told him that was fine to start with, but once you all joined up with the rest of the Proud Boys, he wouldn't be able to march in your ranks.  Do you remember telling him that?

A.  Yes.

Q.  You thought the leaders wouldn't let him march in the ranks of the group because he wasn't a Proud Boy; right?

A.  Yes.  Like, if he was just there lonely, sure, he can hang with us for a while, but when we met up with the rest, no.

Q.  But it turned out, actually, that the leaders were fine with him marching with you all --

MR. SMITH:  Objection.  Speculation.

THE COURT:  The witness can answer if he knows.

THE WITNESS:  I don't know.

BY MR. MULROE:

Q.  Do you remember telling the FBI that you don't think anyone policed that the rest of the day in terms of him

marching with you?

A. I don't believe anyone asked anything specific and I don't recall how often I might have seen him the rest of the day.

Q. The leaders of the group did exercise some control over who walked in the ranks, though; correct?

A. Yes.

MR. MULROE: Can we have Exhibit-1001 in evidence and go to the 2-minute-15-second mark.

BY MR. MULROE:

Q. Sir, do you remember a brother and sister from -- was it Arizona -- who joined up with you all?

A. Yes.

MR. SMITH: Objection. Relevance. Scope. 403. Brother and sister.

THE COURT: Overruled.

MR. MULROE: Ms. Rohde, let's play the video for a few moments.

(Video played.)

MR. MULROE: Let's pause -- well, play it for a few more seconds.

(Video played.)

MR. MULROE: Let's pause there.

BY MR. MULROE:

Q. That guy in the vest and the baseball cap is Billy

Chrestman; correct?

A. Yes.

Q. And he was just walking up to Rufio and tapped him on the shoulder?

A. That's what I saw, yes.

Q. And so this video's showing Billy Chrestman asking Rufio whether the brother and sister could march with you all; correct?

MR. SMITH: Object. Foundation.

THE COURT: The -- sir, do you know the answer?

THE WITNESS: I don't recall if I was close enough to overhear that at the time.

BY MR. MULROE:

Q. Do you know whether, at any time, Billy asked Rufio whether the brother and sister could march with you?

MR. SMITH: Object --

THE WITNESS: I don't remember.

MR. SMITH: Hearsay. Objection. Your Honor, may we be heard briefly?

(Bench conference:)

MR. SMITH: What we have going on right here --

THE COURT: Mr. Smith, it is --

MR. SMITH: -- is the prosecutor reading --

THE COURT: Mr. --

MR. SMITH: -- statements --

THE COURT: Mr. Smith --

MR. SMITH: -- into evidence --

THE COURT: -- be quiet. Be quiet, Mr. Smith. Be quiet.

All right. You may proceed.

MR. SMITH: What we have is the prosecutor reading hearsay into evidence, knowing the witness doesn't -- there's no -- Your Honor --

THE COURT: Mr. Smith --

MR. SMITH: -- there's --

THE COURT: -- what's difficult -- let me just say this -- let me -- Mr. Smith, stop talking now. Stop talking. What's difficult is, you know, that when the -- when Mr. Mulroe is crossing the witness with his prior -- the prior statements and he's saying, you know, "You remember this, you remember that, you remember this," and you object that he's reading from a document, that's -- another way of putting what he was doing is proper cross-examination. So I think you need to hold your horses when you are objecting and explain exactly what is objectionable.

MR. SMITH: I'll explain it, Your Honor.

THE COURT: All right.

MR. SMITH: What we have here is an image on the screen with two people talking. The witness is not visible.

Mr. Mulroe is reading to the jury -- making an assertion of fact without a basis for saying it.  He's saying, "Did -- didn't this woman say -- this person say X to this person on the screen?"  There's no physical evidence this witness on the stand has ever seen --

THE COURT:  Okay.

MR. SMITH:  -- or heard that.

THE COURT:  So --

MR. SMITH:  So how can -- Mr. Jauregui was sanctioned -- almost sanctioned for reading a statement to the jury because the witness had -- there was no possible basis for claiming a witness could testify about that.  Your Honor, we've heard nothing to suggest why this witness would know what one person is saying --

THE COURT:  So --

MR. SMITH:  -- to another on the screen and it's just being read to the jury as --

THE COURT:  Mr. -- all right.  Mr. Mulroe, I don't know where we left off.  But I think the proper question is, "Did you hear one way or the other whether Mr." --

MR. SMITH:  "Had a conversation" --

THE COURT:  -- "had a conversation with Mr. Chrestman about whether he could be a -- march with the group"; right?

MR. MULROE:  I think that's what I was doing.

THE COURT: I --

MR. SMITH: It -- but it -- but, Your Honor --

THE COURT: Well --

MR. SMITH: -- the foundation is, "Was there any conversation that you heard?" Because if there's no -- if he doesn't heard [sic] any conversation, what Mr. Mulroe is being allowed to do is just read facts --

THE COURT: Sure. I --

MR. SMITH: -- without any foundation --

THE COURT: All right.

MR. SMITH: -- to the jury.

MR. MULROE: Your Honor, it's cross. I'm allowed to lead.

THE COURT: I know that you're allowed to lead.

So whether -- whichever way you style it, this -- it doesn't seem to me this is -- I mean, you can ask whether he heard any conversation or, one way or the other, whether he was -- conversation about whether he could join the group one way or the other. I think that would be fine, too. But yeah, I agree, asking him -- I think the objection didn't come until after you'd asked him what was on the video and that, maybe, had been improper, but ask him the question we've talked about and let's continue to move on.

(Return from bench conference.)

BY MR. MULROE:

Q. Sir, do you know one way or the other whether Billy Chrestman ever consulted Rufio about whether the brother and sister could march with you?

A. Off the top of my head, I don't remember.

MR. MULROE: I'll ask for the screen just for the witness, please. And, Ms. Rohde, if we could have 1704.

THE COURT: And, sir, while that's coming up, again, if you would just keep your voice up.

THE WITNESS: Oh.

THE COURT: It's okay.

MR. MULROE: Let's go to Page 39 at the bottom. And, unfortunately, the screen is not working.

BY MR. MULROE:

Q. But you see the bottom three lines, 23 through 25, there? Read those to yourself.

MR. MULROE: And then, Ms. Rohde, if you could scroll down and show the top of Page 40. That's good.

THE WITNESS: That particular instance is in reference -- when we had walked around the other side of the Capitol building opposite of the side facing the Washington Monument, at which point, while we marched past the crowd of people there yelling, "Eff-Antifa" and "Whose streets? Our streets." A group of people approached asking if they could walk with us, at which point they were told they had to stand at the back.

BY MR. MULROE:

Q. They couldn't march in your ranks; correct?

A. Yes.

MR. MULROE: Let's go back to 499A for the witness, please -- I'm sorry, for the jury, please.

BY MR. MULROE:

Q. This guy with the helmet, the vest, the fatigues, and the bat, he was allowed to walk in your ranks; correct?

A. I --

MR. SMITH: Objection. Vague.

THE COURT: Overruled.

MR. SMITH: Who?

THE COURT: Overruled.

THE WITNESS: I don't recall his exact placement. I don't think I had very much more interaction with him throughout the day, or I don't recall having it.

BY MR. MULROE:

Q. You don't remember being near him in the building?

A. In the building? I did run into him again in there at one point.

Q. We'll come back to that.

MR. MULROE: Let's have, just for the witness, please, 1711.

BY MR. MULROE:

Q. And, sir, that is how you were dressed on January 6th;

correct?

A.   Yes.

MR. MULROE:   Move to admit 1711.

MR. SMITH:   Objection.

THE COURT:   Objection?

MR. SMITH:   Yes.

THE COURT:   Overruled.

BY MR. MULROE:

Q.   And that item we see on your chest, that's flexible handcuffs; correct?

A.   Yes, it was a gift from someone while at the food trucks.

Q.   Those are zip-tie handcuffs that you can use to restrain a person?

A.   Yeah, I'd never seen real ones before and I -- because I gave a guy some ibuprofen, he then said, "Here, have these." And I was, like, "Oh, thanks."

Q.   So the FBI didn't ask you to carry those handcuffs; correct?

A.   No.

Q.   And just to be perfectly clear, you are not empowered to make any arrests on behalf of federal law enforcement; correct?

A.   Correct, and had no intention of.  I thought that was just a neat, kind of -- I don't know, like, a memento or

something.

Q.  There came a time after the food trucks that you marched back to the Capitol; right?

A.  Yes.

MR. MULROE:  Let's have 428 which is in evidence.

BY MR. MULROE:

Q.  And you were marching with the group that included a lot of the guys that you had come from home with; correct?

A.  Scattered amongst, yes.  We were not walking cohesively together --

Q.  Mm-hmm.

A.  -- that I recall.

Q.  And I believe --

THE DEPUTY CLERK:  428 has not been ID'd or entered into evidence.

MR. MULROE:  All right.  Let's go to the 21-second mark just for the witness.  We'll play just a portion of a second.

(Video played.)

MR. MULROE:  Let's go to 19, actually -- wait. Sorry.  One more half second.  A little more.  A little more.  All right.

BY MR. MULROE:

Q.  At the 22-second mark, sir, do you see yourself marching in the video?

A. Yes.

MR. MULROE: Move to admit 428.

THE COURT: It will be admitted. And permission to publish.

MR. MULROE: So Ms. Rohde, let's go back to the beginning there and play it to the 16-second mark.

(Video played.)

BY MR. MULROE:

Q. So on the screen here, do you see Ryan Ashlock with those yellow swim goggles above his eyes?

A. Yes.

Q. Do you see Chris Kuehne next to Ryan with the tan helmet and the black clothing?

A. Yes.

Q. And do you see Billy Chrestman on the right of the screen with the vest? The baseball cap?

A. Yes.

Q. And he's got his axe handle in his hand; right?

A. Yes.

MR. MULROE: Let's play another few seconds to 19 seconds.

(Video played.)

BY MR. MULROE:

Q. And you see -- in the orange hoodie, that's another guy you came with; right?

A.   Yes.

Q.   That's Enrique Colon?

A.   Yes.

Q.   Let's keep playing.

(Video played.)

MR. MULROE:  And pause there.

BY MR. MULROE:

Q.   And this is -- we just saw you a moment ago?

A.   Yes.

MR. MULROE:  Let's keep playing to about 24 seconds.

(Video played.)

MR. MULROE:  Okay.

BY MR. MULROE:

Q.   Okay.  Now, you see a bunch of guys with orange winter caps on; right?

A.   Yes.

Q.   And you understood those to be the Arizona Proud Boys; right?

A.   Yes.

Q.   Those orange hats made them pretty easy to spot?

MR. SMITH:  Objection.  Relevance.  Scope.

THE COURT:  Sustained as to relevance.

BY MR. MULROE:

Q.   Sir, there's a map right behind you over your left

shoulder.  Do you see that?

A.  Yes.

Q.  And you see there's a sticker that says "Breach 1"; right?

A.  Yes.

Q.  The Proud Boys group marched up to that part of the map where it says "Peace Monument"; correct?

A.  Yes.

Q.  And shortly after that, the crowd went past the barriers; correct?

A.  Yes.

Q.  Now, you have consistently maintained that you were pretty far back in the crowd when that breach first happened; correct?

A.  About two-thirds of the way back amongst the Proud Boys, I believe.

Q.  You said two-thirds.  You've also said you were three-quarters of the way back?

A.  They're pretty close to the same.

Q.  They -- FBI asked you whether you were in the first 10 or 20 or 50 or 100, and you said you were past 100.  Past 100; correct?

A.  I don't recall specifically, but that's an assumption that I would make, just a guess.

Q.  It seemed to you like all the action was way out in

front of you and you were, kind of, in the back; right?

A.  At the time, yes.

MR. MULROE:  Let's have 400D, please.

Ms. Harris, I'm sorry.  Is this in evidence. 400D, as in delta.

THE DEPUTY CLERK:  Yes.

MR. MULROE:  So pausing that at the beginning, if we could have for the jury.

BY MR. MULROE:

Q.  See the Capitol building in the background there?

A.  Yes.

Q.  And --

A.  Yes.

Q.  And you see a crowd of people in the foreground?

A.  Yes.

Q.  And you see in the middle ground that path is pretty empty; right?  The crowd has not yet breached those barriers?

A.  Correct.

Q.  You'd agree with me that the person filming this is pretty close to the front of that crowd?

MS. HERNANDEZ:  Objection.  Leading.

THE COURT:  Because it's cross-examination, it's overruled.

THE WITNESS:  Looks like they're about 20 people

back, maybe.

BY MR. MULROE:

Q.  If this was a Chiefs game, you'd have to pay a lot of money for seats that close --

MR. SMITH:  Objection.  Relevance.

THE COURT:  Sustained.

MR. MULROE:  Let's play and pause at the three-second mark.

(Video played.)

BY MR. MULROE:

Q.  And we can see you in the video now with your sunglasses and red baseball cap?

A.  Yes.

Q.  And so this video pretty accurately depicts how close you were to the front of the crowd; right?

A.  Yes.

Q.  And we saw your mouth moving.  You were chanting along with the crowd; correct?

A.  Yes.

Q.  And you were surrounded by other Proud Boys at that time?

A.  Yes.

MR. MULROE:  Let's play the video.

(Video played.)

MR. MULROE:  Let's pause there.  Paused at 16

seconds.

BY MR. MULROE:

Q.  Sir, you heard the voice shout, "Fuck them, storm the Capitol"?

A.  I didn't hear that just now.

Q.  When you were there on the ground on the 6th, Proud Boys were shouting things, weren't they?

A.  A lot of people were shouting things.

MR. MULROE:  Let's play and pause at the 58-second mark.

(Video played.)

BY MR. MULROE:

Q.  And we now see you on the left side of the screen walking up toward the Capitol; correct?

A.  Correct.

MR. MULROE:  Can we have 445A, please.

THE DEPUTY CLERK:  That hasn't been ID'd or entered either.

MR. MULROE:  Let's have, just for the witness -- thank you, Ms. Harris -- just for the witness -- we can keep it paused, but go to the 45-second mark.  And if we could do the E-key a couple of times to -- well, strike that.

Let's go to 1:30 -- I'm sorry, same exhibit, but the 1-minute-30-second mark.  So 445A.

BY MR. MULROE:

Q.  And do you see yourself on the right side of the screen there?

A.  Yes.

Q.  Still on the Capitol grounds?

A.  Yes.

MR. MULROE:  Move to admit 445A.

MR. SMITH:  No objection.

THE COURT:  It will be admitted.  And permission to publish.

MR. MULROE:  Let's go back to the beginning and -- let's actually start at about 30 seconds, Ms. Rhode, and then we'll pause at 40 seconds.

(Video played.)

MR. MULROE:  Let's get just a little more.  Maybe half a second.

(Video played.)

BY MR. MULROE:

Q.  Do you see Billy there in the front?  Billy Chrestman.

A.  I'm not sure.

Q.  Let's just keep that going.  Do you see the guy in the black baseball cap with the vest?

A.  Yes.

Q.  That's Billy Chrestman, isn't it?

A.  Yes.

Q.  Right up at the front?

A.  Yes.

Q.  Scrambling over that snow fencing?

A.  Yes.

MR. MULROE:  Let's play another 2 seconds.  Pause at about 42 or 43 seconds.

(Video played.)

MR. MULROE:  Okay.

BY MR. MULROE:

Q.  See those officers running away?

A.  Yes.

MR. MULROE:  Let's play it to about 45 seconds.

(Video played.)

MR. MULROE:  Pause.  Can we get the E-key once or twice.

THE WITNESS:  Is that the very first one?

MR. MULROE:  Let's go back a second.  Right there.

BY MR. MULROE:

Q.  And, sir, you see yourself following right behind with your black baseball cap, tan vest, and track suit stripes; right?

A.  Yes.

Q.  Following after those officers who were running away?

A.  No, not following after the officers.

MR. MULROE:  Let's play it to about 56 seconds.

(Video played.)

MR. MULROE:  Pause there.

THE WITNESS:  I'm sorry?

BY MR. MULROE:

Q.  Sir, there were hundreds and hundreds and hundreds of people coming behind you, weren't there?

A.  Yeah.

MR. MULROE:  Play it to about 1 minute, 30 seconds.

(Video played.)

MR. MULROE:  Right there.

BY MR. MULROE:

Q.  That's you on the right side of the screen?

A.  Yes.

Q.  Marching towards the Capitol?

A.  Walking, yes.

Q.  And you're turning back to look; right?

A.  Yes.

Q.  And you saw all those people following behind you, didn't you?

A.  Yes.

MR. MULROE:  Let's go to 422, please, and just for the witness.

Apologies to Ms. Harris.

If we can take that to the 1-minute-57-second mark.

THE DEPUTY CLERK:  It's not in evidence.

MR. MULROE:  And let's let that play for just a few seconds.

(Video played.)

MR. MULROE:  Pause there.

BY MR. MULROE:

Q.  Do you see yourself on the left side of the screen?

A.  Yes.

Q.  Still headed toward the Capitol?

A.  Yes.

MR. MULROE:  Move to admit 422.

MR. SMITH:  No objection.

THE COURT:  It will be admitted.  And permission to publish.

MR. MULROE:  Ms. Rohde, if we could turn the sound off and let that play for the jury.

(Video played.)

BY MR. MULROE:

Q.  So sir, we see you walking with the crowd up toward the Capitol; correct?

A.  Yes.

Q.  It looks like you're walking with some purpose, aren't you?

A.  I wouldn't say that it's with purpose.

Q.  You were feeling confident, weren't you?

A.  I was still feeling kind of tired.  That vest is heavy, too.

Q.  You knew you had a couple hundred of your Proud Boys brothers with you?

A.  That wasn't my thoughts at the time.

MR. MULROE:  Let's pause it there.

BY MR. MULROE:

Q.  And having all those Proud Boys with you made you feel powerful, just like on December 12th, didn't it?

A.  No.  I -- that wasn't my thoughts at the time.

Q.  Your thoughts at the time were the Proud Boys didn't do this?

A.  When the first barrier went down, yes.

MR. MULROE:  Let's go to about 2:38.

BY MR. MULROE:

Q.  Here we are at 2:39 of Exhibit-422.  We're now right up at the front, near the terrace area in the front of the Capitol; correct?

A.  Terrace area?

Q.  Well, take a look up at the map.  And you see the sticker that says, "Breach 2"?

A.  Yes.

Q.  It's pointing to a line for a fence?

A.  (Indicates affirmatively.)

Q.  We're, kind of, just short of that.  Just under that

fence line; correct?

A.   Yes.

          MR. MULROE:  Let's play that until about 2:45.

          (Video played.)

          THE WITNESS:  Sir, I'm a little confused.

          MR. MULROE:  Pause there.

          THE WITNESS:  And this may be because my memory is a little off on it, but I thought that there was somewhere, between two and one, another barrier at one point.

BY MR. MULROE:

Q.   Sir, you're on cross-examination, and I'm going to ask you the questions.  And if there's something that's unclear about my question, I want you to let me know, but otherwise, you'll give the answers.  Sound good?

A.   Okay.

          MR. MULROE:  Now, if we could scroll back just about two seconds.

BY MR. MULROE:

Q.   And I'm going to play it for you, sir, and ask you if you see people throwing barricades aside.

          (Video played.)

          THE WITNESS:  Yes.

          MR. MULROE:  Pause there.

BY MR. MULROE:

Q.   And you see the guy with the American flag bandana on

his head?

A.  Yes.

Q.  Do you recognize him from the group that marched with you?

A.  Not specifically.

MR. MULROE:  Let's play it a little bit more to 2:57.

(Video played.)

MR. MULROE:  Let's pause it there.

BY MR. MULROE:

Q.  Do you see the bottom part of your outfit there?

A.  Yes.

Q.  You're right up at the front, aren't you?

A.  At that point, yes.

MR. MULROE:  Let's have 447A, please, just for the jury to start -- I mean, just for the witness to start.  Go to 1 minute, 16 seconds, please, Ms. Rohde.

THE DEPUTY CLERK:  It's in.

MR. MULROE:  This is in?

THE DEPUTY CLERK:  Mm-hmm.

MR. MULROE:  Thank you, Ms. Harris.

If we could have that -- sound for this, please, and we'll have that for the jury.

(Brief pause.)

And we can play it from 1:16.

(Video played.)

MR. MULROE:  Let's pause it there.

BY MR. MULROE:

Q.  Do you see this fellow on the right who's got some orange tape on his shoulder?

A.  I see that.

Q.  And you're familiar with the orange tape; right?

A.  Yes.

Q.  What's the orange tape mean?

A.  It was because everyone was under the impression Antifa would be infiltrating dressed like Trump supporters, and if there had to be, you know, self-defense done, we wouldn't accidentally get hurt by each other by having orange tape to signify that we were one of the non-aggressors.

Q.  Orange tape helps you to recognize the guys you're with; correct?

A.  Yes.

Q.  And so this guy with the orange tape, you recognize him as a guy you were with?

A.  Well, I don't recognize him.  They passed around tape at the thing and a lot of people put it on.

Q.  That guy with the orange tape is moving barricades aside?

A.  Yes.  I wasn't aware -- I don't recall that --

MR. MULROE:  Let's play to about --

THE WITNESS: -- incident.

MR. MULROE: Let's play to about 1:52.

(Video played.)

MR. MULROE: Let's pause there.

BY MR. MULROE:

Q. Did you see yourself just go out of view on the left side of the screen? There you go.

A. Okay. There we are.

Q. So you're right there at the front still; correct?

A. At the time, yes.

MR. MULROE: Let's play just another one second.

(Video played.)

BY MR. MULROE:

Q. All right. And that was Billy standing right in front of you who's waving people forward; correct?

A. Yes.

Q. And you thought the Proud Boys didn't do this or inspire it?

A. That was sent -- that text was sent previous.

Q. Yeah. We'll come back to that.

MR. MULROE: Let's have 423, please, just for the witness. And at the 5-minute-and-2-second mark. Let's play just a few seconds.

(Video played.)

MR. MULROE: You can pause it there.

BY MR. MULROE:

Q. Does this pretty accurately depict the scene as things were like up there at the front?

A. Yes.

Q. And you were not making any effort to de-escalate things, were you?

A. At that time, I was still a little surprised by everything and I was -- I told myself multiple times, "Don't involve yourself. Just observe."

Q. Don't involve yourself, but also don't leave?

A. So -- what?

Q. But also, don't leave?

A. Don't leave?

Q. Don't leave.

A. I figured an emergency situation, that, you know, I'd probably want to be asked about it and --

Q. Take a look at that map at the sticker that says, "Breach 2." Do you see it?

A. Yes.

Q. And you remember there was a fence where Breach 2 is pointing, short black fence.

A. From the video, yes.

          MR. MULROE: Let's have 445B which, I think, is in evidence. 445-boy. Let's play that to 13 seconds, please.

          (Video played.)

MR. SMITH:  Your Honor, objection.  Foundation.  We don't know if the witness has seen -- he hasn't been asked whether he saw this yet.

THE COURT:  All right.  This exhibit is in evidence currently; correct?  All right.  I understand.

So Mr. Mulroe, if you'll ask the witness a foundational question.

MR. MULROE:  Your Honor, if I could play just four more seconds.

THE COURT:  Very well.  It's in evidence already.  You may play it.

MR. MULROE:  Go ahead to the 13-second mark, Ms. Rohde.

(Video played.)

MR. MULROE:  Stop there.

BY MR. MULROE:

Q.  Did you see yourself on the right side of the screen?

A.  Yes, I did.

Q.  That's the scene up at that black fence; correct?

A.  That's the -- I'm sorry?

Q.  That's what the scene was like up at that black fence; correct?

A.  Yes.

Q.  And you were right up there almost right against the fence, weren't you?

A.   Yes.   I did retreat away from it after a while.

Q.   And you were surrounded by other Proud Boys up at --

there at the fence, weren't you?

A.   And regular Trump supporters all mixed in.

          MR. MULROE:  Let's play to about 16 seconds.

          (Video played.)

          MR. MULROE:  A little more.

          (Video played.)

          MR. MULROE:  Okay.

BY MR. MULROE:

Q.   That's Rufio right up there at the fence with you?

A.   I wasn't -- I don't recall being aware that he was near

me.  I just don't recall it.

Q.   You recognize him in the video --

A.   Yes --

Q.   -- though; correct?

A.   -- I do.

Q.   And he was right there at the front with --

          MR. SMITH:  Objection.  Foundation.

          THE COURT:  Overruled.

          MR. MULROE:  Let's play to about 26 seconds.

          (Video played.)

          MR. MULROE:  Pause there.

BY MR. MULROE:

Q.   And you're right there near the guy with the black hat

and the thick-framed glasses?

A.  Yes.

            MR. MULROE:  And just play another few seconds.

            (Video played.)

            MR. MULROE:  All right.  Let's hold there for a moment.

BY MR. MULROE:

Q.  Now, sir, you mentioned that you understood that the FBI was going to want to know about this when you got home; correct?

A.  At that point, I was going under an assumption, yeah.

Q.  You knew that they would have some questions for you?

A.  Yes.

Q.  And you understood that there was a whole lot of video being filmed at this event; correct?

A.  Yes.

Q.  People all around you had cameras and were taking pictures and filming?

A.  Yes.

Q.  And you watched some of that video before your interviews with the FBI; correct?

A.  I recall watching Wall Street Journal videos specifically, yeah.

Q.  And you also understood that there was probably a whole lot of other video that you would not get the chance to

watch before your interview with the FBI; correct?

A. I hadn't actively thought that, but that's a good assumption.

Q. You had plenty of time to think about what videos might be out there --

MR. SMITH: Objection. Relevance. Scope. 403.

THE COURT: Overruled.

BY MR. MULROE:

Q. You knew there were going to be videos that might have you in it; correct?

A. Yes.

Q. And you wanted to make sure, when you went and spoke with the FBI, that you did not incriminate yourself; correct?

A. I was just being honest with them for what I -- from my point of view or recall, and if I was in error sometimes, that's -- wasn't intentional.

Q. You wanted to make sure that, when you told the FBI what happened, it would be your account of whatever facts they might have on video; correct?

A. I answered what questions they had for me.

Q. And so regarding that black fence at the sticker for Breach 2, you actually volunteered to the FBI that you might have grabbed that fence; right?

A. A different fence that was gray. I had seen a girl kick

it and it bent forward and I grabbed it and tried to pull it back and I thought, Well, her legs are stronger than my arms. So -- and then I said, if I get in -- am seen even touching this, then, you know, it will look like I'm taking down a barrier.

Q. So you told the FBI that you grabbed the fence but you told them that you were trying to put it back up?

MR. SMITH: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I did try to pull it back the opposite direction of which it had been kicked and then let go of it and let it be.

MR. MULROE: Can we have 417, please. And if we could play just a couple of seconds.

(Video played.)

MR. MULROE: Let's pause there.

