IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SOUTHERN POVERTY LAW CENTER, INC. and<br>HEIDI BEIRICH | )<br>)<br>)<br>)<br>)<br>) | CR. NO. 2:26-cr-00139-ECM-KFP |

**UNITED STATES' RESPONSE AND OBJECTION TO BEIRICH'S MOTION TO DISMISS**

A few months back, this Court denied the Southern Poverty Law Center, Inc.'s (SPLC) motion to dismiss based on a theory of vindicative prosecution. *See generally* Docs. 49 and 112. Picking up where the SPLC left off, Heidi Beirich now levies similar accusations against the government. *See generally* Doc. 186. Beirich contends she was charged because of her views of conservative and Christian groups and the reporting and listing of such groups on the SPLC's "Hate Map." Doc. 186 at 32-33. Her argument, though, "emphasizes noise over substance" and stacks "speculation upon conjecture" to conclude the government's prosecution is illegal. Doc. 112 at 1, 34. But cutting through that noise reveals this is not "one of those rare cases in which discovery is warranted," much less relief. *Id.* at 1, 14.

Contrary to her allegations, Beirich was charged because the government believed that the facts and evidence established that she conspired to commit wire fraud, false statements to financial institutions, and money laundering beyond a reasonable doubt. Similar to the deficiencies in the SPLC's motion, Beirich cannot proffer evidence, beyond speculation, that the charging decision was motivated by a "desire to punish a person for exercising his rights," *United States v.*

*Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006), rather than a decision based on the law and evidence made under the broad discretion afforded to such prosecutorial decisions.

Instead, Beirich cherry-picks from the enormous discovery in this financial fraud case a handful of fact-finding questions where agents asked witnesses about Beirich's actions concerning such groups. *See generally* Doc. 186 at 1-2. As an initial matter, Beirich's arguments are wholly out of context. Selectively plucking some portions of statements from the multitude of lengthy interviews conducted in this case does not constitute some evidence tending to show prosecutorial vindictiveness.

Moreover, Beirich cannot fill the gap, outside of pure speculation, connecting how agents asking questions as part of a fact-finding endeavor is any evidence at all that the ultimate charging decision was based on a desire to punish Beirich for improper reasons. Good investigators ask questions and seek facts on a broad array of subjects, even on some topics that might be outside the crime under investigation. For example, an agent in a drug-trafficking investigation may ask witnesses about their knowledge of a subject's finances as a means of uncovering potential money laundering charges. An agent investigating a wire fraud case may ask witnesses about any evidence of other schemes committed by the subject. Or an agent may ask witnesses about a host of topics that may not relate to potential criminal charges at all but may be useful background information or may provide evidence on motive or opportunity, etc. Far from suggesting animus, that is what good agents do to follow where the facts take them. Speculation that these limited examples of fact-finding questions from agents as part of an investigation somehow suggest evidence of animus on the decision to charge Beirich is a bridge too far.

Finally, apart from these problems, Beirich fails to specifically articulate how isolated, out-of-context statements during the fact-finding stage of the investigation related to the United States Attorney's Office for the Middle District of Alabama's (USAO) charging decision. Specifically, Beirich does not present "some evidence tending to show animus on the part of the prosecutors involved in bringing this case and that such animus resulted in the prosecution." Doc. 112. at 2. Thus, Beirich's motion, reliant on out-of-context allegations and conjecture, should be denied.

## I. Brief Factual Background

In August 2026, a federal grand jury returned a Second Superseding Indictment (the "Indictment") against the SPLC and Beirich. Doc. 115. More specifically, Beirich was charged with conspiracy to commit wire fraud, bank fraud, and money laundering. *Id.* at 14–23. These charges stemmed, in part, from a scheme where Beirich and the SPLC hid the fact that donated monies were covertly being sent to members of extremist groups and that money was ultimately used for the benefit of those groups. *Id.* at 1–14. Some of these members then used the funds to, among other things, purchase racist regalia, attend rallies, recruit new members, and otherwise promote ideologies that Beirich and the SPLC avowed to combat. *Id.*

Beirich now seeks to dismiss these charges by arguing that she is being both vindictively and selectively prosecuted due to her protected speech. *See generally* Doc. 186. She asks that she be allowed limited discovery into these claims to the extent dismissal may not be warranted. *Id*.