BY MR. MULROE:

Q. Did you see yourself on the lower right-hand corner of the screen?

A. I think that's me.

MR. MULROE: Let's play to about eight seconds.

(Video played.)

MR. MULROE: Good.

BY MR. MULROE:

Q. Sir, you were not making any effort to de-escalate the

crowd here, were you?

A.  At that time, I was thinking, surely, it's not going to go past this point.

Q.  You were thinking, surely, it was not going to go past this point.  So that's you pumping your fist in the air; right?

A.  Yes.  Well, because, you know, guys were up there waving the flag and it was, you know -- at that point, it was almost like a circus before things got serious, like, a guy running along the scaffolding having to be chased down.  It was, kind of, funny.

Q.  Pretty exciting, was it?

A.  Funny.  Yeah.

        MR. MULROE:  Let's play that to about 41 seconds.

        (Video played.)

BY MR. MULROE:

Q.  That's you we saw on the bottom?

A.  I'm sorry?

Q.  That's you we see at the bottom of the screen?

A.  Yes.

        MR. MULROE:  Let's continue.

        (Video played.)

        MR. MULROE:  I'm going to let this play to about 1:30.

        (Video played.)

BY MR. MULROE:

Q.  And that fence came down, didn't it?

A.  Yes, it did.

MR. MULROE:  Let's keep playing.

(Video played.)

BY MR. MULROE:

Q.  That's you helping the lady up?

A.  Yeah, what looked like an older lady.  I didn't want her to get stepped on.

MR. MULROE:  Let's keep playing.

(Video played.)

BY MR. MULROE:

Q.  Hear them chanting, "Whose streets?  Our streets"?

A.  I hear it.

Q.  That's the Proud Boys chant, isn't it?

MR. PATTIS:  Objection.

THE COURT:  I mean, overruled.

THE WITNESS:  Proud Boys, Antifa.  A lot of people chant "Whose streets?  Our streets" at rallies and everything.

BY MR. MULROE:

Q.  There wasn't any Antifa there at the Capitol, though, with you?

A.  No, that was a collection of Trump supporters and Proud Boys and other groups.

Q. Now, after that fence came down at Breach 2, the crowd took over that entire lower area; correct?

A. Correct.

Q. And the police were trying very hard to restore order, weren't they?

A. Correct.

Q. They were using crowd-control measures; correct?

A. They hadn't started using those yet.

Q. There came a point when they were using crowd-control measures; correct?

A. Yes.

Q. And those officers were using crowd control so close to you that you could feel the concussion against your legs?

MR. SMITH: Objection. Relevance. Scope. 403.

THE COURT: Mr. Mulroe, let me just hear you at sidebar quickly.

(Bench conference:)

THE COURT: What's the relevance on this line of questioning?

MR. MULROE: Your Honor, I think that his direct testimony portrayed him as, sort of, an observer who was not actively in the mix, and I think it's relevant if he was so immersed in this that the -- in his words, flash bangs were going up right against his legs.

MR. SMITH: Your Honor --

MR. MULROE: It's also going to feed into my very next line of questioning which I think we're going to impeach the fact that he sent that text message earlier. I expect we're going to prove that he didn't send it until after this.

THE COURT: It's just -- I mean, Mr. Smith, it sounds like it's just a passing question about what he experienced that day. I don't --

MR. SMITH: Your Honor, he -- first of all, Mr. Mulroe is saying he was portrayed. Nothing was done to portray a witness. Questions were asked of him. He did not say he was not in the thick of things. He never said he didn't see any violence. This is just a gratuitous attempt to show the jury violent scenes. We object under relevance, 403. It's outside the scope. The witness did not testify he did not see violent scenes. It's not impeachment. And the witness did send the text message at 1:00 p.m. Eastern time --

THE COURT: Well, okay.

MR. SMITH: -- which is before this.

THE COURT: They're going to be able to -- right now, what's before me is just a question or two about what he experienced that day. It's clearly within the scope for him to be able to answer that question. And it sounds like it's a question or two, and I can't -- there's no

conceivable 403 -- we've already heard all sorts of testimony about this. So Mr. Mulroe, you may proceed with that question or two and move on as to what else he experienced.

MR. SMITH: And, Your Honor, the other thing while we're here, the prosecutor made a gratuitous effort to expose the witness's place of residence by referring to the Chiefs. That was a deliberate effort. The question had no relevance. The witness is extremely sensitive. He's been threatened in the past. The Government knows this. And the Government has made much of protecting the security of CHS witnesses. That was utterly uncalled for, inappropriate --

THE COURT: Mr. Smith --

MR. SMITH: -- and we move for sanctions. And if --

THE COURT: All right.

MR. SMITH: -- the defense had done that, we would lose our bar licenses.

THE COURT: Oh, Lord. Mr. -- we've already had -- the number of times we've had -- I could count from when Mr. Jauregui joined the case.

MR. SMITH: This was --

THE COURT: We had --

MR. SMITH: -- a gratuitous --

THE COURT: Mr. Smith, I understand your argument.

You can stop talking.

Mr. Mulroe, I do think it's a fair question. We can take -- I don't want to take it up with the jury here now, but I do think there was no obvious reason for that. Now, you're going to say in part -- and I think it's fair, given where we are on all this -- it's very clear he was with a particular chapter, even though you haven't mentioned it here. The public reporting regarding his associates and all the rest is going to make that clear, but I do think it was a gratuitous question. Why did you think -- I don't want to address it now, but we'll address it later.

MR. MULROE: Yeah. And if I may just say, I understood Your -- Court's ruling at the beginning of the day to be that we could say "Kansas City." I've avoided doing that, but I -- but that was my understanding of where we were.

THE COURT: Right. I -- and whether -- I didn't rule one way or the other on the issue of "Kansas City," but I think it seems plain that -- and I think that's a fair point. It seems plain, again, given what we -- what is already publicly known about these other -- Chrestman and all the rest, that they were from Kansas City. So I don't think that's -- I mean, I do think there was no particular reason to ask that question either, but I agree. I mean, "Kansas City" -- I never said one way or the other about

"Kansas City."

MR. SMITH:  Your Honor, this witness has said he's been threatened in the past, and what we have seen is a deliberate effort, without any relevance, to expose the --

THE COURT:  Mr. --

MR. SMITH:  -- witness's --

THE COURT:  Mr. Smith, we just --

MR. SMITH:  -- place of residence.

THE COURT:  We're --

MR. SMITH:  It's a danger.

THE COURT:  Let's continue.  Let's -- Mr. Mulroe, let's continue.

(Return from bench conference.)

BY MR. MULROE:

Q.  Back to my question, sir.  You were so close that you could feel concussion against your legs from the crowd-control measures; correct?

A.  When they started using crowd-control measures, they began firing them, to my best recollection, from some kind of device that projected them over the crowd into about the middle area.  And it would cause people to part in a circle before it blew.  A few flew directly over people's heads ahead of me.  So when the circle parted, yes, I was able to feel that concussion.

Q.  And you knew very well at that point that the police

were trying to clear the area; correct?

A. Yes, I even had walked up and advised two people, "Hey, maybe, you should come down from the front."

Q. And you knew very well at that point that the people in the crowd wanted to put a stop to what was going on inside the building --

MR. SMITH: Objection. Speculation.

THE COURT: Overruled.

THE WITNESS: I was not thinking of that at the time.

BY MR. MULROE:

Q. You heard people shouting, "Stop the vote," didn't you?

A. I don't recall.

Q. You don't recall texting the FBI to say that "People are shouting, 'stop the vote'"?

A. If I did, I don't recall it.

MR. MULROE: Let's have, just for the witness, 1722, please.

BY MR. MULROE:

Q. Do you see that message up at the top?

A. Yes.

Q. It says, "Shouts of 'stop the vote'"?

A. Yes.

Q. That was a message you sent; correct?

A. Yeah.

Q. So you heard people shouting that, didn't you?

A. Yes, among other things. I just don't have a -- it was a -- I'd never been in a situation like that before. So it's, kind of, hard processing some of it.

Q. Now, you were aware at that point that the FBI knew you were there?

A. Yes.

Q. You were aware that they knew you were with the Proud Boys?

A. Yes.

Q. You were aware that they knew -- strike that.

You were aware that there were cameras everywhere?

A. Yes.

Q. You were aware this was going to be all over the news?

A. I wasn't thinking that at the time.

Q. You were aware that a whole bunch of those Proud Boys were on the Capitol grounds with you?

A. Yes.

Q. And you knew that this was all going to look very, very, very bad; correct?

A. I don't recall having that thought.

Q. And it is at that moment that you texted your FBI contact, "The Proud Boys didn't do this or inspire"; isn't that right?

A. No. I believe I had done it down near the first breach.

And I recall looking at my phone multiple times to see it saying, "Sending, sending, sending."

Q.  So let's talk about the timing of that message. Mr. Smith showed it to you on direct.  And you'll agree with me that that message was received by the FBI at 12:02 Central time?

MR. SMITH:  Misstates the -- objection.  Misstates the testimony.

THE COURT:  The witness can answer or correct it -- correct the premise of the question if it needs correcting.

BY MR. MULROE:

Q.  12:02 Central time is what the exhibit showed as the timestamp for that message?

A.  That's what it showed.

Q.  And so that would be the time it was received?

A.  Yes.

MR. MULROE:  Ms. Rhode, let's have Exhibit-160, please.

And this is in evidence, I believe.  So I'll ask for it to be published.

MR. SMITH:  No objection.

MR. MULROE:  Let's go to the 6-minute mark in the video.

BY MR. MULROE:

Q.   Sir, you'll agree with me this video shows an overall view of the west side of the Capitol?

A.   Yes.

Q.   Do you see the timestamp in the upper left corner?

A.   Yes.

Q.   It says "12:56 p.m."?

A.   Correct.

Q.   And that would be Eastern time, in your understanding?

A.   Yes.

Q.   And at 12:56, we see in the upper-right the first members of the crowd starting to make their way towards the building on that grassy area; correct?

A.   Yes.

          MR. MULROE:  Let's go to the 8-minute mark of the video.

BY MR. MULROE:

Q.   Sir, this is now 12:58 p.m.; correct?

A.   Yes.

Q.   And at this point, the rioters have spread out all along that black fence; correct?

A.   Yes.

          MR. MULROE:  Let's go to the 8-minute-and-45-second mark.

BY MR. MULROE:

Q.   We are now at 12:58:45 p.m. Eastern?

A. Yes.

Q. 12:58:45; correct?

A. Correct.

Q. And at this point, rioters, including you, have broken through that fence and are moving forward?

A. I didn't break through. I walked through.

THE COURT: Sir, I just -- I need you -- I can barely hear you and I'm --

THE WITNESS: I didn't --

THE COURT: -- only three feet from you.

THE WITNESS: I didn't break through. I just walked.

BY MR. MULROE:

Q. Rioters broke through the fence and then you walked forward with them?

A. Yes.

MR. MULROE: Let's go to the 10-minute mark.

BY MR. MULROE:

Q. And at this point, the rioters have taken over the entire lower west terrace; correct?

A. Yes.

MR. MULROE: And let's go to the 10-minute -- the 12-minute mark.

BY MR. MULROE:

Q. So at 1:02 p.m. Eastern, sir, that is when -- that is

the time reflected on the timestamp of your text message to the FBI; correct?

A.   When they received it.

Q.   When they received it.  Correct.

Now, you had testimony on direct that there were times when you looked down at your phone and realized the message had not sent yet; correct?

A.   It would just say, "Sending."

Q.   And your understanding, that you testified to the jury today, is that's because there was too much signal traffic with all the people there?

A.   That was my opinion.

Q.   That was your opinion.

This is not the first time that you've discussed the timing of that message; is it?

A.   They had asked me about it previously and pointed out differences in the time.  And I told them that that's the first time I even questioned my timing of the events.  And then I thought more about it and I'm, like, "Well, I remember seeing 'sending, sending, sending,' multiple times."  And I reached out to them and said, "I think that that was probably what it was."

Q.   And so on January 13th, 2021 -- that's about a week after the riot; right?

A.   I believe so.

Q.   You met with the FBI on January 13th, one week later?

A.   Yes.

Q.   And you told them that you sent that message right as soon as you saw the crowd moving forward and before you went with them; right?

A.   It was before I went through the first barrier.  Yes.

Q.   And then you met with the FBI again on April 5th; correct, 2021?

A.   Yes, I believe that's right.

Q.   And so that's about three months after the riot?

A.   Yes.

Q.   And they asked you again about the timing of that message; correct?

A.   Yes.

Q.   And, again, you told them that you sent it as soon as you saw the crowd moving forward; correct?

A.   Yes.  When I saw the crowd moving forward, I, kind of, paused and said, "I thought there was barriers there."  And someone said, "Oh, they took them down," and I was a little bit in a state of shock for the moment, but I, then, texted real quick.

Q.   And then on August 11th, 2021, about seven months after the riot, you met with the FBI again and there was a lawyer there?

A.   Yes.

Q.   And they asked you about the timing of that message again?

A.   Yes.

Q.   And that time, they pushed you, kind of, hard on that, didn't they?

A.   I -- they pointed out how -- timestamp issues.

Q.   They showed you videos of different times?

A.   Yes.

Q.   And they pointed you to the timestamps and they pointed out the discrepancy; correct?

A.   Yes.

Q.   And you didn't say anything about the message failing to send, did you?

A.   Because I was trying to figure out why I had a discrepancy at that time, and I believe it was just within hours.  I -- as I thought back through everything, I recalled, you know, looking at my phone multiple times to see if it had gone through or if I had gotten a response back yet.

Q.   And so now on that witness stand, more than two years after January 6th, now is the time that you're giving this explanation about how the message was delayed in sending; correct?

A.   I had mentioned it to an agent back then, the -- August that you referenced.

Q. Now, sir, even on your telling, very soon after sending that message, you realized that it wasn't entirely accurate; correct?

THE COURT: All right. Mr. Mulroe, let me pause, because I sense you're about to transition.

Ladies and gentlemen, it's lunchtime. We will see you in one hour.

(Jury returned to jury room.)

THE COURT: All right. You all may be seated.

Sir, you may step down.

(Witness steps down.)

THE COURT: And we're getting out of here a little bit late. So why don't we come back at -- in one hour at 1:35. It's now 12:35. See you then.

THE DEPUTY CLERK: All rise. This Honorable Court stands in recess.

(Luncheon recess taken at 12:35 p.m.)

* * * * * * * * * * * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 29th day of March 2023.

/s/Timothy R. Miller, RPR, CRR, NJ-CCR
Official Court Reporter

United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001

# '

'sending [1] - 15841:20
'stop [2] - 15836:15, 15836:22

# /

/s/Timothy [1] - 15844:25

# 0

06511 [1] - 15695:22

# 1

1 [9] - 15698:3, 15698:9, 15698:13, 15717:5, 15717:17, 15781:4, 15810:3, 15816:7, 15820:17
1,000 [1] - 15775:23
1-ETHAN [1] - 15695:4
1-hour-27-minute [1] - 15738:23
1-minute-30-second [1] - 15813:24
1-minute-57-second [1] - 15816:24
10 [7] - 15715:8, 15737:10, 15742:1, 15747:11, 15747:12, 15747:14, 15810:20
10-minute [3] - 15747:2, 15840:17, 15840:22
100 [3] - 15810:21, 15810:22
10003 [1] - 15695:18
10016 [1] - 15696:13
1014 [1] - 15696:9
10:00 [1] - 15715:7
113 [1] - 15696:15
11th [1] - 15842:22
12 [1] - 15763:10
12-minute [1] - 15840:23
12:02 [4] - 15732:22, 15733:6, 15838:5, 15838:13
12:35 [2] - 15844:14, 15844:17
12:56 [2] - 15839:6, 15839:10
12:58 [1] - 15839:17
12:58:45 [2] - 15839:25, 15840:2
12th [2] - 15773:10,

15818:9
13 [2] - 15780:3, 15823:24
13-second [1] - 15824:12
13th [2] - 15841:23, 15842:1
1420 [1] - 15695:24
15 [1] - 15737:10
153 [1] - 15696:5
16 [3] - 15812:25, 15820:17, 15825:5
16-hour [1] - 15774:8
16-second [1] - 15808:6
17 [2] - 15717:6, 15717:17
1701B [1] - 15779:9
1704 [1] - 15804:6
1705A [2] - 15787:19, 15788:2
1710A [1] - 15795:12
1710B [1] - 15779:9
1711 [2] - 15805:23, 15806:3
1722 [1] - 15836:18
1776 [1] - 15794:3
18 [3] - 15774:9, 15776:10, 15785:1
18-hour [1] - 15784:18
19 [2] - 15807:20, 15808:20
1:00 [1] - 15832:17
1:02 [2] - 15733:7, 15840:25
1:16 [1] - 15820:25
1:21-cr-00175-TJK-1 [1] - 15695:2
1:21-cr-00175-TJK-2 [1] - 15695:3
1:21-cr-00175-TJK-3 [1] - 15695:3
1:21-cr-00175-TJK-5 [1] - 15695:4
1:21-cr-00175-TJK-6 [1] - 15695:4
1:30 [2] - 15813:23, 15829:24
1:35 [1] - 15844:14
1:52 [1] - 15822:2
1st [1] - 15695:21

# 2

2 [10] - 15698:4, 15698:9, 15698:14, 15721:11, 15815:4, 15818:21, 15823:18, 15823:20, 15827:23, 15831:1

2-JOSEPH [1] - 15695:5
2-minute-15-second [1] - 15799:9
20 [5] - 15737:13, 15745:19, 15774:9, 15810:21, 15811:25
20001 [2] - 15696:19, 15845:2
20005 [1] - 15695:25
2008 [2] - 15762:3, 15763:8
2019 [3] - 15711:12, 15711:15, 15764:23
202 [3] - 15695:15, 15695:25, 15696:20
2020 [1] - 15773:11
2021 [9] - 15711:20, 15724:18, 15725:12, 15742:16, 15766:5, 15790:18, 15841:23, 15842:8, 15842:22
2023 [2] - 15695:6, 15844:24
203 [1] - 15695:22
20530 [1] - 15695:15
20777 [1] - 15696:3
209 [1] - 15696:6
20th [1] - 15695:17
21 [1] - 15747:17
21-175 [2] - 15698:2, 15747:20
21-second [1] - 15807:16
22-second [1] - 15807:24
23 [1] - 15804:14
24 [1] - 15809:10
240 [1] - 15696:3
25 [1] - 15804:14
252-7233 [1] - 15695:15
253-0514 [1] - 15696:13
26 [1] - 15825:21
29 [1] - 15695:6
29th [1] - 15844:24
2:38 [1] - 15818:14
2:39 [1] - 15818:16
2:45 [1] - 15819:3
2:57 [1] - 15820:7

# 3

3 [3] - 15698:4, 15698:10, 15698:14
3-ZACHARY [1] - 15695:5
30 [3] - 15725:10, 15814:11, 15816:7

300 [1] - 15752:2
305 [2] - 15696:7, 15696:10
33012 [1] - 15696:9
33014 [1] - 15696:6
333 [2] - 15696:19, 15845:2
34 [1] - 15728:8
354-3111 [1] - 15696:20
383 [1] - 15695:21
39 [1] - 15804:11
393-3017 [1] - 15695:22

# 4

4 [2] - 15728:8
40 [2] - 15804:17, 15814:12
400D [2] - 15811:3, 15811:5
403 [11] - 15751:13, 15765:15, 15770:2, 15770:19, 15773:13, 15777:22, 15799:14, 15827:6, 15831:14, 15832:15, 15833:1
403-7323 [1] - 15696:7
41 [1] - 15829:14
417 [1] - 15828:13
42 [1] - 15815:5
422 [2] - 15816:21, 15817:11
423 [1] - 15822:21
428 [3] - 15807:5, 15807:14, 15808:2
429-6520 [1] - 15695:25
43 [2] - 15728:9, 15815:5
436 [2] - 15728:6, 15728:7
437 [1] - 15728:6
44 [1] - 15721:11
445-boy [1] - 15823:24
445A [3] - 15813:16, 15813:24, 15814:6
445B [1] - 15823:23
447A [1] - 15820:15
45 [1] - 15815:11
45-second [1] - 15813:21
472-3391 [1] - 15696:3
49 [1] - 15696:9
499A [2] - 15797:12, 15805:4
4r [1] - 15695:18
4th [2] - 15695:14, 15795:2

# 5

5 [3] - 15698:5, 15698:11, 15698:15
5-ENRIQUE [1] - 15695:6
5-minute-and-2-second [1] - 15822:22
50 [3] - 15717:6, 15721:11, 15810:21
512-5 [1] - 15791:21
54 [1] - 15715:9
555 [1] - 15695:14
56 [2] - 15695:8, 15815:24
58-second [1] - 15813:9
59 [1] - 15717:17
59047 [1] - 15696:16
5th [4] - 15714:21, 15725:12, 15742:11, 15842:7

# 6

6 [5] - 15698:5, 15698:12, 15698:15, 15732:4, 15732:5
6-DOMINIC [1] - 15695:6
6-minute [1] - 15838:23
6175 [1] - 15696:5
646 [1] - 15696:13
6722 [2] - 15696:18, 15845:1
6th [40] - 15696:12, 15711:20, 15712:17, 15713:7, 15714:24, 15715:5, 15716:12, 15724:15, 15727:9, 15728:3, 15743:3, 15743:17, 15748:18, 15749:11, 15749:16, 15750:5, 15750:8, 15751:4, 15752:9, 15753:6, 15763:10, 15771:8, 15776:14, 15776:20, 15784:13, 15785:17, 15786:8, 15787:22, 15788:16, 15790:18, 15791:3, 15791:6, 15794:18, 15794:21, 15796:1, 15797:4, 15797:25, 15805:25, 15813:6, 15843:21

| 7 |
|---|
| **7** [1] - 15695:17 |
| **7166** [1] - 15696:2 |
| **764-9347** [1] - 15696:16 |
| **775** [1] - 15696:16 |

| 8 |
|---|
| **8** [4] - 15738:18, 15738:19, 15738:20 |
| **8-minute** [1] - 15839:14 |
| **8-minute-and-45-second** [1] - 15839:23 |
| **822-2901** [1] - 15696:10 |

| 9 |
|---|
| **9** [2] - 15738:17, 15738:23 |
| **902-3869** [1] - 15695:19 |
| **917** [1] - 15695:19 |
| **99** [1] - 15696:12 |
| **9:00** [1] - 15695:6 |

| A |
|---|
| **a.m** [2] - 15695:6, 15715:7 |
| **Aaron** [16] - 15711:7, 15711:8, 15715:16, 15717:7, 15717:23, 15721:14, 15724:25, 15728:11, 15729:6, 15730:7, 15732:12, 15736:9, 15738:2, 15739:1, 15739:17, 15743:6 |
| **AARON** [2] - 15697:3, 15711:3 |
| **ability** [2] - 15709:17, 15844:24 |
| **able** [16] - 15717:11, 15717:14, 15717:23, 15729:12, 15729:24, 15734:19, 15740:14, 15740:15, 15785:15, 15786:17, 15792:14, 15793:20, 15798:10, 15832:21, 15832:24, 15835:23 |
| **access** [6] - 15786:2, 15789:10, 15790:20, 15790:23, 15791:1 |
| **accidentally** [1] - |

15821:13
**accommodations** [1] - 15780:18
**account** [2] - 15699:17, 15827:19
**accurate** [3] - 15766:15, 15844:2, 15844:21
**accurately** [3] - 15769:9, 15812:14, 15823:2
**act** [2] - 15714:2, 15772:11
**acted** [2] - 15774:20, 15775:4
**action** [2] - 15749:18, 15810:25
**active** [1] - 15790:18
**actively** [5] - 15756:21, 15777:19, 15778:4, 15827:2, 15831:22
**activities** [4] - 15714:17, 15731:8, 15768:7, 15772:3
**activity** [3] - 15713:15, 15714:8, 15771:3
**additional** [2] - 15743:8, 15744:11
**address** [3] - 15747:22, 15834:11
**admiration** [1] - 15754:15
**admit** [6] - 15758:14, 15788:2, 15806:3, 15808:2, 15814:6, 15817:11
**admitted** [10] - 15726:17, 15732:9, 15736:20, 15739:13, 15758:6, 15758:11, 15788:5, 15808:3, 15814:8, 15817:13
**advanced** [1] - 15735:17
**advancing** [1] - 15730:14
**advised** [1] - 15836:2
**advising** [1] - 15793:6
**affinity** [1] - 15765:7
**affirmatively** [1] - 15818:24
**afternoon** [1] - 15747:25
**agent** [27] - 15712:5, 15712:7, 15712:10, 15712:12, 15712:16, 15713:2, 15713:6, 15713:10, 15713:13, 15724:15, 15731:2,

15731:4, 15731:7, 15731:10, 15731:13, 15733:2, 15740:23, 15741:5, 15741:22, 15742:9, 15749:24, 15751:6, 15751:25, 15752:1, 15752:2, 15843:24
**agent's** [2] - 15712:22, 15741:11
**agents** [5] - 15712:16, 15741:22, 15742:13, 15742:17, 15742:20
**aggression** [2] - 15777:19, 15778:3
**aggressive** [1] - 15765:18
**aggressors** [1] - 15821:14
**ago** [4] - 15718:24, 15734:1, 15748:5, 15809:8
**agree** [5] - 15803:20, 15811:20, 15834:24, 15838:4, 15839:1
**agreeable** [1] - 15761:3
**agreed** [1] - 15757:16
**agreement** [2] - 15737:20, 15737:24
**ahead** [4] - 15771:4, 15784:9, 15824:12, 15835:23
**aided** [1] - 15696:21
**air** [1] - 15829:5
**Airbnb** [1] - 15784:20
**al** [1] - 15747:20
**aligned** [1] - 15744:17
**Alioto's** [1] - 15738:22
**alley** [1] - 15778:7
**allow** [1] - 15752:3
**allowed** [6] - 15735:23, 15772:22, 15803:7, 15803:12, 15803:14, 15805:8
**almost** [6] - 15732:19, 15777:9, 15796:19, 15802:10, 15824:24, 15829:9
**alone** [5] - 15713:22, 15714:5, 15714:14, 15794:11, 15798:6
**Amendment** [3] - 15698:24, 15699:5, 15761:8
**AMERICA** [1] - 15695:2
**America** [2] - 15698:3, 15747:20
**American** [1] -