## II. General Principles and Governing Law

Under our constitutional system, it is the "[t]he Executive Branch—not the Judiciary—[that] makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 679 (2023) (citations omitted). To that end, "the Government retains 'broad

discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (citing *United States v. Goodwin*, 457 U.S. 368, 380, n. 11 (1982)). So "long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

"This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. Indeed, "[p]rosecutorial charging decisions are rarely simple." *Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987). They represent the culmination of a host of competing considerations such as "how best to allocate the scarce resources of a criminal justice system," "the strength and importance of a case," as well as "other tangible and intangible factors, such as government enforcement priorities." *Id.* (citations omitted). Similarly, facts change overtime, and a "prosecutor's assessment of the proper extent of prosecution may not [crystallize]" until after the discovery of a previously unknown facts or witnesses. *See, e.g.*, *Goodwin*, 457 U.S. at 381; *see also United States v. Mays*, 738 F.2d 1188, 1190 (11th Cir. 1984) ("The [*Goodwin*] Court recognized that acquisition of additional information or an increased appreciation of the facts previously available to the state might be an inducement to enhance the charges."). As such, courts rightly are reluctant to "engage in Monday-morning quarterbacking" of the government's prosecutorial decisions without compelling evidence otherwise. Doc. 112 at 16; *see also Wayte*, 470 U.S. at 607–08.

In keeping with these principles, a defendant seeking to dismiss her charges on a theory of either vindicative or selective prosecution faces a "demanding burden." *United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021) (selective prosecution claim) (citation omitted); *United States*

*v. Lee,* No. 23-13057, 2024 WL 4210779, at *4 (11th Cir. Sept. 17, 2024) (stating that a claim of actual vindictiveness is "exceedingly difficult to make" (citing *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987))).

A claim of vindicative prosecution can be proven in two ways. The first involves rare cases where a court will *presume* vindictiveness — that is, where the underlying facts evince "a reasonable likelihood [that] vindictiveness exists." *Goodwin*, 457 U.S. at 373. But if a defendant cannot make out a claim for presumptive vindictiveness, the burden remains on the defendant to show *actual* vindictiveness. *See Alabama v. Smith,* 490 U.S. 794, 799–800 (1989). This requires evidence that "(1) the prosecutor wanted to punish the defendant for exercising his rights (animus); and (2) the prosecutor's animus caused the prosecutor to bring charges of increased severity (causation)." *United States v. Brown*, 862 F. Supp. 2d 1276, 1290 (N.D. Ala. 2012), *aff'd*, 516 F. App'x 872 (11th Cir. 2013).

A claim of selective prosecution, on the other hand, requires the defendant to show that a "federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015) (citation omitted). This argument, at its core, asserts that a prosecutor chose to charge an individual and not others based on some impermissible reason. *See United States v. Smith*, 231 F.3d 800, 807–08 (11th Cir. 2000). The standard to prove such a claim is a "demanding one," *United States v. Armstrong*, 517 U.S. 456, 463 (1996), and must be proven with "clear and convincing" evidence. *Smith*, 231 F.3d at 808; *see also Cannon*, 987 F.3d at 937 ("[T]o dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." (citing *Smith*).)

## III. Beirich has failed to allege credible evidence of either presumptive or actual vindictiveness.

Before delving into the reasons Beirich has failed to make a threshold showing of prosecutorial vindictiveness, two things should be noted. First, Beirich effectively admits that her allegations cannot establish prosecutorial vindictiveness. Doc. 186 at 6. Rather, what Beirich seeks is to gain access to discovery in hopes of hunting after facts to support her theories. *Id*. ("Dr. Beirich is primarily focused on discovery at this time[.]"). Beirich argues that she "has met the standard for discovery on actual or presumed vindictiveness." Doc. 186 at 40. Contrary to her arguments, Beirich has not met this heavy burden. For as this Court noted, "[t]o obtain discovery, [a defendant] must do more than simply identify a potential motive for prosecutorial animus." Doc. 112 at 13 (citing *United States v. Bucci*, 582 F.3d 108, 114 (1st Cir. 2009) (internal citation omitted). Instead, Beirich "must connect any vindictive animus to those make the challenged charging decisions in [her] case." *Id*. (citation omitted). As demonstrated below, Beirich's failure to make that connection (in addition to the fact that her potential motive rests both on speculation and statements taken out of context) forecloses relief.

Second, Beirich's brief does not appear to specifically delineate whether her allegations of prosecutorial vindictiveness relate to actual or presumed vindictiveness. Instead, Beirich appears to merge those standards together. Doc. 186 at 39-41. The fact that Beirich does not specifically detail whether or how her allegations meet the standards for actual vs. presumptive vindictiveness undermines her contention that she has demonstrated "some evidence" of prosecutorial vindictiveness.

In any event, under either standard, she has failed to make a threshold showing. Concerning presumptive vindictiveness, although she attempts to dress up her arguments with new

facts, she merely repackages those previously rejected by this Court. Doc. 112 at 19–22. That's because her claim of presumptive vindictiveness rests on the same flaw: reliance on speculation rather than proffering evidence showing a "a reasonable likelihood [that] vindictiveness exists." *Goodwin*, 457 U.S. at 373.