15819:25
**amount** [1] - 15755:5
**angry** [3] - 15794:14, 15794:25, 15795:3
**annotation** [1] - 15788:10
**answer** [16] - 15710:15, 15725:16, 15741:14, 15759:22, 15764:11, 15770:10, 15777:25, 15782:19, 15782:20, 15783:20, 15796:14, 15796:16, 15798:21, 15800:10, 15832:24, 15838:9
**answered** [4] - 15719:14, 15770:19, 15827:21, 15828:8
**answering** [2] - 15710:19, 15710:20
**answers** [1] - 15819:14
**anticipated** [1] - 15750:6
**Antifa** [27] - 15713:20, 15714:4, 15714:6, 15714:8, 15714:14, 15714:18, 15753:20, 15753:22, 15753:25, 15754:4, 15765:11, 15765:19, 15766:3, 15768:25, 15769:6, 15769:10, 15772:19, 15776:5, 15776:25, 15777:20, 15777:23, 15778:5, 15793:20, 15804:22, 15821:10, 15830:18, 15830:22
**Antifa's** [1] - 15783:13
**anyway** [2] - 15755:24, 15776:23
**apart** [1] - 15793:9
**apologies** [1] - 15816:23
**apologize** [1] - 15731:20
**appear** [2] - 15748:5, 15748:6
**APPEARANCES** [2] - 15695:11, 15696:1
**appeared** [1] - 15765:18
**approach** [1] - 15739:24
**approached** [3] - 15797:25, 15798:5, 15804:23
**approaching** [1] - 15739:22
**appropriate** [2] -

15748:25, 15754:16
**approve** [1] - 15778:19
**April** [4] - 15724:18, 15725:12, 15742:11, 15842:7
**area** [12] - 15724:11, 15725:21, 15726:1, 15728:12, 15738:12, 15784:25, 15818:17, 15818:19, 15831:2, 15835:21, 15836:1, 15839:12
**areas** [1] - 15738:14
**arguing** [1] - 15756:5
**argument** [3] - 15754:13, 15757:20, 15833:25
**argumentative** [1] - 15781:14
**Arizona** [2] - 15799:12, 15809:18
**arms** [1] - 15828:3
**arrangements** [1] - 15780:5
**arrested** [3] - 15769:1, 15769:7, 15769:11
**arrests** [1] - 15806:22
**arrive** [1] - 15714:20
**arrived** [3] - 15716:12, 15716:16, 15793:4
**Ashlock** [3] - 15782:23, 15783:13, 15808:9
**aside** [3] - 15753:13, 15819:20, 15821:23
**asserted** [1] - 15757:3
**assertion** [1] - 15802:1
**assessing** [1] - 15762:17
**associated** [1] - 15752:20
**associates** [2] - 15750:5, 15834:8
**assume** [1] - 15737:13
**assuming** [1] - 15733:10
**assumption** [4] - 15790:22, 15810:23, 15826:11, 15827:3
**AT** [1] - 15696:15
**ate** [1] - 15721:4
**attack** [1] - 15776:7
**attempt** [1] - 15832:13
**attend** [2] - 15773:17, 15794:16
**attendees** [1] - 15776:7
**attending** [1] -

| | | | | |
|---|---|---|---|---|
| 15776:16<br>**ATTORNEY** [1] - 15696:15<br>**ATTORNEY'S** [1] - 15695:14<br>**attorneys** [1] - 15761:1<br>**audio** [1] - 15717:19<br>**August** [4] - 15742:14, 15766:5, 15842:22, 15843:24<br>**authenticity** [1] - 15756:17<br>**authorization** [4] - 15714:13, 15769:20, 15771:8, 15771:12<br>**authorized** [2] - 15772:2, 15772:11<br>**available** [1] - 15777:13<br>**Avenue** [3] - 15696:12, 15696:19, 15845:2<br>**average** [2] - 15722:12, 15766:2<br>**avoid** [1] - 15750:21<br>**avoided** [2] - 15750:12, 15834:14<br>**aware** [11] - 15763:18, 15776:13, 15783:1, 15821:24, 15825:12, 15837:5, 15837:8, 15837:11, 15837:12, 15837:14, 15837:16<br>**axe** [1] - 15808:18<br><br>**B**<br><br>**B.A** [1] - 15695:12<br>**background** [4] - 15786:16, 15786:19, 15787:4, 15811:10<br>**backwards** [2] - 15728:17, 15788:12<br>**bad** [4] - 15713:15, 15714:7, 15714:17, 15837:20<br>**bail** [1] - 15777:13<br>**bait** [1] - 15753:24<br>**bandana** [1] - 15819:25<br>**bangs** [1] - 15831:23<br>**bar** [1] - 15833:18<br>**barbecues** [1] - 15768:10<br>**barely** [1] - 15840:8<br>**barricades** [2] - 15819:20, 15821:22<br>**barrier** [6] - 15730:20, 15733:16, 15818:13, | 15819:9, 15828:5, 15842:6<br>**barriers** [6] - 15730:17, 15732:18, 15741:5, 15810:10, 15811:18, 15842:18<br>**baseball** [8] - 15728:17, 15788:12, 15797:20, 15799:25, 15808:16, 15812:12, 15814:21, 15815:19<br>**based** [14] - 15719:21, 15720:12, 15722:7, 15723:13, 15750:18, 15750:19, 15750:24, 15758:18, 15758:20, 15759:5, 15777:15, 15784:12, 15794:17, 15794:20<br>**basis** [4] - 15743:23, 15751:13, 15802:2, 15802:12<br>**bat** [2] - 15797:20, 15805:8<br>**beard** [1] - 15788:22<br>**bears** [1] - 15749:23<br>**beat** [1] - 15749:17<br>**became** [2] - 15772:15, 15776:13<br>**become** [1] - 15778:9<br>**becomes** [1] - 15757:13<br>**beer** [1] - 15768:10<br>**BEFORE** [1] - 15695:9<br>**began** [4] - 15726:5, 15730:8, 15793:6, 15835:19<br>**beginning** [5] - 15753:25, 15808:6, 15811:7, 15814:10, 15834:13<br>**begrudge** [2] - 15755:6, 15755:8<br>**behalf** [2] - 15759:22, 15806:22<br>**behind** [9] - 15720:22, 15726:11, 15733:3, 15750:17, 15793:8, 15809:25, 15815:18, 15816:5, 15816:18<br>**below** [1] - 15740:4<br>**Bench** [6] - 15700:9, 15743:12, 15762:6, 15770:24, 15800:20, 15831:17<br>**bench** [5] - 15745:7, 15763:6, 15771:25, 15803:24, 15835:13<br>**bent** [1] - 15828:1<br>**best** [3] - 15791:19, | 15835:19, 15844:23<br>**better** [2] - 15713:23, 15784:1<br>**between** [2] - 15714:8, 15819:9<br>**beyond** [3] - 15748:19, 15754:19, 15756:23<br>**bias** [2] - 15748:24, 15753:11<br>**big** [1] - 15752:19<br>**Biggs** [6] - 15698:4, 15698:14, 15727:4, 15787:13, 15787:16, 15788:18<br>**BIGGS** [1] - 15695:5<br>**Billy** [14] - 15743:14, 15743:19, 15751:18, 15784:6, 15784:10, 15799:25, 15800:6, 15800:14, 15804:1, 15808:15, 15814:18, 15814:23, 15822:14<br>**bit** [16] - 15745:3, 15745:5, 15751:20, 15760:18, 15779:12, 15781:3, 15781:10, 15781:22, 15787:19, 15788:1, 15795:13, 15798:4, 15798:7, 15820:6, 15842:20, 15844:13<br>**black** [10] - 15728:17, 15808:13, 15814:21, 15815:19, 15823:21, 15824:19, 15824:21, 15825:25, 15827:22, 15839:20<br>**blah** [3] - 15794:24<br>**blew** [1] - 15835:22<br>**BLM** [3] - 15777:20, 15777:23, 15778:5<br>**boarded** [1] - 15784:16<br>**body** [1] - 15739:1<br>**Bones** [1] - 15789:12<br>**boost** [1] - 15774:21<br>**boots** [2] - 15722:18, 15793:23<br>**Boots** [2] - 15727:16, 15790:17<br>**bottom** [12] - 15779:23, 15780:24, 15781:4, 15781:12, 15781:19, 15781:24, 15795:12, 15804:11, 15804:14, 15820:11, 15829:17, 15829:19<br>**box** [3] - 15710:7, 15747:11, 15761:19 | **Boy** [4] - 15735:10, 15743:15, 15775:18, 15798:14<br>**Boys** [54] - 15711:9, 15712:24, 15713:7, 15715:1, 15716:6, 15727:18, 15728:13, 15730:13, 15730:15, 15731:14, 15740:15, 15742:24, 15749:10, 15749:22, 15751:8, 15755:21, 15762:14, 15763:13, 15763:15, 15764:23, 15766:9, 15766:16, 15766:22, 15767:24, 15768:6, 15772:12, 15773:9, 15773:21, 15774:5, 15774:13, 15775:24, 15776:5, 15789:23, 15790:21, 15791:1, 15794:9, 15797:9, 15798:9, 15809:18, 15810:6, 15810:15, 15812:20, 15813:6, 15818:3, 15818:8, 15818:11, 15822:17, 15825:2, 15830:15, 15830:18, 15830:25, 15837:9, 15837:16, 15837:23<br>**Boys'** [1] - 15750:2<br>**breach** [5] - 15730:12, 15734:7, 15794:5, 15810:13, 15837:25<br>**Breach** [6] - 15810:3, 15818:21, 15823:18, 15823:20, 15827:23, 15831:1<br>**breached** [2] - 15730:10, 15811:17<br>**break** [8] - 15699:20, 15700:1, 15710:3, 15713:21, 15744:23, 15747:2, 15840:6, 15840:11<br>**brewing** [1] - 15750:8<br>**Brief** [10] - 15709:11, 15710:5, 15717:20, 15724:22, 15745:8, 15747:15, 15747:18, 15760:15, 15760:22, 15760:24<br>**brief** [4] - 15726:19, 15740:18, 15791:22, 15820:24<br>**briefly** [3] - 15698:21, 15756:2, 15800:19<br>**Briggs** [1] - 15788:18<br>**bring** [14] - 15698:19, | 15709:10, 15715:8, 15721:9, 15721:10, 15724:20, 15726:17, 15726:20, 15731:25, 15736:4, 15736:6, 15738:21, 15748:17, 15760:21<br>**bringing** [1] - 15728:5<br>**broke** [2] - 15768:3, 15840:14<br>**broken** [1] - 15840:4<br>**brother** [5] - 15799:11, 15799:15, 15800:7, 15800:15, 15804:2<br>**brothers** [2] - 15778:25, 15818:4<br>**brought** [1] - 15794:6<br>**building** [28] - 15717:9, 15719:5, 15723:16, 15723:24, 15724:12, 15725:21, 15726:6, 15730:9, 15732:19, 15734:24, 15735:14, 15736:1, 15737:2, 15737:8, 15737:12, 15737:19, 15737:20, 15737:22, 15738:4, 15740:19, 15741:12, 15741:15, 15804:20, 15805:18, 15805:19, 15811:10, 15836:6, 15839:12<br>**Building** [1] - 15732:19<br>**bunch** [2] - 15809:15, 15837:16<br>**Bureau** [1] - 15712:5<br>**burn** [1] - 15699:22<br>**burning** [2] - 15783:4, 15783:13<br>**BY** [133] - 15711:5, 15711:16, 15714:12, 15715:15, 15715:25, 15717:22, 15718:9, 15718:14, 15718:20, 15719:12, 15720:2, 15720:15, 15721:13, 15723:12, 15724:24, 15728:10, 15728:15, 15729:5, 15729:23, 15730:6, 15732:11, 15736:8, 15736:12, 15736:24, 15738:25, 15739:4, 15739:16, 15740:13, 15741:9, 15745:10, 15746:18, 15761:25, 15763:7, 15764:13, 15764:22, 15765:22, 15767:9, 15767:15, 15769:8, |

## C (continued, column 1)

15769:14, 15770:4, 15770:15, 15772:1, 15773:15, 15775:5, 15775:12, 15778:1, 15778:23, 15779:14, 15780:2, 15780:11, 15781:5, 15781:11, 15781:18, 15781:23, 15782:13, 15782:22, 15783:12, 15783:23, 15785:16, 15786:12, 15787:20, 15788:11, 15792:2, 15792:10, 15793:1, 15795:21, 15795:25, 15796:25, 15797:18, 15798:23, 15799:10, 15799:24, 15800:13, 15803:25, 15804:13, 15805:1, 15805:6, 15805:17, 15805:24, 15806:8, 15807:6, 15807:23, 15808:8, 15808:23, 15809:7, 15809:14, 15809:24, 15811:9, 15812:2, 15812:10, 15813:2, 15813:12, 15813:25, 15814:17, 15815:8, 15815:17, 15816:3, 15816:11, 15817:6, 15817:18, 15818:7, 15818:15, 15819:10, 15819:18, 15819:24, 15820:10, 15821:3, 15822:5, 15822:13, 15823:1, 15824:16, 15825:10, 15825:24, 15826:7, 15827:8, 15828:17, 15828:24, 15829:16, 15830:1, 15830:6, 15830:12, 15830:21, 15835:14, 15836:11, 15836:19, 15838:12, 15838:25, 15839:16, 15839:24, 15840:13, 15840:18, 15840:24

### C

**cam** [1] - 15739:1
**camera** [1] - 15767:20
**cameras** [2] - 15826:17, 15837:12
**camouflage** [1] - 15797:19
**candidly** [1] - 15699:6
**cap** [8] - 15728:17, 15788:12, 15788:22, 15799:25, 15808:16, 15812:12, 15814:21,

15815:19
**Capitol** [52] - 15717:9, 15719:5, 15719:22, 15719:23, 15720:4, 15720:11, 15720:17, 15720:25, 15721:7, 15721:24, 15723:1, 15723:4, 15723:15, 15723:19, 15723:20, 15724:5, 15724:11, 15724:12, 15725:21, 15726:2, 15726:5, 15726:9, 15726:10, 15728:21, 15729:25, 15730:9, 15732:18, 15734:24, 15737:21, 15741:12, 15745:18, 15746:14, 15746:19, 15751:19, 15754:1, 15754:3, 15771:12, 15784:11, 15804:20, 15807:3, 15811:10, 15813:4, 15813:14, 15814:4, 15816:14, 15817:9, 15817:20, 15818:18, 15830:22, 15837:17, 15839:2
**caps** [1] - 15809:16
**caption** [1] - 15725:5
**care** [1] - 15764:16
**careful** [1] - 15784:5
**carefully** [1] - 15750:12
**Carmen** [3] - 15696:2, 15698:11, 15745:12
**carpool** [1] - 15774:7
**carpooling** [1] - 15780:9
**carry** [1] - 15806:18
**carrying** [2] - 15734:16, 15734:21
**cars** [1] - 15780:13
**case** [12] - 15725:5, 15726:21, 15749:6, 15749:14, 15751:16, 15753:21, 15754:16, 15754:20, 15762:17, 15774:3, 15785:11, 15833:21
**catch** [1] - 15781:1
**caused** [1] - 15735:22
**CCR** [3] - 15696:17, 15844:20, 15844:25
**cell** [1] - 15733:11
**cellular** [1] - 15733:12
**center** [2] - 15714:8, 15726:11
**Central** [3] - 15782:16, 15838:6, 15838:13
**certain** [5] - 15767:11,

15769:25, 15774:1, 15777:9, 15797:6
**certainly** [2] - 15762:14, 15769:24
**CERTIFICATE** [1] - 15844:19
**certify** [1] - 15844:20
**cetera** [1] - 15772:6
**chair** [2] - 15735:18, 15737:5
**chairman** [1] - 15786:23
**challenging** [2] - 15777:20, 15778:5
**chambers** [1] - 15699:17
**chance** [1] - 15826:25
**change** [1] - 15723:1
**changing** [1] - 15740:21
**channel** [3] - 15765:1, 15765:6, 15765:10
**chant** [3] - 15794:1, 15830:15, 15830:19
**chanted** [2] - 15794:3, 15794:6
**chanting** [3] - 15721:24, 15812:17, 15830:13
**chapter** [21] - 15749:10, 15749:14, 15768:9, 15768:12, 15776:16, 15777:2, 15777:6, 15777:11, 15777:13, 15777:15, 15778:3, 15778:14, 15778:18, 15779:1, 15791:9, 15791:17, 15792:12, 15792:17, 15792:19, 15795:5, 15834:7
**chapter's** [1] - 15776:19
**chapters** [1] - 15792:6
**characterize** [2] - 15717:11, 15722:1
**charge** [2] - 15791:2, 15793:5
**charged** [2] - 15749:14, 15751:12
**chased** [1] - 15829:10
**chat** [36] - 15749:8, 15750:4, 15751:22, 15751:23, 15752:15, 15752:18, 15752:19, 15753:1, 15753:25, 15778:24, 15779:6, 15780:3, 15780:10, 15780:12, 15782:1, 15782:10, 15782:24,

15784:6, 15789:10, 15789:12, 15789:14, 15789:16, 15789:18, 15789:19, 15789:22, 15789:25, 15790:3, 15790:7, 15790:8, 15790:11, 15790:14, 15790:17, 15795:4, 15796:1
**chats** [7] - 15727:12, 15727:15, 15727:18, 15748:1, 15748:6, 15755:23, 15792:19
**checked** [1] - 15788:22
**chest** [1] - 15806:9
**Chiefs** [2] - 15812:3, 15833:8
**choice** [2] - 15758:16, 15758:20
**Chrestman** [14] - 15743:14, 15743:20, 15751:18, 15784:6, 15784:10, 15800:1, 15800:6, 15802:23, 15804:2, 15808:15, 15814:18, 15814:23, 15834:21
**Chris** [10] - 15749:14, 15779:3, 15779:5, 15779:17, 15779:20, 15781:6, 15781:12, 15781:19, 15782:23, 15808:12
**CHS** [8] - 15763:22, 15764:2, 15764:4, 15764:8, 15769:16, 15770:6, 15775:19, 15833:11
**circle** [6] - 15726:14, 15728:16, 15729:7, 15739:17, 15835:21, 15835:23
**circled** [1] - 15729:11
**circus** [1] - 15829:9
**City** [6] - 15743:15, 15834:14, 15834:18, 15834:22, 15834:25, 15835:1
**claiming** [1] - 15802:12
**claims** [2] - 15757:17, 15757:21
**clarify** [1] - 15719:13
**clear** [9] - 15713:2, 15742:24, 15762:13, 15782:14, 15793:4, 15806:21, 15834:6, 15834:9, 15836:1
**cleared** [1] - 15738:12

**clearly** [1] - 15832:23
**CLERK** [16] - 15698:2, 15710:6, 15710:24, 15728:6, 15732:4, 15738:19, 15747:13, 15747:16, 15761:18, 15807:14, 15811:6, 15813:17, 15817:1, 15820:18, 15820:20, 15844:15
**close** [11] - 15744:22, 15750:4, 15755:1, 15755:2, 15800:11, 15810:19, 15811:21, 15812:4, 15812:14, 15831:12, 15835:15
**closely** [1] - 15752:20
**closer** [1] - 15699:13
**clothing** [1] - 15808:13
**club's** [3] - 15765:1, 15765:11, 15768:7
**Coast** [4] - 15732:25, 15733:3, 15733:7, 15789:25
**coat** [1] - 15788:22
**cohesively** [2] - 15721:22, 15807:9
**cold** [1] - 15744:9
**collection** [1] - 15830:24
**Colon** [1] - 15809:2
**color** [4] - 15794:13, 15795:4, 15796:7, 15796:9
**colorful** [1] - 15749:16
**colors** [1] - 15792:7
**COLUMBIA** [1] - 15695:1
**coming** [4] - 15749:21, 15778:14, 15804:7, 15816:5
**Command** [1] - 15790:1
**comment** [1] - 15757:1
**comments** [1] - 15754:4
**commit** [1] - 15769:17
**committed** [1] - 15741:13
**committing** [1] - 15736:2
**communicate** [2] - 15731:7, 15731:13
**communicated** [3] - 15731:1, 15731:4, 15731:10
**communicating** [1] - 15793:10

complete [1] - 15844:23

completely [1] - 15762:16

computer [1] - 15696:21

computer-aided [1] - 15696:21

conceivable [1] - 15833:1

concern [1] - 15778:18

concerns [4] - 15777:15, 15777:17, 15777:18, 15778:2

conclusion [2] - 15716:24, 15749:4

concussion [3] - 15831:13, 15835:16, 15835:24

condone [1] - 15776:20

conducting [1] - 15756:6

conference [11] - 15700:9, 15743:12, 15745:7, 15762:6, 15763:6, 15770:24, 15771:25, 15800:20, 15803:24, 15831:17, 15835:13

confident [1] - 15817:25

confidential [2] - 15712:1, 15763:22

confirming [1] - 15784:3

conflict [1] - 15777:9

confront [1] - 15743:24

confused [2] - 15730:23, 15819:5

confusion [1] - 15789:21

Congress [1] - 15723:23

connection [4] - 15754:1, 15762:2, 15772:11, 15773:9

Conor [2] - 15695:13, 15698:8

consider [2] - 15733:24, 15784:10

considered [2] - 15764:14, 15769:16

consistent [1] - 15742:21

consistently [1] - 15810:12

constant [1] -

15753:21

constitutes [1] - 15844:21

Constitution [2] - 15696:19, 15845:2

consultation [3] - 15759:9, 15760:11, 15760:19

consulted [1] - 15804:2

contact [4] - 15786:15, 15787:10, 15787:15, 15837:23

contacted [1] - 15740:23

contacts [2] - 15764:16, 15766:21

contain [1] - 15748:6

contemplate [1] - 15713:14

context [4] - 15714:4, 15767:4, 15786:2, 15790:6

contextualized [1] - 15752:6

continue [4] - 15803:23, 15829:21, 15835:11, 15835:12

CONTINUED [1] - 15696:1

contrary [2] - 15751:8, 15752:21

control [7] - 15776:6, 15799:5, 15831:7, 15831:9, 15831:12, 15835:17, 15835:18

converging [1] - 15734:2

conversation [9] - 15713:13, 15714:4, 15714:16, 15802:21, 15802:22, 15803:5, 15803:6, 15803:17, 15803:18

conversations [2] - 15750:20, 15753:8

conversing [1] - 15722:6

cool [1] - 15786:22

cop [2] - 15735:24, 15737:5

cops [2] - 15738:13, 15794:23

corner [2] - 15828:18, 15839:4

cornered [1] - 15772:19

correct [131] - 15713:4, 15713:8, 15719:19, 15725:18,

15743:3, 15744:11, 15750:17, 15755:15, 15755:17, 15757:5, 15762:3, 15763:10, 15763:25, 15764:1, 15764:3, 15764:12, 15764:23, 15765:11, 15765:25, 15766:10, 15766:20, 15767:25, 15768:2, 15768:7, 15768:8, 15768:17, 15768:22, 15768:24, 15769:18, 15772:12, 15772:13, 15774:5, 15776:14, 15776:18, 15776:20, 15777:7, 15777:8, 15777:16, 15778:16, 15778:20, 15782:2, 15782:11, 15783:2, 15783:24, 15784:11, 15785:22, 15787:17, 15787:22, 15788:25, 15789:1, 15789:3, 15790:18, 15790:22, 15790:25, 15791:4, 15791:8, 15791:11, 15792:4, 15792:5, 15792:12, 15792:15, 15792:16, 15793:5, 15793:11, 15793:12, 15793:17, 15796:3, 15797:2, 15799:6, 15800:1, 15800:8, 15805:2, 15805:8, 15806:1, 15806:10, 15806:19, 15806:23, 15806:24, 15807:8, 15810:7, 15810:10, 15810:14, 15810:22, 15811:19, 15812:18, 15813:14, 15813:15, 15817:20, 15818:18, 15819:1, 15821:16, 15822:9, 15822:15, 15824:5, 15824:19, 15824:22, 15825:16, 15826:10, 15826:15, 15826:21, 15827:1, 15827:10, 15827:14, 15827:20, 15831:2, 15831:3, 15831:6, 15831:7, 15831:10, 15835:17, 15836:1, 15836:24, 15837:20, 15838:9, 15838:10, 15839:7, 15839:12, 15839:17, 15839:20, 15840:2, 15840:3, 15840:20, 15841:2, 15841:4, 15841:7, 15842:8,

15842:13, 15842:16, 15843:10, 15843:23, 15844:3

correcting [1] - 15838:11

counsel [5] - 15699:23, 15743:10, 15749:4, 15759:4, 15759:5

count [1] - 15833:20

couple [12] - 15718:24, 15726:21, 15734:1, 15734:16, 15743:18, 15745:17, 15748:5, 15748:12, 15760:25, 15813:22, 15818:3, 15828:14

court [8] - 15700:5, 15709:8, 15710:16, 15710:21, 15747:2, 15748:6, 15759:13, 15775:10

Court [6] - 15696:17, 15696:18, 15747:13, 15770:19, 15844:15, 15844:25

COURT [188] - 15695:1, 15698:16, 15699:8, 15699:13, 15699:19, 15700:3, 15700:7, 15709:9, 15709:17, 15709:21, 15709:23, 15710:1, 15710:4, 15710:8, 15710:17, 15711:1, 15711:14, 15715:11, 15718:13, 15718:19, 15719:10, 15719:25, 15720:14, 15723:10, 15732:9, 15736:20, 15739:13, 15741:8, 15743:7, 15743:10, 15743:22, 15744:4, 15744:7, 15744:10, 15744:14, 15744:24, 15745:2, 15746:17, 15747:1, 15747:6, 15747:9, 15747:21, 15748:22, 15750:16, 15751:20, 15752:5, 15753:9, 15754:7, 15755:2, 15755:8, 15755:12, 15755:14, 15756:3, 15756:7, 15756:18, 15756:22, 15757:8, 15757:24, 15758:2, 15758:5, 15758:8, 15758:22, 15758:24, 15759:5, 15759:13, 15759:17,

15759:21, 15759:25, 15760:8, 15760:13, 15760:17, 15760:20, 15760:25, 15761:10, 15761:13, 15761:17, 15761:20, 15762:5, 15762:7, 15762:10, 15762:18, 15762:21, 15762:24, 15763:2, 15764:11, 15764:20, 15765:14, 15765:16, 15767:8, 15767:13, 15769:5, 15769:13, 15770:3, 15770:10, 15770:22, 15770:25, 15771:10, 15771:17, 15771:19, 15771:21, 15771:23, 15773:14, 15774:24, 15775:11, 15777:25, 15778:22, 15779:11, 15779:25, 15780:8, 15781:15, 15782:5, 15782:9, 15782:19, 15783:7, 15783:9, 15783:11, 15783:18, 15785:13, 15786:11, 15788:3, 15788:5, 15791:25, 15792:25, 15795:17, 15795:20, 15796:15, 15797:16, 15798:21, 15799:16, 15800:10, 15800:22, 15800:24, 15801:1, 15801:3, 15801:9, 15801:11, 15801:23, 15802:6, 15802:8, 15802:15, 15802:18, 15802:22, 15803:1, 15803:3, 15803:8, 15803:10, 15803:14, 15804:7, 15804:10, 15805:11, 15805:13, 15806:5, 15806:7, 15808:3, 15809:23, 15811:23, 15812:6, 15814:8, 15817:13, 15824:4, 15824:10, 15825:20, 15827:7, 15828:9, 15830:17, 15831:15, 15831:18, 15832:6, 15832:19, 15832:21, 15833:13, 15833:16, 15833:19, 15833:23, 15833:25, 15834:17, 15835:5, 15835:7, 15835:9, 15835:11, 15836:8, 15838:9, 15840:7, 15840:10, 15844:4, 15844:9, 15844:12, 15844:19