To the extent she argues actual vindictiveness, her claim fares no better. She stacks "speculation upon conjecture, relying upon hypothetical links in assumed chains to show prosecutorial vindictiveness." Doc. 112 at 34–35. Her selective quotations, oblique references to internal DOJ and FBI reporting requirements, and overreliance of a government witness' alleged role do not make out a claim of actual vindictiveness viewed either independently or collectively. Entirely absent from the evidence she puts forth is any direct link (or even an inference therefrom) that these influenced the decision to bring the current charges. *See* Doc. 112 at 22 (citing *United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) ("In all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant." (citing *United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995)). As such, her claims fail.

*a. Beirich has failed to make a threshold showing that a presumption of vindictiveness applies.*

Beirich has failed to allege facts that would show a "realistic likelihood of vindictiveness." *Barner*, 441 F.3d at 1318. "Presumptions are strong medicine." Doc. 112 at 19 (citing *Godwin*, 457 U.S. at 373). This is especially so when it comes to a court and a defendant second-guessing a prosecutor's charging decisions. A decision to prosecute is "rarely simple." *Rumery*, 480 U.S. at 396. Also similarly complex is an attempt to discern a prosecutor's motivations. *Godwin*, 457 U.S. at 373. Presumptions cut through this complexity by applying even "in the absence of any proof of an improper motive." *Id.*

Given this "severity," such a presumption should be saved for cases "involving a specific fact pattern or series of events that would, no matter when or where that pattern or series appeared, *necessarily* give rise to a 'reasonable likelihood of vindictiveness.'" Doc. 112 at 19 (emphasis in original). In practice, this has happened in exceedingly few cases. For example, in *Blackledge v. Perry*, the Supreme Court presumed vindictiveness where the prosecutor sought felony charges after the defendant appealed a misdemeanor assault conviction. 417 U.S. 21, 22–23, 28–29 (1974). A presumption was also applied in *North Carolina v. Pearce* when a sentencing judge imposed a harsher sentence after a defendant successfully attacked his conviction. 395 U.S. 711, 725–26 (1969). In a more recent case, a district court found that a defendant had made a showing of presumptive vindictiveness when prosecutors sought charges against an individual engaged in specific and discrete conduct (*i.e.* flag burning) in accordance with a specific policy directive targeting that specific conduct. *See United States v. Carey*, 816 F. Supp. 3d 129, 144 (D.D.C. 2026). Common to each case is that a defendant exercised a *specific* and *discrete* protected right followed closely by a *specific* governmental response tied to the same. Beirich's claims simply do not fill that bill.[1]

---

1. The government maintains that a claim of prosecutorial vindictiveness cannot arise in the absence of a defendant exercising a specific, protected right in formal, legal proceedings and that no controlling precedent has applied the defense of vindictive prosecution to the defendant's assertion of generic First Amendment activity in the public sphere. *See* Doc. 68 at 1–10; *see also* Doc. 112 at 17–19. As the cases cited above suggest, vindictiveness can only be found after a defendant exercises a *specific* and *discrete* legal right that is followed by a *specific* government action. That has not happened here, and Beirich's claims fail as a result. Moreover, the government further maintains that the Eleventh Circuit has never specifically held that the presumption of vindictiveness applies in a pre-trial setting—the procedural context in which Beirich raises her claim. Doc. 68 at 12.

Instead of pointing to specific instances of protected conduct, Beirich cites her general exercise of speech critical to the current administration and her views of conservative groups as grounds to presume vindictiveness. *See* Doc. 186 at 23–47. But recognizing a presumption based on such amorphous conduct would stretch the concept beyond all recognition. Indeed, under such a theory, a defendant "could effectively immunize [herself] from prosecution simply by engaging in protected speech, such as criticizing political figures and their policies." Doc. 112 at 21. The law does not support such a result, nor should this Court. Beirich's speculative argument begins with rehashing a fact that this Court previously addressed, namely, that an FBI report detailing that a matter was opened relating to complaints from conservative groups that the SPLC had made fraudulent representations about those groups as part of its fundraising strategy. See Doc. 74-1 (report); Doc. 112 at 27-29; Doc. 186 at 17-19. Beirich then suggests that there was animus in the decision to charge her because there was still a "focus" on whether there was evidence that the SPLC targeted conservative groups during the financial fraud investigation. Doc. 186 at 19. Beirich selectively chooses a few parts of the sizable investigation in this case to support her claims, but none have merit.

*The interviews of Individual-1 do not suggest some evidence of animus.*

Beirich primarily supports this theory of animus by referencing interviews conducted with Individual-1, a former director of the SPLC's Intelligence Project who left the SPLC in 2013 or 2014. *Id*. at 19-26. In Beirich's view, the focus of these interactions showed that "the agents wanted to know Dr. Beirich's role in the SPLC's supposed 'targeting' of conservative groups. *Id*. at 26. But Beirich's own arguments and evidence undermine this characterization and confirm that her theory is premised on conjecture and exaggeration.