**Court's** [3] - 15743:16, 15795:19, 15834:13
**court's** [2] - 15743:18, 15770:18
**Courthouse** [2] - 15696:18, 15845:1
**courtroom** [1] - 15748:24
**cover** [1] - 15748:15
**CR** [1] - 15695:2
**credibility** [9] - 15748:24, 15749:24, 15750:23, 15751:11, 15754:6, 15757:4, 15762:9, 15762:17
**Crew** [1] - 15789:16
**crime** [1] - 15741:13
**crimes** [1] - 15769:17
**Criminal** [3] - 15698:2, 15747:17, 15747:19
**CROSS** [1] - 15761:24
**Cross** [1] - 15697:4
**cross** [17] - 15744:16, 15744:21, 15747:3, 15748:25, 15751:25, 15754:11, 15754:21, 15755:4, 15755:5, 15755:9, 15756:4, 15759:16, 15761:22, 15801:19, 15803:12, 15811:23, 15819:11
**CROSS-EXAMINATION** [1] - 15761:24
**cross-examination** [12] - 15744:16, 15747:3, 15748:25, 15754:11, 15754:21, 15755:4, 15755:5, 15755:9, 15761:22, 15801:19, 15811:23, 15819:11
**Cross-Examination** [1] - 15697:4
**cross-examinations** [1] - 15756:4
**cross-examining** [1] - 15751:25
**crossing** [1] - 15801:14
**crowd** [33] - 15730:3, 15730:7, 15730:11, 15730:14, 15730:17, 15732:17, 15732:19, 15734:2, 15734:19, 15776:25, 15784:11, 15804:21, 15810:9, 15810:13, 15811:14, 15811:17, 15811:21, 15812:15, 15812:18,

15817:19, 15829:1, 15831:1, 15831:7, 15831:9, 15831:12, 15835:17, 15835:18, 15835:20, 15836:5, 15839:11, 15842:4, 15842:16, 15842:17
**crowd-control** [4] - 15831:7, 15831:9, 15835:17, 15835:18
**CRR** [3] - 15696:17, 15844:20, 15844:25
**CT** [1] - 15695:22
**curative** [2] - 15698:22, 15699:4
**cussing** [1] - 15794:23

## D

**D.C** [28] - 15695:5, 15711:19, 15711:23, 15712:15, 15712:17, 15712:24, 15713:3, 15714:20, 15727:8, 15728:3, 15749:10, 15766:24, 15773:10, 15773:20, 15774:6, 15774:10, 15776:14, 15776:20, 15778:24, 15784:14, 15784:17, 15784:19, 15784:20, 15784:25, 15790:3, 15794:20, 15796:2, 15796:10
**Dahmer** [1] - 15787:3
**danger** [1] - 15835:10
**date** [2] - 15725:7, 15725:11
**dated** [1] - 15844:24
**DAVID** [1] - 15695:17
**DAY** [1] - 15695:8
**days** [5] - 15742:1, 15752:8, 15771:8, 15795:2, 15796:1
**DC** [4] - 15695:15, 15695:25, 15696:19, 15845:2
**de** [2] - 15823:5, 15828:25
**de-escalate** [2] - 15823:5, 15828:25
**dealing** [2] - 15699:22, 15767:21
**December** [7] - 15773:10, 15773:21, 15774:15, 15776:10, 15777:16, 15784:23, 15818:9
**decide** [3] - 15735:7,

15739:24, 15740:19
**decided** [9] - 15711:22, 15712:14, 15712:15, 15714:22, 15714:23, 15716:20, 15735:9, 15737:19, 15748:4
**deciding** [3] - 15716:18, 15722:9, 15722:10
**decision** [1] - 15759:11
**decorum** [1] - 15770:21
**deep** [3] - 15759:1
**defend** [1] - 15793:20
**defendant** [2] - 15749:14, 15760:6
**Defendant** [16] - 15698:3, 15698:4, 15698:5, 15698:9, 15698:10, 15698:11, 15698:12, 15698:13, 15698:14, 15698:15, 15710:10
**DEFENDANT** [1] - 15711:3
**defendants** [3] - 15726:21, 15759:19, 15759:22
**Defendants** [3] - 15695:7, 15695:16, 15696:2
**defense** [12] - 15699:11, 15699:17, 15699:23, 15749:4, 15751:16, 15754:10, 15760:3, 15760:9, 15766:8, 15794:15, 15821:12, 15833:17
**Defense** [6] - 15727:10, 15727:13, 15790:9, 15790:12, 15790:15, 15790:24
**defensive** [2] - 15778:12, 15778:17
**define** [3] - 15764:4, 15773:5, 15775:25
**degree** [5] - 15768:17, 15768:19, 15768:23, 15769:10, 15778:9
**delayed** [1] - 15843:22
**delete** [1] - 15792:21
**deleted** [2] - 15792:18, 15792:19
**deliberate** [2] - 15833:8, 15835:4
**deliberately** [1] - 15750:20
**delta** [1] - 15811:5

**demonstrative** [1] - 15744:21
**dependent** [1] - 15733:15
**depict** [1] - 15823:2
**depicts** [1] - 15812:14
**DEPUTY** [16] - 15698:2, 15710:6, 15710:24, 15728:6, 15732:4, 15738:19, 15747:13, 15747:16, 15761:18, 15807:14, 15811:6, 15813:17, 15817:1, 15820:18, 15820:20, 15844:15
**describe** [1] - 15763:25
**described** [3] - 15764:25, 15766:18, 15769:9
**describing** [1] - 15721:18
**designates** [1] - 15711:25
**destroyed** [1] - 15746:23
**destroying** [2] - 15735:4, 15735:10
**detail** [1] - 15769:24
**determination** [1] - 15760:4
**developed** [1] - 15762:2
**device** [1] - 15835:20
**difference** [1] - 15752:4
**differences** [1] - 15841:17
**different** [13] - 15723:8, 15724:9, 15751:20, 15752:1, 15754:21, 15755:17, 15755:22, 15755:24, 15755:25, 15771:9, 15782:18, 15827:25, 15843:7
**difficult** [3] - 15710:23, 15801:11, 15801:13
**Direct** [2] - 15697:3, 15697:4
**direct** [22] - 15710:11, 15743:8, 15744:11, 15746:5, 15748:15, 15749:4, 15753:6, 15758:17, 15758:18, 15758:24, 15759:4, 15759:6, 15759:19, 15760:9, 15760:19, 15772:14, 15773:17,

15785:3, 15786:15, 15831:20, 15838:4, 15841:5
**DIRECT** [2] - 15711:4, 15745:9
**directed** [1] - 15766:10
**direction** [2] - 15765:2, 15828:11
**directly** [2] - 15749:23, 15835:22
**disappear** [1] - 15792:22
**discovery** [1] - 15749:3
**discrepancy** [2] - 15843:10, 15843:15
**discuss** [4] - 15710:2, 15714:17, 15759:9, 15760:12
**discussed** [3] - 15749:11, 15761:2, 15841:14
**discussing** [1] - 15735:6
**discussions** [2] - 15743:2, 15780:12
**disputing** [1] - 15757:9
**distinct** [1] - 15794:11
**DISTRICT** [3] - 15695:1, 15695:1, 15695:10
**document** [2] - 15724:21, 15801:17
**Dominic** [2] - 15698:5, 15789:8
**done** [8] - 15710:20, 15731:19, 15731:22, 15748:11, 15821:12, 15832:10, 15833:17, 15837:25
**door** [1] - 15760:7
**doors** [1] - 15759:1
**doorway** [1] - 15737:6
**down** [30] - 15710:22, 15718:10, 15718:17, 15732:18, 15733:9, 15733:12, 15733:16, 15737:4, 15740:16, 15747:7, 15747:8, 15749:18, 15779:12, 15781:2, 15781:10, 15781:17, 15781:22, 15792:9, 15804:17, 15818:13, 15828:5, 15829:10, 15830:2, 15831:1, 15836:3, 15837:25, 15841:6, 15842:19, 15844:10,

15844:11
**downstairs** [1] - 15738:12
**dozens** [1] - 15753:1
**draw** [3] - 15725:15, 15728:16, 15729:13
**dressed** [3] - 15776:25, 15805:25, 15821:11
**drew** [3] - 15764:25, 15765:10, 15766:5
**drinking** [1] - 15768:10
**Drive** [1] - 15696:15
**drive** [2] - 15774:8, 15784:18
**driving** [1] - 15780:13
**drove** [2] - 15776:10, 15785:1
**drugs** [1] - 15770:8
**during** [2] - 15744:21, 15754:11

## E

**E-key** [2] - 15813:22, 15815:13
**early** [4] - 15745:5, 15764:23, 15785:17, 15785:18
**earned** [1] - 15754:14
**easel** [1] - 15744:22
**easiest** [1] - 15699:18
**easily** [1] - 15748:7
**East** [6] - 15695:17, 15696:15, 15732:25, 15733:3, 15733:7, 15789:25
**Eastern** [4] - 15832:17, 15839:8, 15839:25, 15840:25
**easy** [2] - 15734:19, 15809:21
**eating** [2] - 15722:5
**Eff** [1] - 15804:22
**Eff-Antifa** [1] - 15804:22
**effect** [1] - 15731:16
**effective** [1] - 15776:5
**effectively** [1] - 15752:17
**effort** [6] - 15774:11, 15823:5, 15828:25, 15833:6, 15833:8, 15835:4
**efforts** [1] - 15736:1
**ego** [1] - 15774:21
**Egypt** [1] - 15795:8
**eight** [2] - 15763:12, 15828:21

**either** [6] - 15767:18, 15781:6, 15781:13, 15790:16, 15813:18, 15834:24
**election** [1] - 15753:23
**electric** [1] - 15716:10
**elicit** [3] - 15744:2, 15751:7, 15771:13
**Elon** [1] - 15789:20
**embedded** [1] - 15766:16
**emergency** [5] - 15713:18, 15733:22, 15733:24, 15741:1, 15823:15
**empowered** [1] - 15806:21
**empty** [1] - 15811:17
**encountered** [1] - 15713:14
**end** [3] - 15735:13, 15745:13, 15765:18
**ended** [3] - 15726:8, 15726:9, 15777:10
**energy** [3] - 15765:1, 15765:6, 15765:10
**enforcement** [4] - 15723:20, 15738:3, 15738:9, 15806:22
**engaged** [1] - 15769:6
**engaging** [1] - 15713:15
**Enrique** [6] - 15698:5, 15727:2, 15778:19, 15786:8, 15786:13, 15809:2
**entered** [6] - 15734:24, 15745:18, 15746:14, 15746:19, 15807:15, 15813:18
**entire** [6] - 15717:8, 15750:5, 15797:6, 15797:8, 15831:2, 15840:20
**entirely** [2] - 15766:18, 15844:2
**entitled** [1] - 15750:3
**equivalent** [1] - 15751:24
**Erik** [2] - 15695:12, 15698:8
**error** [2] - 15737:16, 15827:16
**escalate** [2] - 15823:5, 15828:25
**Esq** [12] - 15695:12, 15695:12, 15695:13, 15695:13, 15695:16, 15695:20, 15695:23,

15696:2, 15696:4, 15696:8, 15696:11, 15696:14
**estimating** [1] - 15729:10
**et** [2] - 15747:20, 15772:6
**Ethan** [7] - 15698:3, 15726:23, 15728:24, 15729:12, 15747:20, 15787:7, 15787:11
**evening** [2] - 15714:21, 15741:19
**event** [2] - 15774:13, 15826:15
**events** [2] - 15743:3, 15841:18
**everyday** [1] - 15766:2
**everywhere** [1] - 15837:12
**evidence** [23] - 15736:19, 15739:10, 15756:12, 15756:14, 15756:23, 15769:3, 15769:4, 15777:24, 15791:20, 15797:13, 15797:16, 15799:8, 15801:2, 15801:7, 15802:4, 15807:5, 15807:15, 15811:4, 15817:1, 15823:24, 15824:5, 15824:10, 15838:20
**exact** [2] - 15738:11, 15805:14
**exactly** [4] - 15731:14, 15763:14, 15775:16, 15801:20
**examination** [18] - 15710:12, 15744:16, 15747:3, 15748:15, 15748:25, 15749:4, 15754:11, 15754:21, 15755:4, 15755:5, 15755:9, 15759:6, 15759:19, 15760:9, 15761:22, 15801:19, 15811:23, 15819:11
**Examination** [3] - 15697:3, 15697:4, 15697:4
**EXAMINATION** [3] - 15711:4, 15745:9, 15761:24
**examinations** [1] - 15756:4
**examine** [1] - 15748:10
**examining** [1] - 15751:25

**example** [1] - 15772:25
**exciting** [3] - 15765:21, 15765:23, 15829:12
**excuse** [1] - 15728:7
**exercise** [1] - 15799:5
**exhibit** [4] - 15717:5, 15813:23, 15824:4, 15838:13
**Exhibit-1001** [1] - 15799:8
**Exhibit-160** [1] - 15838:18
**Exhibit-1710B** [1] - 15749:8
**Exhibit-301** [3] - 15715:8, 15721:9, 15721:10
**Exhibit-422** [1] - 15818:16
**Exhibit-436** [1] - 15726:18
**Exhibit-437** [1] - 15728:5
**Exhibit-6** [1] - 15732:1
**Exhibit-7** [2] - 15736:5, 15736:19
**Exhibit-9** [1] - 15738:17
**exhibits** [2] - 15748:12, 15749:1
**existence** [1] - 15763:16
**exit** [1] - 15740:9
**exited** [2] - 15778:7, 15784:17
**exiting** [2] - 15738:5, 15738:15
**expect** [4] - 15754:3, 15756:20, 15793:20, 15832:4
**expectation** [5] - 15713:9, 15741:3, 15741:5, 15741:11, 15750:13
**expectations** [2] - 15749:21, 15750:11
**expected** [1] - 15755:20
**expecting** [3] - 15730:22, 15730:23
**expects** [1] - 15749:15
**experience** [6] - 15719:21, 15720:12, 15722:7, 15723:7, 15774:15, 15774:17
**experienced** [3] - 15832:8, 15832:23, 15833:4

**explain** [3] - 15757:1, 15801:20, 15801:22
**explained** [4] - 15713:22, 15713:24, 15737:18, 15766:4
**explanation** [1] - 15843:22
**explicitly** [1] - 15746:12
**expose** [2] - 15833:7, 15835:4
**exposing** [1] - 15748:19
**extra** [1] - 15780:25
**extreme** [1] - 15765:4
**extremely** [1] - 15833:9
**eye** [2] - 15730:3, 15787:2
**eyes** [3] - 15768:2, 15783:14, 15808:10

## F

**face** [5] - 15777:10, 15778:8, 15789:4
**facing** [3] - 15721:7, 15726:9, 15804:20
**fact** [6] - 15751:10, 15752:20, 15762:15, 15784:12, 15802:2, 15832:3
**facts** [3] - 15769:4, 15803:7, 15827:19
**failing** [1] - 15843:12
**fair** [12] - 15743:17, 15752:22, 15764:2, 15764:4, 15764:14, 15765:7, 15790:20, 15790:23, 15791:1, 15834:2, 15834:5, 15834:19
**fairly** [1] - 15771:14
**false** [1] - 15766:19
**familiar** [3] - 15767:4, 15787:5, 15821:7
**familiarity** [1] - 15789:3
**fan** [1] - 15789:19
**far** [10] - 15698:17, 15726:16, 15729:14, 15734:12, 15750:23, 15756:8, 15768:17, 15787:10, 15787:15, 15810:13
**farthest** [1] - 15796:22
**fatigues** [1] - 15805:7
**fault** [1] - 15750:2
**FBI** [53] - 15711:23, 15711:25, 15750:7,

15751:3, 15751:5, 15751:25, 15752:1, 15762:2, 15762:9, 15762:16, 15763:18, 15764:14, 15764:16, 15766:5, 15766:10, 15766:15, 15766:21, 15767:5, 15767:10, 15767:16, 15767:23, 15768:7, 15769:16, 15769:19, 15769:25, 15773:16, 15775:19, 15782:2, 15782:11, 15785:3, 15785:5, 15786:3, 15786:22, 15787:21, 15792:14, 15798:24, 15806:18, 15810:20, 15826:8, 15826:21, 15827:1, 15827:13, 15827:18, 15827:23, 15828:6, 15836:14, 15837:5, 15837:22, 15838:5, 15841:2, 15842:1, 15842:7, 15842:23

**federal** [1] - 15806:22
**Federal** [1] - 15712:5
**feed** [1] - 15832:1
**feelings** [1] - 15775:20
**feet** [3] - 15722:20, 15786:18, 15840:10
**fellow** [1] - 15821:4
**felt** [4] - 15740:24, 15765:6, 15782:2, 15782:11
**fence** [21] - 15729:25, 15730:8, 15730:12, 15818:23, 15819:1, 15823:20, 15823:21, 15824:19, 15824:21, 15824:25, 15825:3, 15825:11, 15827:22, 15827:24, 15827:25, 15828:6, 15830:2, 15831:1, 15839:20, 15840:5, 15840:14
**fencing** [1] - 15815:2
**few** [17] - 15719:1, 15727:19, 15733:14, 15744:12, 15744:13, 15752:8, 15763:15, 15789:5, 15794:22, 15797:10, 15799:18, 15799:21, 15808:20, 15817:3, 15822:23, 15826:3, 15835:22
**field** [1] - 15752:1
**fight** [4] - 15768:3, 15768:25, 15769:10,

15778:9
**fighting** [5] - 15735:18, 15765:11, 15766:4, 15766:8, 15778:11
**fights** [1] - 15753:20
**figure** [4] - 15712:24, 15728:18, 15786:24, 15843:14
**figured** [2] - 15767:17, 15823:15
**figures** [2] - 15717:25, 15718:2
**film** [2] - 15735:25, 15736:15
**filmed** [2] - 15737:9, 15826:15
**filming** [6] - 15715:21, 15716:1, 15716:7, 15719:1, 15811:20, 15826:18
**fine** [5] - 15699:10, 15771:10, 15798:8, 15798:18, 15803:19
**finger** [1] - 15729:14
**finish** [3] - 15770:20, 15796:14, 15796:15
**finishes** [1] - 15744:23
**firearms** [1] - 15770:8
**firing** [1] - 15835:19
**First** [3] - 15698:24, 15699:5, 15761:8
**first** [38] - 15699:18, 15699:20, 15700:1, 15710:3, 15713:5, 15715:19, 15717:7, 15725:3, 15733:15, 15735:2, 15735:16, 15736:6, 15738:21, 15738:24, 15739:2, 15742:1, 15743:7, 15749:7, 15753:4, 15761:14, 15762:2, 15763:8, 15776:15, 15776:16, 15779:16, 15784:14, 15784:25, 15794:5, 15810:13, 15810:20, 15815:15, 15818:13, 15832:9, 15837:25, 15839:10, 15841:14, 15841:18, 15842:6
**fist** [1] - 15829:5
**fists** [1] - 15788:13
**fit** [1] - 15750:7
**five** [3] - 15759:8, 15760:11, 15786:17
**five-minute** [2] - 15759:8, 15760:11

**FL** [2] - 15696:6, 15696:9
**flag** [2] - 15819:25, 15829:8
**flags** [7] - 15730:14, 15731:24, 15734:8, 15734:14, 15734:16, 15734:18, 15734:21
**flash** [1] - 15831:23
**flew** [1] - 15835:22
**flexible** [1] - 15806:9
**floor** [1] - 15737:7
**Floor** [2] - 15695:21, 15696:12
**Florida** [1] - 15789:22
**focused** [2] - 15748:16, 15781:8
**folks** [2] - 15763:19, 15785:15
**follow** [4] - 15698:23, 15699:6, 15740:2, 15789:20
**followed** [3] - 15776:1, 15793:13, 15797:5
**Following** [2] - 15700:10, 15709:8
**following** [5] - 15714:24, 15815:18, 15815:22, 15815:23, 15816:18
**food** [9] - 15721:7, 15721:14, 15721:18, 15721:21, 15722:1, 15722:24, 15726:4, 15806:11, 15807:2
**footage** [2] - 15738:22, 15739:1
**FOR** [2] - 15695:1, 15711:3
**Force** [3] - 15789:18, 15789:19, 15789:22
**force** [2] - 15765:24, 15776:8
**foregoing** [1] - 15844:21
**foreground** [1] - 15811:14
**forgot** [1] - 15699:6
**form** [5] - 15771:7, 15771:8, 15772:2, 15772:9, 15773:6
**formed** [1] - 15721:22
**forms** [2] - 15772:5, 15772:8
**forward** [12] - 15709:18, 15730:8, 15732:19, 15747:22, 15749:24, 15822:15, 15828:1, 15840:5,

15840:15, 15842:4, 15842:16, 15842:17
**forwarded** [1] - 15748:5
**foundation** [18] - 15719:24, 15744:2, 15744:19, 15754:18, 15754:24, 15756:19, 15779:10, 15779:24, 15780:7, 15782:3, 15783:5, 15783:17, 15791:23, 15800:9, 15803:4, 15803:9, 15824:1, 15825:19
**foundational** [1] - 15824:7
**foundations** [1] - 15754:16
**fountain** [2] - 15726:16, 15728:12
**four** [2] - 15749:2, 15824:8
**fourth** [3] - 15768:23, 15769:10, 15778:9
**framed** [1] - 15826:1
**free** [1] - 15769:17
**front** [25] - 15721:14, 15724:12, 15725:1, 15725:21, 15726:1, 15729:25, 15730:15, 15734:9, 15744:9, 15788:13, 15792:4, 15793:8, 15811:1, 15811:21, 15812:15, 15814:18, 15814:25, 15818:17, 15820:13, 15822:9, 15822:14, 15823:3, 15825:18, 15836:3
**Fuck** [1] - 15813:3
**full** [2] - 15764:2, 15844:22
**full-time** [1] - 15764:2
**fully** [2] - 15710:19, 15756:20
**fundamentally** [1] - 15755:24
**funds** [1] - 15777:13
**funny** [4] - 15760:2, 15796:5, 15829:11, 15829:13

## G

**game** [2] - 15735:19, 15812:3
**games** [1] - 15760:2
**garage** [1] - 15784:16
**garbled** [1] - 15740:15
**gates** [1] - 15726:11

**gather** [1] - 15767:23
**general** [1] - 15727:25
**generally** [1] - 15768:5
**generic** [1] - 15728:1
**gentleman** [3] - 15735:18, 15735:22, 15745:13
**gentlemen** [3] - 15710:9, 15747:1, 15844:6
**gift** [1] - 15806:11
**girl** [1] - 15827:25
**given** [9] - 15698:22, 15709:21, 15743:16, 15746:10, 15750:2, 15755:4, 15771:12, 15834:6, 15834:20
**glasses** [1] - 15826:1
**goggles** [1] - 15808:10
**goodness** [1] - 15759:22
**government** [15] - 15698:7, 15698:25, 15699:6, 15699:10, 15747:4, 15747:25, 15749:25, 15753:21, 15754:11, 15754:23, 15758:23, 15760:3, 15771:13, 15833:10, 15833:11
**Government** [3] - 15698:23, 15726:18, 15728:5
**government's** [1] - 15699:24
**Government's** [1] - 15754:16
**grabbed** [3] - 15827:24, 15828:1, 15828:6
**gracious** [1] - 15759:23
**graffiti** [2] - 15772:16, 15772:25
**grassy** [1] - 15839:12
**gratuitous** [4] - 15832:13, 15833:6, 15833:24, 15834:10
**gray** [1] - 15827:25
**Ground** [2] - 15727:16, 15790:18
**ground** [2] - 15811:16, 15813:6
**grounds** [2] - 15814:4, 15837:17
**group** [64] - 15711:9, 15716:7, 15716:17, 15717:23, 15718:10,

15718:22, 15719:5, 15719:15, 15719:19, 15719:22, 15720:4, 15720:10, 15720:17, 15720:22, 15721:4, 15721:20, 15722:8, 15723:3, 15723:15, 15723:19, 15724:4, 15726:5, 15728:13, 15729:7, 15730:13, 15733:20, 15734:3, 15734:20, 15737:21, 15749:9, 15750:4, 15751:22, 15752:19, 15753:1, 15756:21, 15757:21, 15764:25, 15766:7, 15778:24, 15779:3, 15780:3, 15782:2, 15782:10, 15782:24, 15789:25, 15790:3, 15790:8, 15790:11, 15790:14, 15790:17, 15794:1, 15794:6, 15794:9, 15795:4, 15797:4, 15798:14, 15799:5, 15802:24, 15803:18, 15804:23, 15807:7, 15810:6, 15820:3

**group's** [1] - 15765:7

**groups** [4] - 15751:23, 15763:1, 15789:10, 15830:25

**grudging** [1] - 15754:15

**Guard** [2] - 15796:2, 15797:1

**guarding** [1] - 15737:6

**guess** [9] - 15729:18, 15737:10, 15737:13, 15738:17, 15752:14, 15757:2, 15757:8, 15761:6, 15810:24

**guidance** [6] - 15767:19, 15767:20, 15777:3, 15777:5, 15777:9, 15777:11

**guiding** [1] - 15740:2

**guy** [16] - 15778:7, 15788:12, 15788:19, 15788:21, 15797:19, 15799:25, 15805:7, 15806:16, 15808:24, 15814:20, 15819:25, 15821:18, 15821:19, 15821:22, 15825:25, 15829:9

**guys** [15] - 15722:3, 15722:4, 15722:12, 15774:19, 15776:22,

---

15777:3, 15793:11, 15795:4, 15796:1, 15796:17, 15798:5, 15807:8, 15809:15, 15821:15, 15829:7