First, Beirich takes isolated comments out of context to support her theory. As Beirich admits, the government interviewed Individual-1 twice before the original indictment. *Id*. at 21. The first interview in January 2026 lasted more than two hours. *Id*. The second interview in March 2026 was also lengthy, lasting over an hour and a half. Exhibit A. In her motion, Beirich selectively attaches only portions of those interviews. Doc. 186-16, 186-17. Nevertheless, despite the length of the interviews with Individual-1 and the breadth of topics covered, it appears that Beirich can only highlight two instances where agents even referenced "conservative type organizations" in their questioning. Doc. 186 at 23-24; Doc. 186-17 at 4, 51[2]. Given the length and scope of the interviews with Individual-1, these isolated references, even with the portions of the interviews Beirich provides, hardly support her speculative assertion that the "agents' focus [was] consistent with a motivation tied to the SPLC's and Dr. Beirich's speech." Doc. 186 at 26. Indeed, a fairer reading of the portions of the interview provided by Beirich suggests that agents were simply asking general background questions about the upheaval at that SPLC during the 2013-2014 timeframe in which certain employees were "walked out" or escorted out of the building. *See e.g*. Doc. 186-17 at 10, 12, 16-19.

Second, even assuming that agents asked a few isolated questions to Individual-1 about whether there was a targeting of conservative organizations, Beirich fails to convincingly explain how this is "some evidence" of animus towards her. Simply the fact that agents asked one witness a few questions over the course of two lengthy interviews about a subject that Beirich claims constitutes protected speech, without more, does not suggest animus at all. During investigations, agents often seek information on a broad array of topics ranging from information about

[2] The government cites to the pages of the transcript.

background or context, information that might develop potential future leads, or information that might relate to current charges under consideration or other potential charges for consideration, among other things. Even the selected transcripts Beirich chose to include show that the interviews of Individual-1 covered a variety of topics—just as investigative interviews often do. *See* Doc. 186-16, 186-17. But in Beirich's view, questions on topics outside the limited confines of "financial mechanics" in a "fraud interview" might raise the specter of animus. Doc. 186 at 25. Beirich provides neither a comparison in caselaw nor a compelling argument supporting such speculation. Nor does she articulate a basis for a subtle, yet unsupported, assumption in her motion: that agents would be prohibited from asking questions about anything related to Beirich's role in classifying organizations on the SPLC's Hate Map without raising a suggestion of animus.

Finally, Beirich fails to link any aspects of the interviews of Individual-1, outside of pure speculation, to the ultimate charging decision by the USAO in her case. As noted above, the SPLC and Beirich ultimately were indicted on federal financial crimes that did not pertain to the SPLC's alleged false representations of conservative groups on the Hate Map. Relevant here, Beirich also was not indicted in April, after the March 2026 interview with Individual-1. Rather, she was not indicted until the current indictment was returned in August 2026. Doc. 115. These arguments are insufficient to suggest some evidence of prosecutorial vindictiveness[3].

---

[3] In addition to the fact that her motion relies on speculation and the selection of quotes out of context, the government disputes Beirich's overall insinuation that certain agents had a motivation to charge Beirich based on her speech. Doc. 186 at 26. To the contrary, the thrust of the portions of the interviews Beirich provides do not reflect the agents' bias but the progression of their understanding of the underlying evidence. For example, during an exchange with Individual-1, Beirich points to the fact that an agent had this to say: "you mentioned just a minute ago, you know, what y'all were doing then was different than the crap they're doing now. What ... exactly do you mean by that?" Doc. 186 at 24. Notably, this question arose during an exchange with Individual-1 where Individual-1 discussed his *perceptions* about changes in the field source

Nor has Beirich made a sufficient showing that any views by the agents in this case "prevailed upon" the prosecutors to bring charges against her based on animus. Doc. 186 at 33. Simply the fact that agents may have been aware of and asked a few questions about Beirich's role with the Hate Map is insufficient to raise a threshold showing of prosecutorial vindictiveness. *See United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (finding that the fact that a former prosecutor and a receiver for a business may have been responsible for bringing the business's alleged fraudulent activities to the attention of the U.S. Attorney's Office was insufficient to sustain defendant's claim of prosecutorial vindictiveness, particularly where "there was no evidence that the decision to prosecute was the result of [the receiver's] allegedly improper motives."). As noted above, Beirich's speculative theory of animus is based on cherry-picking comments out-of-context during agents' investigative interviews of certain witnesses. Such a tenuous foundation for this theory of animus crumbles on its own. But it certainly is insufficient to raise "some evidence" about how this non-existent animus ultimately prevailed on prosecutors.