## H

**half** [2] - 15807:21, 15814:15

**hand** [3] - 15797:21, 15808:18, 15828:18

**handcuffs** [3] - 15806:10, 15806:13, 15806:18

**handful** [1] - 15794:25

**handicapped** [1] - 15715:20

**handle** [1] - 15808:18

**handler** [4] - 15712:12, 15731:2, 15740:23, 15746:6

**hands** [2] - 15735:21, 15737:4

**hang** [1] - 15798:16

**happy** [3] - 15699:16, 15775:7, 15775:14

**hard** [6] - 15754:22, 15785:14, 15831:4, 15837:4, 15843:4

**harm** [1] - 15713:19

**Harris** [8] - 15709:9, 15721:12, 15738:18, 15747:9, 15811:4, 15813:20, 15816:23, 15820:21

**Harry's** [3] - 15785:17, 15785:20, 15791:5

**HASSAN** [1] - 15696:5

**Hassan** [2] - 15696:4, 15698:11

**hat** [1] - 15825:25

**hats** [1] - 15809:21

**Haven** [1] - 15695:22

**head** [5] - 15720:22, 15726:15, 15741:20, 15804:4, 15820:1

**headed** [2] - 15728:13, 15817:9

**heading** [2] - 15740:6, 15765:1

**heads** [1] - 15835:22

**health** [1] - 15698:18

**hear** [25] - 15699:2, 15710:9, 15710:16, 15715:14, 15719:18, 15723:22, 15724:3, 15724:10, 15740:14, 15743:7, 15743:10, 15750:15, 15753:11,

---

15753:12, 15758:8, 15759:14, 15770:22, 15785:15, 15791:17, 15802:20, 15813:5, 15830:13, 15830:14, 15831:15, 15840:8

**heard** [18] - 15699:3, 15715:12, 15715:13, 15723:14, 15725:20, 15748:23, 15750:19, 15760:2, 15800:19, 15802:7, 15802:13, 15803:5, 15803:6, 15803:17, 15813:3, 15833:1, 15836:12, 15837:1

**hearing** [1] - 15778:13

**hearsay** [5] - 15775:8, 15783:6, 15783:16, 15800:18, 15801:7

**heated** [1] - 15779:5

**heavy** [1] - 15818:1

**HELD** [1] - 15695:9

**helmet** [3] - 15797:20, 15805:7, 15808:12

**help** [2] - 15769:25, 15793:23

**helping** [1] - 15830:7

**helps** [1] - 15821:15

**herd** [2] - 15731:15, 15732:17

**hereby** [1] - 15844:20

**HERNANDEZ** [15] - 15699:2, 15709:12, 15709:20, 15709:22, 15709:24, 15743:9, 15744:12, 15745:10, 15746:18, 15746:24, 15761:11, 15765:12, 15765:15, 15769:2, 15811:22

**Hernandez** [8] - 15696:2, 15698:11, 15698:24, 15699:7, 15744:10, 15744:15, 15744:23, 15745:12

**Hernandez..............**
**15745** [1] - 15697:4

**Hialeah** [1] - 15696:9

**Highland** [1] - 15696:3

**highly** [1] - 15752:5

**historic** [2] - 15735:4, 15735:11

**history** [2] - 15762:8, 15765:11

**hmm** [3] - 15735:11, 15807:11, 15820:20

**hold** [6] - 15747:17, 15768:13, 15795:17, 15796:15, 15801:19,

---

15826:5

**holding** [1] - 15788:13

**Hollow** [1] - 15696:2

**home** [10] - 15741:20, 15742:2, 15776:11, 15784:21, 15785:1, 15791:12, 15791:18, 15794:16, 15807:8, 15826:9

**honest** [2] - 15768:4, 15827:15

**honestly** [1] - 15759:8

**Honor** [64] - 15699:9, 15700:4, 15709:12, 15710:2, 15710:13, 15710:24, 15715:10, 15719:7, 15732:7, 15736:18, 15739:9, 15743:13, 15743:25, 15744:20, 15746:25, 15747:24, 15748:8, 15748:15, 15748:20, 15748:23, 15749:8, 15750:9, 15750:12, 15750:20, 15750:22, 15750:25, 15751:7, 15751:13, 15751:24, 15752:3, 15752:23, 15753:5, 15753:19, 15756:17, 15757:6, 15757:11, 15757:16, 15759:10, 15759:16, 15759:20, 15759:24, 15760:2, 15760:10, 15760:16, 15761:23, 15762:19, 15762:23, 15770:21, 15771:15, 15775:9, 15795:15, 15800:18, 15801:8, 15801:22, 15802:13, 15803:2, 15803:12, 15824:1, 15824:8, 15831:20, 15831:25, 15832:9, 15833:5, 15835:2

**Honor's** [1] - 15758:19

**HONORABLE** [1] - 15695:9

**Honorable** [2] - 15747:13, 15844:15

**hoodie** [1] - 15808:24

**hope** [2] - 15735:10, 15794:13

**hopefully** [2] - 15710:20, 15795:6

**hopper** [1] - 15709:19

**horses** [1] - 15801:19

**hour** [5] - 15717:5, 15717:17, 15733:3, 15844:7, 15844:13

---

**hours** [5] - 15721:11, 15776:10, 15782:16, 15785:1, 15843:16

**house** [1] - 15737:7

**Hull** [2] - 15695:23, 15698:10

**HULL** [2] - 15695:24, 15715:10

**human** [3] - 15712:1, 15763:22, 15764:5

**hundred** [1] - 15818:3

**hundreds** [3] - 15816:4

**hungry** [1] - 15722:3

**hurt** [2] - 15713:23, 15821:13

## I

**ibuprofen** [2] - 15722:23, 15806:16

**ID'd** [2] - 15807:14, 15813:17

**idea** [1] - 15755:3

**identified** [1] - 15729:12

**identify** [2] - 15748:7, 15787:24

**identity** [2] - 15748:20, 15764:5

**II** [1] - 15696:11

**illegal** [3] - 15769:21, 15770:14, 15771:16

**illegally** [1] - 15772:11

**image** [2] - 15716:11, 15801:24

**immersed** [1] - 15831:23

**impeach** [3] - 15754:12, 15754:24, 15832:3

**impeached** [3] - 15753:3, 15757:7, 15757:14

**impeaches** [1] - 15753:10

**impeaching** [1] - 15754:5

**impeachment** [7] - 15748:21, 15750:21, 15750:22, 15755:25, 15756:23, 15757:3, 15832:16

**implicitly** [2] - 15773:4, 15773:5

**important** [1] - 15746:22

**impression** [2] - 15732:8, 15821:10

**improper** [1] -

15803:22
**improved** [1] - 15740:4
**improving** [1] - 15740:21
**IN** [1] - 15695:1
**inappropriate** [1] - 15833:12
**incident** [1] - 15822:1
**inclined** [3] - 15722:21, 15744:1, 15757:19
**included** [1] - 15807:7
**including** [1] - 15840:4
**inconsistent** [4] - 15754:2, 15754:5, 15775:9, 15795:18
**incorrect** [1] - 15769:23
**incriminate** [1] - 15827:13
**indicated** [2] - 15745:14, 15757:12
**Indicates** [1] - 15818:24
**indicating** [8] - 15717:24, 15718:3, 15725:8, 15725:17, 15729:16, 15730:1, 15743:9, 15758:7
**indication** [1] - 15712:22
**individual** [2] - 15715:20, 15716:3
**individuals** [2] - 15716:5, 15729:24
**indulgence** [1] - 15795:19
**inference** [1] - 15757:22
**infiltrating** [2] - 15776:25, 15821:11
**inflammatory** [2] - 15743:21, 15751:1
**inform** [1] - 15712:16
**information** [6] - 15751:21, 15763:19, 15764:15, 15767:23, 15786:5, 15792:11
**informed** [1] - 15742:20
**informing** [1] - 15751:8
**initial** [1] - 15715:19
**initiative** [2] - 15711:17, 15751:9
**inside** [4] - 15723:23, 15735:13, 15737:24, 15836:5

**insinuate** [1] - 15751:15
**insofar** [1] - 15755:15
**inspire** [3] - 15732:17, 15822:17, 15837:23
**instance** [1] - 15804:18
**instigators** [1] - 15784:10
**instruction** [7] - 15698:22, 15698:24, 15699:4, 15761:1, 15761:2, 15761:3, 15772:10
**instructions** [1] - 15785:23
**intend** [1] - 15748:2
**intention** [1] - 15806:24
**intentional** [1] - 15827:17
**interaction** [3] - 15738:3, 15738:8, 15805:15
**interactions** [3] - 15714:8, 15714:18, 15778:17
**interesting** [1] - 15774:17
**interfere** [4] - 15723:19, 15723:23, 15724:6, 15724:7
**interpretation** [1] - 15775:17
**interview** [1] - 15827:1
**interviewed** [2] - 15724:15, 15742:7
**interviews** [1] - 15826:21
**invade** [1] - 15723:15
**Investigation** [1] - 15712:5
**involve** [5] - 15720:8, 15744:22, 15797:1, 15823:9, 15823:10
**involved** [3] - 15743:2, 15756:21, 15770:6
**involves** [1] - 15765:24
**involving** [1] - 15789:22
**issue** [10] - 15699:4, 15699:22, 15751:4, 15751:22, 15755:16, 15755:25, 15758:5, 15758:10, 15761:9, 15834:18
**issued** [1] - 15777:2
**issues** [3] - 15699:5, 15748:16, 15843:6

**item** [1] - 15806:9
**items** [1] - 15770:1
**IV** [1] - 15695:23

## J

**January** [36] - 15711:20, 15712:17, 15713:7, 15714:24, 15716:12, 15724:15, 15727:9, 15728:3, 15743:3, 15743:17, 15748:18, 15749:11, 15749:16, 15750:5, 15750:8, 15751:4, 15752:9, 15753:6, 15763:10, 15771:8, 15776:14, 15776:20, 15784:13, 15784:15, 15786:8, 15787:22, 15788:16, 15790:18, 15791:3, 15795:2, 15796:1, 15797:25, 15805:25, 15841:23, 15842:1, 15843:21
**Jason** [2] - 15695:12, 15698:7
**Jauregui** [4] - 15696:8, 15698:12, 15802:9, 15833:21
**JAUREGUI** [1] - 15696:8
**Jeez** [1] - 15794:12
**Jeffrey** [1] - 15787:3
**job** [1] - 15764:2
**Joe** [2] - 15787:13, 15787:16
**Joes** [1] - 15766:2
**John** [2] - 15695:23, 15698:10
**join** [2] - 15711:17, 15803:18
**joined** [10] - 15711:8, 15751:9, 15764:23, 15766:9, 15766:22, 15775:24, 15775:25, 15798:9, 15799:12, 15833:21
**joke** [1] - 15796:19
**Joseph** [2] - 15698:4, 15727:4
**Journal** [1] - 15826:22
**JUDGE** [1] - 15695:10
**Judge** [2] - 15698:21, 15764:10
**judging** [1] - 15731:23
**jump** [1] - 15757:15
**jumped** [1] - 15765:19
**juror** [1] - 15698:18
**JURY** [1] - 15695:8

**Jury** [4] - 15710:7, 15747:5, 15761:19, 15844:8
**jury** [29] - 15698:20, 15709:10, 15710:6, 15710:7, 15711:6, 15719:13, 15732:8, 15747:5, 15747:10, 15751:1, 15751:15, 15752:25, 15760:21, 15761:18, 15761:19, 15797:17, 15802:1, 15802:11, 15802:17, 15803:11, 15805:5, 15811:8, 15817:16, 15820:16, 15820:23, 15832:14, 15834:3, 15841:9, 15844:8
**jury's** [1] - 15750:3
**justify** [2] - 15735:9, 15735:12

## K

**Kansas** [6] - 15743:15, 15834:14, 15834:18, 15834:22, 15834:25, 15835:1
**keep** [14] - 15715:13, 15722:21, 15730:3, 15768:2, 15780:23, 15785:14, 15788:7, 15804:8, 15809:4, 15809:10, 15813:20, 15814:20, 15830:4, 15830:10
**keeping** [1] - 15776:5
**KELLY** [1] - 15695:9
**KENERSON** [2] - 15699:9, 15699:15
**Kenerson** [3] - 15695:12, 15698:8, 15699:8
**kept** [2] - 15746:8, 15766:25
**key** [2] - 15813:22, 15815:13
**kick** [1] - 15827:25
**kicked** [1] - 15828:11
**kicking** [1] - 15760:7
**kind** [19] - 15742:19, 15744:18, 15764:7, 15765:1, 15765:3, 15765:21, 15767:17, 15768:9, 15773:4, 15788:13, 15806:25, 15811:1, 15818:1, 15818:25, 15829:11, 15835:19, 15837:4, 15842:17, 15843:4

**kinetic** [2] - 15752:12, 15752:17
**knowing** [1] - 15801:7
**knowledge** [3] - 15716:7, 15787:12, 15787:14
**known** [3] - 15712:11, 15765:4, 15834:21
**knows** [2] - 15798:21, 15833:10
**Kuehne** [6] - 15749:15, 15749:20, 15779:3, 15779:5, 15782:23, 15808:12

## L

**ladies** [3] - 15710:9, 15747:1, 15844:6
**lady** [2] - 15830:7, 15830:8
**laid** [4] - 15754:16, 15754:18, 15754:23, 15758:20
**Lake** [1] - 15696:15
**Lakes** [1] - 15696:6
**landmarks** [1] - 15726:13
**language** [5] - 15698:22, 15699:5, 15699:10, 15749:16, 15779:5
**large** [1] - 15716:17
**largely** [1] - 15749:1
**larger** [1] - 15776:8
**lark** [1] - 15774:10
**last** [1] - 15794:24
**late** [1] - 15844:13
**law** [4] - 15723:20, 15738:3, 15738:9, 15806:22
**LAW** [3] - 15696:5, 15696:8, 15696:15
**lawn** [1] - 15797:9
**lawyer** [4] - 15710:20, 15742:19, 15742:21, 15842:23
**lawyers** [2] - 15759:9, 15760:11
**laying** [1] - 15771:7
**lead** [2] - 15803:13, 15803:14
**leader** [1] - 15777:11
**leaders** [5] - 15788:16, 15790:9, 15798:13, 15798:18, 15799:5
**leadership** [16] - 15717:2, 15717:5, 15717:12, 15718:4, 15719:19, 15742:25,

| | | | | |
|---|---|---|---|---|
| 15768:13, 15776:19, 15777:2, 15777:7, 15777:15, 15778:3, 15778:14, 15778:20, 15790:21, 15793:10<br>**leadership's** [1] - 15778:18<br>**leading** [9] - 15714:10, 15715:23, 15718:12, 15718:18, 15719:6, 15720:13, 15723:9, 15728:21, 15811:22<br>**leads** [1] - 15716:24<br>**lean** [1] - 15710:15<br>**leaning** [2] - 15765:3, 15765:5<br>**learn** [3] - 15715:6, 15767:11, 15767:18<br>**learned** [2] - 15715:2, 15754:14<br>**leave** [8] - 15713:22, 15740:19, 15741:15, 15744:25, 15823:10, 15823:12, 15823:13, 15823:14<br>**led** [3] - 15723:7, 15734:5, 15793:13<br>**left** [12] - 15709:12, 15726:10, 15735:17, 15788:21, 15797:2, 15797:20, 15802:19, 15809:25, 15813:13, 15817:7, 15822:6, 15839:4<br>**left-wing** [1] - 15797:2<br>**legal** [1] - 15770:7<br>**legit** [1] - 15796:6<br>**legs** [4] - 15828:2, 15831:13, 15831:24, 15835:16<br>**less** [3] - 15744:16, 15776:7, 15789:4<br>**letting** [2] - 15738:10, 15738:13<br>**libertarian** [2] - 15765:3, 15765:5<br>**libertarian-leaning** [2] - 15765:3, 15765:5<br>**licenses** [1] - 15833:18<br>**life** [3] - 15764:15, 15775:7, 15775:14<br>**likely** [1] - 15776:7<br>**limited** [3] - 15758:19, 15758:21, 15772:3<br>**line** [8] - 15725:7, 15725:15, 15739:23, 15739:24, 15818:23, 15819:1, 15831:18, | 15832:2<br>**lines** [4] - 15700:5, 15749:20, 15798:7, 15804:14<br>**list** [1] - 15764:8<br>**listen** [1] - 15720:23<br>**lives** [1] - 15764:21<br>**Livingston** [1] - 15696:16<br>**LLC** [1] - 15695:20<br>**local** [4] - 15777:6, 15778:19, 15778:25, 15792:6<br>**locate** [1] - 15712:23<br>**logistically** [1] - 15744:20<br>**logistics** [1] - 15780:6<br>**lonely** [1] - 15798:15<br>**look** [14] - 15699:19, 15721:17, 15733:9, 15735:23, 15752:9, 15754:21, 15771:10, 15779:15, 15779:19, 15816:16, 15818:20, 15823:17, 15828:4, 15837:19<br>**looked** [11] - 15716:4, 15716:9, 15731:18, 15731:20, 15734:8, 15735:16, 15774:19, 15787:1, 15830:8, 15841:6<br>**looking** [6] - 15731:5, 15752:10, 15777:20, 15778:4, 15838:1, 15843:17<br>**looks** [3] - 15698:17, 15811:25, 15817:22<br>**Lord** [1] - 15833:19<br>**lose** [1] - 15833:18<br>**loud** [1] - 15725:14<br>**lower** [3] - 15828:18, 15831:2, 15840:20<br>**lunch** [2] - 15699:21, 15721:4<br>**Luncheon** [1] - 15844:17<br>**lunchtime** [1] - 15844:6<br><br>**M**<br><br>**machine** [1] - 15696:21<br>**maintained** [1] - 15810:12<br>**majority** [1] - 15795:1<br>**Mall** [3] - 15718:11, 15718:17, 15718:21<br>**manually** [1] - 15792:5 | **map** [4] - 15809:25, 15810:6, 15818:20, 15823:17<br>**March** [2] - 15695:6, 15844:24<br>**march** [19] - 15713:6, 15717:8, 15719:2, 15720:12, 15721:3, 15725:20, 15728:21, 15750:19, 15760:5, 15793:6, 15797:6, 15797:8, 15798:10, 15798:13, 15800:7, 15800:15, 15802:23, 15804:3, 15805:2<br>**marched** [9] - 15718:17, 15719:22, 15794:1, 15794:6, 15797:4, 15804:21, 15807:2, 15810:6, 15820:3<br>**marching** [11] - 15717:2, 15718:10, 15729:6, 15737:21, 15793:11, 15794:9, 15798:19, 15799:1, 15807:7, 15807:24, 15816:14<br>**mark** [17] - 15738:23, 15799:9, 15807:17, 15807:24, 15808:6, 15812:8, 15813:10, 15813:21, 15813:24, 15816:25, 15822:22, 15824:12, 15838:23, 15839:14, 15839:23, 15840:17, 15840:23<br>**marked** [5] - 15732:1, 15732:5, 15736:5, 15738:16<br>**massive** [1] - 15749:18<br>**material** [1] - 15748:21<br>**materials** [2] - 15748:13, 15771:18<br>**matter** [3] - 15709:15, 15757:3, 15762:20<br>**Matter** [3] - 15698:2, 15747:17, 15747:19<br>**MCCULLOUGH** [1] - 15710:2<br>**McCullough** [3] - 15695:12, 15698:7, 15709:22<br>**MCGUIRE** [1] - 15695:24<br>**MD** [1] - 15696:3<br>**mean** [22] - 15730:10, 15751:21, 15752:9, | 15752:12, 15752:18, 15753:2, 15753:13, 15754:25, 15756:13, 15757:8, 15759:25, 15765:24, 15769:16, 15786:2, 15792:25, 15803:16, 15820:16, 15821:9, 15830:17, 15832:6, 15834:23, 15834:24<br>**meaning** [1] - 15792:17<br>**meant** [1] - 15713:25<br>**measures** [4] - 15831:7, 15831:10, 15835:17, 15835:18<br>**meet** [3] - 15714:23, 15715:1, 15715:7<br>**meeting** [3] - 15715:3, 15716:23, 15772:6<br>**member** [18] - 15716:6, 15727:9, 15742:24, 15753:1, 15768:5, 15782:23, 15784:6, 15789:12, 15789:14, 15789:16, 15789:18, 15789:25, 15790:3, 15790:8, 15790:11, 15790:14, 15790:17, 15791:24<br>**members** [7] - 15723:23, 15724:7, 15734:20, 15749:9, 15749:13, 15790:12, 15839:11<br>**memento** [1] - 15806:25<br>**memory** [2] - 15791:19, 15819:7<br>**mentality** [2] - 15731:15, 15732:18<br>**mention** [1] - 15766:21<br>**mentioned** [13] - 15714:6, 15717:4, 15718:24, 15719:1, 15734:1, 15734:16, 15735:8, 15766:23, 15767:2, 15772:18, 15826:8, 15834:7, 15843:24<br>**message** [32] - 15733:13, 15733:17, 15733:18, 15733:22, 15749:19, 15779:16, 15779:19, 15779:20, 15781:6, 15781:12, 15781:13, 15781:19, 15783:19, 15792:4, 15792:8, 15796:5, | 15832:3, 15832:17, 15836:20, 15836:24, 15838:3, 15838:5, 15838:14, 15841:1, 15841:7, 15841:15, 15842:3, 15842:13, 15843:1, 15843:12, 15843:22, 15844:2<br>**messages** [13] - 15732:14, 15748:1, 15748:10, 15749:2, 15749:19, 15757:14, 15758:4, 15779:22, 15780:23, 15783:4, 15792:15, 15792:22, 15795:13<br>**met** [10] - 15726:25, 15727:2, 15727:4, 15727:6, 15741:17, 15742:12, 15798:16, 15842:1, 15842:7, 15842:23<br>**Metcalf** [2] - 15696:11, 15698:13<br>**METCALF** [4] - 15696:11, 15764:18, 15769:3<br>**metro** [1] - 15784:25<br>**Miami** [1] - 15696:6<br>**mic** [1] - 15710:15<br>**microphone** [1] - 15699:14<br>**middle** [3] - 15782:7, 15811:16, 15835:21<br>**might** [17] - 15713:14, 15721:6, 15724:17, 15729:14, 15744:25, 15754:21, 15756:25, 15767:17, 15772:3, 15777:3, 15787:4, 15789:19, 15799:3, 15827:4, 15827:9, 15827:20, 15827:23<br>**miles** [1] - 15752:2<br>**militia** [1] - 15798:5<br>**MILLER** [1] - 15844:20<br>**Miller** [2] - 15696:17, 15844:25<br>**milling** [1] - 15716:17<br>**mind** [8] - 15725:22, 15741:7, 15789:21, 15794:7, 15794:10, 15794:11, 15796:9, 15796:12<br>**Ministry** [6] - 15727:10, 15727:12, 15790:8, 15790:11, 15790:14, 15790:24<br>**Mink** [1] - 15696:2<br>**minor** [9] - 15713:19, |

| | | | | |
|---|---|---|---|---|
| 15714:1, 15746:2, 15746:3, 15746:7, 15746:13, 15746:15, 15746:20, 15772:16 <br> **minute** [5] - 15759:8, 15760:11, 15760:13, 15816:7, 15820:17 <br> **minutes** [16] - 15715:9, 15717:6, 15717:17, 15718:24, 15721:11, 15728:8, 15733:14, 15733:16, 15734:1, 15737:10, 15745:19, 15747:11, 15747:12, 15747:14, 15748:5 <br> **misstates** [4] - 15769:3, 15777:24, 15838:7 <br> **misunderstood** [1] - 15784:24 <br> **mix** [1] - 15831:22 <br> **mixed** [1] - 15825:4 <br> **moment** [14] - 15699:22, 15711:2, 15730:11, 15730:16, 15730:23, 15736:25, 15753:15, 15758:17, 15779:11, 15795:19, 15809:8, 15826:6, 15837:22, 15842:20 <br> **moments** [1] - 15799:18 <br> **money** [1] - 15812:4 <br> **monologue** [1] - 15751:18 <br> **monologues** [1] - 15743:19 <br> **months** [2] - 15842:10, 15842:22 <br> **Monument** [11] - 15715:7, 15716:13, 15717:8, 15719:16, 15721:8, 15726:10, 15791:15, 15793:2, 15798:1, 15804:21, 15810:7 <br> **Moore** [2] - 15695:13, 15698:8 <br> **morning** [14] - 15698:16, 15709:24, 15710:14, 15716:12, 15716:16, 15745:11, 15762:1, 15784:13, 15785:17, 15785:18, 15791:5, 15794:12, 15794:17, 15797:25 <br> **MORNING** [1] - 15695:9 <br> **most** [3] - 15717:16, | 15719:20, 15768:9 <br> **mostly** [1] - 15797:9 <br> **motivation** [1] - 15713:1 <br> **motivations** [1] - 15774:2 <br> **mouse** [1] - 15795:23 <br> **mouth** [2] - 15699:13, 15812:17 <br> **move** [16] - 15699:13, 15732:7, 15736:18, 15739:9, 15747:22, 15757:19, 15759:16, 15788:2, 15795:23, 15803:23, 15806:3, 15808:2, 15814:6, 15817:11, 15833:3, 15833:14 <br> **movement** [4] - 15731:24, 15734:8, 15734:14, 15734:19 <br> **movie** [1] - 15786:24 <br> **moving** [10] - 15730:8, 15730:17, 15759:10, 15771:24, 15812:17, 15821:22, 15840:5, 15842:4, 15842:16, 15842:17 <br> **MR** [425] - 15698:21, 15699:4, 15699:9, 15699:15, 15700:2, 15700:4, 15700:8, 15710:2, 15710:13, 15711:5, 15711:16, 15714:10, 15714:11, 15714:12, 15715:10, 15715:15, 15715:23, 15715:24, 15715:25, 15717:19, 15717:22, 15718:9, 15718:12, 15718:14, 15718:16, 15718:20, 15719:6, 15719:7, 15719:9, 15719:12, 15719:24, 15720:2, 15720:13, 15720:15, 15721:12, 15721:13, 15723:9, 15723:12, 15724:20, 15724:24, 15728:7, 15728:10, 15728:15, 15729:5, 15729:23, 15730:6, 15731:25, 15732:5, 15732:6, 15732:7, 15732:11, 15736:4, 15736:8, 15736:12, 15736:18, 15736:22, 15736:24, 15738:16, 15738:20, 15738:25, 15739:4, 15739:9, 15739:12, | 15739:16, 15740:13, 15741:6, 15741:7, 15741:9, 15743:5, 15743:13, 15743:25, 15744:5, 15744:8, 15744:20, 15744:25, 15746:16, 15747:24, 15748:23, 15750:9, 15750:18, 15751:24, 15752:23, 15753:19, 15754:10, 15755:7, 15755:11, 15755:13, 15756:2, 15756:4, 15756:16, 15756:19, 15757:5, 15757:6, 15757:11, 15757:15, 15757:25, 15758:3, 15758:7, 15758:16, 15758:23, 15758:25, 15759:3, 15759:8, 15759:10, 15759:15, 15759:20, 15759:24, 15760:1, 15760:10, 15760:16, 15760:18, 15761:8, 15761:16, 15761:23, 15761:25, 15762:4, 15762:8, 15762:12, 15762:19, 15762:22, 15762:25, 15763:7, 15764:10, 15764:13, 15764:18, 15764:22, 15765:13, 15765:22, 15767:7, 15767:9, 15767:12, 15767:15, 15769:3, 15769:4, 15769:8, 15769:12, 15769:14, 15770:2, 15770:4, 15770:9, 15770:15, 15770:17, 15770:18, 15770:20, 15771:6, 15771:15, 15771:18, 15771:20, 15771:22, 15772:1, 15773:13, 15773:15, 15774:23, 15775:5, 15775:8, 15775:12, 15777:22, 15777:24, 15778:1, 15778:21, 15778:23, 15779:8, 15779:10, 15779:12, 15779:14, 15779:24, 15780:2, 15780:7, 15780:11, 15781:2, 15781:5, 15781:10, 15781:11, 15781:14, 15781:17, 15781:18, 15781:22, 15781:23, 15782:3, 15782:13, 15782:22, 15783:5, 15783:6, 15783:8, 15783:10, | 15783:12, 15783:15, 15783:16, 15783:17, 15783:23, 15785:16, 15786:10, 15786:12, 15787:18, 15787:20, 15788:2, 15788:4, 15788:9, 15788:11, 15791:20, 15791:23, 15792:2, 15792:8, 15792:10, 15792:24, 15793:1, 15795:11, 15795:15, 15795:18, 15795:19, 15795:21, 15795:23, 15795:25, 15796:13, 15796:25, 15797:12, 15797:15, 15797:18, 15798:20, 15798:23, 15799:8, 15799:10, 15799:14, 15799:17, 15799:20, 15799:23, 15799:24, 15800:9, 15800:13, 15800:16, 15800:18, 15800:21, 15800:23, 15800:25, 15801:2, 15801:6, 15801:10, 15801:22, 15801:24, 15802:7, 15802:9, 15802:16, 15802:21, 15802:25, 15803:2, 15803:4, 15803:9, 15803:11, 15803:12, 15803:25, 15804:5, 15804:11, 15804:13, 15804:16, 15805:1, 15805:4, 15805:6, 15805:10, 15805:12, 15805:17, 15805:22, 15805:24, 15806:3, 15806:4, 15806:6, 15806:8, 15807:5, 15807:6, 15807:16, 15807:20, 15807:23, 15808:2, 15808:5, 15808:8, 15808:20, 15808:23, 15809:6, 15809:7, 15809:10, 15809:13, 15809:14, 15809:22, 15809:24, 15811:3, 15811:7, 15811:9, 15812:2, 15812:5, 15812:7, 15812:10, 15812:23, 15812:25, 15813:2, 15813:9, 15813:12, 15813:16, 15813:19, 15813:25, 15814:6, 15814:7, 15814:10, 15814:14, 15814:17, 15815:4, 15815:7, 15815:8, 15815:11, | 15815:13, 15815:16, 15815:17, 15815:24, 15816:1, 15816:3, 15816:7, 15816:10, 15816:11, 15816:21, 15817:2, 15817:5, 15817:6, 15817:11, 15817:12, 15817:15, 15817:18, 15818:6, 15818:7, 15818:14, 15818:15, 15819:3, 15819:6, 15819:10, 15819:16, 15819:18, 15819:23, 15819:24, 15820:6, 15820:9, 15820:10, 15820:15, 15820:19, 15820:21, 15821:2, 15821:3, 15821:25, 15822:2, 15822:4, 15822:5, 15822:11, 15822:13, 15822:21, 15822:25, 15823:1, 15823:23, 15824:1, 15824:8, 15824:12, 15824:15, 15824:16, 15825:5, 15825:7, 15825:9, 15825:10, 15825:19, 15825:21, 15825:23, 15825:24, 15826:3, 15826:5, 15826:7, 15827:6, 15827:8, 15828:8, 15828:13, 15828:16, 15828:17, 15828:21, 15828:23, 15828:24, 15829:14, 15829:16, 15829:21, 15829:23, 15830:1, 15830:4, 15830:6, 15830:10, 15830:12, 15830:16, 15830:21, 15831:14, 15831:20, 15831:25, 15832:1, 15832:9, 15832:20, 15833:5, 15833:14, 15833:17, 15833:22, 15833:24, 15834:12, 15835:2, 15835:6, 15835:8, 15835:10, 15835:14, 15836:7, 15836:11, 15836:17, 15836:19, 15838:7, 15838:12, 15838:18, 15838:22, 15838:23, 15838:25, 15839:14, 15839:16, 15839:22, 15839:24, 15840:13, 15840:17, 15840:18, 15840:22, 15840:24 <br> **MS** [15] - 15699:2, 15709:12, 15709:20, |