*The interviews of two witnesses, out of the scores of interviews conducted, do not suggest some evidence of animus.*

Beirich also suggests that other interviews with witnesses similarly "focused" on the SPLC's targeting of conservative groups on its Hate Map. Doc. 186 at 26-28. Again, Beirich relies on isolated examples plucked out of context to support this speculative argument. During this investigation, agents have conducted scores of interviews since the investigation was opened in 2025. Despite the large scope of the investigation, Beirich identifies isolated comments in just two

---

program over time, including a *shift away* from providing information to law enforcement. Doc. 186-17 at 46-54. Indeed, Individual-1 offered this assessment of the SPLC's conduct right before the agent's question: "I mean, we were doing some good stuff back then, but none of this crap they're doing now." Doc. 186-17 at 46-47.

witness interviews to support her theory. In one case, Beirich points to an interview with one individual on February 3, 2026. Doc. 186 at 27. Despite the fact that this witness was interviewed on February 3, 2026, and again on April 9, 2026, for nearly two hours, *see* Exhibit B, Beirich points to a solitary question on page 65 of the transcript from the February 3rd interview in which "conservative type organizations" are mentioned. Doc. 186-18. And even with the limited portions of the transcript provided by Beirich, it is evident that the interviewing agents asked questions on a variety of topics. *Id*. In the other case, Beirich highlights a February 23, 2026, interview with another witness. Although that interview lasted nearly an hour, see Exhibit C, Beirich can point to only a single exchange in which the discussion centered on whether conservative groups were put on the Hate Map. Doc. 186-19[4]. This is hardly a showing that agents "focused" on the SPLC's targeting of conservative groups as Beirich suggests.

Further, it should be noted that the portions of the transcripts attached to the motion of the interviews of these two witnesses do not mention Beirich by name at all. *See* Doc 186-18, Doc. 186-19. Thus, it is quite a stretch for Beirich to suggest that these interviews suggest animus against her where she is not even mentioned.

Finally, the most egregious example of Beirich's speculation concerns her argument about a call that agents conducted with a former field source, F-9, on April 20, 2026. Doc. 186 at 29. Beirich points to the fact that, towards the end of a nearly 18-minute call, after F-9 stated "Shut them down. Take all their money. Make them not go after conservative Christians or decent people

[4] The discussion about conservative groups was not suggested by the agents, but was proffered by the witness, who mentioned that the SPLC was going "after right-wing groups" in response to a question about whether the SPLC began putting different type of groups on the Hate Map. Doc. 186-19 at 35.

again", an agent responded "Yes sir" before thanking the witness and concluding the call. Doc. 186 at 29. Beirich contends that the agent's "Yes sir" comment was an affirmation of the witness's sentiment. Doc. 186 at 30.

This is yet another example of Beirich selecting isolated comments while removing all context. As Beirich notes, the government contacted or interviewed F-9 dozens of times prior to the original indictment. Doc. 186 at 30. And this particular call with F-9 lasted over 18 minutes. Doc. 186-20. Given this context, Beirich's attempt to pluck a mere two words from the massive inventory of interviews with F-9 to suggest that an agent affirmed F-9's statement is not a serious argument.

Rather, even a cursory review of the transcript provided by Beirich shows that, in context, the comment "Yes sir" was not a specific affirmation of F-9's statement, but was simply a reflexive, extraneous pleasantry, as the agent was politely attempting to end the phone call. Indeed, the transcript of the rest of the call consisted of the agent thanking the witness and trying to conclude the call by stating that they would talk later. *See e.g.* Doc. 186-20 ("No sir. We'll, we'll talk to you by Friday. We look forward to it."; "All right. We appreciate it. Thank you, []. You'll have a great day, sir").

The speculative nature of Beirich's argument is buttressed by the fact that the comments she complains about by F-9 do not even mention her, but refer to the SPLC. *Id*. ("Shut *them* down."). This exchange simply cannot be "some evidence" of animus towards *Beirich* when the full context of F-9's statement refers not to her, but the SPLC. Indeed, the record Beirich shows the opposite of animus towards her, as F-9 spoke positively of her. *Id*. ("And she did nothing

wrong.")[5]. The full context of Beirich's own evidentiary submissions undercut her speculation that there was a realistic likelihood of vindictiveness towards her. In full context, Beirich's selective quotes picked from the immense number of interviews conducted in this case do not suggest that agents had any animus about her "targeting" of conservative groups. Thus, there is no linkage between the local field agents and Executive Branch officials as Beirich contends. Doc. 186 at 35.