15709:22, 15709:24, 15743:9, 15744:12, 15745:10, 15746:18, 15746:24, 15761:11, 15765:12, 15765:15, 15769:2, 15811:22

**MT** [1] - 15696:16

**MULROE** [240] - 15714:10, 15715:23, 15718:12, 15719:6, 15719:9, 15719:24, 15720:13, 15723:9, 15732:6, 15739:12, 15741:6, 15743:25, 15744:5, 15744:8, 15744:20, 15744:25, 15748:23, 15756:16, 15756:19, 15757:5, 15757:15, 15757:25, 15758:3, 15759:3, 15761:23, 15761:25, 15762:8, 15762:12, 15763:7, 15764:13, 15764:22, 15765:22, 15767:9, 15767:15, 15769:8, 15769:14, 15770:4, 15770:15, 15770:20, 15771:6, 15772:1, 15773:15, 15775:5, 15775:12, 15778:1, 15778:23, 15779:8, 15779:12, 15779:14, 15780:2, 15780:11, 15781:2, 15781:5, 15781:10, 15781:11, 15781:17, 15781:18, 15781:22, 15781:23, 15782:13, 15782:22, 15783:12, 15783:23, 15785:16, 15786:12, 15787:18, 15787:20, 15788:2, 15788:9, 15788:11, 15791:20, 15792:2, 15792:8, 15792:10, 15793:1, 15795:11, 15795:19, 15795:21, 15795:23, 15795:25, 15796:25, 15797:12, 15797:18, 15798:23, 15799:8, 15799:10, 15799:17, 15799:20, 15799:23, 15799:24, 15800:13, 15802:25, 15803:12, 15803:25, 15804:5, 15804:11, 15804:13, 15804:16, 15805:1, 15805:4, 15805:6, 15805:17, 15805:22, 15805:24, 15806:3, 15806:8,

15807:5, 15807:6, 15807:16, 15807:20, 15807:23, 15808:2, 15808:5, 15808:8, 15808:20, 15808:23, 15809:6, 15809:7, 15809:10, 15809:13, 15809:14, 15809:24, 15811:3, 15811:7, 15811:9, 15812:2, 15812:7, 15812:10, 15812:23, 15812:25, 15813:2, 15813:9, 15813:12, 15813:16, 15813:19, 15813:25, 15814:6, 15814:10, 15814:14, 15814:17, 15815:4, 15815:7, 15815:8, 15815:11, 15815:13, 15815:16, 15815:17, 15815:24, 15816:1, 15816:3, 15816:7, 15816:10, 15816:11, 15816:21, 15817:2, 15817:5, 15817:6, 15817:11, 15817:15, 15817:18, 15818:6, 15818:7, 15818:14, 15818:15, 15819:3, 15819:6, 15819:10, 15819:16, 15819:18, 15819:23, 15819:24, 15820:6, 15820:9, 15820:10, 15820:15, 15820:19, 15820:21, 15821:2, 15821:3, 15821:25, 15822:2, 15822:4, 15822:5, 15822:11, 15822:13, 15822:21, 15822:25, 15823:1, 15823:23, 15824:8, 15824:12, 15824:15, 15824:16, 15825:5, 15825:7, 15825:9, 15825:10, 15825:21, 15825:23, 15825:24, 15826:3, 15826:5, 15826:7, 15827:8, 15828:13, 15828:16, 15828:17, 15828:21, 15828:23, 15828:24, 15829:14, 15829:16, 15829:21, 15829:23, 15830:1, 15830:4, 15830:6, 15830:10, 15830:12, 15830:21, 15831:20, 15832:1, 15834:12, 15835:14, 15836:11, 15836:17, 15836:19, 15838:12,

15838:18, 15838:23, 15838:25, 15839:14, 15839:16, 15839:22, 15839:24, 15840:13, 15840:17, 15840:18, 15840:22, 15840:24

**Mulroe** [28] - 15695:13, 15698:8, 15743:22, 15748:4, 15748:11, 15748:22, 15754:13, 15756:10, 15757:9, 15757:11, 15761:21, 15762:5, 15762:7, 15763:2, 15770:22, 15770:25, 15780:1, 15801:14, 15802:1, 15802:18, 15803:6, 15824:6, 15831:15, 15832:10, 15833:2, 15834:2, 15835:11, 15844:4

**Mulroe................. 15761** [1] - 15697:4

**multiple** [7] - 15716:5, 15733:9, 15764:21, 15823:8, 15838:1, 15841:20, 15843:17

**Musk** [1] - 15789:20

## N

**Nadia** [2] - 15695:13, 15698:8

**name** [9] - 15699:3, 15711:6, 15728:23, 15728:25, 15773:25, 15779:17, 15787:5, 15788:18, 15795:16

**name's** [1] - 15745:11

**named** [4] - 15743:14, 15743:19, 15787:11, 15787:16

**names** [3] - 15727:24, 15789:4, 15795:16

**narrow** [2] - 15760:4, 15769:19

**National** [4] - 15718:11, 15718:21, 15796:2, 15797:1

**national** [4] - 15727:21, 15727:22, 15777:7, 15790:21

**Nayib** [2] - 15696:4, 15698:11

**NAYIB** [1] - 15696:5

**Nazi** [1] - 15763:1

**near** [5] - 15805:18, 15818:17, 15825:12, 15825:25, 15837:25

**neat** [1] - 15806:25

**necessarily** [1] - 15774:25

**necessary** [1] - 15772:15

**need** [12] - 15710:24, 15711:1, 15725:13, 15759:6, 15759:8, 15768:6, 15782:2, 15782:11, 15785:15, 15786:6, 15801:19, 15840:7

**needs** [2] - 15748:20, 15838:10

**negative** [1] - 15795:10

**neglected** [1] - 15698:23

**neo** [1] - 15763:1

**neo-Nazi** [1] - 15763:1

**neutral** [1] - 15775:21

**never** [30] - 15743:23, 15752:3, 15757:17, 15767:23, 15769:6, 15772:2, 15772:9, 15775:6, 15775:13, 15778:10, 15786:15, 15787:10, 15787:15, 15789:11, 15789:14, 15789:16, 15789:18, 15789:25, 15790:3, 15790:8, 15790:11, 15790:14, 15790:17, 15792:3, 15796:18, 15797:3, 15806:15, 15832:12, 15834:25, 15837:3

**new** [2] - 15722:18, 15793:23

**New** [3] - 15695:18, 15695:22, 15696:13

**news** [1] - 15837:14

**next** [11] - 15710:21, 15725:7, 15725:16, 15729:20, 15733:19, 15741:20, 15741:21, 15753:16, 15771:4, 15808:12, 15832:2

**Nicholas** [2] - 15695:16, 15698:9

**night** [5] - 15777:19, 15778:4, 15782:8, 15793:21, 15794:24

**NJ** [3] - 15696:17, 15844:20, 15844:25

**NJ-CCR** [3] - 15696:17, 15844:20, 15844:25

**non** [1] - 15821:14

**non-aggressors** [1] - 15821:14

**nonetheless** [1] - 15768:1

**NORDEAN** [2] - 15695:4, 15711:3

**Nordean** [16] - 15698:3, 15698:14, 15710:10, 15715:8, 15721:9, 15721:10, 15726:23, 15728:24, 15729:12, 15732:1, 15736:5, 15736:19, 15738:17, 15747:20, 15787:7, 15787:11

**Norman** [2] - 15695:20, 15698:10

**Nos** [1] - 15695:2

**note** [2] - 15749:2, 15750:12

**notebook** [2] - 15699:12, 15699:16

**notes** [1] - 15844:22

**nothing** [11] - 15712:24, 15723:6, 15723:11, 15754:2, 15774:3, 15774:5, 15782:1, 15782:10, 15785:11, 15802:13, 15832:10

**noun** [1] - 15719:8

**number** [4] - 15717:25, 15718:2, 15754:10, 15833:20

**numbers** [1] - 15776:4

**NW** [5] - 15695:14, 15695:24, 15696:5, 15696:19, 15845:2

**NY** [2] - 15695:18, 15696:13

## O

**object** [15] - 15714:10, 15715:23, 15718:12, 15719:6, 15719:9, 15719:24, 15720:13, 15723:9, 15741:6, 15743:15, 15763:3, 15800:9, 15800:16, 15801:17, 15832:14

**objecting** [1] - 15801:20

**objection** [63] - 15719:10, 15732:6, 15739:12, 15746:16, 15759:3, 15762:4, 15763:4, 15764:10, 15764:18, 15765:12, 15765:13, 15767:7, 15767:12, 15769:2, 15769:3, 15769:4,

15769:12, 15770:2, 15770:9, 15770:17, 15770:18, 15771:24, 15773:13, 15774:23, 15775:8, 15777:22, 15777:24, 15778:21, 15779:10, 15779:24, 15780:7, 15781:14, 15782:3, 15783:5, 15783:6, 15783:15, 15783:16, 15786:10, 15788:4, 15792:24, 15796:13, 15797:15, 15798:20, 15799:14, 15800:18, 15803:20, 15805:10, 15806:4, 15806:5, 15809:22, 15811:22, 15812:5, 15814:7, 15817:12, 15824:1, 15825:19, 15827:6, 15828:8, 15830:16, 15831:14, 15836:7, 15838:7, 15838:22
**objectionable** [1] - 15801:21
**observation** [2] - 15750:18, 15757:23
**observations** [1] - 15753:6
**observe** [2] - 15717:11, 15823:9
**observed** [4] - 15713:10, 15748:17, 15750:14, 15794:20
**observer** [1] - 15831:21
**observing** [2] - 15731:8, 15733:20
**obvious** [1] - 15834:4
**obviously** [1] - 15796:18
**occupy** [3] - 15724:11, 15725:21, 15726:1
**OF** [5] - 15695:1, 15695:2, 15695:8, 15696:5, 15844:19
**offer** [1] - 15744:1
**offering** [1] - 15749:12
**office** [1] - 15752:1
**OFFICE** [1] - 15695:14
**officer** [4] - 15735:18, 15738:3, 15738:9, 15738:10
**Officer** [1] - 15738:22
**officers** [6] - 15739:23, 15739:25, 15815:9, 15815:22, 15815:23, 15831:12
**OFFICES** [1] -

15696:5
**official** [1] - 15763:19
**Official** [3] - 15696:18, 15789:14, 15844:25
**OFFICIAL** [1] - 15844:19
**often** [1] - 15799:3
**OG** [1] - 15789:16
**older** [1] - 15830:8
**once** [5] - 15780:19, 15786:16, 15793:6, 15798:9, 15815:13
**one** [53] - 15700:4, 15710:17, 15712:7, 15712:8, 15716:6, 15717:7, 15717:23, 15727:25, 15728:20, 15733:3, 15743:13, 15745:5, 15749:13, 15750:4, 15751:14, 15752:10, 15752:23, 15756:9, 15760:13, 15761:9, 15761:15, 15765:18, 15770:3, 15776:15, 15778:7, 15781:20, 15781:24, 15782:7, 15784:10, 15788:16, 15794:3, 15794:4, 15795:17, 15795:19, 15797:11, 15802:14, 15802:20, 15803:17, 15803:19, 15804:1, 15805:20, 15807:21, 15815:15, 15819:9, 15821:14, 15822:11, 15834:18, 15834:25, 15842:1, 15844:7, 15844:13
**ones** [2] - 15727:24, 15806:15
**Op** [1] - 15790:15
**open** [5] - 15709:8, 15727:25, 15759:1, 15760:7, 15768:2
**opening** [1] - 15759:11
**opinion** [4] - 15750:13, 15792:24, 15841:12, 15841:13
**opinions** [1] - 15748:18
**opportunities** [1] - 15720:8
**opportunity** [4] - 15720:25, 15735:25, 15748:10, 15761:15
**opposite** [3] - 15751:9, 15804:20, 15828:11
**Orange** [1] - 15695:21

**orange** [11] - 15795:9, 15808:24, 15809:15, 15809:21, 15821:5, 15821:7, 15821:9, 15821:13, 15821:15, 15821:18, 15821:22
**order** [2] - 15723:15, 15831:4
**ordinary** [1] - 15774:18
**Oregon** [1] - 15765:11
**organization** [1] - 15752:2
**organized** [1] - 15732:18
**organizing** [2] - 15780:9, 15791:2
**originally** [1] - 15784:21
**otherwise** [4] - 15769:20, 15770:7, 15772:3, 15819:13
**ought** [1] - 15750:2
**ourselves** [1] - 15784:9
**out-of-court** [1] - 15775:10
**outfit** [1] - 15820:11
**outside** [6] - 15730:9, 15748:4, 15748:19, 15775:8, 15784:20, 15832:15
**overall** [1] - 15839:1
**overhear** [1] - 15800:12
**overly** [1] - 15765:18
**overruled** [33] - 15719:10, 15723:10, 15741:8, 15746:17, 15764:11, 15764:20, 15765:14, 15765:16, 15767:8, 15767:13, 15769:5, 15770:3, 15770:10, 15773:14, 15774:24, 15775:11, 15779:11, 15780:8, 15781:15, 15782:5, 15783:9, 15783:11, 15786:11, 15799:16, 15805:11, 15805:13, 15806:7, 15811:24, 15825:20, 15827:7, 15828:9, 15830:17, 15836:8
**own** [7] - 15711:17, 15729:13, 15735:7, 15750:24, 15751:9, 15792:22

**P**

**P.A** [2] - 15696:5, 15696:8
**P.C** [1] - 15696:11
**p.m** [7] - 15732:22, 15832:17, 15839:6, 15839:17, 15839:25, 15840:25, 15844:17
**PAGE** [1] - 15697:2
**page** [1] - 15725:3
**Page** [4] - 15725:10, 15781:4, 15804:11, 15804:17
**pages** [1] - 15749:2
**paint** [1] - 15713:20
**panel** [2] - 15710:6, 15761:18
**paper** [2] - 15699:12, 15699:16
**Park** [3] - 15696:12, 15777:20, 15778:5
**parking** [1] - 15784:16
**part** [13] - 15717:16, 15750:8, 15751:16, 15751:23, 15752:12, 15765:10, 15774:13, 15778:18, 15779:3, 15810:6, 15820:11, 15834:5, 15835:21
**parted** [1] - 15835:23
**partially** [1] - 15765:9
**particular** [7] - 15727:20, 15752:6, 15773:23, 15781:25, 15804:18, 15834:7, 15834:23
**parties** [4] - 15747:21, 15761:3, 15761:5, 15761:7
**parties'** [1] - 15761:13
**party** [2] - 15754:24, 15783:22
**pass** [1] - 15769:17
**passed** [1] - 15821:20
**passing** [1] - 15832:7
**past** [16] - 15720:22, 15726:11, 15730:17, 15740:2, 15753:8, 15767:22, 15771:20, 15795:8, 15804:21, 15810:9, 15810:21, 15829:3, 15829:4, 15833:10, 15835:3
**path** [2] - 15740:2, 15811:16
**Pattis** [8] - 15695:20, 15698:10, 15699:25, 15754:9, 15755:14, 15756:1, 15761:1,

15761:15
**PATTIS** [17] - 15695:20, 15698:21, 15699:4, 15700:2, 15754:10, 15755:7, 15755:11, 15755:13, 15756:2, 15756:4, 15761:8, 15761:16, 15764:10, 15770:17, 15781:14, 15796:13, 15830:16
**pause** [37] - 15709:11, 15710:5, 15717:20, 15724:22, 15726:19, 15728:16, 15734:9, 15735:23, 15740:18, 15745:8, 15747:18, 15760:15, 15760:22, 15760:24, 15791:22, 15799:20, 15799:23, 15809:6, 15812:7, 15812:25, 15813:9, 15814:12, 15815:4, 15815:13, 15816:1, 15817:5, 15818:6, 15819:6, 15819:23, 15820:9, 15820:24, 15821:2, 15822:4, 15822:25, 15825:23, 15828:16, 15844:4
**paused** [3] - 15812:25, 15813:21, 15842:18
**pausing** [1] - 15811:7
**pay** [1] - 15812:3
**PB** [1] - 15732:17
**PC** [1] - 15695:24
**Peace** [1] - 15810:7
**peaceful** [1] - 15795:1
**pending** [1] - 15779:25
**People** [1] - 15836:14
**people** [54] - 15710:22, 15711:25, 15713:14, 15716:17, 15716:18, 15719:1, 15723:22, 15724:3, 15728:20, 15729:1, 15733:11, 15734:10, 15736:1, 15738:12, 15740:16, 15741:4, 15741:17, 15753:1, 15753:8, 15754:3, 15764:18, 15765:4, 15765:19, 15775:7, 15775:14, 15776:20, 15780:3, 15787:24, 15789:5, 15792:7, 15794:16, 15794:22, 15795:3, 15797:2,

15797:5, 15801:25, 15804:22, 15804:23, 15811:14, 15811:25, 15813:8, 15816:5, 15816:18, 15819:20, 15821:21, 15822:15, 15826:17, 15830:18, 15835:21, 15836:2, 15836:4, 15836:12, 15837:1, 15841:11

**people's** [3] - 15750:21, 15775:20, 15835:22

**percipient** [1] - 15755:18

**perfectly** [1] - 15806:21

**perhaps** [1] - 15772:17

**permission** [8] - 15732:10, 15736:21, 15739:10, 15739:14, 15788:5, 15808:3, 15814:8, 15817:13

**permit** [2] - 15744:2, 15758:12

**permitted** [1] - 15796:13

**person** [23] - 15728:23, 15729:11, 15739:5, 15739:17, 15743:14, 15743:19, 15748:17, 15749:25, 15751:6, 15754:4, 15754:24, 15774:1, 15774:3, 15785:9, 15787:9, 15792:6, 15792:21, 15802:3, 15802:14, 15806:14, 15811:20

**person's** [1] - 15753:3

**personal** [2] - 15726:22, 15764:15

**PEZZOLA** [1] - 15695:6

**Pezzola** [5] - 15698:6, 15698:15, 15758:16, 15760:10, 15789:8

**Pezzola's** [1] - 15759:4

**phone** [5] - 15733:2, 15736:16, 15838:1, 15841:6, 15843:17

**phones** [2] - 15733:11, 15792:23

**photo** [4] - 15786:21, 15786:22, 15787:21, 15789:2

**photographs** [8] - 15718:25, 15719:4,

15719:15, 15720:8, 15720:11, 15720:18, 15721:1, 15723:4

**phrase** [3] - 15790:6, 15795:4, 15796:9

**physical** [3] - 15713:19, 15765:24, 15802:4

**Pickleback** [1] - 15789:16

**picture** [2] - 15787:23, 15787:25

**pictures** [3] - 15720:21, 15793:8, 15826:18

**piece** [1] - 15751:17

**place** [10] - 15713:5, 15727:20, 15748:7, 15780:6, 15780:21, 15793:13, 15793:14, 15795:16, 15833:7, 15835:8

**placed** [2] - 15735:21, 15737:4

**placement** [1] - 15805:14

**plain** [2] - 15834:19, 15834:20

**plan** [2] - 15725:20, 15750:1

**planned** [1] - 15776:14

**planning** [6] - 15712:18, 15743:2, 15773:18, 15776:15, 15782:24, 15791:2

**plans** [1] - 15749:12

**play** [40] - 15729:19, 15730:4, 15736:6, 15738:24, 15739:1, 15739:2, 15743:18, 15760:3, 15799:17, 15799:20, 15807:17, 15808:6, 15808:20, 15812:7, 15812:23, 15813:9, 15815:4, 15815:11, 15815:24, 15816:7, 15817:2, 15817:16, 15819:3, 15819:19, 15820:6, 15820:25, 15821:25, 15822:2, 15822:11, 15822:22, 15823:24, 15824:8, 15824:11, 15825:5, 15825:21, 15826:3, 15828:14, 15828:21, 15829:14, 15829:23

**played** [49] - 15717:21, 15718:8,

15728:14, 15729:4, 15729:22, 15730:5, 15736:11, 15736:23, 15739:3, 15739:15, 15740:12, 15799:19, 15799:22, 15807:19, 15808:7, 15808:22, 15809:5, 15809:12, 15812:9, 15812:24, 15813:11, 15814:13, 15814:16, 15815:6, 15815:12, 15815:25, 15816:9, 15817:4, 15817:17, 15819:4, 15819:21, 15820:8, 15821:1, 15822:3, 15822:12, 15822:24, 15823:25, 15824:14, 15825:6, 15825:8, 15825:22, 15826:4, 15828:15, 15828:22, 15829:15, 15829:22, 15829:25, 15830:5, 15830:11

**playing** [6] - 15735:19, 15796:20, 15809:4, 15809:10, 15830:4, 15830:10

**plenty** [1] - 15827:4

**PLLC** [1] - 15695:17

**point** [42] - 15700:4, 15716:19, 15716:22, 15721:23, 15722:9, 15722:24, 15723:7, 15723:8, 15723:13, 15729:7, 15731:18, 15733:18, 15737:8, 15738:4, 15740:24, 15741:4, 15743:25, 15745:5, 15753:16, 15755:16, 15757:19, 15769:15, 15771:11, 15772:9, 15804:21, 15804:24, 15805:20, 15819:9, 15820:14, 15826:11, 15827:16, 15829:3, 15829:5, 15829:8, 15831:9, 15834:20, 15835:25, 15836:4, 15837:5, 15839:19, 15840:4, 15840:19

**pointed** [4] - 15841:16, 15843:6, 15843:9

**pointing** [2] - 15818:23, 15823:21

**police** [6] - 15735:18, 15739:23, 15739:25, 15740:16, 15831:4,

15835:25

**policed** [2] - 15755:15, 15798:25

**political** [1] - 15748:16

**politics** [1] - 15748:19

**pools** [1] - 15734:14

**portion** [3] - 15749:8, 15797:7, 15807:17

**portray** [1] - 15832:11

**portrayed** [2] - 15831:21, 15832:10

**position** [4] - 15760:6, 15768:12, 15768:13, 15786:6

**possess** [1] - 15770:7

**possessed** [1] - 15771:16

**possessing** [2] - 15770:6, 15770:13

**possible** [2] - 15796:23, 15802:11

**possibly** [1] - 15796:24

**post** [1] - 15781:25

**potential** [3] - 15714:7, 15714:17, 15748:17

**powerful** [2] - 15774:15, 15818:9

**powers** [1] - 15757:23

**practice** [1] - 15749:5

**premise** [1] - 15838:10

**prepare** [1] - 15778:24

**prepared** [2] - 15749:17, 15759:15

**preparing** [1] - 15752:7

**presence** [1] - 15766:1

**present** [9] - 15698:7, 15698:8, 15698:9, 15698:10, 15698:11, 15698:12, 15698:13, 15732:8, 15791:9

**present-sense** [1] - 15732:8

**presenting** [1] - 15753:23

**preservation** [1] - 15714:2

**president** [6] - 15778:19, 15791:9, 15791:14, 15791:18, 15792:12, 15792:18

**presidential** [1] - 15753:23

**Presidents** [1] - 15789:14

**pressed** [1] - 15754:22

**pressured** [1] - 15772:7

**pretty** [14] - 15755:2, 15775:21, 15779:5, 15783:1, 15793:4, 15795:1, 15809:21, 15810:13, 15810:19, 15811:16, 15811:21, 15812:14, 15823:2, 15829:12