*DOJ and FBI reporting requirements do not suggest some evidence of animus.*

Finally, Beirich fails to establish how various internal DOJ and FBI reporting requirements show either animus or causation. Beirich notes that because the investigation into the SPLC was a sensitive investigative matter (SIM), certain coordination with FBI Headquarters and the DOJ Civil Rights Division was required. Doc. 186 at 36. As her argument goes, because both FBI and DOJ had to complete additional forms and fulfil additional reporting requirements, the Court should infer that the conduct of those higher up in the administration can be imputed to the prosecutors. *Id.* at 38.

---

[5] Nor can the motivations of F-9 be imputed to the prosecution team as suggested by Beirich. Here, Beirich points to the alleged out-sized role that F-9 played in the lead up to her prosecution, going as far as insinuating F-9 helped craft the government's charging decisions. Doc. 186 at 30. While F-9 may have identified some legal theories that he believed applied, it does not follow that prosecutors heeded his advice. Indeed, the current Indictment leaves off a number of charges that F-9 suggested be included such as extortion, blackmail, obstruction, tax evasion, and offenses under the Hobbs Act. *See* Doc. 186-14. Beirich does not explain this omission given the government's alleged reliance on F-9 and his role. That's because the prosecution based its current charges on the evidence and not the whims of a government witness. Her reliance on F-9 is misplaced. Beirich also faults the government for apparently having all the necessary evidence to bring the current charges back in 2021 and that the reopening of the investigation was for improper purposes. Doc. 186 at 17-19. But if that were true, then the government already had identified the appropriate theories, and F-9's alleged help in identifying charging theories for the case was not only not needed but also irrelevant. Beirich cannot have it both ways.

But that reasoning does not hold, and more concerningly, if adopted, this would mean that opinions and comments of high-ranking government officials could always be imputed to those below them. Reporting requirements are not a "specific fact pattern or series of events that would, no matter when or where that pattern or series appeared, *necessarily* give rise to a 'reasonable likelihood of vindictiveness.'" Doc. 112 at 19 (emphasis in original) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 725–26 (1969)). In any event, as noted above, there is no "common theme" between statements from Administration officials and the agents as the full context of the investigative interviews Beirich selectively provides does not constitute "some evidence" of animus. Doc. 186 at 38[6].

Beirich has failed to carry her burden of making a showing of presumptive vindictiveness, and her motion should be denied.

*b. Beirich has failed to demonstrate actual vindictiveness.*

Beirich has failed to make a threshold showing, much less any showing, of actual vindictiveness on the part of the prosecutors. To establish actual vindictiveness, a defendant must show objective evidence that "the charge was brought to influence the respondent's conduct." *Goodwin*, 457 U.S. at 381. A claim of actual vindictiveness requires both "animus" and "causation." *Barner*, 441 F.3d at 1322 (noting that a defendant must establish that the prosecution

[6] Beirich also suggests that reports of a whistleblower report described in a letter from the Ranking Member of the House Judiciary Committee also supports discovery. Doc. 186 at 38. Beirich notes that she is not privy to the details of the whistleblower reports. *Id.* at 38-39. Neither is the government. Obviously, whistleblower reports are provided in certain confidential, separated channels. But it leaves the government in a situation of trying to prove a negative where Beirich relies on the existence of such reports, yet the parties are without any evidence of its context, specificity, or veracity. Such speculation cannot constitute "some evidence" of prosecutorial vindictiveness.

was "actually motivated" by the desire to punish the defendant for exercising his rights and that the indictment was "the result of such animus."). That is, the evidence must show that "(1) the prosecutor wanted to punish the defendant for exercising his rights (animus); and (2) the prosecutor's animus caused the prosecutor to bring charges of increased severity (causation)." *Brown*, 862 F. Supp. 2d at 1290. The focus generally is on the prosecutor alone. *See Gilbert*, 266 F.3d at 1187. This "showing is, of course, exceedingly difficulty to make." *Lee*, 2024 WL 4210779, at *4 (citation omitted).

Beirich has failed to present any objective evidence that her prosecution is retribution for her asserting any right, including her contention that she exercised protected speech by putting conservative groups on the Hate Map. It is undisputed that Beirich has failed to allege any "direct" evidence of a prosecutor's animus here, "such as a statement by the prosecutor evidencing the vindictive motive." *Koh*, 199 F.3d at 640. None of the allegations in her motion provide objective evidence that the government indicted the defendant to punish her for exercising a specific legal right. Outside of speculation, Beirich has offered nothing suggesting that prosecutors were "actually motivated" by an improper animus to Beirich.

Nor has Beirich alleged objective evidence that the prosecutors were "prevailed upon" in the ultimate charging decisions. *See United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (explaining that actual vindictiveness can be shown through evidence that the prosecutor was "prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse'"). As noted above, Beirich's reliance on out-of-context comments by agents during interviews does not raise a credible suggestion of animus of anyone. It certainly provides no connection to the prosecutor's motives, outside of conjecture. *See also Gilbert*, 266

F.3d at 1187 ("The purported motivation of another agency, the IRS, is no indication that the prosecutor brought charges against Gilbert to punish him for his action against the IRS.").[7] Accordingly, Beirich has failed to carry her burden of making a threshold showing of actual vindictiveness.