**prevent** [4] - 15735:3, 15736:1, 15765:20, 15776:8

**previous** [1] - 15822:19

**previously** [1] - 15841:16

**primarily** [1] - 15712:8

**primary** [1] - 15762:15

**problem** [3] - 15710:18, 15756:17, 15756:19

**proceed** [12] - 15710:11, 15744:14, 15744:15, 15747:11, 15756:3, 15759:15, 15760:20, 15761:21, 15763:5, 15780:1, 15801:5, 15833:2

**proceedings** [3] - 15700:10, 15709:8, 15844:23

**Proceedings** [1] - 15696:21

**processed** [1] - 15775:2

**processing** [1] - 15837:4

**produced** [1] - 15696:21

**projected** [1] - 15835:20

**proof** [1] - 15753:2

**proper** [3] - 15748:21, 15801:18, 15802:19

**proposed** [4] - 15699:5, 15699:11, 15699:15

**prosecutor** [6] - 15742:18, 15742:19, 15742:20, 15800:23, 15801:6, 15833:6

**prosecutor's** [1] - 15775:9

**protect** [2] - 15713:18, 15772:15

**protecting** [1] - 15833:11

| | | | | |
|---|---|---|---|---|
| **Proud** [58] - 15711:9, 15712:24, 15713:7, 15715:1, 15716:6, 15727:18, 15728:13, 15730:13, 15730:15, 15731:14, 15740:15, 15742:24, 15743:15, 15749:10, 15749:22, 15750:2, 15751:8, 15755:21, 15762:14, 15763:13, 15763:15, 15764:23, 15766:9, 15766:16, 15766:22, 15767:24, 15768:5, 15772:12, 15773:9, 15773:21, 15774:5, 15774:13, 15775:18, 15775:24, 15776:5, 15789:22, 15790:21, 15791:1, 15794:9, 15797:9, 15798:9, 15798:14, 15809:18, 15810:6, 15810:15, 15812:20, 15813:6, 15818:3, 15818:8, 15818:11, 15822:17, 15825:2, 15830:15, 15830:18, 15830:24, 15837:8, 15837:16, 15837:23 | **pursuant** [1] - 15770:21<br>**pushed** [1] - 15843:4<br>**put** [12] - 15725:7, 15733:6, 15744:9, 15749:24, 15755:18, 15758:5, 15758:10, 15758:12, 15777:5, 15821:21, 15828:7, 15836:5<br>**putting** [5] - 15709:13, 15744:22, 15753:13, 15796:18, 15801:18<br><br>## Q<br><br>**quarters** [1] - 15810:18<br>**question's** [1] - 15710:19<br>**questioned** [1] - 15841:18<br>**questioning** [2] - 15831:19, 15832:2<br>**questions** [11] - 15710:14, 15726:21, 15729:20, 15742:5, 15744:12, 15745:17, 15780:25, 15819:12, 15826:12, 15827:21, 15832:11 | **rather** [1] - 15699:22<br>**re** [1] - 15721:22<br>**re-formed** [1] - 15721:22<br>**reach** [2] - 15733:23, 15741:1<br>**reached** [2] - 15791:14, 15841:21<br>**react** [1] - 15735:20<br>**reaction** [3] - 15730:19, 15775:1, 15775:20<br>**read** [8] - 15725:13, 15732:14, 15732:16, 15792:5, 15792:6, 15802:17, 15803:7, 15804:15<br>**reading** [6] - 15775:10, 15800:23, 15801:6, 15801:17, 15802:1, 15802:10<br>**ready** [1] - 15716:20<br>**real** [2] - 15806:15, 15842:21<br>**realized** [3] - 15787:8, 15841:6, 15844:2<br>**really** [5] - 15710:23, 15718:16, 15726:15, 15751:21, 15785:20 | **recollection** [3] - 15725:15, 15725:19, 15835:19<br>**record** [4] - 15747:16, 15747:19, 15755:9, 15755:11<br>**recorded** [1] - 15696:21<br>**red** [1] - 15812:12<br>**redaction** [1] - 15795:16<br>**redactions** [1] - 15748:2<br>**refer** [2] - 15718:3, 15719:7<br>**reference** [1] - 15804:19<br>**referenced** [1] - 15843:25<br>**references** [1] - 15748:6<br>**referring** [5] - 15718:3, 15749:16, 15753:20, 15797:6, 15833:7<br>**reflect** [3] - 15755:9, 15755:13, 15757:4<br>**reflected** [1] - 15841:1<br>**reflection** [1] - 15734:14 | 15773:13, 15774:23, 15777:22, 15778:21, 15783:10, 15786:10, 15792:24, 15799:14, 15809:22, 15809:23, 15812:5, 15827:6, 15831:14, 15831:18, 15832:14, 15833:9, 15835:4<br>**relevant** [6] - 15749:20, 15753:11, 15762:9, 15762:17, 15771:11, 15831:22<br>**remain** [1] - 15778:17<br>**remarks** [2] - 15750:24, 15751:1<br>**remember** [41] - 15710:15, 15721:6, 15721:25, 15724:13, 15726:13, 15735:6, 15736:25, 15741:25, 15753:15, 15756:15, 15756:20, 15756:25, 15757:18, 15758:4, 15770:16, 15771:3, 15772:2, 15777:18, 15778:2, 15779:20, 15781:6, 15781:7, 15781:8, 15781:13, 15781:20, 15783:19, 15789:17, 15790:19, 15793:19, 15795:5, 15798:10, 15798:24, 15799:11, 15800:17, 15801:16, 15804:4, 15805:18, 15823:20, 15841:20 |
| **prove** [1] - 15832:4<br>**provide** [4] - 15747:25, 15763:19, 15786:5, 15792:15<br>**provided** [3] - 15749:3, 15767:19<br>**public** [4] - 15728:1, 15786:24, 15787:2, 15834:8<br>**publicly** [1] - 15834:21<br>**publish** [12] - 15732:3, 15732:7, 15732:10, 15736:21, 15739:10, 15739:14, 15752:24, 15788:6, 15797:14, 15808:4, 15814:9, 15817:14<br>**published** [2] - 15797:17, 15838:21<br>**pull** [2] - 15828:1, 15828:10<br>**pumping** [1] - 15829:5<br>**purpose** [9] - 15719:23, 15720:3, 15720:5, 15724:10, 15745:3, 15750:17, 15755:21, 15817:22, 15817:24<br>**purposes** [1] - 15753:16 | **quick** [3] - 15747:2, 15752:12, 15842:21<br>**quickly** [1] - 15831:16<br>**quiet** [3] - 15801:3, 15801:4<br>**quit** [1] - 15792:19<br>**quite** [2] - 15756:7, 15763:15<br><br>## R<br><br>**raise** [2] - 15744:6, 15767:21<br>**raised** [2] - 15709:24, 15761:8<br>**raising** [1] - 15757:22<br>**rallies** [1] - 15830:19<br>**rally** [10] - 15750:17, 15773:10, 15773:17, 15774:15, 15776:7, 15776:10, 15776:14, 15777:16, 15794:16, 15795:2<br>**Rally** [1] - 15789:25<br>**random** [2] - 15742:4, 15745:20<br>**ranks** [5] - 15798:10, 15798:14, 15799:6, 15805:2, 15805:8 | **reason** [18] - 15720:10, 15720:17, 15720:24, 15722:25, 15723:3, 15723:7, 15723:14, 15723:18, 15724:4, 15735:5, 15737:18, 15750:3, 15775:21, 15794:15, 15834:4, 15834:24<br>**reasons** [1] - 15748:3<br>**recalled** [1] - 15843:17<br>**receive** [1] - 15773:6<br>**received** [8] - 15714:14, 15772:10, 15785:23, 15792:11, 15838:5, 15838:16, 15841:3, 15841:4<br>**recess** [5] - 15747:12, 15747:14, 15747:15, 15844:16, 15844:17<br>**recognize** [16] - 15728:20, 15736:10, 15736:13, 15736:15, 15739:2, 15739:5, 15739:17, 15779:17, 15788:25, 15789:2, 15797:23, 15820:3, 15821:15, 15821:18, 15821:20, 15825:14<br>**recognized** [1] - 15788:16 | **refresh** [2] - 15725:19, 15725:22<br>**refreshes** [1] - 15725:15<br>**regarding** [2] - 15827:22, 15834:8<br>**regular** [1] - 15825:4<br>**Rehl** [5] - 15698:4, 15698:14, 15727:6, 15745:12, 15789:6<br>**REHL** [1] - 15695:5<br>**Rehl's** [1] - 15698:18<br>**relate** [2] - 15727:20, 15753:22<br>**related** [5] - 15714:14, 15714:18, 15753:23, 15761:4, 15771:9<br>**relating** [2] - 15727:12, 15727:15<br>**relationship** [7] - 15711:23, 15712:1, 15712:4, 15712:11, 15726:23, 15749:25, 15763:16<br>**relatively** [1] - 15752:18<br>**relevance** [23] - 15741:6, 15749:7, 15765:13, 15769:12, 15770:2, 15770:9, | **remembered** [2] - 15782:1, 15782:10<br>**remembers** [1] - 15771:7<br>**repeat** [1] - 15778:2<br>**repeatedly** [1] - 15754:13<br>**rephrase** [3] - 15746:4, 15764:6, 15767:14<br>**report** [6] - 15713:10, 15750:7, 15751:10, 15768:6, 15782:2, 15782:11<br>**reported** [5] - 15751:3, 15751:4, 15751:9, 15762:13, 15762:22<br>**Reporter** [3] - 15696:17, 15696:18, 15844:25<br>**reporter** [4] - 15710:16, 15710:21, 15747:3, 15759:13 |

**REPORTER** [1] - 15844:19
**reporting** [4] - 15711:23, 15749:25, 15786:3, 15834:8
**reports** [1] - 15776:24
**represent** [1] - 15745:12
**represented** [1] - 15748:12
**represents** [1] - 15728:12
**request** [2] - 15743:8, 15761:14
**requested** [3] - 15698:21, 15698:25, 15699:7
**required** [2] - 15768:21, 15768:25
**resemble** [1] - 15716:11
**residence** [4] - 15741:18, 15748:7, 15833:7, 15835:8
**resolved** [1] - 15761:12
**respond** [3] - 15699:20, 15699:23, 15699:24
**response** [4] - 15712:19, 15712:22, 15719:9, 15843:18
**responsible** [1] - 15734:6
**rest** [6] - 15798:9, 15798:16, 15798:25, 15799:3, 15834:9, 15834:22
**restating** [1] - 15699:25
**restore** [1] - 15831:4
**restrain** [1] - 15806:13
**result** [2] - 15737:20, 15794:13
**resumed** [1] - 15760:23
**retreat** [1] - 15825:1
**Return** [5] - 15745:7, 15763:6, 15771:25, 15803:24, 15835:13
**returned** [4] - 15710:7, 15747:5, 15761:19, 15844:8
**revolution** [10] - 15794:7, 15794:10, 15794:13, 15795:4, 15795:8, 15795:9, 15796:7, 15796:9, 15796:12, 15797:1
**Rhode** [2] - 15814:11,

15838:18
**right-hand** [1] - 15828:18
**rights** [1] - 15754:21
**riot** [3] - 15841:24, 15842:10, 15842:23
**rioters** [4] - 15839:19, 15840:4, 15840:14, 15840:19
**rise** [2] - 15747:13, 15844:15
**Road** [1] - 15696:2
**robust** [3] - 15754:20, 15755:4, 15755:9
**rock** [3] - 15774:20, 15774:21, 15775:3
**Roger** [2] - 15696:14, 15698:13
**ROGER** [1] - 15696:15
**Rohde** [12] - 15779:13, 15781:2, 15791:20, 15792:8, 15795:24, 15799:17, 15804:6, 15804:16, 15808:5, 15817:15, 15820:17, 15824:13
**role** [1] - 15796:20
**role-playing** [1] - 15796:20
**room** [5] - 15735:15, 15735:16, 15747:5, 15780:15, 15844:8
**Room** [2] - 15696:18, 15845:1
**Roots** [4] - 15696:14, 15698:13, 15758:9, 15758:15
**ROOTS** [16] - 15696:15, 15758:7, 15758:16, 15758:23, 15758:25, 15759:8, 15760:10, 15760:16, 15760:18, 15767:7, 15767:12, 15769:4, 15777:24, 15783:6, 15783:8, 15783:16
**roughly** [1] - 15749:2
**roundabout** [1] - 15726:13
**RPR** [3] - 15696:17, 15844:20, 15844:25
**Rufio** [8] - 15729:2, 15787:5, 15793:4, 15800:3, 15800:6, 15800:14, 15804:2, 15825:11
**rule** [2] - 15758:25, 15834:18
**ruling** [3] - 15743:16, 15770:19, 15834:13

**run** [4] - 15710:18, 15735:24, 15778:8, 15805:19
**running** [3] - 15815:9, 15815:22, 15829:10
**Ryan** [5] - 15782:23, 15783:13, 15783:24, 15808:9, 15808:12

## S

**Sabino** [2] - 15696:8, 15698:12
**sacrificed** [1] - 15778:12
**safe** [2] - 15738:14, 15746:8
**safety** [1] - 15772:15
**sanctioned** [2] - 15802:10
**sanctions** [1] - 15833:14
**saw** [26] - 15723:14, 15733:15, 15735:18, 15741:13, 15750:19, 15751:2, 15751:3, 15751:19, 15753:6, 15753:14, 15755:20, 15756:24, 15765:17, 15766:2, 15782:1, 15782:10, 15794:17, 15800:5, 15809:8, 15812:17, 15816:18, 15824:3, 15829:17, 15842:4, 15842:16, 15842:17
**scaffolding** [1] - 15829:10
**scattered** [1] - 15807:9
**scenarios** [1] - 15796:18
**scene** [11] - 15715:16, 15716:12, 15716:15, 15721:17, 15722:1, 15728:11, 15736:13, 15738:7, 15823:2, 15824:19, 15824:21
**scenes** [2] - 15832:14, 15832:16
**scheduling** [1] - 15760:25
**scope** [29] - 15748:4, 15748:19, 15749:1, 15751:6, 15754:14, 15754:19, 15755:16, 15756:6, 15758:19, 15758:21, 15760:4, 15760:5, 15762:4, 15765:13, 15767:7,

15767:12, 15770:2, 15770:9, 15770:19, 15771:14, 15772:8, 15773:13, 15777:22, 15799:14, 15809:22, 15827:6, 15831:14, 15832:15, 15832:23
**scrambling** [1] - 15815:2
**screaming** [1] - 15794:23
**screen** [25] - 15715:16, 15716:11, 15725:1, 15729:13, 15732:12, 15739:5, 15758:13, 15779:16, 15788:10, 15792:4, 15801:25, 15802:4, 15802:16, 15804:5, 15804:12, 15808:9, 15808:16, 15813:13, 15814:1, 15816:12, 15817:7, 15822:7, 15824:17, 15828:19, 15829:19
**scroll** [11] - 15779:12, 15779:22, 15780:24, 15781:2, 15781:10, 15781:17, 15781:22, 15787:19, 15795:12, 15804:17, 15819:16
**scrolls** [1] - 15753:19
**seal** [1] - 15700:10
**seated** [4] - 15710:8, 15747:6, 15761:20, 15844:9
**seats** [1] - 15812:4
**second** [14] - 15718:7, 15736:9, 15742:6, 15753:5, 15758:8, 15768:17, 15788:21, 15795:17, 15807:18, 15807:21, 15812:8, 15814:15, 15815:16, 15822:11
**seconds** [31] - 15715:9, 15717:6, 15717:18, 15721:11, 15728:8, 15728:9, 15738:23, 15799:21, 15808:20, 15808:21, 15809:11, 15813:1, 15814:11, 15814:12, 15815:4, 15815:5, 15815:11, 15815:24, 15816:8, 15817:3, 15819:17, 15820:17, 15822:23, 15823:24, 15824:9, 15825:5, 15825:21, 15826:3,

15828:14, 15828:21, 15829:14
**secret** [1] - 15766:25
**security** [1] - 15833:11
**see** [90] - 15699:18, 15712:23, 15715:16, 15717:14, 15717:23, 15718:1, 15719:18, 15721:14, 15724:21, 15724:25, 15725:4, 15725:7, 15725:16, 15728:18, 15729:19, 15729:24, 15732:12, 15732:22, 15733:9, 15734:19, 15739:1, 15744:17, 15744:19, 15745:4, 15746:9, 15748:3, 15748:8, 15750:7, 15750:15, 15752:13, 15752:14, 15752:24, 15753:4, 15753:19, 15753:25, 15754:22, 15756:12, 15757:21, 15766:2, 15768:6, 15782:4, 15785:9, 15788:12, 15788:21, 15795:13, 15797:19, 15804:14, 15806:9, 15807:24, 15808:9, 15808:12, 15808:15, 15808:24, 15809:15, 15810:1, 15810:3, 15811:10, 15811:14, 15811:16, 15812:11, 15813:13, 15814:1, 15814:18, 15814:20, 15815:9, 15815:18, 15817:7, 15817:19, 15818:20, 15819:20, 15819:25, 15820:11, 15821:4, 15821:6, 15822:6, 15823:18, 15824:17, 15828:18, 15829:19, 15832:13, 15832:16, 15836:20, 15838:1, 15839:4, 15839:10, 15843:18, 15844:6, 15844:14
**seeing** [4] - 15756:15, 15756:20, 15765:20, 15841:20
**seek** [2] - 15714:3, 15744:1
**seem** [1] - 15803:16
**Self** [6] - 15727:10, 15727:13, 15790:9, 15790:12, 15790:15, 15790:24

| | | | | |
|---|---|---|---|---|
| **self** [2] - 15714:2, 15821:12<br>**Self-Defense** [6] - 15727:10, 15727:13, 15790:9, 15790:12, 15790:15, 15790:24<br>**self-defense** [1] - 15821:12<br>**self-preservation** [1] - 15714:2<br>**selfie** [3] - 15744:18, 15786:16, 15786:18<br>**send** [9] - 15699:16, 15733:13, 15733:17, 15733:18, 15749:19, 15786:21, 15832:4, 15832:17, 15843:13<br>**sending** [8] - 15733:10, 15779:20, 15838:2, 15841:20, 15843:22, 15844:1<br>**Sending** [2] - 15838:2, 15841:8<br>**sense** [6] - 15716:18, 15722:11, 15732:8, 15744:25, 15786:5, 15844:5<br>**sensitive** [1] - 15833:9<br>**sent** [14] - 15733:5, 15733:7, 15733:21, 15748:4, 15748:11, 15748:14, 15796:5, 15822:19, 15832:3, 15836:24, 15841:7, 15842:3, 15842:15<br>**separate** [1] - 15749:14<br>**serious** [2] - 15749:17, 15829:9<br>**service** [1] - 15733:12<br>**SESSION** [1] - 15695:9<br>**settled** [1] - 15761:7<br>**seven** [1] - 15842:22<br>**several** [1] - 15748:23<br>**severely** [1] - 15713:23<br>**sheer** [1] - 15755:4<br>**sheet** [2] - 15699:12, 15699:15<br>**shirts** [1] - 15790:5<br>**shock** [1] - 15842:20<br>**shoot** [1] - 15772:22<br>**short** [3] - 15709:15, 15818:25, 15823:21<br>**shorthand** [1] - 15696:21<br>**shortly** [5] - 15738:7, 15740:9, 15776:13, 15794:4, 15810:9 | **shoulder** [4] - 15735:23, 15800:4, 15810:1, 15821:5<br>**shoulders** [2] - 15735:21, 15737:5<br>**shout** [1] - 15813:3<br>**shouting** [5] - 15813:7, 15813:8, 15836:12, 15836:15, 15837:1<br>**Shouts** [1] - 15836:22<br>**show** [8] - 15712:8, 15728:11, 15732:2, 15751:1, 15751:15, 15791:21, 15804:17, 15832:14<br>**showed** [7] - 15787:21, 15791:6, 15793:6, 15838:4, 15838:13, 15838:15, 15843:7<br>**showing** [3] - 15743:16, 15751:17, 15800:6<br>**shows** [1] - 15839:1<br>**sic** [1] - 15803:6<br>**side** [14] - 15717:23, 15717:25, 15726:12, 15780:25, 15796:6, 15804:19, 15804:20, 15813:13, 15814:1, 15816:12, 15817:7, 15822:7, 15824:17, 15839:2<br>**sidebar** [5] - 15743:11, 15744:5, 15770:23, 15831:16<br>**siding** [1] - 15797:2<br>**signal** [1] - 15841:10<br>**signed** [4] - 15771:8, 15772:5, 15772:7, 15772:9<br>**significance** [4] - 15734:17, 15734:18, 15735:4, 15735:11<br>**signify** [1] - 15821:14<br>**signing** [2] - 15771:7, 15772:2<br>**signs** [1] - 15768:2<br>**sister** [5] - 15799:11, 15799:15, 15800:7, 15800:15, 15804:3<br>**sit** [1] - 15760:14<br>**situation** [9] - 15713:18, 15733:23, 15733:24, 15740:4, 15740:21, 15741:1, 15775:17, 15823:15, 15837:3<br>**situations** [1] - | 15746:6<br>**six** [1] - 15782:16<br>**skeptical** [1] - 15744:18<br>**Skull** [1] - 15789:12<br>**sleep** [1] - 15780:18<br>**slightly** [1] - 15724:9<br>**slowing** [1] - 15733:12<br>**small** [3] - 15735:15, 15756:21, 15757:21<br>**smaller** [2] - 15717:24, 15718:2<br>**smiling** [1] - 15788:23<br>**Smith** [25] - 15695:16, 15698:9, 15700:3, 15710:11, 15715:11, 15747:23, 15749:24, 15754:18, 15754:23, 15758:20, 15759:13, 15759:21, 15763:2, 15771:23, 15789:11, 15800:22, 15801:1, 15801:3, 15801:9, 15801:12, 15832:6, 15833:13, 15833:25, 15835:7, 15838:4<br>**SMITH** [150] - 15695:17, 15695:20, 15700:4, 15700:8, 15710:13, 15711:5, 15711:16, 15714:11, 15714:12, 15715:15, 15715:24, 15715:25, 15717:19, 15717:22, 15718:9, 15718:14, 15718:16, 15718:20, 15719:7, 15719:12, 15720:2, 15720:15, 15721:12, 15721:13, 15723:12, 15724:20, 15724:24, 15728:7, 15728:10, 15728:15, 15729:5, 15729:23, 15730:6, 15731:25, 15732:5, 15732:7, 15732:11, 15736:4, 15736:8, 15736:12, 15736:18, 15736:22, 15736:24, 15738:16, 15738:20, 15738:25, 15739:4, 15739:9, 15739:16, 15740:13, 15741:7, 15741:9, 15743:5, 15743:13, 15746:16, 15747:24, 15750:9, 15750:18, 15751:24, 15752:23, 15753:19, 15757:6, 15757:11, 15759:10, 15759:15, 15759:20, | 15759:24, 15760:1, 15762:4, 15762:19, 15762:22, 15762:25, 15765:13, 15769:12, 15770:2, 15770:9, 15770:18, 15771:15, 15771:18, 15771:20, 15771:22, 15773:13, 15774:23, 15775:8, 15777:22, 15778:21, 15779:10, 15779:24, 15780:7, 15782:3, 15783:5, 15783:10, 15783:15, 15783:17, 15786:10, 15788:4, 15791:23, 15792:24, 15795:15, 15795:18, 15797:15, 15798:20, 15799:14, 15800:9, 15800:16, 15800:18, 15800:21, 15800:23, 15800:25, 15801:2, 15801:6, 15801:10, 15801:22, 15801:24, 15802:7, 15802:9, 15802:16, 15802:21, 15803:2, 15803:4, 15803:9, 15803:11, 15805:10, 15805:12, 15806:4, 15806:6, 15809:22, 15812:5, 15814:7, 15817:12, 15824:1, 15825:19, 15827:6, 15828:8, 15831:14, 15831:25, 15832:9, 15832:20, 15833:5, 15833:14, 15833:17, 15833:22, 15833:24, 15835:2, 15835:6, 15835:8, 15835:10, 15836:7, 15838:7, 15838:22<br>**Smith..................15711** [1] - 15697:3<br>**snippets** [1] - 15753:22<br>**snow** [1] - 15815:2<br>**sockets** [1] - 15783:14<br>**solely** [1] - 15748:16<br>**someone** [23] - 15712:8, 15712:11, 15712:23, 15716:25, 15728:17, 15732:25, 15735:3, 15735:8, 15739:22, 15751:10, 15752:15, 15752:17, 15752:20, 15752:25, 15765:20, 15766:18, 15768:3, 15772:22, 15787:2, 15787:11, | 15787:15, 15806:11, 15842:19<br>**sometime** [1] - 15787:21<br>**sometimes** [7] - 15710:18, 15712:8, 15766:1, 15779:21, 15780:25, 15796:24, 15827:16<br>**somewhere** [1] - 15819:8<br>**soon** [3] - 15842:4, 15842:15, 15844:1<br>**sore** [1] - 15722:20<br>**sorry** [15] - 15699:2, 15711:13, 15745:23, 15746:11, 15779:9, 15781:3, 15794:8, 15794:19, 15805:5, 15807:21, 15811:4, 15813:23, 15816:2, 15824:20, 15829:18<br>**sort** [3] - 15729:13, 15771:13, 15831:21<br>**sorts** [1] - 15833:1<br>**sought** [1] - 15754:11<br>**sound** [5] - 15736:7, 15763:8, 15817:15, 15819:14, 15820:22<br>**sounds** [5] - 15699:21, 15699:25, 15744:16, 15832:7, 15832:24<br>**source** [3] - 15712:11, 15763:22, 15764:15<br>**sources** [1] - 15712:1<br>**Space** [3] - 15789:18, 15789:19, 15789:22<br>**speaking** [4] - 15719:9, 15752:9, 15755:14, 15760:10<br>**special** [1] - 15750:2<br>**specific** [9] - 15715:3, 15720:5, 15732:21, 15742:4, 15769:20, 15772:10, 15777:17, 15785:23, 15799:2<br>**specifically** [6] - 15772:11, 15772:18, 15781:21, 15810:23, 15820:5, 15826:23<br>**specifics** [1] - 15714:25<br>**speculation** [3] - 15746:16, 15798:20, 15836:7<br>**speech** [1] - 15778:13<br>**spent** [3] - 15750:5, 15755:5, 15756:5<br>**spot** [1] - 15809:21 |