*c. Beirich is not entitled to discovery or an evidentiary hearing.*

This Court should deny Beirich's motion outright, as she has failed to make a threshold showing of either presumptive or actual vindictiveness. As referenced above, Beirich does not seriously contend that she has demonstrated prosecutorial vindictiveness. Her aim is trying to obtain discovery. Doc. 186 at 40.

It appears that the Eleventh Circuit has not set out a standard for discovery in the context of a claim of prosecutorial vindictiveness. Even assuming, without conceding, that the "some evidence" standard applies, *see United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2001), Beirich is not entitled to discovery. Under any standard, she has not made a threshold showing of prosecutorial vindictiveness. This Court need not engage in determining how to conduct discovery, including the interplay of potential privilege issues, where Beirich's allegations do not even get past the starting line. As detailed repeatedly above, Beirich's bare allegations are based on speculation and selectively-chosen, isolated statements from investigator interviews without context. And when placed in context, these statements are not examples of animus, but completely legitimate inquiries in a broad, fact-finding investigation. Such speculative allegations do not suffice as "some evidence" of animus attributable to the prosecutor's charging decision.

---

[7] As this Court explained, a "stalking horse" is "a horse or a figure like a horse behind which a hunter stalks game." Doc. 112 at 22 n.11.

Indeed, the contrast between Beirich's bare allegations and a case she relies on in her brief, *United States v. Carey*, 816 F. Supp. 3d 129 (D.D.C. 2026), highlights the fact that she has not made a sufficient showing to pierce the broad discretion afforded prosecutorial decision and engage in a fishing expedition for discovery. Doc. 186 at 39-40. Beirich makes much of the fact that *Carey* involved an Executive Order in that case, but the facts are wholly distinguishable. Unlike in Beirich's case, in *Carey*, the defendant's specific exercise of an alleged First Amendment right—the burning of an American flag—was inextricably intertwined with the criminal charges themselves. The Executive Order in that case specifically directed the prosecution of individuals who burned the American Flag. 816 F. Supp. 3d at 133. The evidence before that court showed that the defendant was specifically "[o]utraged" over the Executive Order, and in response, went to Lafayette Park in Washington, D.C., directly across from the White House, and burned an American flag. *Id*. U.S. Park Police Officers responded to the scene and charged the defendant with misdemeanors for lighting or maintaining a fire in an undesignated area or in a manner that created a public safety hazard. *Id*. at 134. Those facts are inherently unique and not present here. The district court noted that flag burning was protected speech under the First Amendment. *Id*. at 133. Yet the defendant was charged criminally because he committed a specific, direct act that the defendant alleged involved the exercise of protected speech.

In contrast to *Carey*, Beirich does not allege that she committed some specific, direct, but protected act, *in response* to an Executive Order. Nor do her criminal charges specifically involve the exercise of protected speech—rather, they are financial crimes. *Carey* is not relevant to Beirich's claims.

Accordingly, Beirich is not entitled to discovery.

## IV. Beirich has failed to make a threshold showing to support her claim of selective prosecution.

In addition to her claim that she is being vindictively prosecuted, Beirich also complains that she is being selectively prosecuted. Doc. 186 at 41 ("This prosecution is also driven by an unconstitutional discriminatory purpose: to target and prosecute Dr. Beirich, and not other similarly situated individuals, because the government disfavors Dr. Beirich's perceived political views and First Amendment-protected speech."). This claim should be rejected as well.

To establish that she is "being selectively prosecuted in an unconstitutional manner," a defendant "bear[s] a 'demanding' burden." *Jordan*, 635 F.3d at 1188 (quoting *Smith*, 231 F.3d at 807). "'[T]o dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present *clear* evidence to the contrary.'" *Id*. (emphasis in original). She "must show 'that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015) (quoting *Jordan*, 635 F.3d at 1188). In other words, she "must establish two elements: (1) the discriminatory effect prong of this test requires a showing that similarly situated individuals were not prosecuted . . ., and (2) the discriminatory purpose prong requires that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id*. Beirich has shown neither.

*a. Beirich has failed to make a threshold showing of discriminatory effect*

Beirich identifies Individual-1 as someone similarly situated that, unlike her, is not being prosecuted. Doc. 186 at 46 ("Individual-1's conduct fits squarely within the same counts as Dr. Beirich based on his own statements and the evidence gathered during the 2019 and 2025 investigations."). But contrary to the allegation, Individual-1 is not similarly situated to Beirich.