| | | | | |
|---|---|---|---|---|
| **spray** [1] - 15713:20<br>**spread** [1] - 15839:19<br>**spring** [3] - 15711:12,<br>15711:15, 15795:8<br>**stabbed** [1] - 15768:3<br>**stairs** [1] - 15737:4<br>**stand** [11] - 15700:6,<br>15711:2, 15740:16,<br>15747:10, 15760:23,<br>15765:23, 15765:24,<br>15793:9, 15802:5,<br>15804:25, 15843:20<br>**standing** [4] -<br>15722:4, 15730:8,<br>15765:17, 15822:14<br>**stands** [2] - 15747:14,<br>15844:16<br>**star** [2] - 15775:3,<br>15786:24<br>**stars** [2] - 15774:20,<br>15774:21<br>**start** [4] - 15798:8,<br>15814:11, 15820:16<br>**started** [8] - 15730:11,<br>15733:20, 15734:10,<br>15763:8, 15763:13,<br>15763:14, 15831:8,<br>15835:18<br>**starting** [1] - 15839:11<br>**starts** [1] - 15730:17<br>**state** [3] - 15711:6,<br>15741:7, 15842:20<br>**statement** [5] -<br>15739:10, 15775:9,<br>15775:10, 15794:12,<br>15802:10<br>**statements** [15] -<br>15748:1, 15748:9,<br>15748:18, 15749:13,<br>15749:15, 15750:10,<br>15750:21, 15750:25,<br>15751:15, 15752:11,<br>15753:14, 15753:22,<br>15754:25, 15800:25,<br>15801:15<br>**STATES** [3] - 15695:1,<br>15695:2, 15695:10<br>**States** [4] - 15695:12,<br>15698:3, 15747:20,<br>15845:1<br>**stationary** [1] -<br>15730:13<br>**stationed** [1] -<br>15731:23<br>**status** [2] - 15775:18,<br>15775:19<br>**stay** [3] - 15720:21,<br>15780:21, 15793:8<br>**stenographic** [1] -<br>15844:22 | **step** [3] - 15737:14,<br>15747:7, 15844:10<br>**stepped** [1] - 15830:9<br>**steps** [2] - 15747:8,<br>15844:11<br>**Steven** [2] - 15696:11,<br>15698:12<br>**stick** [1] - 15798:3<br>**sticker** [4] - 15810:3,<br>15818:21, 15823:17,<br>15827:22<br>**still** [13] - 15722:12,<br>15731:11, 15733:10,<br>15753:10, 15757:2,<br>15757:12, 15758:17,<br>15781:3, 15814:4,<br>15817:9, 15818:1,<br>15822:9, 15823:7<br>**Stop** [1] - 15836:12<br>**stop** [11] - 15720:23,<br>15735:12, 15754:17,<br>15793:7, 15793:9,<br>15801:12, 15824:15,<br>15834:1, 15836:5<br>**stopped** [2] -<br>15721:21, 15754:14<br>**stops** [1] - 15774:8<br>**storm** [2] - 15754:3,<br>15813:3<br>**storming** [1] -<br>15751:18<br>**Street** [8] - 15695:14,<br>15695:17, 15695:21,<br>15695:24, 15696:5,<br>15696:9, 15790:3,<br>15826:22<br>**street** [3] - 15717:24,<br>15717:25, 15770:1<br>**streets** [7] - 15720:6,<br>15804:22, 15804:23,<br>15830:13, 15830:19<br>**strike** [6] - 15712:14,<br>15721:25, 15740:22,<br>15765:5, 15813:22,<br>15837:11<br>**strikes** [2] - 15755:23,<br>15756:10<br>**stripes** [1] - 15815:19<br>**stronger** [1] - 15828:2<br>**struggled** [1] -<br>15788:1<br>**stuff** [12] - 15734:18,<br>15759:2, 15766:3,<br>15767:18, 15767:19,<br>15767:20, 15769:22,<br>15778:6, 15783:13,<br>15784:1, 15789:20,<br>15793:8<br>**stupid** [1] - 15795:7<br>**style** [2] - 15778:20, | 15803:15<br>**subject** [2] - 15731:5,<br>15762:20<br>**subway** [1] - 15784:17<br>**subways** [1] -<br>15741:18<br>**successfully** [2] -<br>15733:7, 15733:8<br>**suggest** [2] - 15785:5,<br>15802:13<br>**suggested** [1] -<br>15761:17<br>**suggestion** [2] -<br>15709:18, 15750:25<br>**suit** [2] - 15797:19,<br>15815:19<br>**Suite** [2] - 15695:18,<br>15696:6<br>**sunglasses** [3] -<br>15728:18, 15788:13,<br>15812:11<br>**supporters** [12] -<br>15731:19, 15731:22,<br>15734:2, 15734:5,<br>15774:19, 15775:23,<br>15777:1, 15794:14,<br>15821:11, 15825:4,<br>15830:24<br>**suppose** [2] -<br>15772:18, 15781:12<br>**surely** [2] - 15829:2,<br>15829:4<br>**surged** [1] - 15732:19<br>**surprised** [9] -<br>15730:24, 15731:11,<br>15752:13, 15752:16,<br>15753:17, 15755:1,<br>15775:1, 15793:16,<br>15823:7<br>**surrounded** [3] -<br>15713:20, 15812:20,<br>15825:2<br>**suspicion** [1] -<br>15767:21<br>**sustain** [1] - 15763:4<br>**sustained** [9] -<br>15718:13, 15719:25,<br>15720:14, 15769:13,<br>15771:23, 15778:22,<br>15792:25, 15809:23,<br>15812:6<br>**swear** [1] - 15710:25<br>**Sweepers** [1] -<br>15790:4<br>**swim** [1] - 15808:10<br>**switch** [1] - 15753:24<br>**SWORN** [1] - 15711:3 | **T**<br><br>**T-shirts** [1] - 15790:5<br>**tad** [1] - 15787:19<br>**tan** [2] - 15808:12,<br>15815:19<br>**tape** [8] - 15821:5,<br>15821:7, 15821:9,<br>15821:13, 15821:15,<br>15821:18, 15821:20,<br>15821:22<br>**tapped** [1] - 15800:3<br>**Tarrio** [5] - 15698:5,<br>15698:15, 15727:2,<br>15786:8, 15786:13<br>**TARRIO** [1] - 15695:6<br>**Tarrio's** [1] - 15778:19<br>**task** [1] - 15751:12<br>**tasked** [1] - 15751:8<br>**tasking** [4] - 15767:4,<br>15771:1, 15771:2<br>**tattoo** [1] - 15768:21<br>**Telegram** [7] -<br>15727:12, 15727:15,<br>15727:18, 15778:25,<br>15789:10, 15792:12,<br>15792:22<br>**telephone** [1] -<br>15700:5<br>**term** [4] - 15763:19,<br>15763:24, 15767:4,<br>15774:20<br>**terms** [6] - 15726:13,<br>15750:6, 15761:6,<br>15768:12, 15789:10,<br>15798:25<br>**terrace** [3] - 15818:17,<br>15818:19, 15840:20<br>**testified** [14] -<br>15719:18, 15723:3,<br>15726:4, 15728:13,<br>15740:23, 15742:21,<br>15750:14, 15750:16,<br>15751:12, 15752:16,<br>15753:17, 15754:2,<br>15791:23, 15841:9<br>**testifies** [1] - 15752:24<br>**testify** [3] - 15750:11,<br>15802:12, 15832:15<br>**testifying** [1] -<br>15755:19<br>**testimony** [13] -<br>15737:17, 15750:1,<br>15750:23, 15752:12,<br>15753:11, 15756:24,<br>15760:6, 15760:7,<br>15831:21, 15833:2,<br>15838:8, 15841:5<br>**text** [7] - 15732:12,<br>15732:14, 15749:2, | 15822:19, 15832:3,<br>15832:17, 15841:1<br>**texted** [2] - 15837:22,<br>15842:20<br>**texting** [2] - 15732:24,<br>15836:14<br>**texts** [1] - 15748:13<br>**THE** [240] - 15695:1,<br>15695:1, 15695:9,<br>15698:2, 15698:16,<br>15699:8, 15699:13,<br>15699:19, 15700:3,<br>15700:7, 15709:9,<br>15709:17, 15709:21,<br>15709:23, 15710:1,<br>15710:4, 15710:6,<br>15710:8, 15710:17,<br>15710:24, 15711:1,<br>15711:14, 15711:15,<br>15715:11, 15718:13,<br>15718:19, 15719:10,<br>15719:11, 15719:25,<br>15720:14, 15723:10,<br>15723:11, 15728:6,<br>15732:4, 15732:9,<br>15736:20, 15738:19,<br>15739:13, 15741:8,<br>15743:7, 15743:10,<br>15743:22, 15744:4,<br>15744:7, 15744:10,<br>15744:14, 15744:24,<br>15745:2, 15746:17,<br>15747:1, 15747:6,<br>15747:9, 15747:13,<br>15747:16, 15747:21,<br>15748:22, 15750:16,<br>15751:20, 15752:5,<br>15753:9, 15754:7,<br>15755:2, 15755:8,<br>15755:12, 15755:14,<br>15756:3, 15756:7,<br>15756:18, 15756:22,<br>15757:8, 15757:24,<br>15758:2, 15758:5,<br>15758:8, 15758:22,<br>15758:24, 15759:5,<br>15759:13, 15759:17,<br>15759:21, 15759:25,<br>15760:8, 15760:13,<br>15760:17, 15760:20,<br>15760:25, 15761:10,<br>15761:13, 15761:17,<br>15761:18, 15761:20,<br>15762:5, 15762:7,<br>15762:10, 15762:18,<br>15762:21, 15762:24,<br>15763:2, 15764:11,<br>15764:12, 15764:20,<br>15764:21, 15765:14,<br>15765:16, 15765:17,<br>15767:8, 15767:13, |

15767:14, 15769:5, 15769:6, 15769:13, 15770:3, 15770:10, 15770:13, 15770:22, 15770:25, 15771:10, 15771:17, 15771:19, 15771:21, 15771:23, 15773:14, 15774:24, 15774:25, 15775:11, 15777:25, 15778:22, 15779:11, 15779:25, 15780:8, 15780:9, 15781:15, 15781:16, 15782:5, 15782:7, 15782:9, 15782:12, 15782:19, 15782:21, 15783:7, 15783:9, 15783:11, 15783:18, 15783:21, 15785:13, 15786:11, 15788:3, 15788:5, 15791:25, 15792:25, 15795:17, 15795:20, 15796:15, 15796:17, 15797:16, 15798:21, 15798:22, 15799:16, 15800:10, 15800:11, 15800:17, 15800:22, 15800:24, 15801:1, 15801:3, 15801:9, 15801:11, 15801:23, 15802:6, 15802:8, 15802:15, 15802:18, 15802:22, 15803:1, 15803:3, 15803:8, 15803:10, 15803:14, 15804:7, 15804:9, 15804:10, 15804:18, 15805:11, 15805:13, 15805:14, 15806:5, 15806:7, 15807:14, 15808:3, 15809:23, 15811:6, 15811:23, 15811:25, 15812:6, 15813:17, 15814:8, 15815:15, 15816:2, 15817:1, 15817:13, 15819:5, 15819:7, 15819:22, 15820:18, 15820:20, 15822:1, 15824:4, 15824:10, 15825:20, 15827:7, 15828:9, 15828:10, 15830:17, 15830:18, 15831:15, 15831:18, 15832:6, 15832:19, 15832:21, 15833:13, 15833:16, 15833:19, 15833:23, 15833:25, 15834:17, 15835:5, 15835:7, 15835:9, 15835:11,

15836:8, 15836:9, 15838:9, 15840:7, 15840:9, 15840:10, 15840:11, 15844:4, 15844:9, 15844:12, 15844:15
**theme** [1] - 15753:21
**theories** [1] - 15754:12
**theory** [1] - 15751:2
**they've** [1] - 15753:2
**thick** [2] - 15826:1, 15832:12
**thick-framed** [1] - 15826:1
**thinking** [10] - 15746:21, 15776:16, 15777:3, 15778:9, 15793:19, 15829:2, 15829:4, 15836:9, 15837:15
**third** [3] - 15709:19, 15754:24, 15768:19
**third-party** [1] - 15754:24
**thirds** [3] - 15729:10, 15810:15, 15810:17
**thoughts** [4] - 15781:7, 15818:5, 15818:10, 15818:11
**threatened** [2] - 15833:10, 15835:3
**three** [5] - 15804:14, 15810:18, 15812:8, 15840:10, 15842:10
**three-quarters** [1] - 15810:18
**three-second** [1] - 15812:8
**throughout** [2] - 15768:5, 15805:16
**throwing** [1] - 15819:20
**thrust** [1] - 15762:15
**tie** [1] - 15806:13
**timestamp** [5] - 15732:22, 15838:14, 15839:4, 15841:1, 15843:6
**timestamps** [2] - 15782:15, 15843:9
**timing** [5] - 15838:3, 15841:15, 15841:18, 15842:12, 15843:1
**Timothy** [1] - 15696:17
**TIMOTHY** [2] - 15695:9, 15844:20
**tired** [3] - 15722:14, 15722:15, 15818:1

**today** [4] - 15709:14, 15742:22, 15794:13, 15841:10
**together** [2] - 15777:6, 15807:10
**took** [6] - 15734:12, 15774:11, 15784:16, 15786:16, 15831:2, 15842:19
**top** [7] - 15725:5, 15726:15, 15764:8, 15779:16, 15804:4, 15804:17, 15836:20
**total** [1] - 15737:11
**totally** [1] - 15752:16
**touching** [1] - 15828:4
**toward** [3] - 15813:14, 15817:9, 15817:19
**towards** [25] - 15710:15, 15719:5, 15719:15, 15719:22, 15719:23, 15720:4, 15720:11, 15720:17, 15720:25, 15721:24, 15722:25, 15723:4, 15723:15, 15723:19, 15724:5, 15724:11, 15726:5, 15729:25, 15730:8, 15730:12, 15730:14, 15731:23, 15737:21, 15816:14, 15839:11
**track** [2] - 15698:17, 15815:19
**traffic** [3] - 15726:14, 15729:7, 15841:10
**transcript** [4] - 15696:21, 15724:25, 15844:22, 15844:23
**TRANSCRIPT** [1] - 15695:8
**transcript's** [1] - 15725:4
**transcription** [1] - 15696:21
**transition** [1] - 15844:5
**travel** [1] - 15780:5
**traveled** [1] - 15773:10
**traveling** [1] - 15712:16
**trial** [2] - 15750:23, 15787:3
**TRIAL** [1] - 15695:8
**tried** [2] - 15754:20, 15828:1
**trip** [5] - 15749:12, 15749:21, 15778:24, 15784:15

**troops** [1] - 15796:6
**trouble** [6] - 15714:1, 15746:3, 15746:7, 15768:2, 15777:12, 15788:9
**trounced** [1] - 15766:3
**truck** [1] - 15721:14
**trucks** [8] - 15721:7, 15721:18, 15721:21, 15722:2, 15722:24, 15726:5, 15806:12, 15807:2
**true** [2] - 15844:21, 15844:22
**Trump** [14] - 15730:14, 15731:18, 15731:22, 15734:2, 15734:5, 15734:18, 15774:18, 15775:23, 15776:25, 15794:14, 15821:11, 15825:4, 15830:24
**truth** [1] - 15757:3
**truthfully** [1] - 15741:14
**try** [6] - 15712:23, 15713:21, 15715:1, 15744:9, 15796:23, 15828:10
**trying** [14] - 15733:13, 15733:17, 15738:11, 15758:1, 15762:12, 15765:20, 15771:1, 15771:13, 15781:8, 15786:7, 15828:7, 15831:4, 15836:1, 15843:14
**tug** [2] - 15735:19, 15735:22
**turn** [1] - 15817:15
**turned** [3] - 15735:15, 15796:6, 15798:18
**turning** [2] - 15797:1, 15816:16
**twice** [1] - 15815:14
**two** [20] - 15709:13, 15710:22, 15729:10, 15729:24, 15733:16, 15752:23, 15795:2, 15795:13, 15796:1, 15801:25, 15810:15, 15810:17, 15819:9, 15819:17, 15832:22, 15832:25, 15833:3, 15836:2, 15843:20
**two-thirds** [3] - 15729:10, 15810:15, 15810:17
**type** [4] - 15755:25, 15784:5

**typed** [1] - 15699:16
**typical** [1] - 15722:3

**U**

**U.S** [2] - 15695:14, 15696:18
**Ukraine** [1] - 15795:9
**ultimately** [1] - 15734:23
**uncalled** [1] - 15833:12
**unclear** [1] - 15819:12
**under** [7] - 15700:10, 15735:2, 15776:6, 15818:25, 15821:10, 15826:11, 15832:14
**understood** [11] - 15741:12, 15746:1, 15746:5, 15773:2, 15773:4, 15776:22, 15809:18, 15826:8, 15826:14, 15826:24, 15834:13
**unfortunately** [1] - 15804:12
**uniform** [1] - 15749:5
**UNITED** [3] - 15695:1, 15695:2, 15695:10
**United** [4] - 15695:12, 15698:3, 15747:20, 15845:1
**unlawful** [2] - 15771:2, 15772:4
**unrelated** [1] - 15762:16
**up** [79] - 15698:23, 15699:6, 15699:16, 15699:21, 15700:1, 15712:8, 15715:1, 15715:8, 15715:10, 15715:14, 15721:9, 15721:10, 15721:22, 15723:13, 15724:20, 15726:8, 15726:9, 15726:17, 15726:20, 15728:5, 15730:14, 15731:19, 15731:22, 15731:25, 15734:10, 15734:14, 15735:13, 15736:4, 15736:6, 15738:21, 15741:17, 15744:9, 15744:22, 15748:17, 15753:19, 15758:12, 15759:11, 15765:17, 15765:23, 15765:24, 15774:19, 15776:25, 15777:10, 15780:23, 15781:1, 15781:3, 15785:14,

15788:8, 15791:6, 15793:6, 15795:13, 15797:9, 15798:9, 15798:16, 15799:12, 15800:3, 15804:7, 15804:8, 15810:6, 15813:14, 15814:25, 15817:19, 15818:16, 15818:20, 15820:13, 15823:3, 15824:19, 15824:21, 15824:24, 15825:2, 15825:11, 15828:7, 15829:7, 15830:7, 15831:24, 15834:3, 15836:2, 15836:20

**upper** [2] - 15839:4, 15839:10

**upper-right** [1] - 15839:10

**UTC** [2] - 15782:15, 15782:17

**utterly** [2] - 15749:18, 15833:12

## V

**vague** [3] - 15764:10, 15772:21, 15805:10

**vaguely** [3] - 15716:14, 15787:23, 15794:22

**valid** [1] - 15735:5

**variety** [1] - 15754:12

**vehicles** [1] - 15784:16

**venue** [1] - 15749:11

**vest** [7] - 15797:20, 15799:25, 15805:7, 15808:16, 15814:21, 15815:19, 15818:1

**vibe** [3] - 15775:3, 15775:6, 15775:13

**video** [20] - 15731:5, 15736:9, 15743:13, 15743:16, 15799:17, 15803:21, 15807:25, 15812:11, 15812:14, 15812:23, 15823:22, 15825:14, 15826:14, 15826:20, 15826:25, 15827:20, 15838:24, 15839:1, 15839:15

**Video** [49] - 15717:21, 15718:8, 15728:14, 15729:4, 15729:22, 15730:5, 15736:11, 15736:23, 15739:3, 15739:15, 15740:12, 15799:19, 15799:22,

15807:19, 15808:7, 15808:22, 15809:5, 15809:12, 15812:9, 15812:24, 15813:11, 15814:13, 15814:16, 15815:6, 15815:12, 15815:25, 15816:9, 15817:4, 15817:17, 15819:4, 15819:21, 15820:8, 15821:1, 15822:3, 15822:12, 15822:24, 15823:25, 15824:14, 15825:6, 15825:8, 15825:22, 15826:4, 15828:15, 15828:22, 15829:15, 15829:22, 15829:25, 15830:5, 15830:11

**video's** [1] - 15800:6

**videos** [6] - 15743:18, 15744:18, 15826:22, 15827:4, 15827:9, 15843:7

**view** [5] - 15731:18, 15744:3, 15822:6, 15827:16, 15839:2

**views** [1] - 15765:8

**violence** [10] - 15713:11, 15749:17, 15749:18, 15750:6, 15750:11, 15750:13, 15753:22, 15754:1, 15754:4, 15832:13

**violent** [3] - 15753:7, 15832:14, 15832:16

**visible** [1] - 15801:25

**voice** [5] - 15715:14, 15785:14, 15788:8, 15804:8, 15813:3

**voices** [1] - 15715:10

**voluntarily** [1] - 15772:6

**volunteered** [1] - 15827:23

**vote** [1] - 15836:12

**vote'** [2] - 15836:15, 15836:22

## W

**wager** [1] - 15756:5

**wait** [3] - 15710:18, 15710:20, 15807:20

**waiting** [4] - 15716:25, 15717:2, 15735:16, 15793:7

**waive** [1] - 15760:19

**waived** [1] - 15758:18

**walk** [6] - 15720:22, 15722:14, 15793:19,

15798:6, 15804:24, 15805:8

**walked** [17] - 15719:5, 15719:15, 15719:19, 15720:4, 15721:24, 15731:19, 15731:22, 15735:21, 15738:10, 15776:2, 15776:3, 15799:6, 15804:19, 15836:2, 15840:6, 15840:12, 15840:14

**walking** [23] - 15719:23, 15720:11, 15720:17, 15720:25, 15722:21, 15722:25, 15723:4, 15723:15, 15723:19, 15724:4, 15724:11, 15726:5, 15729:24, 15730:11, 15733:20, 15740:1, 15793:17, 15800:3, 15807:9, 15813:14, 15816:15, 15817:19, 15817:22

**Wall** [1] - 15826:22

**wall** [1] - 15713:21

**wants** [1] - 15699:24

**war** [2] - 15735:19, 15735:22

**Washington** [21] - 15695:5, 15695:15, 15695:25, 15696:19, 15711:19, 15711:22, 15712:15, 15714:20, 15715:7, 15716:13, 15717:8, 15719:16, 15721:8, 15726:10, 15727:8, 15728:3, 15749:10, 15773:10, 15796:2, 15804:20, 15845:2

**watch** [5] - 15718:6, 15736:9, 15765:21, 15765:23, 15827:1

**watched** [1] - 15826:20

**watching** [4] - 15730:13, 15765:19, 15795:8, 15826:22

**water** [1] - 15726:16

**waving** [3] - 15730:14, 15822:15, 15829:7

**wear** [1] - 15792:7

**Wednesday** [1] - 15695:6

**week** [2] - 15841:23, 15842:1

**weight** [1] - 15750:3

**West** [1] - 15696:9

**west** [2] - 15839:2,

15840:20

**whatsoever** [1] - 15751:21

**wheelchair** [2] - 15715:21, 15716:10

**whereas** [1] - 15794:25

**whichever** [1] - 15803:15

**whole** [6] - 15752:12, 15753:24, 15764:15, 15826:14, 15826:24, 15837:16

**wide** [1] - 15759:1

**wild** [1] - 15783:1

**window** [1] - 15713:21

**wing** [1] - 15797:2

**winter** [2] - 15788:22, 15809:15

**Witness** [2] - 15747:8, 15844:11

**WITNESS** [37] - 15697:2, 15711:3, 15711:15, 15719:11, 15723:11, 15764:12, 15764:21, 15765:17, 15767:14, 15769:6, 15770:13, 15774:25, 15780:9, 15781:16, 15782:7, 15782:12, 15782:21, 15783:21, 15796:17, 15798:22, 15800:11, 15800:17, 15804:9, 15804:18, 15805:14, 15811:25, 15815:15, 15816:2, 15819:5, 15819:7, 15819:22, 15822:1, 15828:10, 15830:18, 15836:9, 15840:9, 15840:11

**witness** [70] - 15698:20, 15700:5, 15710:10, 15710:25, 15724:21, 15732:2, 15736:6, 15738:21, 15738:24, 15739:11, 15743:17, 15744:2, 15747:10, 15748:1, 15748:8, 15748:18, 15748:25, 15749:5, 15749:6, 15749:9, 15750:11, 15751:2, 15751:7, 15751:14, 15751:16, 15751:19, 15752:24, 15757:6, 15757:12, 15757:14, 15760:1, 15760:4, 15760:21, 15760:23, 15761:4, 15764:11,

15770:10, 15777:25, 15779:8, 15781:3, 15787:18, 15795:11, 15798:21, 15801:7, 15801:14, 15801:25, 15802:4, 15802:11, 15802:12, 15802:13, 15804:6, 15805:5, 15805:22, 15807:17, 15813:19, 15813:20, 15816:22, 15820:16, 15822:22, 15824:2, 15824:6, 15832:11, 15832:15, 15832:17, 15833:9, 15835:2, 15836:17, 15838:9, 15843:20

**witness's** [8] - 15743:20, 15748:9, 15749:21, 15750:10, 15750:24, 15750:25, 15833:7, 15835:6

**witnesses** [5] - 15709:13, 15754:11, 15755:19, 15833:12

**woman** [1] - 15802:3

**wondering** [1] - 15722:13

**word** [5] - 15717:4, 15766:4, 15794:7, 15794:10, 15794:11

**words** [6] - 15738:11, 15743:20, 15746:3, 15775:16, 15784:12, 15831:23

**world** [1] - 15759:25

**worse** [1] - 15713:19

**worst** [1] - 15796:23

**wrestling** [1] - 15737:5

**writing** [1] - 15773:6

## Y

**years** [6] - 15763:10, 15763:12, 15763:15, 15765:4, 15795:8, 15843:20

**yelling** [1] - 15804:22

**yellow** [2] - 15725:7, 15808:10

**yesterday** [6] - 15698:23, 15699:7, 15709:13, 15747:24, 15748:11, 15748:12

**York** [2] - 15695:18, 15696:13

**yourself** [13] - 15763:25, 15779:15, 15804:15, 15807:24,

15814:1, 15815:18, 15817:7, 15822:6, 15823:9, 15823:10, 15824:17, 15827:13, 15828:18
**YouTube** [1] - 15765:21

## Z

**Zachary** [4] - 15698:4, 15727:6, 15745:12, 15789:6
**zero** [3] - 15790:20, 15790:23, 15791:1
**zip** [1] - 15806:13
**zip-tie** [1] - 15806:13
**zone** [1] - 15782:18
**zoom** [1] - 15787:19