A "similarly situated" individual is "one who engaged in the same type of conduct" as the defendant. *Brantley*, 803 F.3d at 1271. The "comparator" must have "committed the same basic crime in substantially the same manner as the defendant–so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan–and against whom the evidence was as strong or stronger than that against the defendant." *Id*. at 1271-72.

Most notably, Individual-1 is not similarly situated to Beirich for a readily apparent reason—he is a cooperating witness and she is not. "[A] a defendant fails to satisfy the 'similarly situated' prong of the selective prosecution defense *when those not prosecuted cooperated with the government*, or were lower in the organizational structure of the conspiracy than those prosecuted, and when the defendant offers nothing but bare general allegations that the selectivity was [improperly] motivated[.]" *United States v. Silien*, 825 F.2d 320, 322 (11th Cir. 1987) (emphasis added) (citing *United States v. Jennings*, 724 F.2d 436, 445-46 (5th Cir. 1984). In *Silien*, 825 F.2d 320, 322 (11th Cir. 1987), a case involving marriage fraud, the Court found that it was not selective prosecution for the government to bring charges against the putative husbands, but not against the putative wives. In part, the Court reached that conclusion because the "American women cooperated with the government and testified against the putative husbands at trial." *Id*. Similarly here, Individual-1's cooperation and assistance with the investigation is itself a justifiable reason to treat him differently and make different prosecution decisions.

Even so, there are additional reasons Individual-1 is not similarly situated to Beirich. As alleged in the Indictment, Beirich is alleged to have written a story for Hate Watch based upon documents stolen by F-9 on behalf of the SPLC and for which she paid another field source to

falsely admit to having stolen. Doc. 115 at ¶18(a)(ii). Also, donor funds flowed into bank accounts she had signature authority over and a portion of the funds was used to pay her personal living expenses. *Id.* at ¶18(a)(iv). Beirich's conduct, as compared to alleged conduct by Individual-1 is more recent. Individual-1 left the SPLC in 2013 or 2014. Beirich left in 2019. The Government also has more financial records regarding Beirich's role in creating and/or maintaining fictitious accounts. The Government has expense reports filed by F's with the SPLC approved by Beirich; the Government has no such records regarding Individual-1. These are simply a few of the ways that the evidence is not "as strong or stronger" against individual-1 as it is against Beirich.

*b. Beirich has failed to make a threshold showing of discriminatory purpose*

Based on Beirich's failure to demonstrate the first element of a valid selective prosecution claim, this Court need not consider whether she has demonstrated a discriminatory purpose. Should it do so, however, Beirich has failed in that regard as well. Again, "[t]he discriminatory purpose prong requires that 'the decisionmaker selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *Jordan*, 635 F.3d at 1188 (quoting *Wayte*, 470 U.S. at 610). Beirich has made no such showing. She has not demonstrated that the Government chose to prosecute her and to not prosecute Individual-1 based on her membership in an "identifiable group," such as a classification based on race, national origin, age, religion, or other arbitrary classification.

Although Beirich provides bare allegations that the charges against her are a result of "her exercise of First Amendment protected activities," those allegations are insufficient. For the reasons set out in response to her vindictive prosecution claim above, the contentions in that regard are unsupported by the record.

Finally, Beirich's request for discovery related to her selective prosecution claim should be denied as well. "[T]o obtain an evidentiary hearing on a selective prosecution claim, 'the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution.'" *Jordan*, 635 F.3d at 1188 (quoting *Silien*, 825 F.2d at 322). "Similarly, in order to obtain discovery of such a claim, a defendant must provide 'some evidence tending to show the existence of the essential elements of the defense.'" *Id*. (quoting *Armstrong*, 517 U.S. at 468). Beirich has failed to allege or produce evidence that Individual-1 is "similar situated" to her or that, even assuming otherwise, the decision not to prosecute her is based on some arbitrary classification.

## Conclusion

For the foregoing reasons, the Government respectfully requests that this Court deny Beirich's motion to dismiss for vindictive/selective prosecution without discovery or an evidentiary hearing.

Respectfully submitted this 24th day of November, 2026.


THOMAS GOVAN
UNITED STATES ATTORNEY

/s/ Kevin P. Davidson
Kevin P. Davidson
First Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Telephone: (334) 223-7280
Fax: (334) 223-7135
E-mail: kevin.p.davidson@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:26-cr-00139-ECM-KFP |
| | ) | |
| SOUTHERN POVERTY LAW CENTER, INC. and | ) | |
| HEIDI BEIRICH | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Respectfully submitted,

/s/ Kevin P. Davidson
Kevin P. Davidson
Assistant United States Attorney
131 Clayton Street
Montgomery, AL 36104
Telephone: (334) 223-7280
Fax: (334) 223-7135
E-mail: kevin.p.davidson@usdoj.gov